1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   EDWARD PERUTA,                              CASE NO. 09-CV-2371 - IEG (BLM)

12                          Plaintiff,          ORDER DENYING DEFENDANT'S
                                                MOTION TO DISMISS
         vs.
13                                              [Doc. No. 3]
     COUNTY OF SAN DIEGO; and WILLIAM
14   D. GORE, individually and in his capacity as
     sheriff,
15
                            Defendants.
16

17

18          This is a Section 1983 action, challenging the constitutionality of California's law governing

19   the carrying of concealed weapons, both facially and as applied to Plaintiff. Currently before the Court

20   is Defendant William Gore's ("Gore") Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Having

21   considered the parties' arguments, and for the reasons set forth below, the Court DENIES the motion.

22                                        **BACKGROUND**

23          Plaintiff is a sixty year old United States citizen and a California resident, who "maintains

24   several residences across the United States, including but not limited to a residence in San Diego

25   County." (Compl. ¶ 17.) According to Plaintiff, he maintains a permanent mailing address in San

26   Diego, "where he and his wife have a room in which they keep a wardrobe and other personal items."

27   (Id.) Plaintiff and his wife have made their motor home their "permanent residence," and allegedly

28   stay in San Diego for extended periods of time. (Id. ¶ 18.) For example, Plaintiff claims to have

                                              - 1 -                            09cv2371-IEG (BLM)

1   reserved space at Campland on the Bay, in San Diego, from November 15, 2008 through April 15,

2   2009. He had also reserved spaces at the same place from February 2007 through April 2007. Plaintiff

3   is a founder, and sole stockholder, of American News and Information Services, Inc., which gathers

4   and provides raw, breaking news video, photographs, and news tips to various mainstream media

5   outlets. According to Plaintiff, both his work and his lifestyle choice often require him to travel to

6   high crime areas as well as remote rural areas, sometimes carrying large sums of cash, valuables, and

7   equipment.

8           By way of background, Plaintiff is a certified National Rifles Association ("N.R.A.") instructor

9   with the authority to train and certify individuals in the N.R.A. Basic Pistol Safety Course. Plaintiff

10  has a valid pistol permit issued by the State of Connecticut, and is recognized by the Department of

11  Public Safety to teach the pistol course required to obtain a Connecticut Pistol Permit. In 1969,

12  Plaintiff was assigned as a marine small arms instructor (rifle and pistol) at the U.S. Naval Academy.

13  In 1970, Plaintiff successfully completed the Connecticut Municipal Training Course. From 1969 to

14  1971, Plaintiff was a law enforcement officer in the State of Connecticut.

15          The present case arises from Plaintiff's attempts to obtain a concealed weapon's permit in San

16  Diego County. Plaintiff alleges that he obtained and provided to the San Diego County Sheriff the

17  required 8 Hour Firearms Safety and Proficiency Certificate in accordance with California Penal Code

18  § 12050(E)(i). He also alleges that the Firearms Licensing and Permits Unit of the State of California

19  Department of Justice found him eligible to possess firearms. On November 17, 2008, Plaintiff

20  requested a license to carry a concealed weapon from the San Diego County Sheriff's License

21  Division ("SD License Division"), at which time he was interviewed by a licensing supervisor to

22  determine whether he satisfied the licensing criteria. On February 3, 2009, Plaintiff submitted an

23  application for a license to carry a concealed weapon. Plaintiff alleges he was denied a license to carry

24  a concealed weapon by Defendant Gore's predecessor because the SD License Division made a

25  finding that Plaintiff did not have good cause and was not a resident of San Diego–both of which are

26  requirements under Section 12050.

27          Plaintiff filed his complaint on October 9, 2009, alleging three causes of action. First, Plaintiff

28  argues Section 12050's requirements of (1) "good cause" beyond the interests of self-defense and (2)

1  durational "residency" violate the Second and Fourteenth Amendments to the U.S. Constitution.

2  Second, Plaintiff alleges that Defendants' subjective application of the "good cause" and "residency"

3  requirements results in an unequal treatment of similarly situated individuals, and therefore violates

4  the Eighth Amendment of the U.S. Constitution. Finally, Plaintiff argues the requirement that

5  individuals reside full time in San Diego County before they can apply for a concealed weapon's

6  permit violates Plaintiff's right to travel under the Fourteenth Amendment to the U.S. Constitution.

7       On November 12, 2009, Defendant Gore filed the current Motion to Dismiss. [Doc. No. 3].

8  Plaintiff filed a response on December 7, 2009, and Defendant Gore filed a reply on December 14,

9  2009. [Doc. Nos. 4, 5]. On December 17, 2009, having determined that the Court can proceed without

10  oral argument, the Court vacated the hearing set for December 21, 2009. [Doc. No. 6].

11                                          **LEGAL STANDARD**

12       A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the pleadings. A

13  complaint survives a motion to dismiss if it contains "enough facts to state a claim to relief that is

14  plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.544, 570 (2007). The court may dismiss

15  a complaint as a matter of law for: (1) "lack of cognizable legal theory," or (2) "insufficient facts

16  under a cognizable legal claim." SmileCare Dental Group v. Delta Dental Plan of California, 88 F.3d

17  780, 783 (9th Cir. 1996) (citation omitted). The court only reviews the contents of the complaint,

18  accepting all factual allegations as true, and drawing all reasonable inferences in favor of the

19  nonmoving party.  al-Kidd v. Ashcroft, 580 F.3d 949, 956 (9th Cir. 2009) (citation omitted).

20       Despite the deference, the court need not accept "legal conclusions" as true. Ashcroft v. Iqbal,

21  --- U.S. ---, 129 S.Ct. 1937, 1949-50 (2009). It is also improper for the court to assume "the [plaintiff]

22  can prove facts that [he or she] has not alleged." Assoc. Gen. Contractors of Cal., Inc. v. Cal. State

23  Council of Carpenters, 459 U.S. 519, 526 (1983). On the other hand, "[w]hen there are well-pleaded

24  factual allegations, a court should assume their veracity and then determine whether they plausibly

25  give rise to an entitlement to relief." Iqbal, 129 S.Ct. at 1950.

26                                            **DISCUSSION**

27       The Second Amendment provides: "A well regulated Militia, being necessary to the security

28  of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme

1  Court's landmark decision in District of Columbia v. Heller, --- U.S. ---, 128 S. Ct. 2783 (2008),

2  resolved some of the hotly debated issues with regard to the Second Amendment, but left many others

3  lingering for future determination. In Heller, after an exhaustive analysis of the text of the Amendment

4  and the founding-era sources of its original public meaning, the Supreme Court stated unequivocally

5  that the Second Amendment guarantees "the individual right to possess and carry weapons in case of

6  confrontation." 128 S. Ct. at 2797. However, like most rights, "the right secured by the Second

7  Amendment is not unlimited." Id. at 2816. Thus, the Supreme Court also made it clear that "the right

8  was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

9  purpose." Id. For example, the Supreme Court noted that:

10          the majority of the 19th-century courts to consider the question held that prohibitions
            on carrying concealed weapons were lawful under the Second Amendment or state
11          analogues. Although we do not undertake an exhaustive historical analysis today of the
            full scope of the Second Amendment, nothing in our opinion should be taken to cast
12          doubt on longstanding prohibitions on the possession of firearms by felons and the
            mentally ill, or laws forbidding the carrying of firearms in sensitive places such as
13          schools and government buildings, or laws imposing conditions and qualifications on
            the commercial sale of arms.
14
   Id. at 2816-17 (internal citations omitted). In a footnote immediately following, the Supreme Court
15
   explained: "We identify these presumptively lawful regulatory measures only as example; our list does
16
   not purport to be exhaustive." Id. at 2817 n.26.
17
          In Heller, having concluded that the Second Amendment protects an individual right to "keep
18
   and bear arms," and noting that "the inherent right of self-defense has been central to the Second
19
   Amendment right," the Supreme Court turned to the challenged law before it.[1] Id. at 2817-18. Without
20
   deciding what level of scrutiny should be applied (except stating that it would have to be more than
21
   "rational basis"), the Supreme Court concluded that the District of Columbia's "absolute prohibition
22
   of handguns held and used for self-defense in the home" clearly violated the Second Amendment. Id.
23
   at 2817-22.[2]
24

25

26          [1] The Supreme Court characterized the challenged law as follows: "the law totally bans
   handgun possession in the home. It also requires that any lawful firearm in the home be disassembled
27   or bound by a trigger lock at all times, rendering it inoperable." Heller, 128 S. Ct. at 2817.

            [2] Because Heller involved a challenge to a District of Columbia statute, the Supreme Court
28   there did not have to decide whether the Second Amendment also applied to the states. See id. at 2812-
   13. No party has raised this issue in the present case either. Accordingly, because it appears that both

1  **I.      Right to Bear Arms**

2          A.      Parties' arguments

3          Plaintiff's first cause of action alleges that Section 12050's requirements of (1) "good cause"

4  beyond the interests of self-defense and (2) durational residency violate the Second and Fourteenth

5  Amendments.[3] Defendant moves to dismiss this cause of action, arguing that the Supreme Court in

6  Heller, 128 S. Ct. 2816-17, expressly stated that the right secured by the Second Amendment is not

7  unlimited, and that it certainly does not prohibit states from regulating the carrying of concealed

8  weapons. Defendant argues that, unlike possession of a gun for protection within a residence–which

9  _____

10  parties agree that the Second Amendment applies in this case, the Court will proceed on that
   assumption, without deciding the issue at this time. The Court does note, however, that it is aware of
11  the pre-Heller Ninth Circuit case law on this issue, as well as the post-Heller trend. Compare Fresno
   Rifle & Pistol Club, Inc., 965 F.2d 723, 731 (9th Cir. 1992) (concluding that until such time as United
12  States v. Cruikshank, 92 U.S. 542 (1876), and Presser v. Illinois, 116 U.S. 252 (1886), are overturned,
   "the Second Amendment limits only federal action") with Nordyke v. King, 563 F.3d 439, 457 (9th
13  Cir. 2009), reh'g en banc granted, 575 F.3d 890 (concluding that "the Due Process Clause of the
   Fourteenth Amendment incorporates the Second Amendment and applies it against the states and local
14  governments"). It should also be noted that after rehearing Nordyke en banc,  the Ninth Circuit
   vacated its submission of the case pending the Supreme Court's disposition of Maloney v. Rice, 08-
15  1592; McDonald v. City of Chicago, No. 08-1521; and N.R.A. v. City of Chicago, No. 08-1497.

16          [3] Section 12050(a)(1) provides, in pertinent part:

17          (A) The sheriff of a county, upon proof that the person applying is of good moral
           character, that good cause exists for the issuance, and that the person applying satisfies
18          any one of the conditions specified in subparagraph (D) and has completed a course
           of training as described in subparagraph (E), may issue to that person a license to carry
19          a pistol, revolver, or other firearm capable of being concealed upon the person in either
           one of the following formats:
20
                   (i) A license to carry concealed a pistol, revolver, or other firearm capable of
21                 being concealed upon the person.

22                 (ii) Where the population of the county is less than 200,000 persons according
                   to the most recent federal decennial census, a license to carry loaded and
23                 exposed in only that county a pistol, revolver, or other firearm capable of being
                   concealed upon the person.
24
           . . . .
25
           (D) For the purpose of subparagraph (A), the applicant shall satisfy any one of the
26          following:

27                 (i) Is a resident of the county or a city within the county.

28                 (ii) Spends a substantial period of time in the applicant's principal place of
                   employment or business in the county or a city within the county.

1   was the issue in <u>Heller</u>–carrying a concealed firearm presents a recognized "'threat to public order.'"

2   (Def. MTD, at 3 (quoting <u>People v. Hale</u>, 43 Cal. App. 3d 353, 356 (1974).)[4]

3        Plaintiff agrees that the constitutional right to "keep and bear arms" is not unlimited, and

4   therefore concedes that some regulations are permissible under the Second Amendment. However,

5   also relying on <u>Heller</u>, Plaintiff argues that at the center of the Second Amendment is an individual

6   right "to possess and carry weapons in case of confrontation, self-defense, or other traditionally lawful

7   purposes, unconnected with service in a militia." (Pl. Opp., at 3.) Thus, to be armed and ready in case

8   of confrontation, Plaintiff argues the Second Amendment requires that a person be allowed to carry

9   a weapon "that is immediately capable of being used for its intended purpose." (<u>Id.</u> at 4.) According

10  to Plaintiff, by imposing the "good cause" requirement, Section 12050 violates the Second

11  Amendment. In the alternative, Plaintiff argues the application of Section 12050's "good cause" and

12  "residency" requirements violates the Second Amendment because law abiding citizens who desire

13  to carry concealed firearms solely for self-defense purposes and/or those that are not full-time

14  residents of San Diego County are deemed by the sheriff not to satisfy the statute's requirements.

15       B.    Analysis

16       The Supreme Court's decision in <u>Heller</u> made it clear–for the first time–that the Second

17  Amendment guarantees "the individual right to possess and carry weapons in case of confrontation."

18  128 S. Ct. at 2797. It also made clear that this right is not unlimited. <u>Id.</u> at 2816-17. Accordingly,

19  while <u>Heller</u> does not preclude Second Amendment challenges to laws regulating firearm possession

20  outside of home, "<u>Heller</u>'s *dicta* makes pellucidly clear that the Supreme Court's holding should not

21

22       [4] In addition, Defendant argues there is no constitutionally protected interest in a concealed
    weapon's permit because, in light of the extremely broad discretion delegated to the sheriff under
23  Section 12050, there is no legitimate claim of entitlement to such a permit. (Def. Reply, at 2.)
    However, because Defendant raised this issue for the first time in the reply, Plaintiff had no
24  opportunity to respond and the Court has not received the benefit of full briefing. Accordingly, the
    Court will not consider this in deciding the Motion to Dismiss. See <u>Sogeti USA LLC v. Scariano</u>, 606
25  F. Supp. 2d 1080, 1086 (D. Ariz. 2009) ("The Court will not grant a motion to dismiss on the basis
    of argument first raised in a reply."(citing <u>U.S. ex rel. Giles v. Sardie</u>, 191 F. Supp. 2d 1117, 1127
26  (C.D. Cal. 2000))); <u>see also</u> <u>Sanchez v. City of Santa Ana</u>, 915 F.2d 424, 430 (9th Cir. 1990) ("As a
    general rule, an appellant may not raise an argument for the first time in a reply brief." (citation
27  omitted)). In any event, the cases relied on by Defendant for the proposition that there is no protected
    interest in a concealed weapon's permit all predate <u>Heller</u>, which held–for the first time–that the
28  Second Amendment guarantees "the individual right to possess and carry weapons in case of
    confrontation." 128 S. Ct. at 2797. The validity of those cases post-<u>Heller</u> is not clear.

1  be read by lower courts as an invitation to invalidate the existing universe of public weapons

2  regulations." United States v. Masciandaro, 648 F. Supp. 2d 779, 788 (E.D. Va. 2009).

3       In the present case, Plaintiff's complaint challenges constitutionality of Section 12050's

4  requirements of "good cause" and "residency" as they relate to his ability to obtain a concealed

5  weapon's permit. This precise issue was not directly addressed by the Supreme Court in Heller, which

6  involved a challenge to District of Columbia's prohibition on the possession of a loaded firearm *in the*

7  *home*. 128 S. Ct. at 2817-22. Thus, the Court must determine whether Section 12050's application to

8  Plaintiff's request for a permit withstands the appropriate level of constitutional scrutiny.[5]

9            *1.        Presumptive constitutionality of concealed weapon bans*

10      As a threshold matter, the Court rejects Defendant's contention that the Supreme Court in

11 Heller *held* that prohibitions on carrying of concealed weapons are presumptively constitutional. First,

12 because this precise question was not before the Supreme Court, any pronouncements to that effect

13 would generally be considered *dicta*, even if persuasive.[6] Moreover, the Supreme Court in Heller

14 expressly stated that it was leaving the determination of the scope of "permissible" Second

15 Amendment restrictions for a later time. Id. at 2816-18, 2821 ("[T]here will be time enough to

16 expound upon the historical justifications for the exceptions we have mentioned if and when those

17 exceptions come before us.").

18

19      [5] The level of scrutiny is necessary to determine whether the application of Section 12050
20 violates the Second Amendment as applied through the Fourteenth Amendment. The Due Process
Clause of the Fourteenth Amendment, which appears to be implicated by Plaintiff's first cause of
action, provides that "No State shall . . . deprive any person of life, liberty, or property, without due
21 process of law." U.S. CONST. amend. XIV. The Equal Protection Clause of the Fourteenth
Amendment, which is the basis for Plaintiff's second cause of action, provides that: "No State shall
22 . . . deny to any person within its jurisdiction the equal protection of the laws." Id. These two
provisions of the Constitution both stem from the "American ideal of fairness" and are "not mutually
23 exclusive." Bolling v. Sharpe, 347 U.S. 497, 499 (1954). However, depending on the circumstances,
these clauses serve slightly different purposes. As one court has explained, "Substantive Due Process
24 generally provides a constitutional safeguard against arbitrary laws to all citizens, but Equal
Protection[] ensures that a certain class, which might be as small as a single individual, will not be
25 treated differently under the law from people similarly situated." United States v. Miller, 604 F. Supp.
2d 1162, 1168 n.7 (W.D. Tenn. 2009).
26

27      [6] "Dictum," the singular form of "dicta," is a remark "by the way" and is a shortened version
of "obiter dictum," which is a Latin phrase often translated as "something said in passing." BLACK'S
LAW DICTIONARY 519, 1177 (9th ed. 2009). *Black's Law Dictionary* defines "obiter dictum" as "[a]
28 judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision
in the case and therefore not precedential (although it may be considered persuasive)." Id. at 1177.

1      Finally, a closer examination of the cases and authorities relied upon by the Supreme Court

2  suggests that it did not intend to make *all* concealed weapon bans presumptively constitutional. The

3  Supreme Court's entire pronouncement on the validity of concealed weapon bans was:

4          Like most rights, the right secured by the Second Amendment is not unlimited. . . . .
           For example, the majority of the 19th-century courts to consider the question held that
5          prohibitions on carrying concealed weapons were lawful under the Second
           Amendment or state analogues. See, e.g., State v. Chandler, [5 La. Ann. 489, 489-90
6          (1850)]; Nunn v. State,[1 Ga. 243, 251 (1846)]; see generally [2 J. KENT,
           COMMENTARIES ON AMERICAN LAW *340, n. 2 (O. Holmes ed., 12th ed. 1873)]; THE
7          AMERICAN STUDENTS' BLACKSTONE 84, n. 11 (G. Chase ed. 1884).

8  Id. at 2816. Both Chandler and Nunn, the two cases relied upon by the Supreme Court, concerned

9  prohibitions on carrying of concealed weapons where the affected individuals had alternate ways to

10 exercise their Second Amendment rights–by *openly* carrying those weapons. See Chandler, 5 La. Ann.

11 at 489-90 (noting that the law against carrying of concealed weapons was "absolutely necessary" and

12 that "[i]t interfered with no man's right to carry arms . . . 'in full view,' which places men upon an

13 equality"); Nunn, 1 Ga. at 251 ("We are of the opinion, then, that so far as the act of 1837 seeks to

14 suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not

15 deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear

16 arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with

17 the Constitution, and *void* . . . ." (emphases in original)). The applicability of these cases is

18 questionable where, as here, the State expressly *prohibits* individuals such as Plaintiff from openly

19 carrying a loaded firearm in public places. See CAL. PENAL CODE § 12031(a)(1).[7]

20

---

21      [7] Section 12031(a)(1) provides:

22      A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm
        on his or her person or in a vehicle while in any public place or on any public street in
23      an incorporated city or in any public place or on any public street in a prohibited area
        of unincorporated territory.

24

25 Although this statute contains a number of exceptions, see People v. Flores, 169 Cal. App. 4th 568,
   576 (2008), its overall effect cannot be compared to the *unrestricted* right to carry weapons openly
26 as recognized in both Chandler and Nunn. Accordingly, in the present case, the issue is best addressed
   by determining whether Section 12050's requirements, and their application, meet the appropriate
27 level of constitutional scrutiny, rather than by a categorical approach advocated by Defendant. But see
   United States v. Hall, No. 2:08-00006, 2008 WL 3097558, at *1 (S.D. W. Va. Aug. 4, 2008) ("The
28 court concludes that the prohibition, as in West Virginia, on the carrying of a concealed weapon
   without a permit, continues to be a lawful exercise by the state of its regulatory authority
   notwithstanding the Second Amendment.").

1    The other authorities cited by the Supreme Court further undermine Defendant's position.

2    Thus, in *Commentaries on American Law*, James Kent states that "[t]here has been a great difference

3    of opinion on the question" of whether a prohibition on carrying of concealed weapons was

4    constitutional. 2 KENT, *supra*, at \*340 n.(b). Likewise, in *The American Students' Blackstone*, George

5    Chase first notes that "it is generally held that statutes prohibiting the carrying of *concealed* weapons

6    are not in conflict with [the Second Amendment], since they merely prohibit the carrying of arms in

7    a particular manner." THE AMERICAN STUDENTS' BLACKSTONE, *supra*, at 84, n.11. However, he

8    immediately points out that "[i]n some states . . . a contrary doctrine is maintained." Id. These

9    pronouncements are directly at odds with Defendant's contention that Heller expressed constitutional

10   approval for *all* concealed weapon bans. (See Def. MTD, at 3-4.)

11   Finally, Defendant's reliance on Hall, 2008 WL 3097558, is misplaced. In that case, the district

12   court for the Southern District of West Virginia denied the defendant's second motion to suppress

13   made after the Supreme Court's decision in Heller. Hall, 2008 WL 3097558, at \*2. In reaffirming its

14   prior ruling, the court noted that "the prohibition, as in West Virginia, on the carrying of a concealed

15   weapon without a permit, continues to be a lawful exercise by the state of its regulatory authority

16   notwithstanding the Second Amendment." Id. at \*1. However, unlike California, West Virginia is an

17   "open carry" state, and therefore allows individuals to carry weapons openly. See OFFICE OF THE

18   ATT'Y GEN., WEST VIRGINIA FIREARM LAWS 1 (October 2009), attached to Pl. Opp., Ex. B.[8] Thus,

19   just like in Chandler and Nunn, but unlike California, there is a ready alternative available to the

20   affected individuals–the ability to carry weapons openly if they cannot obtain a concealed weapon's

21   permit.

22   For the foregoing reasons, the Court is convinced the Heller decision cannot stand for the

23   broad proposition that *all* concealed weapon bans are presumptively constitutional. Accordingly, the

24

25   [8] The Court can properly take judicial notice of the documents appearing on a governmental
     website, such as the Office of the Attorney General handbook attached to Plaintiff's Opposition. See,
26   e.g., Paralyzed Veterans of Am. v. McPherson, No. C 06-4670 SBA, 2008 WL 4183981, at \*5 (N.D.
     Cal. Sept. 9, 2008) (noting that the information on government agency websites has often been treated
27   as a proper subject for judicial notice and citing cases from numerous circuits). Accordingly, because
     accuracy of the document attached to Plaintiff's Opposition "cannot reasonably be questioned" and
28   because there is no objection to its accuracy by Defendant, the Court will take judicial notice of it. See
     FED. R. EVID. 201(b).

1   Court will proceed to determine whether Section 12050's application to Plaintiff's request for a permit

2   withstands the appropriate level of constitutional scrutiny.

3              2.       *Level of scrutiny*

4          The Supreme Court in <u>Heller</u>, while not designating any specific level of scrutiny for

5   evaluating Second Amendment restrictions, explicitly rejected the "rational basis" test. According to

6   the Supreme Court, the rational basis test "could not be used to evaluate the extent to which a

7   legislature may regulate a specific, enumerated right," such as "the right to keep and bear arms." 128

8   S. Ct. at 2818 n.27 (citation omitted). "If all that was required to overcome the right to keep and bear

9   arms was a rational basis, the Second Amendment would be redundant with the separate constitutional

10  prohibitions on irrational laws, and would have no effect." <u>Id.</u> The <u>Heller</u> majority also rejected an

11  "interest-balancing inquiry" suggested by the dissent that "'asks whether the statute burdens a

12  protected interest in a way or to an extent that is out of proportion to the statute's salutary effect upon

13  other important governmental interests." <u>Id.</u> at 2821. According to the Supreme Court, such a

14  "freestanding" approach, which is subject to future judges' assessments of the constitutional

15  guarantee's usefulness, "is no constitutional guarantee at all." <u>Id.</u>

16         With these standards out, the Court must choose between "strict scrutiny"–typically reserved

17  for laws that restrict certain fundamental rights, see <u>Reno v. Flores</u>, 507 U.S. 292, 301-02 (1993)–and

18  some form of "intermediate scrutiny."[9] Following <u>Heller</u>, courts have not been uniform in the level

19  of scrutiny that should be applied to Second Amendment restrictions. Some courts have applied strict

20  scrutiny,[10] others have used intermediate scrutiny,[11] and still others have either formulated their own

21

22         [9] When a fundamental right is recognized, substantive due process forbids infringement of that
23  right "*at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve
    a compelling state interest." <u>Flores</u>, 507 U.S. at 301-02 (citations omitted) (emphasis in original). On
24  the other hand, intermediate scrutiny allows the State to regulate the right at issue if necessary to
    further an important governmental interest. <u>See</u> <u>Sell v. United States</u>, 539 U.S. 166, 178-80 (2003).

25         [10] <u>See, e.g.</u>, <u>United States v. Engstrum</u>, 609 F. Supp. 2d 1227, 1231-35 (D. Utah 2009)
26  (applying strict scrutiny and upholding 18 U.S.C. § 922(g)(9), which prohibits individuals convicted
    of domestic violence crimes from possessing firearms).

27         [11] <u>See, e.g.</u>, <u>United States v. Skoien</u>, 587 F.3d 803, 810-14 (7th Cir. 2009) (applying
28  intermediate scrutiny and noting that the standard of review would "fluctuate with character and
    degree of the challenged law's burden on the right and sometimes also with the specific iteration of
    the right"); <u>United States v. Miller</u>, 604 F. Supp. 2d 1162, 1169-72 (W.D. Tenn. 2009) (applying

1  tests or have upheld a challenged regulation without specifying a standard of review.[12]

2      At this stage of the proceedings, the Court need not decide which heightened level of scrutiny

3  applies because the government has failed to meet its burden even if the Court applies the more lenient

4  standard of "intermediate scrutiny." Under both "strict scrutiny" and "intermediate scrutiny" the

5  burden is on the government to show that the challenged law is constitutional, by demonstrating that

6  the law is either "narrowly tailored to serve a compelling state interest," Flores, 507 U.S. at 301-02

7  (citations omitted), or necessary to further an important governmental interest, Sell, 539 U.S. at 178-

8  80. In the present case, apart from arguing that Section 12050 is within one of the "presumptively

9  lawful" restrictions recognized in Heller and that it passes "rational basis" standard of review, the

10  government has made little effort to defend the statute's constitutionality under either of the

11  heightened levels of scrutiny.

12      *3.    Application to Plaintiff's case*

13      Accordingly, taking Plaintiff's allegations as true, his first cause of action for violation of the

14  Second Amendment appears to state a claim upon which relief can be granted. Twombly, 550 U.S.

15  at 570. Plaintiff alleges that he was denied a license to carry a concealed weapon by Defendant Gore's

16  predecessor because the SD License Division made a finding that Plaintiff did not have good cause

17  and was not a resident of San Diego–both of which are requirements under Section 12050. As an

18  initial matter, Plaintiff challenges the "good cause" requirement as violating his Second Amendment

19  right "to possess and carry weapons in case of confrontation." See Heller, 128 S. Ct. at 2797. The

20  Supreme Court has explained that the natural meaning of "bear arms" is to "'wear, bear, or carry ...

21  upon the person or in a pocket, for the purpose ... of being armed and ready for offensive or defensive

22  action in a case of conflict with another person.'" Id. at 2793 (quoting Muscarello v. United States,

23

24  intermediate scrutiny and upholding 18 U.S.C. § 922(g)(1), which prohibits possession of firearms by felons).

25      [12] See, e.g., United States v. Marzzarella, 595 F. Supp. 2d 596, 604-06 (W.D. Pa. 2009)
26  (fashioning a standard of review akin to content-neutral "time, place, and manner" test and upholding
18 U.S.C. § 922(k), which prohibits possession of a firearm if the individual has knowledge that the
firearm's serial number has been obliterated, removed, or altered); People v. Flores, 169 Cal. App. 4th
27  568, 573-77 & n.5 (upholding defendant's convictions for possession of a firearm by a person
prohibited from possessing a firearm (Cal. Penal Code § 12021(c)(1)), carrying a concealed firearm
28  (Cal. Penal Code § 12025(a)(2)), and carrying a loaded firearm in a public place (Cal. Penal Code §
12031(a)(1)); and suggesting, but not deciding, that a mid-level standard of scrutiny analogous to the
"undue burden" standard should apply).

1  524 U.S. 125, 143 (1998)). Accordingly, by imposing a "good cause" requirement before a concealed

2  weapon's permit can be issued, the State undoubtedly infringes Plaintiff's right to "possess and carry

3  weapons in case of confrontation." See id. at 2797. For such infringement to pass constitutional

4  muster, Defendant must at the very least demonstrate that it is necessary to further an important

5  governmental interest. See Sell, 539 U.S. at 178-80. In the present case, Defendant has made very little

6  effort to either identify an "important governmental interest" or demonstrate the required "fit" between

7  the law and the interest served.[13] Accordingly, Defendant's Motion to Dismiss for failure to state a

8  claim Plaintiff's challenge to the "good cause" requirement of Section 12050 fails. Cf. Skoien, 587

9  F.3d at 814-15 (vacating and remanding where "the government has made little effort to discharge its

10  burden of demonstrating the relationship between § 922(g)(9)'s means and its end").

11        Plaintiff's challenge to the requirements of Section 12050 as applied by Defendants also

12  survives the Motion to Dismiss. Plaintiff alleges that he satisfies the "good cause" requirement

13  because he needs to carry a gun for self-defense, seeing as he is sixty years old and travels to high

14  crime areas for his job. (Pl. Opp., at 5-7.) Plaintiff also alleges that he satisfies the "residency"

15  requirement because he resides in San Diego at least four months out of the year, even though he does

16  so in a motor home. (Id. at 8-10.) Taking Plaintiff's allegations as true, Defendants' application of

17

18        [13] The Court does note that California law provides a number of exceptions, some of which
19  significantly undermine portions of Plaintiff's claims. For example, Section 12026(b) of the Penal
  Code provides that no permit or license is necessary to possess, keep, or carry, "either openly or
20  concealed, a pistol, revolver, or other firearm capable of being concealed upon the person within the
  citizen's or legal resident's place of residence, place of business, or on private property owned or
21  lawfully possessed by the citizen or legal resident." Because this exemption also applies to anyone
  who is "temporarily within this state," nothing prevents Plaintiff from carrying a gun while inside of
  his motor home. See CAL. PENAL CODE § 12026(b); accord id. § 12031(l) ("Nothing in this section
22  shall prevent any person from having a loaded weapon, if it is otherwise lawful, at his or her place of
  residence, including any temporary residence or campsite."). Likewise, Section 12031(j) allows
23  carrying of a loaded firearm "by a person who reasonably believes that the person or property of
  himself or herself or of another is in immediate, grave danger and that the carrying of the weapon is
24  necessary for the preservation of that person or property." However, this exemption is limited to the
  "brief interval" between the notification of the local law enforcement agency and its arrival for
25  assistance. Id. § 12031(j).

26        Plaintiff's first cause of action is broader than any of these exceptions. What Plaintiff seeks
  is enforcement of what he believes is the right guaranteed by the Second Amendment, as interpreted
27  in Heller, to carry a weapon that is "immediately capable of being used for its intended purpose," both
  in his motor home and while on public property. (Pl. Opp., at 4-5.) At least at this stage of the
28  proceedings, even with the above exceptions in mind, the Court cannot say that as a matter of law,
  Plaintiff's first cause of action either lacks cognizable legal theory, or alleges insufficient facts under
  a cognizable legal theory. See SmileCare Dental Group, 88 F.3d at 783.

1 │ Section 12050's requirements appears to infringe upon Plaintiff's right to "possess and carry weapons

2 │ in case of confrontation." See Heller, 128 S. Ct. at 2797. As already noted, for such infringement to

3 │ be in accord with the Second Amendment, Defendant must at the very least demonstrate that it is

4 │ necessary to further an important governmental interest. See Sell, 539 U.S. at 178-180. Seeing as

5 │ Defendant has failed to either identify an "important governmental interest" or demonstrate the

6 │ required "fit" between the law and the interest served, the Motion to Dismiss Plaintiff's challenge to

7 │ the "good cause" and "residency" requirements as applied by Defendants also fails. Cf. Skoien, 587

8 │ F.3d at 814-15.

9 │          *4.      Conclusion*

10 │        It is important to keep in mind the narrow issue before the Court at this stage of the

11 │ proceedings. The Court is not asked to, and does not, decide whether Section 12050 is constitutional.

12 │ Rather, the question is whether Plaintiff's complaint contains "enough facts to state a claim to relief

13 │ that is plausible on its face." Twombly, 550 U.S. at 570. The Court only reviews the contents of the

14 │ complaint, accepting all factual allegations as true, and drawing all reasonable inferences in favor of

15 │ the nonmoving party. al-Kidd, 580 F.3d at 956 (citation omitted). In the present case, because

16 │ Plaintiff's complaint alleges sufficient facts to state a claim for relief and because Defendant's Motion

17 │ to Dismiss does little to identify an "important governmental interest" or to demonstrate the required

18 │ "fit" between the law and the interest served, the Court **DENIES** Defendant's Motion to Dismiss as

19 │ it relates to Plaintiff's first cause of action for violation of the Second Amendment.

20 │ **II.     Equal Protection**

21 │        A.     Parties' arguments

22 │        Plaintiff's second cause of action alleges that Defendant Gore's application of Section 12050's

23 │ "good cause" and "residency" requirements violates the Equal Protection Clause of the Fourteenth

24 │ Amendment. Defendant argues there is no equal protection violation because the government can

25 │ legitimately treat differently persons dissimilarly situated. Moreover, because no suspect classification

26 │ or fundamental right is involved, Defendant argues the Court should apply rational basis to Plaintiff's

27 │ challenge. According to Defendant, Plaintiff's second cause of action should be dismissed because

28 │ it is both rational and reasonable to deny a permit to an individual, such as Plaintiff, who only

occasionally visits San Diego and who voluntarily places himself in dangerous situations and places.

1      Plaintiff opposes the application of "rational basis" standard of review as contrary to the

2   Supreme Court's decision in Heller. According to Plaintiff, with heightened level of scrutiny applied,

3   there is no justification for treating Plaintiff differently than other residents of San Diego County.

4   First, Plaintiff argues that, as used in Section 12050, "residency" refers to something temporary in

5   nature, as opposed to the fixed nature of "domicile."[14] Thus, because he resides full-time in his motor

6   home and rents space at Campland on the Bay for at least four months during the year, Plaintiff alleges

7   he satisfies the "residency" requirement of Section 12050. (Pl. Opp., at 11-13.) Second, Plaintiff

8   argues he meets the "good cause" requirement because he needs a gun to protect himself and his wife

9   when he travels on business and when they travel to remote areas in their motor home. (Id. at 13-14.)

10      B.    Analysis

11      The Equal Protection Clause of the Fourteenth Amendment provides that no State shall deny

12   to any person within its jurisdiction the equal protection of the laws, which is "essentially a direction

13   that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr.,

14   473 U.S. 432, 439 (1985) (citation omitted). "The general rule is that legislation is presumed to be

15   valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate

16   state interest." Id. at 440 (citations omitted). This general rule gives way, however, where a statute

17   classifies by race, alienage, or national origin, or impinges on personal rights protected by the

18   Constitution. Id. When that is the case, the challenged law is subjected to strict scrutiny and will be

19   upheld only if it is "suitable tailored to serve a compelling state interest." Id. Moreover, laws that

20   classify based on other characteristics beyond the individual's control, such as gender and

21   illegitimacy, are subject to a somewhat heightened review, and will be upheld only if "substantially

22   related to a sufficiently important governmental interest." Id. at 440-41 (citations omitted).

23      Contrary to Defendant's arguments, the Supreme Court in Heller explicitly rejected "rational

24   basis" as the applicable standard of review for Second Amendment restrictions. See 128 S. Ct. at 2818

25   n.27. Accordingly, the Court has to apply one of the heightened levels of scrutiny to Plaintiff's

26   ──────────────

27   [14] Plaintiff urges the Court to adopt the definition of "residency" used in Section 349(c) of the
California Election Code, which provides that: "The residence of a person is that place in which the
person's habitation is fixed for some period of time, but wherein he or she does not have the intention
28   of remaining. At a given time, a person may have more than one residence." The Court need not
decide this issue, however, because as noted below, even if the Court adopts the definition suggested
by Defendant, Plaintiff appears to be a "resident" of San Diego County. See infra Part II.B.1.

challenge to Section 12050. In the present case, the Court need not decide which specific standard

controls because Defendant's Motion to Dismiss fails even if the Court applies "intermediate

scrutiny." As already noted in Part I above, Defendant has made very little effort to either identify an

"important governmental interest" or show how the challenged law is "substantially related" to that

interest. Cf. Skoien, 587 F.3d at 814-15. Thus, as long as Plaintiff can demonstrate that he is "similarly

situated" to other San Diego County residents and was "treated differently" by Defendants, his second

cause of action for violation of the Equal Protection Clause would survive the motion to dismiss.

> *1.      Similarly situated*

Defendant urges the Court to find that Plaintiff is not "similarly situated" to other San Diego

County residents because his residence in San Diego is only temporary. In this regard, Defendant asks

the Court to adopt the definition of "residency" used in Section 17014(a) of the Revenue and Taxation

Code, which defines a resident as "[e]very individual who is in this state for other than a temporary

or transitory purpose." Defendant's argument is undercut, however, by the California Code of

Regulations, which clarifies the meaning of "temporary or transitory purpose" as used in Section

17014(a):

> Whether or not the purpose for which an individual is in this State will be considered
> temporary or transitory in character will depend to a large extent upon the facts and
> circumstances of each particular case. It can be stated generally, however, that if an
> individual is simply passing through this State on his way to another state or country,
> or is here for a brief rest or vacation, or to complete a particular transaction, or perform
> a particular contract, or fulfill a particular engagement, which will require his presence
> in this State for but a short period, he is in this State for temporary or transitory
> purposes, and will not be a resident by virtue of his presence here.

> If, however, an individual is in this State to improve his health and his illness is of such
> a character as to require a relatively long or indefinite period to recuperate, or he is
> here for business purposes which will require a long or indefinite period to accomplish,
> or is employed in a position that may last permanently or indefinitely, or has retired
> from business and moved to California with no definite intention of leaving shortly
> thereafter, he is in the State for other than temporary or transitory purposes, and,
> accordingly, is a resident taxable upon his entire net income even though he may retain
> his domicile in some other state or country.

CAL. CODE REGS. tit. 18, § 17014 (2009). In the present case, Plaintiff alleges that: (1) he and his wife

have maintained and had nearly exclusive use of a single room in a residence located at 3151 Driscoll

Drive, San Diego for the past 15 years, where they have kept a wardrobe and other personal items; (2)

they have resided regularly in San Diego since 2007, including continuously living in San Diego for

two months between February 2007 and April 2007, as well as five months between November 15,

- 15 -                                                        09cv2371-IEG (BLM)

1   2008 and April 15, 2009; and (3) he has a California identification card identifying San Diego as his

2   place of residence. (Compl. ¶¶ 17-22; Pl. Opp., at 8-10, 11-13, Ex. D.) Given these facts, which the

3   Court must accept as true at this stage of the proceedings, Plaintiff's presence in San Diego appears

4   to be more than "temporary or transitory" even under the definition urged by Defendant. Accordingly,

5   Plaintiff alleged sufficient facts to demonstrate he is a "resident" of San Diego County and therefore

6   is "similarly situated" to other San Diego County residents.

7               *2.      Treated differently*

8          According to Plaintiff, he was denied a license to carry a concealed weapon by Defendant

9   Gore's predecessor because the SD License Division made a finding that Plaintiff's need for self-

10  defense was not a "good cause" and because his residency in a motor home did not meet the

11  "residency" requirement. Taking these allegations as true, Plaintiff alleges sufficient facts to

12  demonstrate he was treated differently than other similarly situated individuals.

13              *3.      Conclusion*

14         For the foregoing reasons, because Plaintiff's complaint alleges sufficient facts to state a claim

15  for relief and because Defendant's Motion to Dismiss does little to identify an "important

16  governmental interest" or to demonstrate the required "fit" between the law and the interest served,

17  the Court **DENIES** Defendant's Motion to Dismiss as it relates to Plaintiff's second cause of action

18  for violation of the Equal Protection Clause.

19  **III.    Right to Travel**

20          A.     <u>Parties' arguments</u>

21         Plaintiff's third cause of action alleges that Defendants' requirement of full-time residence

22  violates his right to travel under the Fourteenth Amendment. Defendant moves to dismiss this cause

23  of action, arguing that Section 12050 does not actually deter the right to travel, impeding travel is not

24  one of its primary objectives, and it does not use any classification which serves to penalize the

25  exercise of that right. On the other hand, Plaintiff argues Defendants' application of the statute does

26  actually deter his right to travel because "San Diego residents, such as Plaintiff, must stay fulltime in

27  San Diego in order to have any sort of opportunity to apply and be granted a concealed carrying

28  weapons permit." (Pl. Opp., at 15.)

        //

1    B.     Analysis

2         The constitutional "right to travel"[15] embraces at least three different components: (1) it

3    protects the right of a citizen of one State to enter and to leave another State; (2) the right to be treated

4    as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and

5    (3) for those travelers who elect to become permanent residents, the right to be treated like other

6    citizens of that State. Saenz v. Roe, 526 U.S. 489, 500 (1999). However, not all regulations that

7    merely have an effect on travel raise an issue of constitutional dimension. Rather, "[a] state law

8    implicates the right to travel when it actually deters such travel, when impeding travel is its primary

9    objective, or when it uses any classification which serves to penalize the exercise of that right." Soto-

10   Lopez, 476 U.S. at 903 (plurality) (internal quotation marks and citations omitted).

11        In all cases, the analysis is informed by the same guiding principle–the right to travel "protects

12   residents of a State from being disadvantaged, or from being treated differently, simply because of the

13   timing of their migration, from other similarly situated residents." Id. at 904 (citations omitted).

14   Whenever a state law burdens the right to travel, the court must apply strict scrutiny and ask whether

15   the challenged law is "necessary to further a compelling state interest." Id. at 904-05 & n.4 (citations

16   omitted); accord Saenz, 526 U.S. at 499 (citing Shapiro v. Thompson, 394 U.S. 618, 634 (1969)).

17   Accordingly, in the present case, the Court must engage in a two-step analysis: (1) determine whether

18   Defendants' alleged requirement of full-time residence penalizes certain individuals, such as Plaintiff,

19   with respect to their right to travel; and (2) if it does, Plaintiff "must prevail" unless Defendant can

20   demonstrate that the requirement is "necessary to accomplish a compelling state interest." See Soto-

21   Lopez, 476 U.S. at 906 (plurality) (citations omitted); Saenz, 526 U.S. at 499 (citation omitted).

22                    1.     Does the requirement of full-time residence "penalize" Plaintiff?

23        Not all waiting periods and residency conditions are impermissible. Soto-Lopez, 476 U.S. at

24   903-06 (plurality). Rather, it is important to distinguish between "bona fide residence requirements,

25   which seek to differentiate between residents and nonresidents," and "residence requirements, such

26

27        [15] Although the Supreme Court has made it clear that the "right to travel" exists, it has
     struggled in identifying the precise constitutional source of that right. See, e.g., Att'y Gen. of New
28   York v. Soto-Lopez, 476 U.S. 898, 902-03 (1986) (plurality) (noting that the right has been inferred
     from federal structure of Government, and found variously in Privileges & Immunities Clause of
     Article IV, Commerce Clause, and Privileges & Immunities Clause of the Fourteenth Amendment).

1   as durational, fixed date, and fixed point residence requirements, which treat established residents

2   differently based on the time they migrated into the State." Id. at 903 n.3 (citations omitted).

3        In the present case, Plaintiff alleges he is being penalized because Defendants' requirement

4   of full-time residence "actually deters" him from traveling and spending time outside of San Diego.

5   (Pl. Opp., at 15.) It is well-established "that a State may not impose a penalty upon those who exercise

6   a right guaranteed by the Constitution." Harman v. Forssenius, 380 U.S. 528, 540 (1965) (citation

7   omitted); accord Dunn v. Blumstein, 405 U.S. 330, 340-41 (1972). "Constitutional rights would be

8   of little value if they could be ... indirectly denied, or manipulated out of existence." Harman, 380 U.S.

9   at 540 (internal quotation marks and citations omitted). Taking Plaintiff's allegations as true, it

10  appears the "residency" requirement as applied by Defendants does actually deter individuals such

11  as Plaintiff from exercising their right to travel in that they are being "penalized" for traveling and

12  spending time outside of San Diego by not being able to obtain a concealed weapon's permit.

13              *2.      Does the requirement of full-time residence pass "strict scrutiny"?*

14       Whenever a state law burdens the right to travel, the court must apply strict scrutiny and ask

15  whether the challenged law is "necessary to further a compelling state interest." Soto-Lopez, 476 U.S.

16  at 904-05 & n.4 (plurality) (citations omitted); accord Saenz, 526 U.S. at 499 (citing Shapiro, 394 U.S.

17  at 634). The heavy burden of justification is on the State, and the court will closely scrutinize the

18  challenged law in light of its asserted purposes. Dunn, 405 U.S. at 343. In the present case, Defendant

19  has failed either to identify a "compelling state interest" or to demonstrate that the challenged law is

20  "necessary" to further that interest. Accordingly, the Court **DENIES** Defendant's Motion to Dismiss

21  as it relates to Plaintiff's third cause of action for violation of his right to travel.

22                                        **CONCLUSION**

23       For the foregoing reasons, because Plaintiff's complaint alleges sufficient facts to state claims

24  for relief that are plausible on their face, the Court **DENIES** the Motion to Dismiss in its entirety.

25       **IT IS SO ORDERED.**

26

27  **DATED: January 14, 2010**

28                                        _____
                                          **IRMA E. GONZALEZ, Chief Judge**
                                          **United States District Court**

- 18 -                                    09cv2371-IEG (BLM)