C.D. Michel – SBN 144258
Clint B. Monfort - SBN 255609
Sean A. Brady - SBN 262007
cmichel@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:    (562) 216-4445
www.michellawyers.com
Attorneys for Plaintiffs / Petitioners

Paul Neuharth, Jr. (State Bar #147073)
pneuharth@sbcglobal.net
PAUL NEUHARTH, JR., APC
1440 Union Street, Suite 102
San Diego, CA 92101
Telephone: (619) 231-0401
Facsimile:    (619) 231-8759
Attorney for Plaintiffs / Petitioners

**IN THE UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF, <br><br> Defendants. | **CASE NO: 09-CV-2371 IEG (BGS)** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Date:              November 1, 2010 <br> Time:             10:30 a.m. <br> Location:        Courtroom 1 <br> Judge:            Hon. Irma E. Gonzalez <br> Date Action Filed: October 23, 2009 |

**TABLE OF CONTENTS**

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        **A.**    **California's CCW Regulatory Scheme** . . . . . . . . . . . . . . . . . . . . . . 3

        **B.**    **The County's CCW Issuance Policies and Practices** . . . . . . . . . . . . 3

        **C.**    **Plaintiffs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  **I.**     **THE PEOPLE'S RIGHT TO CARRY HANDGUNS FOR SELF-DEFENSE, IN PRIVATE OR PUBLIC, IS "CORE CONDUCT" PROTECTED BY THE SECOND AMENDMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  **II.**    **THE COUNTY'S POLICY AND PRACTICES ARE SUBJECT TO STRICT SCRUTINY BECAUSE THEY BAR PLAINTIFFS FROM ENGAGING IN CORE CONDUCT PROTECTED BY THE SECOND AMENDMENT RIGHT TO BEAR ARMS; AS SUCH, THE COUNTY BEARS THE BURDEN OF PROVING SUCH POLICY AND PRACTICES ARE CONSTITUTIONAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        **A.**    **Standard of Review: Under the Traditional Model, Strict Scrutiny Should Apply to Second Amendment Rights;** *Heller* **and** *McDonald* **Prelude Lesser Standards of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            **1.**    **Under the Traditional Model, "Strict Scrutiny" Applies to Laws Regulating Fundamental, Enumerated Rights, and It Applies Equally at the Federal, State, and Local Level** . . . . . . . . . . . . . . . . . . . . 9

            **2.**    *Heller* **Adopted a** *Sui Generis* **Historical Approach And Explicitly Rejects Justice Breyer's "Interest-Balancing" Approach, Akin to "Intermediate Scrutiny" Tests that Weigh Burdens and Benefits** . . 10

            **3.**    *Heller's* **Categories Of Historically Acceptable Restrictions On Keeping And Bearing Arms Are Entirely Consisten With Strict Scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        **B.**    **No Matter What Standard of Review This Court Adopts, the Burden Remains on the County** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

  **III.**  **THE COUNTY'S POLICY OF REQUIRING A SHOWING BEYOND SELF-DEFENSE TO BE ELIGIBLE FOR A CCW VIOLATES PLAINTIFFS' HISTORICALLY APPROVED SECOND AMENDMENT RIGHT TO BEAR ARMS UNDER ANY HEIGHTENED STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        **A.**    **The County's CCW Issuance Policy and Practices Do Not Meet Strict Scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        **B.**    **The County's CCW Issuance Policy and Practices Do Not Even Meet Intermediate Scrutiny** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV.   THE COUNTY'S CCW ISSUANCE POLICIES AND PRACTICES
      VIOLATE PLAINTIFFS' RIGHT TO EQUAL PROTECTION . . . . . . . . 18

      1.   The County's Implementation of its "Good Cause" Policy Unlawfully
           Discriminates Among Law-Abiding Citizens Who Seek CCWs for Self-
           Defense Purposes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           a.   Similarly Situated; Treated Differently . . . . . . . . . . . . . . . . . . .

           b.   The County Cannot Legally Justify Its Different Treatment of
                Applicants Based on "Good Cause" . . . . . . . . . . . . . . . . . . . . 19

      2.   The County's Preferential Treatment of Honorary Deputy Sheriff's
           Association Members in Issuing CCWs Violates Plaintiff's Rights to
           Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

           a.   Similarly Situated; Treated Differently . . . . . . . . . . . . . . . 20

           b.   The County Cannot Justify Its Different Treatment of HDSA
                Members from Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

09-CV-2371 IEG (BGS)

# TABLE OF AUTHORITIES

Page

SUPREME COURT CASES

*Burdick v. Takushi,*
    504 U.S. 428 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*City of Cleburne v. Cleburne Living Ctr.,*
    473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*City of L.A. v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*D.C. v. Heller,*
    128 S. Ct. 2781 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Duncan v. La.,*
    391 U.S. 145 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Harper v. Va. Bd. of Elections,*
    383 U.S. 663 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Int'l Union v. Brock,*
    477 U.S. 274 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Johnson v. California,*
    543 U.S. 499 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Landmark Commc'n v. Va.,*
    435 U.S. 829 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McDonald v. City of Chi.,*
    130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Muscarello v. U.S.,*
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Reno v. Flores,*
    507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Shaw v. Hunt,*
    517 U.S. 899 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Thompson v. W. States Med. Ctr.,*
    535 U.S. 357 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**TABLE OF AUTHORITIES Continued**

Page

*Turner Broad. Sys., Inc. v. FCC,*
    520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 17

*Ullmann v. U.S.,*
    350 U.S. 422 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464(1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

FEDERAL COURT CASES

*Cable Vision Sys. Corp v. FCC,*
    597 F.3d 1306 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Guillory v. County of Orange,*
    731 F.2d 1379 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Heller v. D.C.,*
    698 F. Supp. 2d 179 (D.D.C. Mar. 26, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hussey v. City of Portland,*
    64 F.3d 1260 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*U.S. v. Engstrum,*
    609 F. Supp. 2d 1277 (D. Utah 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. v. Everist,*
    368 F.3d 517 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*U.S. v. Yanez-Vasquez,*
    2010 U.S. Dist. LEXIS 8166 (D. Kan. Jan. 28, 2010) . . . . . . . . . . . . . . . . . . . . . . . . 11

STATE CASES

*Andrews v. State,*
    50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Nunn v. State,*
    1Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Chandler,*
    5 La. Ann. 489 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Reid,*
    1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**TABLE OF AUTHORITIES Continued**

Page

OTHER AUTHORITIES

Black's Law Dictionary 214 (6th ed. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Brief of U.S., *D.C. v. Heller*,
    128 S. Ct. 2783 (No. 07-290) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cal. Penal Code § 12050 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

Eugene Volokh, *The Second Amendment and the Right to Keep and Bear Arms After D.C. v.
Heller: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical
Framework and a Research Agenda*,
    56 UCLA L. Rev. 1443 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

James Kent, Commentaries on American Law 340 n. 2 (Oliver Wendell Holmes ed., 1873) . . . 7

William Blackstone, The American Students' Blackstone: Commentaries on
the Laws of England, in Four Books 84 n. 11 (George Chase ed., Banks &
Bros. 1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 15

1   Plaintiffs Edward Peruta, Michelle Laxson, James Dodd, Dr. Leslie Buncher, Mark

2   Cleary, and California Rifle and Pistol Association Foundation (collectively, "Plaintiffs"), bring

3   this Motion for Partial Summary Judgment on their Complaint for Declaratory and Injunctive

4   Relief, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, and submit this

5   Memorandum of Points and Authorities in Support thereof, against the County of San Diego,

6   Sheriff Gore, and their employees, agents, and successors in office (collectively, "the County").

7   **SUMMARY OF ARGUMENT**

8   In two recent landmark cases, the U. S. Supreme Court held the Second Amendment

9   guarantees the right of citizens to "keep and bear Arms," and protects that right from federal,

10   state, and local infringement.[1]  As the plain language of the amendment states – "keep" and "bear"

11   Arms – and as further articulated by the Court, *carrying* handguns for self-defense is protected by

12   this fundamental, enumerated right to Arms.  *Heller*, 128 S. Ct. at 2793-94.  Thus, while states

13   may regulate the bearing of Arms to *some* degree in the interest of public safety, *i.e.*, in "sensitive

14   places," *id*. at 2816-17, such regulations, because they impact conduct within the scope of the

15   Second Amendment, may not constitutionally amount to a general prohibition of that conduct.

16   *See*, *e.g.*, *id.* at 2817-18 (the Supreme Court, in explaining the unlawfulness of the handgun ban at

17   issue in that case, compared it to similar "severe restrictions" found invalid under the right to

18   Arms by state supreme courts, including bans on carrying handguns in public).[2]

19   Here, the County's policy for issuing permits to carry a concealed firearm

20   ("CCW") ultimately denies such permits to responsible, law-abiding citizens seeking to carry

21   handguns for self-defense. This policy, coupled with state law effectively prohibiting "open" carry

22

23   [1] *D.C. v. Heller*, 128 S. Ct. 2783 (2008) and *McDonald v. City of Chi.*, 130 S. Ct.

24   3020 (2010).

25   [2] Arguably, a ban on carrying weapons outside the home is a more serious burden
    on the right to Arms than the ban on handgun possession struck down in *Heller*, for the

26   ban in that case would have at least left open some possibility of self-defense with
    shotguns or rifles. *See* Eugene Volokh, *The Second Amendment and the Right to Bear*

27   *Arms after D.C. v. Heller: Implementing the Right to Keep and Bear Arms for Self-*
    *Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443,

28   1518 (2009) ( hereafter cited as "Volokh").

1    for self-defense purposes, abrogates those persons' right to "possess and carry weapons in case of

2    confrontation," *id.*, at 2797, core conduct under the Second Amendment right to bear Arms. This

3    infringement on the right to bear Arms conflicts with *Heller*, which indicates that government

4    entities may regulate but not completely prohibit the lawful carrying of firearms.  *Heller* rests on

5    the premise that restrictions on carrying concealed firearms are permitted so long as the

6    government allows firearms to be carried openly, or vice versa.  *See*, *e.g.*, *id.* at 2816-2818,

7    (discussing state supreme court cases that permitted restrictions on "concealed carry" where "open

8    carry" was allowed).  Thus, prohibitions on carrying handguns for self-defense purposes by

9    responsible, law-abiding persons are unconstitutional. *Id*. at 2818.

10        And that is the situation here:  Because California prohibits the open carry of loaded

11    firearms, and the County refuses to issue CCWs to responsible, law-abiding applicants who seek a

12    CCW for self-defense purposes, but who are unable to provide evidence documenting a specific

13    threat deemed acceptable by the County, Plaintiffs' right to bear Arms is abrogated–and will

14    continue to be so–unless this Court intervenes to protect that right.

15        It is undisputed that County's CCW issuance policy and practices prevent responsible,

16    law-abiding citizens seeking a CCW for self-defense purposes from obtaining one. The threshold

17    question before this Court is thus one of law: whether County's policy and practices are

18    constitutional.  Plaintiffs contend they are not for three reasons.

19        First, County's policy unjustifiably denied Plaintiffs and other responsible, law-abiding

20    people the ability to carry a handgun for self-defense on account of Plaintiffs' inability to guess at,

21    and offer documentation, of a specific threat of harm acceptable to the County, thereby violating

22    their Second Amendment right to bear Arms.

23        Second, concomitantly, the County's policy deprives Plaintiffs of equal protection of the

24    laws by allowing persons engaged in certain conduct, such as a business, to receive a CCW for

25    self-defense purposes, while it creates a classification of persons (*i.e.*, those unable to guess at,

26    and offer documentation, of a specific threat of harm acceptable to the County), which includes

27    Plaintiffs, who are deprived of their fundamental right to carry a handgun for self-defense.

28    / / /

1    Finally, in apparent breach of its own issuance policy, the County grants CCWs to

2  members of the Honorary Deputy Sheriff's Association ("HDSA") – a private, *civilian* entity,

3  wherein membership is achieved merely by being sponsored by a current member, passing a

4  background check, making a "donation" and paying annual dues – while at the same time the

5  County *denies* other law-abiding, *non*-HDSA-members who are similarly situated. That arbitrary

6  difference in treatment also violates the Equal Protection rights of Plaintiffs.

7                          **RELEVANT FACTS**

8    **A.    California's CCW Regulatory Scheme**

9    With minor exceptions, California law effectively prohibits the unlicensed public carrying

10  of loaded firearms. SUF 1.  The only licensed public carrying of loaded firearms allowed is

11  "concealed carry" (*i.e.*, with a CCW), except in a few sparsely populated counties where one may

12  obtain a license to carry a loaded handgun openly. SUF 2. Thus, in a populous county like San

13  Diego, a CCW is, with few and limited exceptions, the only means for an individual to lawfully

14  carry a firearm in public for self-defense.

15    Depending on the jurisdiction, to obtain a CCW, one must apply to the Chief of Police or

16  Sheriff ("Issuing Authority") for the city or county where the applicant either resides, or spends

17  substantial time conducting business at the applicant's principal place of employment or business

18  located in that county. SUF 3. CCW applicants must also pass a criminal background check (SUF

19  4), and successfully complete a handgun training course. SUF 5. Even then, the Issuing Authority

20  may deny the CCW permit if it finds the applicant lacks good moral character or "good cause" for

21  carrying a concealed handgun. SUF 6.  Issuing Authorities have exercised broad discretion in

22  deciding whether an applicant has "good cause" for a CCW, resulting in some counties, such as

23  San Diego, imposing restrictive standards for issuing CCWs, while other counties issue CCWs to

24  almost all responsible, law-abiding applicants.

25    **B.    The County's CCW Issuance Policies and Practices**

26    In San Diego, Defendant Sheriff William Gore is the sole Issuing Authority. SUF 7.  Thus,

27  to obtain a CCW in San Diego, one must submit an application to Sheriff Gore. SUF 8. The

28  County's written policy for issuing a CCW states:

1    Applicants will be required to submit documentation to support and demonstrate
2    their need. SUF 9.

3    The County *requires* CCW applicants who seek a CCW for purely self-defense purposes (*i.e.*,

4    unrelated to a business/profession) to provide evidence documenting a specific threat of harm to

5    the applicant (*e.g.*, "Current police reports and/or other documentation supporting need (*i.e.*, such

6    as restraining orders or other verifiable written statements))" in order to satisfy the "good cause"

7    requirement of Cal. Pen. Code § 12050. SUF 10.  The County has a separate standard for those

8    seeking a CCW for business purposes (*i.e.*, to protect themselves during business activity). SUF

9    11.

10    As evidenced by the County's letters denying Plaintiffs' CCW applications, it is the

11    County's general practice to follow this policy when considering whether to issue a CCW to any

12    particular applicant. (*See*, for example, Plaintiff Buncher's denial letter, stating: "The

13    documentation you have provided does not indicate you are a specific target or that you are

14    currently being threatened in any manner.  The Sheriff's Department does not issue CCW's based

15    on fear alone."). SUF 12

16    However, despite the County's strict CCW issuance policy, it does not apply it evenly to

17    all applicants, demanding less of some. SUF 13.

18    **C.    Plaintiffs**

19    All individual Plaintiffs are residents of San Diego County. No Plaintiff is prohibited

20    under federal or California law from purchasing or possessing firearms.  All Plaintiffs fear arrest,

21    prosecution, fine, imprisonment, and other penalties if they carry a handgun without a CCW.  But

22    for being prevented from lawfully obtaining a CCW, and the fear of prosecution and other

23    penalties, each Plaintiff would carry a handgun in public for self-defense on occasions they deem

24    appropriate. SUF 14.

25    All Plaintiffs are injured by the County's CCW issuance policy and practices because they

26    either were denied a CCW for supposed lack of "good cause," were unable to meet the County's

27    written policy for determining "good cause," or are citizen taxpayers who are subject to an

28    unconstitutional government policy.

In the case of Plaintiff California Rifle and Pistol Association Foundation ("CRPAF"), an organization dedicated to educating the public about firearms and protecting the rights thereto, its thousands of supporters and CRPA members in San Diego County are likewise injured by the County's issuance policy and practices for these same reasons. (SUF 15).  CRPAF is thus an appropriate associational plaintiff because it represents the shared interests of those individuals to whose benefit the remedy sought in this action will inure. *See Int'l Union v. Brock*, 477 U.S. 274, 287-88 (1986).

## ARGUMENT

### I.  THE PEOPLE'S RIGHT TO CARRY HANDGUNS FOR SELF-DEFENSE, IN PRIVATE OR PUBLIC, IS "CORE CONDUCT" PROTECTED BY THE SECOND AMENDMENT

The *Heller* Court left no doubt that "the people's right to keep and bear Arms" under the Second Amendment includes both a right to keep Arms and a right to *bear* Arms.  In fact, the Court adopted and quoted Justice Ginsburg's definition as to the latter right from her dissent in *Muscarello v. United States*, 524 U.S. 125, 139-40 (1998), where in the course of analyzing the meaning of "carries a firearm" in a federal criminal statute, she wrote:

> Surely a most familiar meaning is, as the *Constitution's Second Amendment* . . . indicate[s]: "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* at 143, 118 S. Ct. 1911, 141 L. Ed. 2d 111 (dissenting opinion) (quoting Black's Law Dictionary 214 (6th ed. 1998)).

*Heller*, 128 S. Ct. at 2793.

Moreover, at the end of its detailed parsing of the Second Amendment's operative clause, the Court found that "[p]utting all of these textual elements together, we find that they guarantee the individual right to possess *and carry* weapons in case of confrontation."[3] *Id.* at 2797

---

[3]  This plain reading of "bear arms" also makes sense upon consideration of other provisions of the Bill of Rights.  For example, the Sixth Amendment guarantees the right to a "speedy and public trial." U.S. Const. amend. VI.  Just as the Sixth Amendment is not read to permit secret, speedy trials or public trials the prosecutions of which are unjustly delayed, the Second Amendment's reference to "keep and bear" refers to two distinct concepts. In addition, the Court flatly rejected Justice Stevens' suggestion that "keep and bear Arms" was a term of art with a unitary meaning, presumably akin to "cease and desist," stating simply: "[t]here is nothing to this." *Heller*, 128 S. Ct. at 2797.

1   (emphasis added).  The Court's reference to "confrontation," along with Justice Ginsburg's

2   reference to "being armed and ready . . . *in case of* conflict" again raises the recurring theme of

3   armed self-defense, and self-preservation recognized by *Heller* as "core conduct" protected by the

4   Second Amendment. *Id*. at 2793 (emphasis added).  The *Heller* Court limited its ruling to address

5   the *keeping* of arms because that was the question of law at issue in the ordinance being

6   challenged.  *See id*. at 2821 ("But since this case represents this Court's first in-depth examination

7   of the Second Amendment, one should not expect it to clarify the entire field, any more than

8   *Reynolds v. United States*, our first in-depth Free Exercise Clause case, left that area in a state of

9   utter certainty." (internal citation omitted).) But by defining "bearing Arms" in terms of  "carrying

10  weapons" or "being armed and ready" in case of confrontation or conflict, *id*. at 2793, the Court

11  implicitly rejects any attempt to limit core conduct associated with the right to Arms to in-home

12  possession and use–as if the right to Arms, self-defense, and self-preservation ends at one's

13  threshold.

14          The *public* carrying of firearms is thus protected activity–indeed, core conduct–under the

15  right to bear Arms.  The Supreme Court reassures us that the right to Arms is not a right to "carry

16  any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 2816

17  (citations omitted).  But even that caveat confirms there *is* a right to carry *some* weapons, in *some*

18  manner, for *some* purposes.  Also, by listing a few "presumptively lawful" firearm regulations, the

19  Court likewise indirectly casts doubt on others, *e.g.*, by presuming the lawfulness of restrictions

20  on carrying firearms in "sensitive places," *id.* at 2817, the Court implies it might well invalidate

21  laws restricting carrying firearms in "non-sensitive places."

22          That courts, including the Supreme Court in *Heller*, have found or indicated that certain

23  local restrictions on carrying *concealed* weapons may be lawful does not alter the basic right to

24  carry, it merely acknowledges the right is not absolute. In commenting on the scope of the right to

25  Arms, the *Heller* Court explained:

26          Like most rights, the right secured by the Second Amendment is not unlimited . . . . For
        example, the majority of the 19th-century courts to consider the question held that
27      prohibitions on carrying concealed weapons were lawful under the Second Amendment or
        state analogues.

28

1  *Heller*, 128 S. Ct. at 2816 (citing *State v. Chandler*, 5 La. Ann. 489, 489-90 (1850); *Nunn v. State*,

2  1Ga. 243, 251 (1846); citing generally James Kent, Commentaries on American Law 340 n. 2

3  (Oliver Wendell Holmes ed., 1873); William Blackstone, The American Students' Blackstone:

4  Commentaries on the Laws of England, in Four Books  84 n. 11 (George Chase ed., 1884)).

5        As the Court itself notes, both state court cases cited as examples of acceptable limits on

6  the right to "concealed carry," *Chandler* and *Nunn*, involved prohibitions where the right to Arms

7  was still available by way of "open carry." *See Chandler*, 5 La.Ann. at 489-90 (noting the

8  prohibition on carrying concealed weapons "interfered with no man's right to carry arms . . . 'in

9  full view,' which places men upon an equality"); *accord*, *Nunn*, 1 Ga. at 251 ("so far as the act . . .

10  seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it

11  does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to

12  keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*,

13  is in conflict with the Constitution, and *void* . . ."(emphasis original).)

14        In addition to *Chandler* and *Nunn*, *Heller* discussed and cited with approval other state

15  supreme court opinions holding bans on open carry invalid, including regulations that, in effect,

16  constitute a ban.  *See Heller*, 128 S. Ct. at 2818 (discussing *Andrews*, 50 Tenn. 165; 178 (1871)

17  and *State v. Reid*, 1 Ala. 612, 616-17 (1840)):

18      In *Andrews* v. *State*, the Tennessee Supreme Court likewise held that a statute that
    forbade openly carrying a pistol "publicly or privately, without regard to time or

19      place, or circumstances," violated the state constitutional provision (which the
    court equated with the *Second Amendment*). That was so even though the statute

20      did not restrict the carrying of long guns. See also *State v. Reid,* ("A statute which,
    under the pretence of regulating, amounts to a destruction of the right, or which

21      requires arms to be so borne as to render them wholly useless for the purpose of
    defence, would be clearly unconstitutional").

22  *Id*. (internal citations omitted).

23        The legal treatises cited by *Heller* in support of concealed carry restrictions also support

24  the view that such prohibitions are valid only where open carrying is allowed as an alternative.

25  *See* William Blackstone, The American Students' Blackstone: Commentaries on the Laws of

26  England, in Fall Books 84 n. 11 (G. Chase ed., Banks and Bros. 1884). ("[I]t is generally held that

27  statutes prohibiting the carrying of *concealed* weapons are not in conflict with these constitutional

28  provisions, since they merely forbid the carrying of arms in a particular manner . . .."), cited in

1    *Heller*, 128 S. Ct. at 2716).

2         In sum, *Heller* identifies carrying handguns in public for self-defense purposes as conduct

3    that may not be infringed by federal, state or local governments, including Defendants' here.

4    While the right to engage in that conduct is not unlimited, *Heller*, 128 S. Ct. at 2816, neither is the

5    ability of local government to restrict that right.  *Heller* indicates that government may impose

6    some limits on the right, *e.g.*, by prohibiting open carry in urban areas, while allowing for

7    concealed carry by law-abiding citizens (similar in theory to California's law). But this Court

8    need not determine with any precision the degree to which governments may infringe the right to

9    bear Arms.  This case does *not* require development of a comprehensive regime setting forth

10   parameters for restrictions on who may carry Arms, what they may carry, how they may carry,

11   where, and for what purpose–because the County's policies are not in dispute, nor is the severe

12   effect of those policies.  Here, the County's policies and practices in effect preclude Plaintiffs and

13   other similarly situated persons from lawfully carrying handguns, period.

14        Plaintiffs cannot obtain the permits that state law requires for concealed carry from the

15   County, nor can they generally carry loaded handguns openly under state law. (SUF 6).  In effect,

16   they cannot bear *any* arms in *any* practical manner for the core purpose of self-defense.  Little

17   more need be said.  The County has violated and continues to violate Plaintiffs' Second

18   Amendment rights, as well as the rights of thousands of similarly situated citizens. And this is

19   true regardless of what type of heightened scrutiny this Court adopts in reviewing the County's

20   policies and practices.  Actually, this Court need not adopt any particular standard of review for,

21   as in *Heller*, the severity of the County's restrictive policy and practices renders them void under

22   any level of heightened scrutiny.

23   **II.    THE COUNTY'S POLICY AND PRACTICES ARE SUBJECT TO STRICT**
         **SCRUTINY BECAUSE THEY BAR PLAINTIFFS FROM ENGAGING IN CORE**
24       **CONDUCT PROTECTED BY THE SECOND AMENDMENT RIGHT TO BEAR**
         **ARMS; AS SUCH, THE COUNTY BEARS THE BURDEN OF PROVING SUCH**
25       **POLICY AND PRACTICES ARE CONSTITUTIONAL**

26        If this Court finds it necessary to determine the appropriate standard of review, it should

27   hold, after *D.C. v. Heller*, 128 S. Ct. 2783 (2008), and *McDonald v. City of Chicago*, 130 S. Ct.

28   3020 (2010), that restrictions on the right to keep and bear arms are subject to strict scrutiny.  That

1   conclusion follows from both *McDonald*'s holding that the right to keep and bear arms is

2   incorporated through the Fourteenth Amendment because of its fundamental nature and from

3   *Heller*'s rejection of rational basis scrutiny and Justice Breyer's "interest-balancing" approach,

4   which was simply intermediate scrutiny by another name.

5        **A.**    **Standard of Review: Under the Traditional Model, Strict Scrutiny Should Apply to Second Amendment Rights; *Heller* and *McDonald* Preclude Lesser**

6              **Standards of Review**

7          Though the Court's recent rulings in *McDonald* and *Heller* do not expressly establish a

8   level of scrutiny for evaluating Second Amendment restrictions, both rulings provide clear

9   direction on what is and is not appropriate.  *Heller* expressly rejects "rational-basis" review,

10  *Heller*, 128 S. Ct. at 2818 n. 27, and all but says "intermediate scrutiny" is insufficient. *McDonald*

11  reaffirms that the right to Arms is "fundamental," thereby requiring the strict scrutiny standard of

12  review.

13       **1.**    **Under the Traditional Model, "Strict Scrutiny" Applies to Laws Regulating Fundamental, Enumerated Rights, and It Applies Equally**

14             **at the Federal, State, and Local Level**

15         When a law interferes with "fundamental constitutional rights," it is subject to "strict

16  judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973); *Perry Educ.*

17  *Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when

18  government action impinges upon a fundamental right protected by the Constitution"). *McDonald*

19  laid to rest any doubt about the fundamental nature of the right to keep and bear arms, declaring

20  that "the right to bear arms was fundamental to the newly formed system of government." 130 S.

21  Ct. at 3037; *accord id.* at 3042 ("[T]he Framers and ratifiers of the Fourteenth Amendment

22  counted the right to keep and bear arms among those fundamental rights necessary to our system

23  of ordered liberty.")

24         Indeed, whether the right to keep and bear arms is fundamental was the basic question

25  presented in *McDonald*: To decide "whether the Second Amendment right to keep and bear arms

26  is incorporated in the concept of due process, . . . we must decide whether the right to keep and

27  bear arms is fundamental to our scheme of ordered liberty." *Id.* at 3036 (emphasis omitted).  The

28  very first sentence of the Court's analysis of this questions stated that "our decision in *Heller*

1  points unmistakably to [an affirmative] answer." *Id.*  *Heller* explained that "[b]y the time of the

2  founding, the right to have arms had become fundamental for English subjects." 128 S. Ct. at

3  2798.  It was this fundamental "pre-existing right" that the Second Amendment "codified." *Id.* at

4  2797.  Burdens on Second Amendment rights are thus subject to strict scrutiny. *See also U.S. v.*

5  *Engstrum*, 2009 U.S. Dist. LEXIS 65684 (D. Utah 2009).

6          **2.**  ***Heller* Adopted a *Sui Generis* Historical Approach And Explicitly Rejects Justice Breyer's "Interest-Balancing" Approach, Akin to**

7  **"Intermediate Scrutiny" Tests that Weigh Burdens and Benefits**

8         Although *Heller* did not explicitly state that "strict scrutiny" is required of laws that

9  restrict the rights protected by the Second Amendment, that is because the *Heller* Court eschewed

10  levels of scrutiny in favor of an approach that focused more directly on history, which provided a

11  clear answer to the ordinance before the Court in *Heller*.  As *Heller* explained, "[f]ew laws in the

12  history of our Nation have come close to the severe restriction of the District's handgun ban." 128

13  S. Ct. at 2818; *see also id.* at 2821.  Nonetheless, *Heller* points clearly to strict scrutiny as the

14  level of scrutiny that would be required within a levels-of-scrutiny framework or when history did

15  not provide a definitive answer, and *McDonald*'s incorporation holding eliminated any potential

16  doubt on that score. *Heller* may leave open a debate between strict scrutiny and the *sui generis*

17  historical approach that it applied, but together *Heller* and *McDonald* leave no room for debate

18  between strict scrutiny and any lesser standard.

19         The *Heller* Court rejected Justice Breyer's suggested standard of review, which it

20  described as a "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute

21  burdens a protected interest in a way or to an extent that is out of proportion to the statute's

22  salutary effects upon other important governmental interests.'" *Id*. at 2821.  Such a test would

23  allow "arguments for and against gun control" and the upholding of a handgun ban "because

24  handgun violence is a problem, [and] because the law is limited to an urban area . . . ." *Id*.  The

25  Court expressly rejected Justice Breyer's approach, which, putting terminology aside, is

26  essentially "intermediate scrutiny."

27         Justice Breyer relied on cases such as *Turner Broadcasting Systems, Inc. v. FCC*, 520 U.S.

28  180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which

1    explicitly apply intermediate scrutiny (*see Heller,* 128 S. Ct. at 2852). Even more revealingly,

2    Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992), the case on which the United

3    States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief of U.S.

4    at 8, 24, 28, *Heller*, 128 S. Ct. 2783 (No. 07-290).  Even the plain text of his proposed test utilizes

5    the same language as the intermediate scrutiny test: "important governmental interests." *See*

6    *Heller,* 128 S. Ct. at 2852. Because Justice Breyer's approach essentially amounts to intermediate

7    scrutiny and the Court rejected it (and reaffirmed that rejection in *McDonald*), it would be

8    inappropriate for this Court to adopt intermediate scrutiny as the standard for judging restrictions

9    on the right to keep and bear arms.

10          The Court's view is in keeping with the characterization of the right to Arms as "the true

11   palladium of liberty," *i.e.*, the single right which secures all others.  See *id.* at 2805 (quoting St.

12   George Tucker's version of Blackstone's Commentaries).  It further indicates why, of the

13   traditional models for standard of review, "strict scrutiny" must apply in this case.  It would be

14   odd indeed if the courts applied a deferential standard when reviewing government regulations

15   restricting a fundamental, enumerated right to Arms intended, in part, to protect citizens from

16   oppressive governments.

17          Some post-*Heller* courts have applied intermediate scrutiny in Second Amendment cases,

18   justifying their decision to do so on the Supreme Court's alleged failure in *Heller* to "expressly"

19   declare the right to Arms "fundamental."  *See*, *e.g.*, *U.S. v. Yanez-Vasquez*, 2010 U.S. Dist.

20   LEXIS 8166 (D. Kan. Jan. 28, 2010); *Heller v. D.C.*, 698 F. Supp. 2d 179 (D.D.C. Mar. 26,

21   2010). That justification was never viable in light of *Heller*'s rejection of Justice Breyer's

22   approach, and is now clearly wrong after *McDonald*'s express holding that the right to keep and

23   bear arms is fundamental. *McDonald* at *87 ("[A] provision of the Bill of Rights that protects a

24   right that is fundamental from an American perspective applies equally to the Federal

25   Government and the States. See *Duncan* v. *La.*, 391 U. S., 145, 149, 149 n. 14. We therefore hold

26   that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment

27   right recognized in *Heller*.").

28   */ / /*

3.      *Heller*'s Categories Of Historically Acceptable Restrictions On Keeping And Bearing Arms Are Entirely Consistent With Strict Scrutiny.

Contrary to Justice Breyer's rejected suggestion in dissent, *see Heller*, 128 S. Ct. at 2851, *Heller*'s underlying logic – that the right to keep and bear arms is fundamental and that restrictions on the right require strict scrutiny – is entirely consistent with its dictum that certain types of restrictions, such as bans on possession by felons and the mentally ill and "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," are "presumptively lawful." *Id*. at 2817, 2817 n. 26.

First, a State obviously has a compelling interest in prohibiting firearm possession by violent felons and the insane.  The interest in keeping private firearms out of certain *truly* sensitive places may well be compelling as well.  Thus, it was of no great moment that the *Heller* Court suggested that in future cases the government might easily prove that laws prohibiting firearm possession by convicted felons, or possession in sensitive places like courthouses or prisons, satisfy strict scrutiny.  Because "[t]he fact that strict scrutiny applies 'says nothing about the ultimate validity of any particular law,'" predicting that such restrictions will be upheld is in no way inconsistent with requiring strict scrutiny. *Johnson v. California*, 543 U.S. 499, 515 (2005) (citation omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n. 6 (1992) (stating in First Amendment context that "presumptive invalidity does not mean invariable invalidity").  This Court need not over-read the "presumptively lawful" dictum to mean any more than that.

Second, it is possible that the *Heller* Court may have been stating merely that based on its preliminary understanding of the relevant history, such restrictions appear to fall outside the bounds of the right as understood at the time of the Framing, with future cases available to test that proposition and refine the precise contours of the right. *See* 128 S. Ct. at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views.  The Second Amendment is no different . . . . [T]here will be time enough to expound upon the historical justifications for the exceptions we

1    have mentioned if and when those exceptions we have mentioned if and when those exceptions

2    come before us.") Indeed, in his concurring opinion in *McDonald*, Justice Scalia specifically

3    explained that "[t]he traditional restrictions [on the right to keep and bear arms] go to show the

4    scope of the right, not its lack of fundamental character." *McDonald*, 130 S. Ct. at 3056 (Scalia ,

5    J., concurring).

6          The need for strict scrutiny of restrictions on the rights protected by the Second

7    Amendment is hardly undermined by the recognition that there may be categories of conduct

8    relating to keeping and bearing arms that fall outside the scope of the Second Amendment.  After

9    all, the fact that there are categories of *un*protected speech is hardly a justification for applying

10   less than strict scrutiny to laws that restrict protected speech. *See, e.g., R.A.V.*, 505 U.S. at 382-83

11   ("From 1791 to the present . . . . our society . . . . has permitted restrictions upon the content of

12   speech in a few limited areas . . . . We have recognized that 'the freedom of speech' referred to by

13   the First Amendment does not include a freedom to disregard these traditional limitations.")  Just

14   as "a limited categorical approach has remained an important part of our First Amendment

15   jurisprudence," *id.* at 383, *Heller*'s suggestion that certain categories of historically supported

16   restrictions are lawful is entirely consistent with recognizing that restrictions on rights that are

17   protected by the Second Amendment must be subjected to strict scrutiny.

18         In the end, given the general rule that restrictions on fundamental constitutional rights are

19   subject to strict scrutiny, the contention that restrictions on Second Amendment rights should be

20   permitted under a less-demanding standard reduces to the contention that the right to keep and

21   bear arms is a lesser right.  Any such contention would have been deeply misguided before

22   *McDonald*, and in light of *McDonald* no such contention is remotely tenable.

23         First, the Court has reiterated that it is improper to prefer certain enumerated constitutional

24   rights while relegating others to a lower plane:  No constitutional right is "less 'fundamental'

25   than" others, and there is "no principled basis on which to create a hierarchy of constitutional

26   values . . . ."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,

27   454 U.S. 464, 484 (1982); *accord Ullmann v. U.S.*, 350 U.S. 422, 428-29 (1956) ("To view a

28   particular provision of the Bill of Rights with disfavor inevitably results in a constricted

1   application of it.  This is to disrespect the Constitution.").

2       Second, the Court has applied this rule against "disrespect[ing] the Constitution" in the

3   specific context of the right to keep and bear arms and has emphatically rejected repeated attempts

4   to deprive that right of the same dignity afforded other fundamental rights.  *Heller* admonished

5   that "[t]he very enumeration of the right takes out of the hands of government-even the Third

6   Branch of Government-the power to decide on a case-by-case basis whether the right is *really*

7   *worth* insisting upon."  128 S. Ct. at 2821.  And *Heller* explained that the "Second Amendment is

8   no different" from the First Amendment in that it was the product of interest-balancing by the

9   People themselves.  *Id.* at 2816.  In *McDonald*, confronted with the argument that the Second

10  Amendment right, even though an individual, enumerated right as held by *Heller*, should be

11  deemed less than fundamental, the Court rejected that argument in the plainest terms: "what

12  [respondents] must mean is that the Second Amendment should be singled out for special-and

13  specially unfavorable-treatment.  We reject that suggestion."  130 S. Ct. at 3043 (plurality

14  opinion); *see also id.* at 3044 (rejecting plea to "treat the right recognized in *Heller* as a

15  second-class right, subject to an entirely different body of rules than the other Bill of Rights

16  guarantees").

17      Accordingly, it is too late in the day to argue that the right to keep and bear arms is less

18  fundamental than the other individual rights enumerated in the Constitution.  There is

19  consequently no basis to review restrictions on that right under anything less demanding than the

20  strict scrutiny that governs challenges to restrictions on other fundamental rights.  *Heller*'s

21  historical approach was no less demanding than ordinary strict scrutiny, and certain types of

22  restrictions may be conducive to that approach.  But to the extent that a levels-of-scrutiny analysis

23  is to apply, the scrutiny must be strict.

24  **B.    No Matter What Standard of Review This Court Adopts, the Burden
          Remains on the County**

25

26      What approach the Supreme Court ultimately approves and how it will affect

27  constitutional challenges to regulations of Arms remains to be seen.  But one thing is certain,

28  *Heller* and *McDonald*, in addition to finding the Second Amendment protects an individual right

1   and applies to the States, have altered the dynamic in litigation over firearm regulations. The

2   burden has shifted to government entities at all levels to prove their regulations do not infringe

3   core conduct protected by the Second Amendment; otherwise, the regulations must further a

4   compelling state interest and be narrowly tailored to serve that interest.  This is a far cry from pre-

5   *Heller* litigation where, in many cases, the government needed only show a rational basis for its

6   firearms restrictions.  Under that deferential standard, the policies and practices challenged herein

7   might pass constitutional muster. That is no longer the case.

8   **III.    THE COUNTY'S POLICY OF REQUIRING A SHOWING BEYOND SELF-
         DEFENSE TO BE ELIGIBLE FOR A CCW VIOLATES PLAINTIFFS'**
9   **HISTORICALLY APPROVED SECOND AMENDMENT RIGHT TO BEAR
         ARMS UNDER ANY HEIGHTENED STANDARD OF REVIEW**
10

11          The County's refusal to accept Plaintiffs' desire for self-defense as "good cause" under

12   Cal. Penal Code § 12050 conflicts with *Heller*, where the Court specifically found the right to

13   Arms and to self-defense inextricably linked.  "[T]he inherent right of self- defense has been

14   central to the Second Amendment right." *Heller*, 128 S. Ct. at 2817.  Self-defense "was the

15   *central component* of the right itself." *Id.* at 2801 (emphasis original) (citation omitted).  The

16   English right to arms "has long been understood to be the predecessor to our Second Amendment

17   . . . . It was, [Blackstone] said, 'the natural right of resistance and self-preservation,' and 'the right

18   of having and using arms for self- preservation and defence.'" *Id.* at 2798 (citations omitted).

19   "[T]he right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding

20   understood to be an individual right protecting against both public and private violence." *Id.* at

21   2798-99.  And, as explained in detail above, the right to armed self-defense includes the right to

22   carry a handgun in furtherance of that purpose. *See McDonald*, 130 S. Ct. at 3042 (concluding

23   that "citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'").

24          By not recognizing Plaintiffs' desire for armed self-defense–the "central component" of

25   the right to bear arms defined in *Heller*–as "good cause" for a CCW,  the County's policy

26   effectively nullifies Plaintiffs' right as law-abiding citizens to bear Arms, and thereby violates

27   Plaintiffs' Second Amendment rights, as defined in *Heller* and *McDonald*, under any heightened

28   standard of review.

**A.     The County's CCW Issuance Policy and Practices Do Not Meet Strict Scrutiny**

In order to prevail under strict scrutiny, the County must show that its policy of denying responsible, law-abiding CCW applicants who seek a CCW for self-defense purposes lest they "submit documentation to support and demonstrate their need" is "narrowly tailored to serve a compelling state interest." (*See Reno v. Flores*, 507 U.S. 292, 301-02 (1993)).  Under this standard, the County is not unbound in its ability to assert a compelling interest. For example, the Court does not generally allow legislative fact-finding to undermine a fundamental right. "Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'n. v. Va.*, 435 U.S. 829, 843 (1978).  Even under the relatively relaxed scrutiny that applies to indirect impositions on *less protected* speech, such as regarding the location of an adult bookstore, the Court has emphasized that a municipality cannot "get away with shoddy data or reasoning.  The municipality's evidence must fairly support the municipality's rationale for its ordinance." *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002).  Thus, the County cannot simply assert that the compelling interest of public safety is being furthered by its policy without providing legitimate empirical evidence showing such.

And, even if the County is able to make such a showing, it then must show that there are *no* less restrictive means to achieve that interest; unfortunately for the County, there are.  For example, the County can require applicants to pass a safety-oriented handgun training course.

In reality, the County's policy lacks any measure of tailoring.  The constitutional default is that all law-abiding citizens have a right to keep and bear arms, and some reasonable restrictions on that right, tailored to a specific governmental interest, are constitutionally acceptable.  The ordinance gets things backward, however, by first burdening every citizen's Second Amendment rights but then granting exceptions to certain favored persons, such as persons with business interests or members of HDSA.  That is the opposite of tailoring and renders the County's policy unconstitutional.

Furthermore, granting CCWs in only the rarest of cases as a blanket attempt to improve public safety would be to resurrect the type of interest-balancing test that *Heller* expressly rejected. *See Heller,* 128 S. Ct. at 2821.  And, the County would have to engage in logical

1   gymnastics to assert denying law-abiding citizens, like Plaintiffs, on the sole basis they cannot

2   document a specific threat, furthers a compelling interest while the County's policy allows

3   issuance of a CCW to an applicant engaged in a business the County considers under a *general*

4   threat of crime without requiring a showing of such documentation. "[I]t remains certain that the . .

5   . . government may not restrain the freedom to bear arms based on mere whimsy or convenience."

6   *U.S. v. Everist*, 368 F.3d 517, 519 n. 1 (5th Cir. 2004).

7        **B.     The County's CCW Issuance Policy and Practices Do Not Even Meet
              Intermediate Scrutiny**
8

9        "A law will be struck down under intermediate scrutiny unless it can be shown that it is

10  substantially related to achievement of an important governmental purpose." *Stop H-3 Ass'n v.*

11  *Dole*, 870 F.2d 1419, 1430 n. 7 (9th Cir. 1989). Courts have warned that "intermediate scrutiny is

12  still tough scrutiny, not a judicial rubber stamp." *Cable Vision Sys. Corp. v. FCC*, 597 F.3d 1306,

13  1323 (D.C. Cir. 2010).  In defending content-neutral regulations under the First Amendment,

14  Courts have also noted that the Government "must demonstrate that the recited harms are real, not

15  merely conjectural, and that the regulation will in fact alleviate these harms in a direct and

16  material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (plurality opinion). In applying this

17  standard, the usual deference afforded legislative or agency findings "does not foreclose our

18   independent judgment of the facts bearing on an issue of constitutional law." *Id.* at 666 (quoting

19  *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)) (internal quotation marks

20  omitted). The same showing should be required of Second Amendment regulations if this Court

21  decides to apply intermediate scrutiny, because no constitutional right is "less 'fundamental' than"

22  others, and "we know of no principled basis on which to create a hierarchy of constitutional

23  values . . . ." *Valley Forge*, 454 U.S. at 484.

24        Once again, the County must show evidence that depriving law-abiding, responsible

25  people the right to carry a firearm simply because they are unable to provide documentation of a

26  specific threat furthers an important state interest, such as public safety.  The County can make no

27  such showing.  Thus, even if this Court applies intermediate scrutiny here, the County cannot

28  meet its burden in legally justifying its policy.

1    The County's policies and practices effectively nullifying Plaintiffs' right to the carrying

2    of Arms for self-defense are unconstitutional on other grounds, as well.

3  **IV.    THE COUNTY'S CCW ISSUANCE POLICIES AND PRACTICES VIOLATE
          PLAINTIFFS' RIGHT TO EQUAL PROTECTION**

4

5    The Equal Protection Clause of the Fourteenth Amendment provides that no State shall

6    deny to any person within its jurisdiction the equal protection of the law, which "is essentially a

7    direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

8    *Living Ctr.*, 473 U.S. 432, 439 (1985) (citation omitted).  Strict scrutiny applies to government

9    classifications that "impinge on personal rights protected by the Constitution." *Id.* at 440

10   (citations omitted).  "Where fundamental rights and liberties are asserted under the Equal

11   Protection Clause, classifications which might invade or restrain them must be closely

12   scrutinized." *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995) (quoting *Harper v.*

13   *Va. Bd. of Elections*, 383 U.S. 663, 670 (1966)).

14    Since Plaintiffs are similarly situated to other persons who the County treated differently

15   by issuing those persons CCWs, the County has violated Plaintiffs' right to Equal Protection.

16       **1.    The County's Implementation of its "Good Cause" Policy Unlawfully
              Discriminates Among Law-Abiding Citizens Who Seek CCWs for Self-
              Defense Purposes.**

17

18       **a.    Similarly Situated; Treated Differently**

19    The Second Amendment right to keep and bear Arms is a "right of the People," not merely

20   the right of a narrow *group of people* comprised of those who can document circumstances that

21   make them "a specific target" of violent attack rather than a "random one."  But that is how the

22   County has unilaterally chosen to interpret the right and fashion its policies and practices in

23   issuing CCWs.  In other words, unless rebutted, it is presumed that responsible, law-abiding

24   citizens, like Plaintiffs, who seek a CCW for self-defense purposes are similarly situated in their

25   worthiness to exercise this constitutionally protected, fundamental right. *See Heller*, 128 S. Ct. at

26   2797-98 (describing the right to Arms as a "pre-existing right").

27    Yet the County denied, and continues to deny, Plaintiffs' self-defense-based CCW

28   applications, while at the same time it issues CCWs to others submitting self-defense-based

1   applications. The only relevant difference between them is those to whom the County issued a

2   CCW provided evidence documenting a specific threat proving their "need" to exercise their right

3   to bear Arms. But the County has it backward.  It is the County that must show a heightened need,

4   *i.*e., a compelling reason to flatly deny Plaintiffs' their right to bear Arms for self-defense.

5            **b.      The County Cannot Legally Justify Its Different Treatment of
               Applicants Based on "Good Cause"**

6

7            The Second Amendment protects the individual right to carry a gun "for the purpose . . . of

8   being armed and ready for offensive or defensive action in case of conflict with another person."

9   *Heller*, 128 S. Ct. at 2793. This language (*i.e.*, "in case of") denotes an attack without warning.

10  Yet, that is exactly the prerequisite the County's policy demands of applicants in order to

11  establish "good cause" for a CCW.

12           The only interest furthered by generally denying CCWs to capable, law-abiding citizens,

13  like Plaintiffs, on the sole basis they do not provide the County with evidence documenting a

14  specific threat, is to limit the amount of CCWs issued in San Diego in attempts to advance public

15  safety.  "To be a compelling interest, the State must show that the alleged objective was the

16  legislature's 'actual purpose' for the classification, and the legislature must have had a strong

17  basis in evidence to support that justification before it implements the classification." *Shaw v.*

18  *Hunt*, 517 U.S. 899, 908 n. 4 (1996) (citation omitted) (citing *Miss. Univ. for Women v. Hogan*,

19  458 U.S. 718 (1932)).  Given that a "strong basis in evidence" is required and the County

20  provided none, and that a constitutional right is not based on "empirical evidence," which can be

21  manipulated to justify anything, reducing the amount of CCWs is not a compelling interest.  And,

22  as mentioned above, limiting the amount of CCWs issued in an attempt to affect public safety

23  would be to engage in the type of interest-balancing test that *Heller* expressly rejected. *See Heller*,

24  128 S. Ct. at 2821. Finally, even if reducing the number of CCWs issued were shown to advance

25  public safety, the general bar to those, like Plaintiffs, without evidence documenting specific

26  threats against them is not narrowly tailored because such is irrelevant as to whether a given

27  individual makes the public more or less safe by having a CCW.

28  / / /

1    All responsible, law-abiding persons are equally entitled to bear arms for self-defense on

2    equal terms. Any classification that deprives individuals of the right to bear arms and that goes

3    beyond filtering dangerous or incompetent individuals, as does the County's "good cause" policy,

4    violates the Equal Protection Clause.

5         2.    **The County's Preferential Treatment of Honorary Deputy Sheriff's Association Members in Issuing CCWs Violates Plaintiff's Rights to**

6              **Equal Protection**

7              a.    **Similarly Situated; Treated Differently**

8    Though all responsible, law-abiding persons are entitled to exercise their rights to bear

9    Arms by carrying a handgun for self-defense, many opt not to.  Those who choose to, and thus

10   seek a CCW to do so lawfully, do so for one or more of several different reasons. Some have been

11   victims of crime or know someone who has, others are engaged in activity that makes them an

12   appealing target to criminals, while others live in an unsafe environment or simply do not feel

13   safe without having ready access to a firearm. Though there are many reasons for wanting to carry

14   a handgun for self-defense, some people have very similar reasons. Some even have similar

15   circumstances underlying their desire to do so.  This is the case with Plaintiffs and certain

16   members of the HDSA who received CCWs from the County.  All Plaintiffs sought a CCW from

17   the County for self-defense purposes, but were denied or, in the cases of Plaintiffs Laxson and

18   Dodd decided not to apply, because they were dissuaded at their initial interview and/or could not

19   satisfy the requirements of County's unlawful policy. (SUF 17). Curiously, certain HDSA

20   members were granted CCWs by the County despite failing to provide such documentation. For

21   example, in the "good cause" section of their applications, some HDSA members merely stated

22   "personal protection" or "protection" *without further explanation or supporting documentation*.

23   SUF 18.  One HDSA member simply stated "personal protection– public figure," without

24   providing *any* supportive documentation. SUF 19 And, in perhaps the most egregious case, one

25   member did not even provide a statement of "good cause" in his application. SUF 20.  Further,

26   multiple HDSA members were issued a CCW by the County for "business reasons" who failed to

27   provide *any* supporting documentation SUF 21.  In fact, one such application simply stated

28   "personal safety, carry large sums of money," and another said he is retired but he needs to

1 | accompany his employees to the bank; again, *neither* providing *any* supportive documentation.

2 | SUF 22.

3 |     The individual circumstances of these HDSA members who were issued CCWs

4 | demonstrates they are treated more favorably by the County than were Plaintiffs as to the issuance

5 | of CCWs; and, notes made by employees of the County who process CCW applications as to

6 | these particular individuals further support this position. SUF 23.  Finally, the account of events

7 | related by Plaintiff Mark Cleary as to his process of obtaining a CCW leaves no doubt that the

8 | County treats HDSA members differently than the members of the general public. SUF 24.

9 |     By these actions, the County has created a classification of persons (*i.e.*, non-members of

10 | the HDSA) who, despite having reasons for wanting a CCW similar to others who were issued

11 | one by the County, are deprived of a fundamental right (*i.e.*, the right to bear arms) because of

12 | their lack of membership in a civilian organization whose primary purpose is to finance projects

13 | for the San Diego Sheriff's Department. SUF 25.  There is no rational basis for this disparate

14 | treatment.

### b.    The County Cannot Justify Its Different Treatment of HDSA Members from Plaintiffs

Defendants can offer no rational basis to justify their disparate treatment of HDSA

members and the general public, let alone an *important or compelling* interest.  *See Guillory v.*

*County of Orange*, 731 F.2d 1379, 1383 (9th Cir. 1984) (A case involving a challenge alleging

disparate treatment in issuing CCWs where the court explained: "A law that is administered so as

to unjustly discriminate between persons similarly situated may deny equal protection," citing

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

HDSA is a private, *civilian* organization, membership in which does not alone make one

more capable or trustworthy with a CCW than non-members, such as Plaintiffs. Membership is

achieved by mere sponsorship by a current member or active deputy, providing three letters of

reference, passing a background check, making a "donation" and paying annual dues.  And,

although a background check is required, the California Penal Code already requires one for CCW

applicants. SUF 26.  Thus, there is nothing inherently or rationally different about HDSA

1  members versus non-HDSA members that would warrant disparate treatment.

2      Regardless, the County holds HDSA members to different, much more lenient standards

3  than the general public, including Plaintiffs, when issuing CCWs.  In fact, not one single HDSA

4  member who, while in good standing, has sought a CCW from the County from 2006 to the

5  present has been denied, while 18 non-members have been denied and an unknown number of

6  others decided not to formally apply based on their initial interview or failure to satisfy the

7  County's strict "good cause" requirement applicable to the general public. SUF 27.

8      Not only is there no compelling or important interest furthered by the County's disparate

9  treatment of HDSA members versus the general public, there is no rational basis for such

10  treatment either. Such treatment constitutes the type of unjust discrimination prohibited by the

11  standards set forth in *Guillory* and *Yick Wo*.  By depriving Plaintiffs of the same access to a CCW

12  as HDSA members have received, the County unjustly and irrationally discriminated, and

13  continues to discriminate, against Plaintiffs, violating their rights to equal protection under the

14  law.  And, even if membership in the HDSA is not the basis for the County's disparate treatment

15  of CCW applicants (despite the overwhelming evidence indicating that it is), the fact remains the

16  same that some people are issued a CCW while similarly situated persons are not.  Regardless of

17  County's (apparently highly inappropriate) motives in electing to favor members of the HDSA

18  regarding the issuance of CCWs, the County's disparate treatment of similarly situated

19  individuals nonetheless violates Plaintiffs' rights to equal protection under the law.

20                              **CONCLUSION**

21      The County's unilateral and arbitrary policy and practices of rejecting self-defense as

22  sufficient "good cause" to issue a CCW, favoring applicants who can document County-approved

23  circumstances that make them a specific threat, and giving preferential treatment to HDSA

24  members are unconstitutional and have caused injury, and continue to cause injury, to Plaintiffs

25  by depriving them the fundamental right to publicly carry a handgun for self-defense, core

26  conduct protected by the Second Amendment.

27      Because State law requires Plaintiffs, for all practical purposes, to procure a CCW in order

28  to lawfully carry a handgun in public for self-defense, and because the County has either denied

the individual Plaintiffs a CCW or the County's policies render Plaintiffs, or their supporters, ineligible for a CCW for the purpose of self-defense – the core of the Second Amendment right – Plaintiffs are entitled to permanent injunctive and declaratory relief enjoining the County's policy and practices.

Finally, Plaintiffs would like to clarify the extent of the relief they seek with this Motion. As set forth *supra*, Plaintiffs do not claim a right to publicly carry handguns in a concealed manner *per se*, only a right to carry handguns in a manner specified by the Legislature, which, in California, is licensed, concealed carry.

As well, Plaintiffs' Second Claim for Relief (Equal Protection) seeks relief for three separate types of conduct, but only two of which are at issue in this Motion: 1) Defendant Gore's preferential treatment of politically connected persons in issuing CCWs; and 2) the County's express policy of refusing issuance of CCWs to applicants who cannot document circumstances that make them a specific target. Each of these is a separate violation of the Equal Protection Clause for which Plaintiffs respectfully request relief from this Court.

Because the County cannot justify its infringements on Plaintiffs' Constitutional rights, this Court should grant Plaintiff's Motion for Partial Summary Judgment in its entirety.

Date: September 3, 2010                         **MICHEL & ASSOCIATES, P.C.**

                                                / s /C.D. Michel
                                                C.D. Michel
                                                E-mail:cmichel@michellawyers.com
                                                Counsel for Plaintiffs

Date: September 3, 2010                         **PAUL NEUHARTH, JR., APC**

                                                / s /Paul Neuharth
                                                Paul Neuharth, Attorney at Law
                                                Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

EDWARD PERUTA, MICHELLE ) **CASE NO. 09-CV-2371 IEG (BGS)**
LAXSON, JAMES DODD, DR. )
LESLIE BUNCHER, MARK ) **CERTIFICATE OF SERVICE**
CLEARY, and CALIFORNIA RIFLE )
AND PISTOL ASSOCIATION )
FOUNDATION )
)
                Plaintiffs, )
)
        v. )
)
COUNTY OF SAN DIEGO, )
WILLIAM D. GORE, )
INDIVIDUALLY AND IN HIS )
CAPACITY AS SHERIFF, )
)
                Defendants. )
_____ )

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

James M. Chapin                      Paul Neuharth, Jr. (State Bar #147073)
County of San Diego                  PAUL NEUHARTH, JR., APC
Office of County Counsel             1140 Union Street, Suite 102
1600 Pacific Highway                 San Diego, CA 92101
Room 355                             Telephone:    (619) 231-0401
San Diego, CA 92101-2469             Facsimile:    (619) 231-8759
(619) 531-5244                       pneuharth@sbcglobal.net
Fax: (619-531-6005
james.chapin@sdcounty.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 3, 2010.

_____                       /s/  C.D. Michel
                                            _____
                                            C. D. Michel
                                            Attorney for Plaintiffs