Exhibit A

Neil R. O'Hanlon, SBN 67018
Hogan Lovells US LLP
999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
E-mail: neil.ohanlon@hoganlovells.com

Adam K. Levin
Tracy L. Hresko
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059
E-Mail: jlowy@bradymail.org

Counsel for *Amicus Curiae*
Brady Center to Prevent Gun Violence

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,<br><br>Defendants. | **CASE NO: 09-CV-2371 IEG**<br><br>**BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE**<br><br>Hearing Date: November 1, 2010<br>Time: 10:30 a.m.<br>Courtroom: 1<br>Honorable Irma E. Gonzales |

1

# TABLE OF CONTENTS

2

Page

3   TABLE OF AUTHORITIES .................................................................................... ii

4   INTRODUCTION ............................................................................................... 1

5   INTEREST OF *AMICUS* ...................................................................................... 2

6   LEGAL BACKGROUND ..................................................................................... 2

7   ARGUMENT ....................................................................................................... 5

8   I.      THE PERMITTING PROCESS IN SECTION 12050 DOES NOT
           IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY .............................. 5
9

10          A.      The Concealed Weapons Permitting Process at Issue Here Does
                   Not Implicate Protected Second Amendment Activity Because it
                   Does Not Impact The Right to Possess Firearms in The Home
11                 Protected in *Heller* and *McDonald* ........................................................ 5

12          B.      The Second Amendment Right Should Not Be Extended to
                   Prevent Communities from Restricting or Prohibiting Carrying
13                 Guns in Public ............................................................................................ 10

14  II.     EVEN IF THE CONCEALED WEAPONS PERMITTING PROCESS IN
           SECTION 12050 DID IMPLICATE PROTECTED SECOND
15          AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE
           APPROPRIATE LEVEL OF SCRUTINY ................................................................ 12
16
            A.      The Reasonable Regulation Test is the Appropriate Standard
17                 of Review ..................................................................................................... 13

18                  1.      Law enforcement officials should be afforded an
                           appropriate amount of discretion in enforcing firearm
19                         regulations ........................................................................................ 16

20                  2.      Given the governmental interest in protecting the public
                           from the harms associated with firearms, deference to
21                         legislative directives is appropriate ................................................. 17

22          B.      The Concealed Weapons Permitting Process at Issue Is
                   Constitutionally Permissible ....................................................................... 18
23
    CONCLUSION ..................................................................................................... 20
24

25

26

27

28

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

1

**TABLE OF AUTHORITIES**

2

Page

3   CASES:

4   *Agricultural Prorate Commission v. Superior Court in and for
      Los Angeles County*, 55 P.2d 495 (Cal. 1936) ........................................... 7

5

6   *Andrews v. State*, 50 Tenn. 165 (1871) ........................................... 9

7   *Aymette v. State*, 21 Tenn. 154 (1840) ........................................... 10

8   *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216 (N.H. 2007) ........................................... 15, 16

9   *Bliss v. Commonwealth*, 12 Ky. 90 (1822) ........................................... 10

10  *Commonwealth v. Robinson*, 600 A.2d 957 (1991) ........................................... 12

11  *Commonwealth v. Romero*, 673 A.2d 374 (1996) ........................................... 12

12  *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ........................................... 18

13  *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) ........................................... *passim*

14  *Dorr v. Weber*, 2010 WL 1976743 (N.D. Iowa May 18, 2010) ........................................... 8

15  *English v. State*, 35 Tex. 473 (1871) ........................................... 9

16  *Ex parte Thomas*, 97 P. 260 (Okla. 1908) ........................................... 10

17  *Fife v. State*, 31 Ark. 455 (1876) ........................................... 9

18  *Gonzales v. Oregon*, 546 U.S. 243 (2006) ........................................... 18, 20

19  *Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977
      (E.D. Wis. May 11, 2010) ........................................... 8

20  *Harman v. Pollock*, 586 F.3d 1254 (10th Cir. 2009) ........................................... 17

21  *Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) ........................................... *passim*

22  *Hill v. State*, 53 Ga. 472 (1874) ........................................... 9

23  *In re Bastiani*, 881 N.Y.S.2d 591 (2008) ........................................... 9

24  *In re Factor*, 2010 WL 1753307 (N.J. Sup. Ct. Apr. 21, 2010) ........................................... 9

25  *Jackson v. State*, 68 So.2d 850 (Ala. Ct. App. 1953) ........................................... 15, 16

26  *Kelley v. Johnson*, 425 U.S. 238 (1976) ........................................... 18

27  *Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008) ........................................... *passim*

28  *Mathews v. Eldridge*, 424 U.S. 319 (1976) ........................................... 14

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

7

1    *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)..............................................*passim*

2    *People v. Dawson*, 2010 WL 3290998 (Ill. App. Ct. Aug. 18, 2010) ...............................8

3    *People v. Dykes*, 209 P.3d 1 (2009)...........................................................................7

4    *People v. Flores*, 169 Cal. App. 4th 568 (2008)......................................................7, 20

5    *People v. Yarbrough*, 169 Cal. App. 4th 303 (2008)....................................................11

6    *People v. Zonver*, 132 Cal. App. 3d Supp. 1 (1982)....................................................13

7    *Planned Parenthood v. Casey*, 505 U.S. 833 (1992)...................................................14

8    *Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80 (1946) ...............................................18

9    *Radenich*, 2009 WL 127648 (N.D. Ind. 2009) ...........................................................20

10    *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ....................................................18

11    *Riddick v. U.S.*, 995 A.2d 212 (D.C. 2010) ................................................................9

12    *Robertson v. Baldwin*, 165 U.S. 275 (1897) ........................................................2, 4, 8

13    *Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) ......................15, 16

14    *Schultz*, 2009 WL 35225 (N.D. Ind. 2009) ...............................................................20

15    *Sims v. U.S.*, 963 A.2d 147 (D.C. 2008) ......................................................................9

16    *State v. Buzzard*, 4 Ark. 18 (1842)..........................................................................10

17    *State v. Cole*, 665 N.W. 328 (Wis. 2003) ............................................................15, 19

18    *State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ........................................................15

19    *State v. Dawson*, 159 S.E.2d 1 (N.C. 1968)..........................................................8, 15

20    *State v. Hamdan*, 665 N.W.2d 785 (Wis. 2002) ........................................................15

21    *State v. Jumel*, 13 La. Ann. 399 (1858) ...................................................................10

22    *State v. Knight*, 218 P.3d 1177 (Kan. Ct. App. 2009).....................................................8

23    *State v. Sieyes*, 225 P.3d 995 (Wash. 2010).............................................................20

24    *State v. Workman*, 35 W. Va. 367 (1891) ................................................................10

25    *Teng v. Town of Kensingson*, 2010 WL 596526 (D. N.H. Feb. 17, 2010) .........................8

26    *Terry v. Ohio*, 392 U.S. 1 (1968) .......................................................................13, 14

27    *Trinen v. City of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) .......................................15

28    *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)................................................18

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

iii

8

1    *United States v. Bledsoe*, 2008 WL 3538717 (W.D. Tex. 2008)................................16, 20

2    *United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah).......................................20

3    *United States  v. Hart*, 2010 WL 2990001 (D. Mass. July 30, 2010)..........................8

4    *United States v. Hayes*, 129 S. Ct. 1079 (2009).......................................................4

5    *United States v. Marzzarella*, --- F.3d ---, 2010 WL 2947233 (3rd Cir. 2010)..................5, 16, 20

6    *United States v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009)...........................20

7    *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)..........................................20

8    *United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ...................16, 18, 20

9    *United States v. Skoien*, --- F.3d ---, 2010 WL 2735747 (7th Cir. 2010) ....................5

10   *United States v. Tooley*, 2010 WL 2380878 (S.D.W.Va. June 14, 2010) ......................9

11   *United States v. Walker*, 380 A.2d 1388 (D.C. 1977)..................................................11

12   *United States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. 2010)...............................20

13   *Young v. American Mini Theatres, Inc.*, 427 U.S 50 (1976) ......................................18

14   STATUTES:

15   18 U.S.C. § 922...........................................................................................................16

16   18 U.S.C. § 922(g)(9) ..................................................................................................4

17   1876 Wyo. Comp. Laws ch. 52, § 1 (1876).................................................................9

18   Ark. Act of Apr. 1, 1881.............................................................................................9

19   CAL. PENAL CODE § 12026(b) .....................................................................................13

20   CAL. PENAL CODE § 12031(a)(5)..................................................................................12

21   CAL. PENAL CODE § 12050 .................................................................................*passim*

22   Tex. Act of Apr. 12, 1871............................................................................................9

23   CONSTITUTIONAL PROVISIONS:

24   Ky. Const. of 1850, Article XIII, § 25 ......................................................................10

25   OTHER AUTHORITIES:

26   Adam Winkler, *Scrutinizing the Second Amendment*,
27        105 Mich. L. Rev. 683 (2007) .............................................................................14

28   Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession
     and Gun Assault*, AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1 (Nov. 2009).........12

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*9*

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009) ................................................................10

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) ........................................13

Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996) ...................19

D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009)..................................................................................19

D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001) ...............................................................................19

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904)......................10

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443 (2009)........................................................................15

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 Cont. L.J. 259 (1874) .............................................................10

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)....................................10

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868) ............................................................................................10

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?*, 59 SYRACUSE L. REV. 225 (2008) .....................................................................10

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379 (2006)........................................................................................13

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009)....................................12

Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009 ...........................................11, 17

Webster, *et al.*, *Relationship Between Licensing*, at 184..................................................19

Weil & Knox, *Effects of Limiting Handgun Purchases*, at 1759.................................................19

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

v

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.   128 S. Ct. 2783 (2008).   Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.   While the Supreme Court has held that the Second Amendment protects a limited right to possess a gun *in the home* for self-defense, the Court has never recognized a far broader right to carry guns in public places, which would subject the public-at-large to those grave risks. On the contrary, *Heller* found that prohibitions on concealed carrying are in line with permissible gun laws, *Heller*, 128 S. Ct. at 2816, and did not disturb the Court's ruling from over a century ago that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).

Nor has the Court stated that concealed carrying can only be banned (or restricted) if open carrying is allowed.   In *Heller* and *McDonald v. City of Chicago*, the Court had ample opportunity to announce a right to carry in public, or to question the continuing validity of *Robertson*. *See McDonald*, 130 S. Ct. 3020 (2010); *Heller*, 128 S. Ct. 2783.   After all, the Court did not limit itself to the constitutionality of the D.C. law at issue, but expounded at length on the limited nature of the Second Amendment right.   Yet it repeatedly stated its holding as bound to the home.   Numerous courts, from the 19th century to post-*Heller* and *McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns – especially concealed handguns – in public.   It would be unprecedented and unwise, therefore, to hold that the Constitution bars states and communities from choosing to keep guns out of public places, or – as California has done – from allowing those tasked with protecting public safety to determine whether individuals have "good cause" to bring hidden handguns into public spaces.   There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily activities, be subjected to the risks of gun carrying.   And there never has been.

An extension of the Second Amendment to deny law enforcement the authority to determine who has "good cause" to carry guns in public would run counter to *Heller* and *McDonald's* "assurances" that "reasonable firearms regulations" will remain permissible, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 128 S. Ct at 2816-17, 2871 & n. 26.  California's law governing the carrying of concealed weapons – California Penal Code Section 12050 – is precisely such a reasonable regulation.

The permitting process of Section 12050 does not implicate protected Second Amendment activity and even if it did, requiring a showing of "good cause" as a condition to issuing a concealed weapons is a reasonable, justified, and permissible exercise of the state's police powers.   While Plaintiffs may disagree with Section 12050, their recourse is through the legislative process, not the judiciary.  This Court is obligated to uphold legislation where there is a reasonable basis to do so; it should not usurp the functions of the Legislature and local law enforcement by declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down a law that so plainly satisfies the state's interest in protecting public safety.

### INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws. *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

### LEGAL BACKGROUND

Recent Supreme Court Second Amendment Jurisprudence:  In *Heller*, the Supreme Court recognized an individual right to keep and bear arms in the home for the purpose of self-defense. 128 S. Ct. at 2818.  While the Court could have simply decided whether the District's handgun

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*12*

1   ban was unconstitutional, it went out of its way to assure courts that its holding did not "cast

2   doubt" on other gun laws – even approving of the constitutionality of a number of laws and then

3   making clear that "[w]e identify these presumptively lawful regulatory measures only as

4   examples; our list does not purport to be exhaustive." *Id.* at 2816-17, 2871 & n. 26. Moreover, in

5   approvingly discussing long-understood limitations on the right to keep and bear arms, the Court

6   specifically noted that "the majority of the 19th-century courts to consider the question held that

7   prohibitions on carrying concealed weapons were lawful under the Second Amendment or state

8   analogues." *Id.* at 2816. The Court thus reaffirmed – and certainly did not disturb – its ruling in

9   *Robertson v. Baldwin* that "the right of the people to keep and bear arms (article 2) is not

10   infringed by laws prohibiting the carrying of concealed weapons." 17 S. Ct. at 326.

11   Nor did the Court in *Heller* state that concealed carry bans could only be permissible if

12   open carrying of guns in public were allowed. Rather, the Court repeatedly referenced the home

13   in its holding. And the Court made clear that "carry" did not imply "outside the home," as the

14   Court ultimately held that "[a]ssuming that Heller is not disqualified from the exercise of Second

15   Amendment rights, the District must permit him to register his handgun and must issue him a

16   license *to carry it in the home*." 128 S. Ct. at 2822 (emphasis added).[1]

17   In *McDonald*, the Court incorporated the Second Amendment to the states, but also

18   "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and

19   agreed that "state and local experimentation with reasonable firearms regulation will continue

20   under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted). Once again, the

21   Court did not extend the Second Amendment right outside the home.

22   The Open Question: Standard of Review: Neither *Heller* nor *McDonald* articulated a

23   standard of review for Second Amendment challenges, though the Court in *Heller* explicitly

24   rejected the "rational basis" test and implicitly rejected the "strict scrutiny test." *See Heller v.*

25   *District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (the "strict scrutiny

26

---

27   [1] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion
     in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of

28   18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of
     misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

- 3 -

1   standard of review would not square with the [*Heller*] majority's references to 'presumptively

2   lawful regulatory measures' . . . ."). The Court's reasoning also foreclosed any form of

3   heightened scrutiny that would require the government to ensure that firearms legislation has a

4   tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures

5   with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 130 S. Ct. at

6   2822, and listed as examples a host of "presumptively lawful" existing firearms regulations

7   without subjecting those laws to any such analysis. *Id.* at 2816-17 & n. 26.

8       *Heller* and *McDonald* thus left lower courts with the task of determining an appropriate

9   standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny,

10  "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable

11  firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes

12  for self-defense. As discussed below, the "reasonable regulation" test, overwhelmingly applied

13  by courts throughout the country construing right to keep and bear arms provisions in the states, is

14  the most appropriate standard of review for the California statute at issue here.

15      The Two-Pronged Approach: In the wake of *Heller* and its progeny, a number of courts

16  have begun to utilize a two-pronged approach to Second Amendment claims. *See, e.g.*, *United

17  States v. Skoien*, --- F.3d ---, 2010 WL 2735747 (7th Cir. 2010); *Heller II*, 698 F. Supp. 2d at 188;

18  *United States v. Marzzarella*, --- F.3d ---, 2010 WL 2947233 at *2 (3rd Cir. 2010). Under this

19  approach, courts ask: (1) does the law or regulation at issue implicate protected Second

20  Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny? *See, e.g.*,

21  *Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 2010 WL 2947233 at *2. If the challenged law or

22  regulation does not implicate protected Second Amendment activity, then the analysis ends and

23  the law is deemed constitutional. Even if the law implicates protected activity, however, it still

24  will be deemed constitutional if it passes muster under the appropriate level of scrutiny.

25  *Marzzarella*, 2010 WL 2947233 at *2.

26      This two-pronged approach represents an appropriate manner in which to approach the

27  issues presented by Second Amendment claims. *Amicus* advocates its use by this Court in

28  analyzing the constitutionality of California Penal Code Section 12050.

**ARGUMENT**

For at least two principal reasons, the firearms regulations in Section 12050 are constitutional.  First, the permitting process in Section 12050 does not implicate protected Second Amendment Activity.   Second, even if it did, Section 12050 is a reasonable regulation that furthers important governmental interests established by the California Legislature and the law enforcement community.

**I.    THE PERMITTING PROCESS IN SECTION 12050 DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.**

While this Court's January 14, 2010 Order denying Defendants' motion to dismiss found that the "good cause" requirement of Section 12050 "undoubtedly infringes Plaintiff's right to 'possess and carry weapons in case of confrontation,'" the decision was limited to determining whether Plaintiffs' claim was "plausible on its face."   Order Denying Defs.' Mot. to Dismiss (Jan. 14, 2010) [Dkt. No. 7] ("MTD Order") at 18, 12 (quoting *Heller*, 128 S. Ct. at 2797). *Amicus* respectfully suggests that, at this stage, the Court should use the two-prong approach to Second Amendment claims and hold that the permitting process in Section 12050 does not implicate protected Second Amendment activity because Plaintiffs have no general Second Amendment "right to 'possess and carry weapons in case of confrontation'" in public places.

**A.    The Concealed Weapons Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because it Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.**

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 128 S. Ct. at 2821 (emphasis added).  In the course of its lengthy majority opinion, the Court had ample opportunity to state that Mr. Heller had a right to carry guns in public.  However, it did not do so: the Court never recognized a right to carry guns in public.  The Court's holding only mentions Heller's right "*to carry* [] *in the home*," *id.* at 2822 (emphasis added), and does not mention the carrying of firearms in public at all.   *See id.*  The Court's opinion focuses on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 2810, and the continuing need to keep and use firearms "in defense

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*15*

1    of hearth and home." *Id.* at 2821. The Court's holding is specifically limited to the right to keep

2    firearms in the home: "[i]n sum, we hold that the District's ban on handgun possession *in the*

3    *home* violates the Second Amendment, as does its prohibition against rendering any lawful

4    firearm *in the home* operable for the purpose of immediate self-defense." *Id.* at 2821-22

5    (emphasis added).

6         Plaintiffs argue, essentially, that the *Heller* Court embraced a Constitutional right to carry

7    guns in public, but for some reason chose not to say so explicitly. Plaintiffs cannot explain why

8    Justice Scalia would be so explicit about the fact that the Second Amendment was "not

9    unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful," yet

10   leave his supposed ruling that the Second Amendment protected a right to carry guns in public

11   hidden, implicit, leaving courts to expand on its "confrontation" reference, if they wished. Nor

12   can Plaintiffs explain why the *Heller* Court expressly approved of decisions upholding concealed

13   carry bans, but chose not to state the flip-side that is crucial to Plaintiffs' argument -- that such

14   bans are (supposedly) only permissible if open carrying is allowed.

15        This Court should not reach for an interpretation of *Heller* as implicitly overruling

16   *Robertson*'s recognition that the Second Amendment does not protect a right to carry concealed

17   weapons – especially given *Heller*'s explicit embrace of concealed carry bans and its repeated

18   statements limiting its holding to the home. Lower courts "should uphold State regulation

19   whenever possible," *Agricultural Prorate Commission v. Superior Court in and for Los Angeles*

20   *County*, 55 P.2d 495, 509 (Cal. 1936), not expand a novel Constitutional right to strike down

21   democratically-enacted legislation.

22        In fact, California courts have refused to read *Heller* and *McDonald* as recognizing a right

23   to carry guns in public. In *People v. Dykes*, for instance, the California Supreme Court noted that:

24        The [*Heller*] court did not recognize a "right to keep and carry any weapon
          whatsoever in any manner whatsoever and for whatever purpose," observing that
25        historically, most courts have "held that prohibitions on carrying concealed
          weapons were lawful under the Second Amendment or state analogues." The high
26        court's decision in *Heller* does not require us to conclude that possession in a
          public place of a loaded, cocked, semiautomatic weapon with a chambered round,
27        concealed in a large glove and ready to fire, cannot be defined as a crime under
          state law.
28

                                                          BRIEF OF AMICUS CURIAE BRADY
                                                          CENTER TO PREVENT GUN VIOLENCE
                              - 6 -

*16*

209 P.3d 1, 44 (2009) (emphasis added) (internal citations omitted).  And in *People v. Flores*, 169

Cal.App.4th 568, 575 (2008), the California Supreme Court explicitly stated that, "[g]iven this

implicit approval of concealed firearm prohibitions, we cannot read *Heller* to have altered the

courts' longstanding understanding that such prohibitions are constitutional."

Other courts have held similarly that the Second Amendment, post-*Heller*, does not

protect a right to carry concealed weapons in public.  In *People v. Dawson*, the Illinois Court of

Appeals rejected arguments strikingly similar to Plaintiffs', and held:

> The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of "bear arms" including wearing or carrying upon the person or in clothing. Nor can the *Heller* majority's holding that the operative clause of the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" require heightened review of the AUUW statute's criminalization of the carrying of an uncased and loaded firearm.  As addressed above, *Heller specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home*, not the right to possess handguns outside of the home in case of confrontation-a fact the dissent heartily pointed out by noting that "[n]o party or *amicus* urged this interpretation; the Court appears to have fashioned it out of whole cloth." The *McDonald* Court refused to expand on this right, explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated.

2010 WL 3290998, *7 (Ill. App. Ct. Aug. 18, 2010) (internal citations omitted) (emphasis added).

Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality

of a statute," *id.* at *6, the *Dawson* Court rejected the contention that the Second Amendment

protects a broad right to carry that would invalidate Illinois's law.

The Kansas Court of Appeals also recognized that "[i]t is clear that the [*Heller*] Court was

drawing a narrow line regarding the violations related solely to use of a handgun in the home for

self-defense purposes. [The defendant's] argument, that *Heller* conferred on an individual the

right to carry a concealed firearm, is unpersuasive." *State v. Knight*, 218 P.3d 1177, 1189 (Kan.

Ct. App. 2009).

Other courts – both state and federal – have similarly held that the right recognized in

*Heller* and *McDonald* is confined to the home. *See, e.g.*, *Gonzalez v. Village of West Milwaukee*,

2010 WL 1904977, *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the

Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*,

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*17*

2010 WL 2990001, *3 (D. Mass. July 30, 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 2010 WL 1976743, *8 (N.D. Iowa May 18, 2010) (*Robertson* remains the law, and "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *Teng v. Town of Kensingson*, 2010 WL 596526 (D. N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright prohibition on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *Sims v. U.S.*, 963 A.2d 147, 150 (D.C. 2008) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."); *Riddick v. U.S.*, 995 A.2d 212, 222 (D.C. 2010) (same); *In re Factor*, 2010 WL 1753307, *3 (N.J. Sup. Ct. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *see also United States v. Tooley*, 2010 WL 2380878, *15 (S.D.W.Va. June 14, 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the "core" of the Second Amendment right as defined by *Heller.* "). And *In re Bastiani*, 881 N.Y.S.2d 591, 593 (2008), upheld New York's law that limited carrying to those permitted based on "special need," noting that "[r]easonable regulation of handgun possession survives the *Heller* decision."

Furthermore, this understanding of the Second Amendment (and its state analogues) as not protecting a general right to carry or a more particular right to carry concealed weapons has been recognized for well over a century. *See, e.g.*, 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); Ark. Act of Apr. 1, 1881; Tex. Act of Apr. 12, 1871; *Andrews v. State*, 50 Tenn. 165 (1871) (upholding statute forbidding any person to carry "publicly or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand" and relying on the state right-to-bear-arms provision, which it read *in pari*

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*18*

*materia* with the Second Amendment); *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *English v. State*, 35 Tex. 473, 473, 478 (1871); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—in the state Constitution of the "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowieknives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense."); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Jumel*, 13 La. Ann. 399, 400 (1858).[2]

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th century sources" commenting on the right to bear arms, 128 S. Ct. at 2812, stated that the right to keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868). Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3)*, 1 Cont. L.J. 259, 287 (1874). An authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons,"

---

[2] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this consistent precedent. *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). In fact, the Kentucky legislature later corrected the anomalous decision by amending the state constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

1  which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict

2  with the requirements of peace, order and security." Ernst Freund, *The Police Power, Public*

3  *Policy and Constitutional Rights* (1904).  Post-*Heller*, scholars continue to recognize the logic

4  behind limiting the right to the home.  *See, e.g.*, Darrell A.H. Miller, *Guns as Smut: Defending the*

5  *Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009); Michael C. Dorf, *Does*

6  *Heller Protect a Right to Carry Guns Outside the Home?*, 59 SYRACUSE L. REV. 225 (2008).

7       The concealed weapons permitting process at issue in this case does not meaningfully

8  impede on the ability of individuals to keep handguns in defense of their homes.  Instead, it only

9  governs the carrying of concealed weapons *in public*, a different issue entirely, and one that

10  neither the Supreme Court nor any other court has recognized as protected under the Second

11  Amendment.  As a result, the Court should not find that Plaintiffs are challenging protected

12  Second Amendment activity.

13      **B.**    **The Second Amendment Right Should Not Be Extended to Prevent**
           **Communities from Restricting or Prohibiting Carrying Guns in Public.**

14

15      There are profound public safety rationales for restricting guns in public, as California

  courts continue to recognize post-*Heller*:

16

17      Unlike possession of a gun for protection within a residence, carrying a concealed
    firearm presents a recognized threat to public order, and is prohibited as a means
    of preventing physical harm to persons other than the offender.  A person who

18      carries a concealed firearm on his person or in a vehicle, which permits him
    immediate access to the firearm but impedes others from detecting its presence,

19      poses an imminent threat to public safety. . . .

20  *People v. Yarbrough*, 169 Cal.App.4th 303, 314 (2008) (internal quotations and citations

21  omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an

22  "inherent risk of harm to the public of such dangerous instrumentality being carried about the

23  community and away from the residence or business of the possessor").  The carrying of firearms

24  in public – and the carrying of *concealed* weapons especially – pose a number of issues and

25  challenges not presented by the possession of firearms in the home.  Three issues, in particular,

26  are worthy of note.

27      First, when firearms are carried out of the home and into public, the safety of a broader

28  range of individuals is threatened.  While firearms kept in the home are primarily a threat to their

BRIEF OF AMICUS CURIAE BRADY<br>CENTER TO PREVENT GUN VIOLENCE

- 10 -

20

owners, family members, friends, and houseguests, firearms carried in public are a threat to strangers, law enforcement officers, random passersby, and other private citizens.  One study has shown that "[b]etween May 2007 and April 2009, concealed handgun permit holders shot and killed 7 law enforcement officers and 42 private citizens."   Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009.  States, therefore, have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals keeping guns in their homes.

Second, the carrying of firearms in public is not a useful or effective form of self-defense and, in fact, has been shown in a number of studies to *increase* the chances that one will fall victim to violent crime.  One study, for instance, found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not protect those who possessed them from being shot in an assault." Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.   Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults.   If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public has other negative implications for a number of social issues and societal ills that are not impacted by the private possession of handguns in the home.  When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*21*

1    reasonable suspicion to detain that individual for further investigation"). The California

2    legislature has similarly enacted Section 12031, which generally prohibits the carrying of loaded

3    firearms in public or in vehicles, and states that peace officers may arrest persons who they have

4    probable cause to believe are illegally carrying loaded guns. CAL. PEN. CODE §12031(a)(5). The

5    law was enacted out of "a growing concern over an increase in the carrying of loaded

6    firearms" and the dangers resulting "from either the use of such weapons or from violent

7    incidents arising from the mere presence of such armed individuals in public places." *People v.*

8    *Zonver*, 132 Cal.App.3d Supp.1, 5 (1982) (quoting Stats. 1967, ch. 960, § 6). Law enforcement's

9    ability to protect the public could be greatly restricted if officers were required to effectively

10   presume that a person carrying a firearm in public was doing so lawfully. Under such a legal

11   regime, it is possible that an officer would not be deemed to have cause to arrest, search, or even

12   engage in a *Terry* stop if she spotted a person carrying a loaded gun, even though far less risky

13   behavior could justify police intervention. Law enforcement should not have to wait for a gun to

14   be fired before protecting the public. Further, if drivers are allowed to carry loaded guns, road

15   rage can become a more serious and even potentially deadly phenomenon. David Hemenway,

16   *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14

17   (2002). And an increase in gun prevalence in public may cause an intensification of criminal

18   violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379,

19   387 (2006).

20       The concealed weapons permitting process at issue here prevents many of these risks to

21   the public, without implicating the Second Amendment activity protected in *Heller*. Individuals

22   in California who are not otherwise disqualified by operation of law and who can demonstrate

23   that they can possess and use firearms responsibly are allowed to maintain handguns to protect

24   themselves in the home. *See* CAL. PENAL CODE *§* 12026(b). The law simply provides no basis

25   for expanding that right to the carrying of concealed weapons in public.

26   **II.     EVEN IF THE CONCEALED WEAPONS PERMITTING PROCESS IN SECTION**

27   **12050 DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.**

28       In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*22*

not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence: strict scrutiny, intermediate scrutiny, or rational basis review. While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, an appropriate choice. The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech. While "words can never hurt me," guns are designed to inflict grievous injury and death – and often do. To protect the public from the risks of gun violence – unlike the significantly more modest risks posed by free speech – states must be allowed wide latitude in exercising their police power authority. Otherwise, the exercise of Second Amendment rights could infringe on the most fundamental rights of others – the preservation of life.

The Supreme Court, moreover, has not limited itself to these three levels of scrutiny in the past, but has instead fashioned a wide variety of standards of review that are tailored to specific constitutional inquiries.[3] For all these reasons, a standard of review specific to the Second Amendment context is warranted here, particularly given the Supreme Court's recognition that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety. To that end, *amicus* respectfully suggests that this Court apply the test that state courts throughout the country have crafted and utilized for over a century in construing the right to keep and bear arms under state constitutions: the "reasonable regulation" test.

## A.    The Reasonable Regulation Test is the Appropriate Standard of Review.

While courts are just beginning to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century. Over forty states have constitutional right-to-keep-and-bear-arms provisions, and despite significant

---

[3] *See, e.g., Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (applying an "undue burden" test to determine whether a statute jeopardized a woman's right to choose); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that determinations of procedural due process require a balancing of three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*23*

1   differences in the political backdrop, timing, and texts of these provisions, the courts in these

2   states have, with remarkable unanimity, coalesced around a single standard for reviewing

3   limitations on the right to bear arms:  the "reasonable regulation" test.  *See* Adam Winkler,

4   *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-87, n. 12 (2007) (describing

5   "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have

6   adopted the "reasonableness" standard of review for right-to-bear-arms cases).   Under the

7   reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under its

8   inherent police power so long as the exercise of that power is reasonable." *Robertson v. City &*

9   *County of Denver*, 874 P.2d 325, 328, 333 n. 10 (Colo. 1994).[4]  More demanding than rational

10  basis review, but more deferential than intermediate scrutiny, this "reasonable regulation" test

11  protects Second Amendment activity without unduly restricting states from protecting the public

12  from gun violence.  The test recognizes "the state's right, indeed its duty under its inherent police

13  power, to make reasonable regulations for the purpose of protecting the health, safety, and

14  welfare of the people."  *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).  The reasonable

15  regulation test, which was specifically designed for cases construing the right to keep and bear

16  arms and has been adopted by the vast majority of states, remains the standard of review best-

17  suited for Second Amendment cases after *Heller* and for the case at hand.

18         The reasonable regulation test is a more heightened form of scrutiny than the rational

19  basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest

20  balancing" test suggested by Justice Breyer in dissent) because it does not permit states to

21  prohibit all firearm ownership.  *See* Eugene Volokh, *Implementing the Right to Keep and Bear*

22  *Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW

23  REVIEW 1443, 1458 (2009).  Instead, it "focuses on the balance of the interests at stake, rather

24  than merely on whether any conceivable rationale exists under which the legislature may have

25  concluded the law could promote the public welfare." *State v. Cole*, 665 N.W. 2d 328, 338 (Wis.

26  ───────────────

27  [4] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the

28  constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power.").

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

- 14 -

24

1    2003).  Laws and regulations governing the use and possession of firearms thus must meet a

2    higher threshold under the reasonable regulation test than they would under rational basis review.

3         Although the reasonable regulation test may be more deferential than intermediate or strict

4    scrutiny, it is not toothless.  Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d

5    785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct.

6    App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v.*

7    *Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down.  Laws that are reasonably designed

8    to further public safety, by contrast, are upheld.  *See, e.g.*, *Robertson v. City & County of Denver*,

9    874 P.2d at 328, 330 n. 10 ("The state may regulate the exercise of [the] right [to bear arms]

10   under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68

11   So.2d at 852 (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d at 1223 (same).

12        Nor would adopting the reasonable regulation test here be at odds with district courts that

13   have elected to use intermediate scrutiny following *Heller*.  In virtually every post-*Heller* case

14   where a district court has adopted intermediate scrutiny, the court was evaluating a particular

15   provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad

16   classes of individuals and types of arms.  *See, e.g.*, *Marzzarella*, 2010 WL 2947233 at *1

17   (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United*

18   *States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5)

19   barring illegal aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162,

20   1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United*

21   *States v. Bledsoe*, 2008 WL 3538717, *1 (W.D. Tex. 2008) (evaluating § 922(x) barring juveniles

22   from possessing firearms). By contrast, Section 12050 involves a permitting process that relies on

23   *individual* determinations and law enforcement discretion, rather than broad categories.[5]  Courts

24   have always looked with a more wary eye on laws that impose restrictions on broad classes of

---

25   [5] The only exception appears to be a recent case in the United States District Court for the District

26   of Columbia, *Heller v. District of Columbia* ("*Heller II*"), in which the plaintiffs challenged (1)
     the District of Columbia's firearm registration procedures, (2) the District's prohibition on assault

27   weapons, and (3) the District's prohibition on large capacity ammunition feeding devices. 698 F.
     Supp. 2d 179, 181 (D.D.C. 2010).  But even in that case, two of the three provisions that the

28   district court was evaluating were broad restrictions on entire classes of firearms. *Id.*

25

1    people than laws that require individual determinations.  Heightened scrutiny – like intermediate

2    scrutiny – is less appropriate here.

3        The reasonable regulation test also has two particular strengths that intermediate scrutiny

4    does not: (1) it affords law enforcement officials the discretion they need to adequately enforce

5    handgun laws, and (2) it gives an appropriate amount of deference to legislative directives.

6                    **1.    Law enforcement officials should be afforded an appropriate amount
                             of discretion in enforcing firearm regulations.**
7

8        Local law enforcement officials are better situated to make determinations about who in

9    their communities can carry concealed weapons safely and responsibly than either courts or

10   juries.  Not only are they extensively trained in the proper and safe use of firearms, they are also

11   more likely to be familiar with the backgrounds and personalities of the members of their

12   communities than courts or juries situated miles (and perhaps even counties) away.  They are

13   uniquely situated to know, for instance, whether a man requesting a concealed weapons permit

14   previously has threatened his wife with violence (even if she, say, declined to testify against him

15   so he was not formally charged), or whether for other reasons an individual requesting a permit

16   would pose dangers if carrying weapons in public.  These are precisely the types of decisions that

17   need to be made in order to protect communities from firearm violence.[6]

18       Law enforcement officials also have a particular stake in who has and can carry firearms

19   in their communities.  Not only are law enforcement officials often tasked with enforcing state

20   and local firearms regulations, they are also charged with responding to situations involving

21   firearms and thus often suffer from the impacts of the irresponsible and criminal uses of firearms

22   in greater numbers than the general population.  Law enforcement officials are thus both uniquely

23   qualified to assess who in their communities possess the proper qualifications and need to carry

24   handguns and uniquely positioned to feel the effects of those decisions.  Courts, accordingly,

25   should afford them an appropriate degree of discretion is enforcing firearm regulations.  *See, e.g.,*

26   *Harman v. Pollock*, 586 F.3d 1254, 1265 (10th Cir. 2009) ("[Courts] must defer to trained law

27   [6] States that do *not* afford any discretion to law enforcement officials have issued handgun carry
28   permits to numerous individuals who have gone on to kill innocent civilians and law enforcement
     members.  *See* Violence Policy Center, *Private Citizens Killed by Concealed Handgun Permit
     Holders: May 2007 to the Present, available at* http:// www.vpc.org/ccwkillers.htm.

*26*

1    enforcement personnel, allowing officers to draw on their own experience and specialized

2    training to make inferences from and deductions about the cumulative information available to

3    them.").

4              2.       **Given the governmental interest in protecting the public from the**
                        **harms associated with firearms, deference to legislative directives is**

5                       **appropriate.**

6              There is a profound governmental interest in regulating the possession and use of

7    firearms.  States have "cardinal civil responsibilities" to protect the health, safety, and welfare of

8    their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside*

9    *Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the

10   chance that human life will be lost . . . .").  States are thus generally afforded "great latitude" in

11   exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and

12   quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations

13   omitted).  Regulations on the carrying of firearms are an essential exercise of those powers, for

14   the "promotion of safety of persons and property is unquestionably at the core of the State's

15   police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

16             While individuals and organizations may differ on the net risks posed by guns in our

17   society, such disagreement underlines that firearm regulation is best suited for the legislative

18   arena, not the courts.  *See Miller*, 604 F. Supp. 2d at 1172 n. 13 ("[D]ue to the intensity of public

19   opinion on guns, legislation is inevitably the result of hard-fought compromise in the political

20   branches.").  Indeed, legislatures are designed to make empirical judgments about the need for

21   and efficacy of regulation, even when that regulation affects the exercise of constitutional rights.

22   *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (state legislatures are "far

23   better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon

24   legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials,

25   by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well

26   qualified to make determinations of public good within their respective spheres of authority.")

27   (internal quotations and citations omitted).  State governments "must [thus] be allowed a

28   reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v.*

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

1    *American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

2         In fulfilling their responsibility to protect the public, states have enacted laws and

3    permitting regimes – like the one at issue here – to ensure that guns are used responsibly and

4    possessed by responsible, law-abiding persons.  These laws have helped reduce the use of guns in

5    crime and saved lives.  *See, e.g.*, D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller*

6    *Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y.

7    ACAD. OF MED. 525 (2009); D.W. Webster, *et al.*, *Relationship Between Licensing, Registration,*

8    *and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184

9    (2001); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate*

10   *Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996).  The risks posed by invalidating or

11   unduly restricting these legislative judgments on firearms regulations is severe, and courts should

12   review such legislative judgments with an appropriate amount of deference.  Here, too, therefore,

13   the reasonable regulation test is better situated than either intermediate or strict scrutiny to defer

14   to legislative judgments.   It allows for different permitting and concealed carry regimes

15   depending on the needs of the particular state or locale, and recognizes the strong interest of the

16   state in protecting its citizens rather than being overly focused on a narrow means-end nexus of

17   the challenged regulation.

18   **B.    The Concealed Weapons Permitting Process at Issue Is Constitutionally**
          **Permissible.**
19

20        California's concealed weapons permitting process passes the reasonable regulation test

21   and "demonstrate[s] the required 'fit' between the law and the interest served."  MTD Order at

22   12.  Courts have repeatedly found that there is a "compelling state interest in protecting the public

23   from the hazards involved with certain types of weapons, such as guns," *Cole*, 665 N.W. 2d at

24   344, particularly given "the danger [posed by the] widespread presence of weapons in public

25   places and [the need for] police protection against attack in these places."  *Id.* (internal quotations

26   omitted).

27        Indeed, as discussed above, there is strong sociological and statistical evidence which

28   suggests that permitting and registration procedures that make it more difficult for someone to

1  carry a gun in public reduce both the number of gun deaths and criminal access to firearms. *See,*

2  *e.g.,* Webster, *et al., Relationship Between Licensing,* at 184. Webster, *et al., Effects of State-*

3  *Level,* at 525; Weil & Knox, *Effects of Limiting Handgun Purchases,* at 1759. The Second

4  Amendment does not forbid state or local governments from using such protocols to achieve

5  these ends and both state and federal courts have upheld them for decades.

6      Moreover, California's concealed weapons permitting process is not an outright ban on

7  the possession or carrying of firearms and thus does not even approach the blanket prohibition on

8  handgun ownership that the Supreme Court struck down in *Heller. See Heller,* 128 S. Ct. at

9  2788. Instead, it merely requires individuals who wish to carry concealed firearms outside the

10 home to meet certain basic requirements and to have their request approved by local law

11 enforcement officials. *See* CAL. PENAL CODE § 12050. Those officials, in turn, review

12 applications to ensure that all the statutory requirements have been met. *See id.* This is a

13 perfectly reasonable process designed to ensure that individuals who carry concealed weapons

14 can do so responsibly. The California Legislature and the law enforcement community already

15 have decided that this is a reasonable way to protect public safety. The Court should not second-

16 guess those judgments, particularly for firearms activity that has never been recognized as a

17 Second Amendment right by any other court.

18      In sum, the California concealed weapons permitting process is both reasonable and not

19 unduly restrictive of an individuals' Second Amendment right to keep guns in their home. It is

20 thus a valid exercise of state's "police powers to legislate as to the protection of the lives, limb,

21 health, comfort, and quiet of all persons" and passes the reasonable regulation test.[7] *Gonzales v.*

22

23 [7] Section 12050 also would survive intermediate (or even strict) scrutiny were the Court to apply
that standard of review because it is substantially related to an important government interest.
24 Indeed, a number of courts have found that the protection of the public from firearm violence is
an important government interest, *see, e.g., Heller II,* 698 F. Supp. 2d at 186; *Miller,* 604
25 F.Supp.2d at 1171; *Bledsoe,* 2008 WL 3538717 at *4, and upheld statutes that impose much
broader restrictions on an individual's ability to possess and carry firearms. *See, e.g.,*
26 *Marzzarella,* 2010 WL 2947233 at *7; *Heller II,* 698 F. Supp. 2d at 197; *State v. Sieyes,* 225 P.3d
995, 995 (Wash. 2010); *United States v. Engstrum,* 609 F. Supp. 2d 1227, 1233 (D. Utah); *Yanez-*
27 *Vasquez,* 2010 WL 411112 at *3; *Miller,* 604 F.Supp.2d at 1171-72; *United States v. McCane,*
573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro,* 648 F. Supp. 2d 779, 789-
28 91 (E.D. Va. 2009); *Radenich,* 2009 WL 127648 (N.D. Ind. 2009); *Schultz,* 2009 WL 35225
(N.D. Ind. 2009); *Flores,* 169 Cal. App. 4th at 574-75; *Bledsoe,* 2008 WL 3538717 at *4.

29

1    *Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted).

2                               **CONCLUSION**

3        For all the foregoing reasons, the Court should find that Section 12050 is constitutional.

4

5    Dated: October 4, 2010                  Respectfully submitted,

6                               s/Neil O'Hanlon

7                               Neil R. O'Hanlon, SBN 67018
                                   Hogan Lovells US LLP

8                               1999 Avenue of the Stars, Suite 1400
                                   Los Angeles, CA 90067

9                               Telephone: (310) 785-4600
                                   Facsimile:  (310) 785-4601

10                             E-mail:  neil.ohanlon@hoganlovells.com

11                             Adam K. Levin
                                   Tracy L. Hresko

12                             Hogan Lovells US LLP
                                   555 13th Street, NW

13                             Washington, DC 20004
                                   Telephone: (202) 637-5600

14                             Facsimile: (202) 637-5910
                                   E-Mail:  adam.levin@hoganlovells.com

15                             Jonathan E. Lowy
                                   Daniel R. Vice

16                             Brady Center to Prevent Gun Violence
                                   Legal Action Project

17                             1225 Eye Street, NW, Suite 1100
                                   Washington, DC 20005

18

19                             Attorneys for *Amicus Curiae* Brady Center to
                                   Prevent Gun Violence

20

21

22

23

24

25

26

27

28

*30*