JOHN J. SANSONE, County Counsel
By JAMES M. CHAPIN, Senior Deputy (SBN 118530)
1600 Pacific Highway, Room 355
San Diego, CA 92101
Telephone: (619) 531-5244
james.chapin@sdcounty.ca.gov

Attorneys for Defendant William D. Gore

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF, <br><br> Defendants. | USSD No. **09-CV-2371 IEG (BLM)** <br><br> Hearing Date: November 1, 2010 <br> Time: 10:30 a.m. <br> Courtroom: 1 <br> Honorable Irma E. Gonzales |

**DEFENDANT WILLIAM D. GORE'S
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

1   Pursuant to Fed. R. Civ. P. 56(b), Defendant William D. Gore hereby moves this Court for

2   summary judgment on all claims in this matter, and opposes Plaintiffs' Motion for Partial Summary

3   Judgment.  The grounds and the reasons are set forth in this Memorandum of Points and Authorities.

4   The Memorandum also serves as Defendant's Opposition to Plaintiffs' Motion for Partial Summary

5   Judgment.  A Separate Statement of Undisputed Facts has been provided, as has Defendant's Opposition

6   to Plaintiffs' Separate Statement of Undisputed Facts.  The Court should grant summary judgment to

7   Defendant because the policies and practices of Defendant in implementing California Penal Code

8   section 12050 do not violate Plaintiffs' constitutional rights and are otherwise lawful.

9                                                          **I**

10                                            **INTRODUCTION**

11   Plaintiffs challenge the San Diego County Sheriff's implementation of the California statutes

12   governing the licensing of persons to carry loaded, concealed weapons in public.  (Penal Code §§

13   12050-12054.)  California law makes it a misdemeanor to carry a loaded, concealed weapon in public

14   places (Penal Code §§ 12025 and 12031), although numerous exceptions are contained in the relevant

15   Penal Code provisions.  Plaintiffs Peruta and Buncher allege that they were denied concealed carry

16   permits because they failed to establish "good cause" as defined by Defendant; Plaintiff Cleary alleges

17   that he was initially denied a permit, but appealed the decision and the permit was granted; Plaintiffs

18   Dodd and Laxson allege they did not apply for permits because they were told they would not meet the

19   "good cause" requirement and decided not to pursue the permit.  Plaintiff Peruta further alleges that he

20   was denied because he did not meet the residency requirement of the statute as interpreted by Defendant.

21   The Plaintiff Association alleges that it has members who are County residents who have been denied

22   permits for lack of good cause or have been told that they would not meet the good cause requirement.

23   The First Amended Complaint challenges California Penal Code section 12050 facially and as

24   applied by Defendant on grounds pursuant to the Second Amendment, the Equal Protection Clause, the

25   Privileges and Immunities Clause, Procedural Due Process and the constitutional right to travel.  The

26   allegations are focused on the "good cause" and "residency" requirements of Penal Code section 12050.

27   ///

28   ///

## II

## FACTUAL BACKGROUND

**A.     California Law**.

Penal Code section 12050(a)(1) provides in relevant part:

> (A)   The sheriff of a county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying satisfies any one of the conditions specified in subparagraph (D) and has completed a course of training as described in subparagraph (E), may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats:

>> (i)     A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

> . . . .

> (D)   For the purpose of subparagraph (A), the applicant shall satisfy any one of the following:

>> (i)     Is a resident of the county or a city within the county.

>> (ii)    Spends a substantial period of time in the applicant's principal place of employment or business in the county or a city within the county.

The licensing statute authorizes a procedure for a limited number of persons who meet the statutory criteria to be excepted from California's prohibition on the concealed carry of firearms.[1] "Section 12050 gives 'extremely broad discretion' to the sheriff concerning the issuance of concealed weapons licenses." *Gifford v. City of Los Angeles*, 88 Cal. App. 4th 801, 805 (2001) quoting *Nichols v. County of Santa Clara*, 223 Cal. App. 3d 1236, 1241 (1990), and "explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements." *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir. 1982.)  This discretion must be exercised in each individual case.  "It is the duty of the sheriff to make such an investigation and determination, on an individual basis, on every application under section 12050." *Salute v. Pitchess*, 61 Cal. App. 3d 557, 560-561 (1976).

///

---

[1] Penal Code section 12025(a) states "A person is guilty of carrying a concealed firearm when he or she does any of the following:  (1) Carries concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable of being concealed upon the person. (2) Carries concealed upon his or her person any pistol, revolver, or other firearm capable of being concealed upon the person. (3) Causes to be carried concealed within any vehicle in which he or she is an occupant any pistol, revolver, or other firearm capable of being concealed upon the person."

**B.      San Diego County Licensing Program.**

Under the statutory framework, the San Diego County Sheriff administers the licensing program for all of San Diego County with the concurrence of all police chiefs in the County as members of the Police Chiefs and Sheriffs Association.  (Pelowitz Decl. ¶¶ 2, 6.)  The Sheriff has delegated to the License Division, under the Law Enforcement Service Bureau, the sole responsibility for all regulatory licensing, including the processing of all carry concealed weapon (CCW) licenses in the County of San Diego.  Blanca Pelowitz, as the Manager of the License Division, has been the Sheriff's authorized representative for reviewing CCW applications and making the final determination for the issuance of all CCW licenses since 2002.  (Pelowitz Decl. ¶¶ 1-2.)

California is a "may issue" state, meaning that law enforcement officials are given discretion to grant or deny a permit based on a number of statutory factors.  "Shall issue" states, in contrast, require the issuance of a permit to anyone who meets certain minimum requirements (e.g., that the applicant is eligible to possess firearms).  Penal Code §§12050-12054 set forth the general criteria that applicants for concealed weapons licenses must meet in this state.  Applicants must be of good moral character, be a resident of or spend substantial time in the County in which they apply, demonstrate good cause and take a firearms course.  The long-standing policy of this Sheriff is generally to approve applications unless the applicant does not meet residency requirements, has had numerous negative law enforcement contacts or is on probation of any sort, or cannot demonstrate good cause.  There are currently 1,223 active CCW licenses in San Diego County.  (Pelowitz Decl. ¶ 6.)

**1.      The Application Process**.

In 1999, AB2022 standardized the CCW license application process statewide.  In 2006, as a courtesy to applicants, the Department initiated an interview process to assist applicants and staff in determining pre-eligibility and to avoid applicants having to pay application fees and firearms safety course fees when they would not qualify for the license.  The interview is voluntary and any person may submit an application without the assistance offered by the interview.  Based on what the applicant outlines during the interview, the information will assist staff in determining what documentation may be required.  Counter clerks are permitted to offer an educated guess based on the scenarios described by applicants.  After the interview, applicants will typically gather their documentation, attend the firearms

09-CV-2371 IEG (BGS)

1   course and return to submit the written application, fees, and documentation.  Applicants are then

2   fingerprinted, photographed and instructed to go to the Sheriff's range to have their weapons safety

3   checked and to complete a final qualify-shoot.  The file and all documents are forwarded to the

4   Background Unit for the comprehensive background and verification process.  Investigators prepare

5   notifications to other law enforcement agencies throughout the County or State for input, clear weapons

6   through AFS (automated firearms systems), conduct a local criminal history check, DMV check, wait

7   for fingerprint results and DOJ firearms eligibility, conduct residence verifications, verify character

8   reference letters and verify documents.  (Pelowitz Decl. ¶ 11.)

9          Once everything has been received and verified, the investigator will provide a recommendation

10   to issue or recommend disapproval and forward to the Manager for final review.  During the final

11   review, the Manager will review the entire application packet, supporting documents, reasons, and

12   results of the background investigation, and will make the decision to issue or deny and will include any

13   reasonable restrictions and/or instructions to staff.  The applicant will be contacted to complete the

14   process and receive the license.  (Pelowitz Decl. ¶ 11.)

15          All renewals must also comply with the 4-hour firearms course and must to go to the Sheriff's

16   range for a qualify-shoot and firearm safety inspection.  Renewals are issued absent any negative law

17   enforcement contacts, crime cases, arrests and if there no

18   changes from the initial application as to the reasons and if supporting documentation is provided.

19   (Pelowitz Decl. ¶ 12.)

20          There are no provisions in the Penal Code for an appeal process involving administrative action

21   from the issuing agency.  The Sheriff's Department in 1998-99 implemented the

22   administrative/reconsideration process for CCW applicants.  When taking administrative action to deny,

23   suspend or revoke a CCW license, an upper command concurrence through the Law Enforcement

24   Service Bureau is required before taking action.  The individual is given the opportunity to request an

25   appeal of the decision by writing to the Assistant Sheriff of the Law Enforcement Service Bureau.  The

26   appeal is heard by the Assistant Sheriff of the Bureau who will make the determination to overturn or

27   uphold the decision.  (Pelowitz Decl. ¶¶ 11-14.)

28   ///

### 2.     The Good Cause Requirement.

"Good cause" under Penal Code section 12050 is defined by this County to be a set of circumstances that distinguish the applicant from other members of the general public and causes him or her to be placed in harm's way.  Generalized fear for one's personal safety is not, standing alone, considered good cause.  Good cause is evaluated on an individual basis and applicants will generally fall into one of the four categories originally set by Judge Huffman in 1987:  (1) protected law enforcement personnel which includes  active and retired reserves, federal agents, police department evidence technicians, Deputy District Attorneys, etc.; (2) personal protection which includes persons with documented threats, restraining orders, and other related situations where an applicant can demonstrate that he or she is a specific target presently at risk of harm; (3) security/investigative personnel which includes plain clothes security, private investigators, private patrol operators, bail bondsmen, etc.; (4) business owners/employees which includes any high risk business or occupation which places an individual at risk of harm.  All new applicants must provide supporting documentation.  If applying for business purposes, proof they are a legitimate and fully credentialed business is required as well as having to demonstrate and elaborate good cause for carrying a firearm; if for specific personal protection, the required documentation may include restraining orders or letters from law enforcement agencies or other persons in order to document the specific threat.  (Pelowitz Decl. ¶¶ 3, 7.)

### 3.     The Residency Requirement.

Residency under Penal Code section 12050 is generally defined by this County to include a person who maintains a permanent residence in the County, or spends more than six months of the taxable year within the County if the applicant claims dual residency.  San Diego County uses the term "resident" as set forth in Penal Code section 12050(D), not "domicile."  Part-time residents who spend less than six months in the County or otherwise fall within section 12050(D)(ii) are considered on a case-by-case basis and CCW licenses have been issued to part-time residents.  (Pelowitz Decl. ¶ 8.)

### C.     Plaintiffs' Claims.

### 1.     Edward Peruta.

Edward Peruta alleges that he was denied a license to carry a concealed weapon by the Sheriff's Department because he was not a resident of San Diego County and because he did not demonstrate

good cause.  In his declaration submitted in support of Plaintiffs' Motion for Partial Summary Judgment,
he states that his need for a CCW license is not different from anyone else's need for a CCW license.
(Peruta Decl. ¶ 6.)  He states that he provided as good cause "the protection of myself and my wife from
criminal attack, because we spend substantial amounts of time in our motor home, often in remote areas,
and we often carry large sums of cash and valuables in the motor-home."  He also states that his work
"gathering breaking news and conducting legal investigations often requires me to enter dangerous
locations." (Peruta Decl. ¶ 9.)  He does not state that he provided any documentation supporting his
"good cause" statement.

Peruta's CCW license application was denied solely because he provided no documentation
supporting his statement of "good cause."  Residency was not a factor in the denial.  In addition, his
alleged "business" is not licensed to do business in the State of California.  (Plaintiffs' Exhibit G;
Pelowitz Decl. ¶17.)  Peruta made no effort to provide supporting documentation, the only document he
provided was a photograph of a sign from a mobile home park.  (Defendant's Exhibit 1.)

### 2.    Michelle Laxson.

Michelle Laxson did not apply for a CCW license.  She was interviewed by line staff, but after a
discussion, she stated that she probably wouldn't qualify for license.  She did not return.

### 3.    James Dodd.

James Dodd applied for a license and the application is pending.

### 4.    Mark Cleary.

Mark Cleary's license was renewed after the appeal of his denial, when the hearing officer was
able to verify his employment.  He had not previously provided verification of employment to the staff.

### 5.    Leslie Buncher.

Leslie Buncher's application was denied because he is retired.

### III

### THE SECOND AMENDMENT DOES NOT ENCOMPASS A
### RIGHT TO CARRY A LOADED CONCEALED WEAPON IN PUBLIC

Plaintiffs' primary challenge is based on a claim that the Sheriff's policies and procedures violate
the Second Amendment.  In *District of Columbia v. Heller*, 554 U.S. 570 (128 S. Ct. 2783, 2788; 171

L.Ed.2d 637) (2008), the United States Supreme Court held that the Second Amendment protects an individual's right to possess firearms in the home for self-defense and that the city's total ban on handguns, as well as its requirement that firearms in the home be kept nonfunctional even when necessary for self-defense, violated that right.  However, the *Heller* decision does not affect the constitutionality of Penal Code sections 12025(a) or 12050.  Plaintiffs challenge the concealed carry permit statue without challenging the Penal Code sections regulating the carrying of concealed and loaded firearms.  Penal Code sections 12025(a) and 12031(a) have been upheld in California against a Second Amendment challenge after *Heller*.  *People v. Flores*, 169 Cal. App. 4th 568, 575-576 (2008); *People v. Yarbrough*, 169 Cal. App. 4th 303, 312-314. (2008).

In *People v. Yarbrough*, the defendant was convicted of violating Penal Code section 12025(a)(2), for carrying a concealed weapon on residential property that was fully accessible to the public.  Noting *Heller* had "specifically expressed constitutional approval of the accepted statutory proscriptions against carrying concealed weapons," (*People v. Yarbrough* at p. 314), *Yarbrough* held:

> we find nothing in Penal Code section 12025, subdivision (a), that violates the limited right of the individual established in *Heller* to possess and carry weapons in case of confrontation. Section 12025, subdivision (a), does not broadly prohibit or even regulate the possession of a gun in the home for lawful purposes of confrontation or self-defense, as did the law declared constitutionally infirmed in *Heller*. Rather, section 12025, subdivision (a), in much more limited fashion, specifically defines as unlawful carrying concealed within a vehicle or "concealed upon his or her person any pistol, revolver, or other firearm capable of being concealed upon the person." Further, carrying a firearm concealed on the person or in a vehicle in violation of section 12025, subdivision (a), is not in the nature of a common use of a gun for lawful purposes which the court declared to be protected by the Second Amendment in *Heller*. (See *People v. Wasley* (1966) 245 Cal.App.2d 383, 386.) Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized "threat to public order," and is "'prohibited as a means of preventing physical harm to persons other than the offender.' [Citation.]" (*People v. Hale* (1974) 43 Cal.App.3d 353, 356.) A person who carries a concealed firearm on his person or in a vehicle, "which permits him immediate access to the firearm but impedes others from detecting its presence, poses an 'imminent threat to public safety … .' [Citation.]" (*People v. Hodges*, *supra*, 70 Cal.App.4th 1348, 1357.)

*Id.* at 313-314.

*People v. Flores* affirmed convictions under sections 12025 and 12031 in the face of a *Heller* challenge.  With regard to the section 12031 conviction, the Court in *Flores* reasoned:

> Section 12031 prohibits a person from "carr[ying] a loaded firearm on his or her person . . . while in any public place or on any public street." [Citation.]. The statute contains numerous exceptions. There are exceptions for security guards (*id.*, subd.

(d)), police officers and retired police officers (*id.*, subd. (b)(1) & (2)), private investigators (*id.*, subd. (d)(3)), members of the military (*id.*, subd. (b)(4)), hunters (*id.*, subd. (i)), target shooters (id., subd. (b)(5)), persons engaged in 'lawful business' who possess a loaded firearm on business premises and persons who possess a loaded firearm on their own private property (*id.*, subd. (h)).  A person otherwise authorized to carry a firearm is also permitted to carry a loaded firearm in a public place if the person 'reasonably believes that the person or property of himself or herself or of another is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property.'  (*Id.*, subd. (j)(1).)  Another exception is made for a person who 'reasonably believes that he or she is in grave danger because of circumstances forming the basis of a current restraining order issued by a court against another person or persons who has or have been found to pose a threat to his or her life or safety.'  (*Id.*, subd. (j)(2).)  Finally, the statute makes clear that '[n]othing in this section shall prevent any person from having a loaded weapon, if it is otherwise lawful, at his or her place of residence, including any temporary residence or campsite.'  (*Id.*, subd. (l).)

*People v. Flores*, 169 Cal. App. 4th at p 576.

"This wealth of exceptions creates a stark contrast between section 12031 and the District of Columbia statutes at issue in *Heller*.  In particular, given the exceptions for self-defense (both inside and outside the home), there can be no claim that section 12031 in any way precludes the use 'of handguns held and used for self-defense in the home.' [Citation.]  Instead, section 12031 is narrowly tailored to reduce the incidence of unlawful *public* shootings, while at the same time respecting the need for persons to have access to firearms for lawful purposes, including self-defense.  [Citation.]  Consequently, section 12031 does not burden the core Second Amendment right announced in *Heller* – the right of law-abiding, responsible citizens to use arms in defense of hearth and home – to any significant degree."  *People v. Flores*, 169 Cal .App. 4th at pp. 576-577, fn. omitted; *accord People v. Villa*, 178 Cal. App. 4th 443, 450  (2009).

Rather than challenge sections 12025 and 12031, Plaintiffs instead press their challenge to the concealed weapons "licensing" statute by claiming that the Sheriff must accept as "good cause" for the purpose of Penal Code section 12050 the constitutional "right to keep and bear arms" under the Second Amendment.  In essence, Plaintiffs are asking this Court to strike the "good cause" language from the statute on the theory that *Heller* provides that everyone has a constitutional right to carry a concealed weapon in public.  There is no such constitutional right.  *Heller* does not support Plaintiffs' position nor has any court so held since *Heller.  See e.g.*, *Dorr v. Weber*, 2010 U.S. Dist. LEXIS 48950 (N. D. Iowa, 2010).

1    In *Heller*, the Supreme Court considered "whether a District of Columbia prohibition on the

2    possession of usable handguns *in the home* violates the Second Amendment to the Constitution." *Id.* at

3    2787-88.  A majority of the court held "that the District's ban on handgun possession *in the home*

4    violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the

5    home operable for the purpose of immediate self-defense." *Heller*, 554 U.S. at ___; 171 L.Ed.2d at 683

6    (italics added).

7    The court emphasized that "the right secured by the Second Amendment is not unlimited.  From

8    Blackstone through the 19th-century cases, commentators and courts routinely explained that the right

9    [to keep and bear arms] was not a right to keep and carry any weapon whatsoever in any manner

10   whatsoever and for whatever purpose." *Id.* at ___; 171 L.Ed.2d at 678.  Thus, the Court has specifically

11   stated that "core right" embodied in the Second Amendment *does not include the right to keep and carry*

12   *in any manner*.

13   Although the Court declined to adopt a level of scrutiny to be imposed upon laws regulating the

14   "core" Second Amendment right it identified or specify the limitations the government may place on an

15   individual's right to possess firearms in public, a nonexclusive list of the many "presumptively lawful

16   regulatory measures" was enumerated.  *Heller* at 171 L.Ed.2d at 678, n. 26 ("We identify these

17   presumptively lawful regulatory measures only as example; our list does not purport to be exhaustive.")

18   The court declared:

19          [T]he majority of the 19th-century courts to consider the question held that
             *prohibitions on carrying concealed weapons were lawful* under the Second
20          Amendment or state analogues. [Citations.] Although we do not undertake an
             exhaustive historical analysis today of the full scope of the Second Amendment,
21          nothing in our opinion should be taken to cast doubt on longstanding prohibitions on
             the possession of firearms by felons and the mentally ill, or laws forbidding the
22          carrying of firearms in sensitive places such as schools and government buildings, or
             laws imposing conditions and qualifications on the commercial sale of arms. [¶] We
23          also recognize another important limitation on the right to keep and carry arms.  *Miller*
             said, as we have explained, that the sorts of weapons protected were those "in
24          common use at the time."  [(*United States v. Miller* (1939) 307 U.S. 174, 179 [83 L.
             Ed. 1206, 59 S. Ct. 816].)]  We think that limitation is fairly supported by the
25          historical tradition of prohibiting the carrying of "dangerous and unusual weapons."
             [Citations.]

26

27          *Heller*, at 554 U.S. at ___ ; 171 L.Ed.2d at 678–679 (fn. omitted, italics added).

28   ///

Penal Code section 12050 does not regulate the possession of a gun in the home for lawful purposes of confrontation or self-defense, as did the law declared unconstitutional in *Heller*. Rather, it involves the licensing of persons in the context of the regulation of the carrying of concealed weapons in public places. Further, carrying a firearm concealed on the person or in a vehicle is not in the nature of a common use of a gun for lawful purposes which the court declared to be protected by the Second Amendment in *Heller*. Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized "threat to public order," and is "'prohibited as a means of preventing physical harm to persons other than the offender.' [Citation.]" *People v. Hale*, 43 Cal. App. 3d 353, 356 (1974). A person who carries a concealed firearm on his person or in a vehicle, "which permits him immediate access to the firearm but impedes others from detecting its presence, poses an 'imminent threat to public safety ….' [Citation.]" *People v. Hodges*, 70 Cal. App. 4th 1348, 1357 (1999). (See also Declaration of Franklin Zimring.)

Rather than cast any doubt upon the continued constitutional validity of concealed weapons bans, the *Heller* opinion expressed apparent constitutional approval of the historically accepted statutory proscriptions against carrying concealed weapons. *Heller*, 554 U.S. ___; 171 L.Ed.2d at 678. Thus, in the aftermath of *Heller*, the prohibition "on the carrying of a concealed weapon without a permit, continues to be a lawful exercise by the state of its regulatory authority notwithstanding the Second Amendment." *United States v. Hall* (S.D.W.Va., Aug. 4, 2008, No. 2:08-00006) 2008 U.S.Dist. Lexis 59641, *3; *People v. Yarbrough*, 169 Cal. App. 4th at 309.

The Court's recognition in *Heller* that prohibitions on carrying concealed weapons were lawful was in full accord with long-standing Supreme Court precedent. Over a century ago, in *Robertson v. Baldwin*, the Supreme Court recognized that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons" *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897). The Ninth Circuit in the now-vacated *Nordyke* panel opinion, *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), rejected a challenge to a county ordinance prohibiting possession of firearms on county property, finding that the law "does not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it." *Cf. United States v. Masciandaro*, 684 F.Supp. 2d 779, (E.D. Va. 2009) ("*[H]eller's*

1    narrow holding is explicitly limited to vindicating the Second Amendment 'right of law-abiding,

2    responsible citizens to use arms in defense *of hearth and home*.'") (emphasis in original).

3        Here, California law does not impede the ability of individuals to defend themselves with

4    firearms in their homes.  Accordingly, a right to carry a concealed weapon in public under the Second

5    Amendment has not been recognized and California's regulation of both concealed carry of firearms and

6    carry of loaded firearms in public do not infringe on the Second Amendment "core right" that has been

7    held to be fundamental by the Supreme Court.  The Sheriff's policies and practices in limiting concealed

8    carry *licensing* to individuals with specifically identifiable and documented needs for concealed carry

9    have no impact on the Second Amendment's core right of self-defense.

10                                                **IV**

11                              **THE SHERIFF'S LICENSING PRACTICES**
                               **MEET ANY STANDARD OF SCRUTINY**
12

13       Even if this Court finds that the core right to keep and bear arms under the Second Amendment

14   is infringed and that *Heller's* narrow holding does not reach or decide the issue in this case, the Sheriff's

15   implementation of the licensing statute withstands any level constitutional scrutiny -- strict scrutiny,

16   intermediate scrutiny, or "undue burden."  In this respect, strict scrutiny requires that a statute or

17   regulation "be narrowly tailored to serve a compelling governmental interest" in order to survive a

18   constitutional challenge.  *Abrams v. Johnson*, 521 U.S. 74, 91 (1997).  Intermediate scrutiny requires

19   that the challenged statute or regulation "be substantially related to an important governmental

20   objective."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  Finally, a statute or regulation survives an "undue

21   burden" analysis where it does not have the "'purpose or effect [of] plac[ing] a substantial obstacle in

22   the path'" of the individual seeking to engage in constitutionally protected conduct.  *Gonzales v.*

23   *Carhart*, 550 U.S. 124, 146 (2007) (quoting *Planned Parenthood of Southeastern Penn. v. Casey*, 505

24   U.S. 833, 878 (1992)).

25       Regardless of the level of constitutional scrutiny, Plaintiffs' as-applied challenge fails.  The

26   governmental interest furthered by Penal Code sections 12025, 12031 and 12050 as administered by

27   Defendant -- the safety of the public from unknown persons carrying concealed, loaded firearms -- is

28   both important and compelling.  (Zimring Declaration.)  In addition, the Penal Code provisions are

                                    11                        09-CV-2371 IEG (BGS)

narrowly tailored and substantially related to furthering public safety.  The reach of the statutes, which

encompass only public carry, along with the numerous enumerated exceptions which allow for keeping

and bearing arms for self-defense in a host of circumstances, do not interfere with any conception of

Second Amendment rights as announced in *Heller*, "to use arms in defense of hearth and home." *Heller*,

128 S. Ct. at 2821.

**A. Strict Scrutiny is not the Appropriate Standard.**

Plaintiffs argue that the Second Amendment guarantees a "fundamental right," hence "strict

scrutiny" should apply.  While the Supreme Court in *McDonald v. City of Chicago*, __ U.S. __, 130

S.Ct. 3020 (2010), has now held that the Second Amendment right to keep and bear arms is a

fundamental right that is applicable to the States, that decision did not extend the Court's interpretation

of the core right set forth in *Heller*.

The Supreme Court expressly declined to establish what standard of review was appropriate in

Second Amendment cases, only ruling out "rational basis" review.  *Heller*, 128 S. Ct. at 2817–18 &

n.27; *See also*, *e.g.*, *United States v. Miller*, 604 F.Supp.2d 1162, 1170 (W.D. Tenn. 2009).  The

Supreme Court found that many traditional types of firearm regulation would pass muster but did not

establish the standard to be used.  *Heller*, 128 S. Ct. at 2816-17 & n. 26.  As Justice Breyer noted in

dissent, strict scrutiny apparently was rejected by the majority:

> Respondent proposes that the Court adopt a "strict scrutiny" test, which would require
> reviewing with care each gun law to determine whether it is "narrowly tailored to
> achieve a compelling governmental interest."  But the majority implicitly, and
> appropriately, rejects that suggestion by broadly approving a set of laws—prohibitions
> on concealed weapons, forfeiture by criminals of the Second Amendment right,
> prohibitions on firearms in certain locales, and governmental regulation of commercial
> firearm sales—whose constitutionality under a strict scrutiny standard would be far
> from clear.

*Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting) (citations omitted).

Justice Breyer comments further on the strict scrutiny standard:

> Indeed, adoption of a true strict-scrutiny standard for evaluating gun regulations would
> be impossible. That is because almost every gun-control regulation will seek to
> advance (as the one here does) a "primary concern of every government--a concern for
> the safety and indeed the lives of its citizens."  [citation.]  The Court has deemed that
> interest, as well as "the Government's general interest in preventing crime," to be
> "compelling," [citation.], and the Court has in a wide" variety of constitutional
> contexts found such public-safety concerns sufficiently forceful to justify restrictions

1   on individual liberties, see *e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (*per*
2   *curiam*) (First Amendment free speech rights); *Sherbert v. Verner*, 374 U.S. 398, 403
    (1963) (First Amendment religious rights); *Brigham City v. Stuart*, 547 U.S. 398, 403–
3   404 (2006) (Fourth Amendment protection of the home); *New York v. Quarles*, 467
    U.S. 649, 655 (1984) (Fifth Amendment rights under *Miranda v. Arizona*, 384 U.S.
4   436 (1966)); *Salerno, supra*, at 755 (Eighth Amendment bail rights).  Thus, any
    attempt *in theory* to apply strict scrutiny to gun regulations will *in practice* turn into an
5   interest-balancing inquiry, with the interests protected by the Second Amendment on
    one side and the governmental public-safety concerns on the other, the only question
6   being whether the regulation at issue impermissibly burdens the former in the course
    of advancing the latter.

7   *Heller*, 128 S. Ct. at 2851-2852 (Breyer, J., dissenting) (extended citations omitted).

8         In addition, *Heller's* list of "presumptively lawful regulatory measures" points persuasively to

9   rejection of strict scrutiny.  *Id.* at 2817 n.26.  Unlike a home or other private property, where the "need

10  for defense of self, family, and property is most acute," the need to carry a concealed firearm in public

11  places is not nearly so dire.  "Even in jurisdictions that have declared the right to keep and bear arms to

12  be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a

13  reasonableness test . . . ."  *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004) (citing cases).

14        All incorporated rights may be fundamental, but not all incorporated rights trigger strict scrutiny.

15  *See generally*, Adam Winkler, *Fundamentally Wrong About Fundamental Rights*, 23 Const. Comment

16  227 (2006).  For instance, strict scrutiny is not always applied to restrictions on free speech and the free

17  exercise of religion.  *Id.*  It thus would not necessarily follow that strict scrutiny is always (or even

18  usually) proper under the Second Amendment, even if the right it protects is fundamental.  As one court

19  has explained, the constitutional text is subject to a rule of reason because the common law right to self-

20  defense is subject to that rule.  *Benjamin v. Bailey*, 662 A.2d 1226, 1232–35 (Conn. 1995).

21        State courts interpreting right-to-bear-arms provisions in state constitutions have uniformly

22  applied a deferential reasonableness standard, in decisions going back decades.  It does not appear that

23  any state's courts apply strict scrutiny or another type of heightened review to firearms laws.  Winkler,

24  *Scrutinizing the Second Amendment*, 105 Mich.L.Rev. 683, 686–87 (2007) (fn. 7:  "hundreds of

25  opinions" by state supreme courts with "surprisingly little variation" that have adopted the

26  "reasonableness" standard of review for right-to-bear-arms cases); *See, e.g., Bleiler v. Chief, Dover*

27  *Police Dep't.*, 927 A.2d 1216, 1222 (N.H. 2007) ("We agree with every other state court that has

28  considered the issue: strict scrutiny is not the proper test to apply" and "the New Hampshire state

1  constitutional right to bear arms 'is not absolute and may be subject to restriction and regulation.'")

2  (quoting *State v. Smith*, 571 A.2d 279, 281 (N.H. 1990)); *Mosby*, 851 A.2d at 1044 (strict scrutiny not

3  appropriate; "the right to possess a handgun, whether a fundamental liberty interest or not, is not

4  absolute and subject to reasonable regulation."); *State v. Cole*, 665 N.W.2d 328, 337 (Wis. 2003)

5  (applying reasonableness test)  ("If this court were to utilize a strict scrutiny standard, Wisconsin would

6  be the only state to do so."); *Robertson v. City & County of Denver*, 874 P.2d 325, 331 (Colo. 1994) (*en

7  banc*) (strict scrutiny not appropriate; "The right to bear arms may be regulated by the state under its

8  police power in a reasonable manner."); *Cf. McIntosh v. Washington*, 395 A.2d 744, 756 (D.C. 1978)

9  ("The Supreme Court has indicated that dangerous or deleterious devices or products are the proper

10  subject of regulatory measures adopted in the exercise of a state's 'police powers.'") (citations omitted).

11      It appears that only one federal or state decision reached after *Heller* has applied strict scrutiny –

12  where the Defendant was in possession of a firearm in his own home -- but it still upheld the challenged

13  regulation.  *See United States v. Engstrum*, 609 F.Supp.2d 1227, 1231 (D.Utah 2009) (applying strict

14  scrutiny, but rejecting challenge to federal statute prohibiting possession of firearms by those with

15  domestic violence convictions).  The Sheriff's practices here have no regulatory effect on guns in the

16  home and do not rise to the level of burdening fundamental rights that would require strict scrutiny.

17  **B.    The Sheriff's Interpretation of Good Cause is Most Appropriately Subject to "Reasonableness" Review.**

18

19      Under a "reasonable regulation" standard of review, a firearm regulation should be upheld where

20  the regulation or law does not interfere with the "core right" the Second Amendment protects by

21  depriving the people of reasonable means to defend themselves in their homes.  Even where a

22  fundamental right is involved, the correct test is "whether or not the restriction upon the carrying of

23  concealed weapons is a reasonable exercise of the State's inherent police powers.  Such a test should not

24  be mistaken for a rational basis test.  The explicit grant of a fundamental right to bear arms clearly

25  requires something more, because the right must not be allowed to become illusory."  *State v. Cole*, 665

26  N.W.2d at 338; *see also*, *State v.Reid*, 1 Ala. 612 (1840); *Benjamin v. Bailey*, 662 A.2d at 1234; *State v.

27  Ricehill*, 415 N.W.2d 481, 483 (N.D. 1987); *State v. McAdams*, 714 P.2d 1236, 1237 (Wyo. 1986).

28  ///

"The protections of the Second Amendment are subject to the same sort of *reasonable restrictions* that have been recognized as limiting, for instance, the First Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007) (emphasis added) (*citing Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "[R]easonable regulations" of firearms "promote the government's interest in public safety consistent with our common law tradition.  Just as importantly, however, they do not impair the core conduct upon which the right was premised." *Id.*  The rights protected by the Bill of Rights have "from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897). There can be little question that preventing crime and promoting public safety are important government goals.  *See, e.g., Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 252, 264 (1984).

State courts interpreting right-to-bear-arms provisions in state constitutions have uniformly applied a deferential reasonableness standard.  Winkler, *Scrutinizing the Second Amendment*, 105 Mich.L.Rev. 683, 686–87 (2007).  The deference due to legislative judgments inherent in reasonableness review is particularly appropriate given the intensity of views about gun control. As one court explained:

> [M]ost legislation will assert broad safety concerns and broad gun control measures to match, covering both 'good' and 'bad' gun possessors and 'good' and 'bad' guns.  Such legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns.  [D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches.  To expect such legislation to reflect a tight fit between ends and means is unrealistic.

*United States v. Miller*, 604 F.Supp.2d at 1172 n.13 (quotation marks and citations omitted).

The Second Amendment must leave the judgment of whether and how to regulate firearms to the legislature, not the judiciary.  *Heller* at 128 S. Ct at 2817.  In reviewing the constitutionality of a statute, "courts must accord substantial deference to the predictive judgments" of the legislature.  *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)).  Such deference is due because the legislature "'is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon' legislative questions." *Id.* (quoting *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331, n.12 (1985)); *see also Gonzalez v. Carhart*, 550 U.S. 124, 163–64 (2007) (legislature should receive deference in absence of expert consensus).  "Even in the realm of First Amendment questions . . . deference must be accorded to

1  [the legislature's] findings as to the harm to be avoided and to the remedial measures adopted for that

2  end . . . ."  *Turner*, 520 U.S. at 665.  "Local officials, by virtue of their proximity to, and their expertise

3  with, local affairs, are exceptionally well qualified to make determinations of public good 'within their

4  respective spheres of authority.'"  *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) (quoting

5  *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 244 (1984)).

6       Moreover, *Heller's* apparent approval of traditional concealed weapons bans and the Court's

7  earlier pronouncement in *Robertson* in 1897 provide further support for rejecting more heightened

8  scrutiny standards, as carrying a concealed, loaded weapon presents the sort of compelling safety risk

9  more adequately resolved by legislation than judicial *ipse dixit*.  (See Zimring Declaration.)

10       California's regulation of public carry of concealed firearms embodies a strong and long-held

11  legislative interest in protecting public safety and reducing crime, and the efforts of the Sheriff in

12  limiting concealed carry to those persons with unique and specific needs consist of reasonable regulation

13  of firearms that have little impact on the "right to keep and bear arms" as so far articulated by the

14  Supreme Court.

15       **C.    Intermediate Scrutiny**.

16       At most, intermediate scrutiny would be appropriate.  To survive intermediate scrutiny, the

17  challenged provision must be substantially related to the achievement of important government interests.

18  *Craig v. Boren*, 429 U.S. 190, 197 (1976); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724

19  (1982); *See also Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("To withstand intermediate scrutiny, a

20  statutory classification must be substantially related to an important government objective.").

21       Some courts have applied intermediate scrutiny in cases after *Heller*.  In *Heller v. D.C.,* 698 F.

22  Supp 2d 179 D.C. Cir 2010) (*Heller II*), it was applied because the firearms registration required the

23  registration of guns for possession *in the home* which clearly touched upon the core right identified by

24  *Heller*.  In *U.S. v. Miller* 604 F. Supp. 2d 1162 (W.D. Tenn 2009), the defendant challenged a penal

25  statute relating to possession of a firearm *in the home* by a felon.  *See also, U.S. v. Schultz*, 2009 U.S.

26  Dist. LEXIS 234 (N.D. Ind. Jan 5 2009); *U.S. v. Radencich, 2009 WL 12648 (N.D. Ind. Jan 20, 2009).*

27  In *U.S. v. Marzzarella*, 595 F. Supp. 2d 596 (W.D. Pa. 2009) the defendant challenged an indictment for

28  possessing a firearm with an obliterated serial number *in his home*.  In *U.S. v. Walker*, 2010 WL

1640340 (E.D. Va 2010) and *U.S. v. Tooley*, 2010 WL 2842915 (S.D.W.Va. May 4, 2010), defendants challenged charges for possessing a firearm *in the home* after having been previously convicted of domestic violence.  In all cases, the regulations were upheld.

Thus, the cases which have adopted intermediate scrutiny have been those where the "core right" of possession in the home is in some way infringed.  That is not the case here where there is no effect on possession in the home.

In any event, maintaining public safety and preventing crime are clearly important (if not paramount) government interests and the regulation of concealed firearms is a critical factor in accomplishing that interest.  (Zimring Declaration; Argument IV D below.)  *See, e.g.*, *Salerno*, 481 U.S. at 750; *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power . . . ."); *People v. Yarbrough*, 169 Cal. App. 4th 303, 312-314. (2008).

**D.    The Sheriff's Licensing Practices Survive Any Standard of Review.**

The governmental interest furthered by limiting the licensing of concealed carry of firearms is both important and compelling.  (Zimring Declaration.)  The relevant Penal Code provisions are narrowly tailored and substantially related to furthering public safety and reducing crime.  Concealed handguns are the priority of law enforcement everywhere because of the use of the concealed handgun in vast numbers of criminal offenses.  (Zimring Declaration.)  Concealed carry of handguns allows for stealth and surprise.  Limiting the number of loaded and concealed firearms in public places helps to keep the balance in favor of law enforcement and avoids the necessity for every place that is open to the public – restaurants, malls, theaters, parks, etc.-- to be equipped with metal detectors, fencing and other forms of security, in order to protect patrons from the fear of widespread and unchecked concealed firearms.

Numerous courts have discussed the need for firearm regulation and the need for imposing restrictions on their use:

> [A]ccidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or, as the legislature pointed out, the danger of a police officer stopping a car with a loaded weapon on the passenger seat. [T]hus, otherwise "innocent" motivations may transform into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression. [T]he

underlying activity of possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable, regardless of the intent of the bearer since it may lead to the endangerment of public safety. [A]ccess to a loaded weapon on a public street creates a volatile situation vulnerable to spontaneous lethal aggression in the event of road rage or any other disagreement or dispute. The prevention of the potential metamorphosis of such "innocent" behavior into criminal conduct is rationally related to the purpose of the statute, which is to enhance public safety. Because the legislature has a compelling interest in preventing the possession of guns in public under any such circumstances, the statute is reasonably related to the legislature's purpose of "mak[ing] communities in this state safer and more secure for their inhabitants."

*People v. Marin*, 795 N.E.2d 953, 958–59 (Ill. App. 2003)(citations omitted); *See also Marshall v. Walker*, 958 F.Supp. 359, 365 (N.D. Ill. 1997) (individuals should be able to walk in public "without apprehension of or danger from violence which develops from unauthorized carrying of firearms and the policy of the statute to conserve and maintain public peace on sidewalks and streets within the cities . . .") (quoting *People v. West*, 422 N.E.2d 943, 945 (Ill.App. 1981)).

The concept of protection of the public peace is a fundamental competing right that appears consistently in all similar firearm regulation. "The possession and use of weapons inherently dangerous to human life constitutes a sufficient hazard to society to call for prohibition unless there appears appropriate justification created by special circumstances." *People v. Price*, 873 N.E.2d 453, 460 (Ill. App. 2007) (quoting 720 ILL. COMP. STAT. ANN. 5/24, Committee Comments—1961, at 7 (2003); *People v. Smythe*, 817 N.E.2d 1100, 1103–1104 (2004) ("this statute was designed to prevent the situation where one has a loaded weapon that is immediately accessible, and thus can use it at a moment's notice and place other unsuspecting citizens in harm's way.")

In *Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009)(now vacated for reconsideration), a Ninth Circuit panel rejected a Second Amendment *Heller* challenge to a county ordinance broader than the regulation at issue in this case. *Nordyke* upheld an ordinance banning all possession of weapons or ammunition on county property because county property includes many "gathering places where high numbers of people might congregate" and, like government building and schools, "possessing firearms in such places risks harm to great numbers of defenseless people (*e.g.*, children)." *Id.* at 460, 459. The ordinance upheld in *Nordyke* did "not meaningfully impede the ability of individuals to defend themselves in their homes with usable firearms, the core of the right as *Heller* analyzed it." *Id.* at 460.

///

18                                                         09-CV-2371 IEG (BGS)

1    Significantly, the subject statutes are far more narrowly framed than the ordinance at issue in

2    *Nordyke*, prohibiting only the carrying of concealed loaded firearms in public places outside the home

3    with numerous exceptions allowing for the keeping and bearing of arms under specific circumstances

4    that fall within the right as defined by *Heller*.  The Sheriff's practices in limiting CCW licenses to those

5    with specific and documented needs is consistent with the compelling and significant legislative goals

6    underlying sections 12025 and 12031, i.e. the protection of the general public from widespread and

7    unchecked public carry of concealed and loaded firearms.  There is a "compelling state interest in

8    protecting the public from the hazards involved with certain types of weapons, such as guns."  *State v.*

9    *Cole*, 665 N.W.2d at 344.

10                                              **V**

11                                   **FACIAL CHALLENGE**

12    Plaintiffs also appear to allege a facial challenge to Penal Code section 12050.  The Supreme

13    Court has recognized that there are generally two types of facial challenges to a law's constitutionality.

14    First, a party ordinarily "can only succeed in a facial challenge by 'establish[ing] that no set of

15    circumstances exists under which the [law] would be valid,' i.e., that the law is unconstitutional in all of

16    its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 128 S. Ct. 1184,

17    1190 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745, (1987)).  The Supreme Court's "cases

18    recognize a second type of facial challenge in the First Amendment context under which a law may be

19    overturned as impermissibly overbroad because a 'substantial number' of its applications are

20    unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"  *Id.* at 1190 n.6 (quoting

21    *New York v. Ferber*, 458 U.S. 747, 769-71, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)).

22    Here, Plaintiffs admit, in fact urge the Court, that Defendant could exercise his discretion in a

23    manner that would satisfy their interpretation of the Second Amendment.  Thus, Plaintiffs cannot

24    establish that "no set of circumstances exists under which" Penal Code section 12050 would be

25    constitutionally valid and have failed to satisfy the essence of a facial challenge.  *Salerno*, 481 U.S. at

26    745.

27    ///

28    ///

                                              19                        09-CV-2371 IEG (BGS)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# VI

## EQUAL PROTECTION

Plaintiff's second claim asserts a violation of equal protection by application of the "residency" and "good cause" requirements. Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." The Equal Protection Clause "is essentially a directive that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). When a government's action does not involve a suspect classification or implicate a fundamental right, even intentional discrimination will survive constitutional scrutiny for an equal protection violation as long as it bears a rational relation to a legitimate state interest. *New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976); *Cleburne*, 473 U.S. at 439; *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990).

Plaintiff argues three theories for an equal protection violation. First, Plaintiffs assert that Plaintiff Peruta was treated differently than similarly situated residents of San Diego County because he resides in San Diego only part of the year. (FAC ¶ 116.) Second, Plaintiff alleges that Sheriff Gore discriminates against responsible, law-abiding citizens who cannot provide evidence documenting a specific threat proving their "need" to exercise the right to bear Arms. (FAC ¶118; Pl. MSJ at 18-20.) Third, Plaintiff contends that Sheriff Gore made an impermissible classification and gave preferential treatment to applicants who were "politically-connected, wealthy, contributors of the Sheriff's campaign," or members of the Honorary Deputy Sheriff's Association. (FAC ¶ 117; Pl. MSJ at 20-22.) All three of Plaintiffs allegations fail to demonstrate a violation of the Equal Protection Clause.

### A. The Sheriff Does Not Discriminate in Application of the Statutory Residency Requirement.

Peruta is the only Plaintiff who alleges he was denied equal protection of the law because he is not considered a "resident" under California Penal Code 12050 as applied by the Sheriff's Department. (FAC ¶ 117.) However, Plaintiff's allegations are simply not true as his application was not denied on "residency" grounds; therefore, he was not "treated differently" than similarly situated San Diego County "residents." (Pelowitz Decl. ¶ 17.)

///

In the context of CCW licenses, "resident" is generally defined by the County to be "any person who maintains a permanent residence or spends more than six months of a taxable year within the County if the applicant claims dual residency." (Pelowitz Decl. ¶ 8.)  Part-time residents who spend less than six months in the County, such as Peruta, are considered on a case-by-case basis.  *Id.*  As such, CCW licenses have been issued in these circumstances.  *Id.*  Peruta claims that his application was denied based upon residency when in fact, as Plaintiff's Declaration and letter of denial by the Sheriff's Department explicitly states, it was denied because "the reasons and documentation [Plaintiff has] provided do not substantiate that *good cause* exists." (Peruta Decl. ¶ 10; Pelowitz Decl. ¶ 17;  Plaintiffs' Ex. G.)  If it were not for Peruta's lack of "good cause," he would have been approved for a CCW license.  *Id.*  Residency was not a factor in his denial.  *Id.*  Thus, Plaintiff's allegation is facially false as he was not treated differently from similarly situated residents of San Diego County.

Even if Peruta's application was denied based upon "residency" and the County did not review "temporary residencies" on a case-by-case basis, application of the provision would not violate the Equal Protection Clause.  Statutory provisions restricting licenses to nonresidents have consistently been held constitutional by state and federal courts against challenges that they violated equal protection.  *See, e.g.*, *Application of Ware*, 474 A.2d 131 (Del. 1984); *Bach v. Pataki*, 546 U.S. 1174 (2006) (New York's interest in monitoring gun licensees was substantial and New York's restriction of licenses to residents and persons working primarily within the state was sufficiently related to that interest and did not violate the Equal Protection Clause.)  In *Application of Ware*, the Supreme Court of Delaware found the residency requirement of Delaware's CCW laws to be constitutional as the State's purpose of protecting the public from the danger caused by the unrestricted flow of dangerous weapons into and through Delaware was a "compelling state interest."  *Application of Ware*, 474 A.2d at 132.  California Penal Code section 12050's residency requirement is no different than other states' restriction.  If anything, section 12050 is broader since it considers "temporary residents" on a case-by-case basis.  Limiting CCW licenses to "residents" of the County, as defined by the Sheriff's Department, is necessarily related to the compelling interest of protecting the public from the unrestricted flow of dangerous weapons and allows the County to more readily monitor gun licensees.

///

In sum, Peruta was not treated different than similarly situated residents as he was denied a CCW license for lack of "good cause" and not his "residency."  Even if Plaintiff was "treated differently" based upon "residency," the restriction would be held constitutional and, accordingly, the policy would not violate the Equal Protection Clause.

**B.     The Sheriff Does Not Provide Preferential Treatment**.

Plaintiffs also contend that Sheriff Gore made an impermissible classification between applicants who were "politically-connected, wealthy, contributors of the Sheriff's campaign," or members of the Honorary Deputy Sheriff's Association (HDSA), and those who were not.  (FAC ¶ 117; Pl. MSJ at 20-22.)  A concealed weapons licensing program that is administered arbitrarily so as to unjustly discriminate between similarly situated people may deny equal protection.  *March v. Rupf*, 2001 WL 1112110 (N.D.Cal. 2001), citing *Guillory v. County of Orange*, 731 F.2d 1379, 1383 (9th Cir. 1984).  To sustain their burden at summary judgment, plaintiffs must show actual evidence that would allow a reasonable jury to conclude first, that others similarly situated generally have not been treated in a like manner; and second, that the denials of concealed weapons licenses to them were based on impermissible grounds.  *See Kuzinich v. County of Santa Clara*, 689 F.2d 1345, 1349 (9th Cir. 1983) (applying this test to a claim of "selective prosecution" in zoning-decision context).

Sheriff Gore does not offer special treatment to anyone and membership in the Honorary Deputy Sheriff's Association has no bearing on the ability to obtain a CCW license.  Plaintiffs' evidence presented in their motion as to HDSA member renewal applications is erroneous and misleading. Supporting documentation has been provided in nearly all cases by these applicants.  (Pl. Exh. "W"-"PP;" Cleary Decl.; Pelowitz Decl. ¶ 22; Defendant's Exhibits 2-15.)  There is no special treatment whatsoever.  The one applicant that is identified as a "public figure" is Peter Q. Davis, a prominent San Diegan who recently ran for mayor.  He did not need to document that status.  Plaintiffs' final claim in their Separate Statement that "not one single HDSA member . . . has been denied, while 18 non-members have been denied" is not supported whatsoever by the evidence referenced (Exhibit WW) which is simply a list of all denials since 2006.  Plaintiffs have not presented evidence sufficient for a reasonable jury to draw inferences on their behalf on these points.  Plaintiffs' supporting documentation is even less than that presented in *March* which was declared to be incomplete and did "not establish

that those who received licenses were in fact similarly situated to plaintiffs." *March*, 2001 WL 1112110 at *5.  Plaintiffs' produce no evidence that politically-connected, wealthy, contributors to the Sheriff's campaign have obtained licenses and in fact, that is not the case.  (Pelowitz Decl. ¶ 22.)

In fact, Plaintiffs have only presented renewal applications.  Of the five Plaintiffs, only one, Cleary, is claiming to be denied a renewal, yet it was granted after appeal.  Under California law, as applied by the Sheriff's Department, renewal applications go through less scrutiny than the initial application process because they have already met the statutory requirements.  Absent any negative law enforcement contacts, crime cases, arrests and changes from the initial application as to the reasons, renewal applications are generally issued on the spot.  (Pelowitz Decl. ¶ 12.)  Review by a supervisor or manager is not needed for the renewal process unless there has been a change to the reason.  *Id.*  And, while documentation to support the applicant's continued need must still be provided, it is not held to the same scrutiny of the initial application process.  *Id.*  Plaintiffs Peruta and Buncher claim a disparity in treatment based upon their initial applications.  Plaintiffs Dodd and Laxson state that they did not even apply for a license for potential lack of "good cause."  Plaintiffs do not present any evidence to prove these select applicants by HDSA members were more favorably treated during their initial application.  In addition, Sheriff Gore was elected in 2009.  Each of the renewal applications Plaintiffs present were originally approved by a different administration.  Therefore, Plaintiffs Peruta, Buncher, Dodd and Laxson who are claiming disparate treatment based solely on their initial application are not similarly situated.

Plaintiff Cleary is the only plaintiff who apparently claims to have had his renewal application denied because he was no longer a part of the HDSA.  (Cleary Decl.)  However, Plaintiff Cleary cannot be classified as "similarly situated, treated differently" because he was in fact issued a CCW permit after appeal.  During his initial application, Cleary was awarded his license after an appeal with then Undersheriff Gore.  Then, Plaintiff Cleary's renewal application was approved after his appeal, when he was no longer a member of the HDSA.  (Cleary Decl. ¶ 18-19.)  Therefore, Plaintiff Cleary cannot prove he was treated differently as an HDSA member.

Plaintiffs infer a connection of preferential treatment to HDSA members due to notations on the applications provided.  At no time, whether in the initial or renewal process, does the Sheriff's

1   Department consider HDSA membership.  (Pelowitz Decl. ¶ 11.)  While many HDSA members provide

2   such information in their application, it is never required, insisted upon or considered by the Sheriff's

3   Department.  *Id.*  Line staff are merely trained to note everything that is said by the applicant during the

4   interview process.  (Pelowitz Decl ¶¶ 11, 22.)  Even with these select applications, plaintiffs have not

5   introduced facts sufficient for a reasonable juror to conclude that the Sheriff's Department's concealed

6   weapons license program has injured them in its purported discrimination among multiple "classes" of

7   similarly-situated individuals.  In *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1186 (9th Cir. 1995), the

8   Ninth Circuit held that plaintiff's denial for a dance permit at her bar was, as applied to her, authorized

9   under the city ordinance.  The Court held that the "selective enforcement of valid laws, without more,

10   does not make the defendants' actions irrational."  *Id.* at 1188.

11          Similarly, Plaintiffs are attacking what they believe to be unequal application of a policy, even

12   though, when their applications are viewed in isolation, the policy was acceptably applied as to them.

13   However "without evidence of anything more than vagaries in its administration, their equal protection

14   claim cannot survive summary judgment."  *March*, 2001 WL 1112110  at *5, referring to *Accord*, *Falls*

15   *v. Town of Dyer, Indiana*, 875 F.2d 146, 149 (7th Cir. 1989).  The Ninth Circuit has found this to be

16   "especially true in light of the 'extremely broad discretion' that the California Penal Code awards

17   sheriffs and police departments in issuing concealed weapons license."  *March*, 2001 WL 1112110 at

18   *5, citing *Gifford v. City of Los Angeles*, 88 Cal. App. 4th 801, 805 (2001).  Thus, while Plaintiffs

19   without evidentiary support claim that all CCW applications by HDSA members were approved and 18

20   non-members were denied along with an unknown number of others who decided not to apply, Plaintiffs

21   offer no evidence as to why the HDSA member applications were approved and the 18 applications were

22   denied.  Plaintiffs do not even take into account that hundreds of other non-member applications were

23   approved.  Plaintiffs fail to show a causal connection and have proven nothing more than "vagaries" in

24   the Sheriff's Department's administration of section 12050.

25          Lastly, Plaintiffs provide no evidence of preferred treatment to "politically-connected, wealthy,

26   contributors of the Sheriff's campaign."  As a result, Plaintiffs claim of being denied equal protection of

27   the law against "politically-connected, wealthy, contributors of the Sheriff's campaign" or HDSA

28   members has no merit.

09-CV-2371 IEG (BGS)

**C.     The Sheriff's Department Does Not Deny Equal Protection of the Law by Requiring Evidence of "Good Cause"**

Plaintiffs allege that Sheriff Gore discriminates against responsible, law-abiding citizens who cannot provide evidence documenting a specific threat proving their "need" to exercise the right to bear Arms.  (FAC ¶118; Pl. MSJ at 18-20.)  To identify the proper classification, both groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified.  *Thornton v. City of Helens*, 425, F.3d 1158, 1166 (9th Cir. 2005).  "The goal of identifying a similarly situated class . . . is to isolate the factor allegedly subject to impermissible discrimination."  *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989); *See also Freeman*, 68 F.3d at 1187.

In the present case, Plaintiffs' allegation of the class of similarly situated individuals would have been properly defined as all persons who applied to the Sheriff's Department for a concealed weapons permit, regardless of whether they were approved or denied.  As it stands now, Plaintiffs attempt to identify the class by implying that all who submitted evidence were in a different class from Plaintiffs, and then claims that they were all approved.  As the Ninth Circuit noted, however, "[a]n equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff."  *Thornton*, 425 F.3d at 1166 (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir. 1986).  Plaintiffs fail to provide any evidence to make such an inference.  Similarly, Plaintiffs offer no evidence that they were treated any differently than those who submitted evidence, as self-defense-based applications may be denied for lack of "good cause" even with documentation.

Even if Plaintiffs are seen as similarly situated and treated differently, requiring documentation proving a need for self-defense would not violate the Equal Protection Clause under any form of scrutiny.  Regardless of the level of constitutional scrutiny, Plaintiffs' as-applied challenge fails.  The governmental interest furthered by Penal Code sections 12025, 12031 and the permit process set forth in 12050 as administered by Defendant -- the safety of the public from unknown persons carrying concealed, loaded firearms -- is both important and compelling.  (Zimring Declaration.)  In addition, the Penal Code provisions are both narrowly tailored and substantially related to furthering public safety.  (See generally Argument IV above.)

///

### 1.       Compelling Interest.

The Court has deemed the interest behind almost every gun-control regulation - advancing safety and the lives of its citizens as well as "the government's general interest in preventing crime," - to be "compelling." *Heller*, 128 S. Ct. at 2851 (Breyer, J., dissenting); *See U.S. v. Salerno*, 481 U.S. at 750, 754 (1987). Specifically, the purpose of concealed-weapon statutes is "that of protecting *the public* by preventing an individual from having on hand a weapon of which the public is unaware, and which might be used by that individual in a *fit of passion*." *Dano v. Collins*, 166 Ariz. 322 (Ct. App. Div. 1 1990); *See State v. Reid*, 1 Ala. 612, 616 (1840) ("the question recurs, does the act, 'to suppress the evil practice of carrying weapons secretly,' trench upon the constitutional rights of the citizen?  We think not."); *Nunn v. State*, 1 Ga. 243 (1846); *Andrews v. State*, 50 Tenn. 165 (1871); *State v. Smith*, 11 La. Ann 633 (1856). Many scholars have declared that "[t]he requirement of a compelling government interest – is likely to be found to be satisfied in nearly every case because the interest in public safety (or some variant of that goal, such as "preventing violence" or "reducing crime") is so obviously important. *Winkler*, 105 Mich. L. Rev. at 727.

Use of concealed weapons in streets and public places pose a greater threat to public safety. (*See generally* Zimring Declaration.) (the problem of gun robbery in American cities is almost exclusively a problem of concealable handguns). The Sheriff's Department's central reason to require a good reason for needing a gun is to reduce the number of secretly armed citizens on the streets and sidewalks of one of the biggest urban areas in the United States. *Id.* As previously noted, limiting the number of loaded and concealed firearms in public places helps to keep the balance in favor of law enforcement and avoids the necessity for every place open to the public – restaurants, malls, theaters, parks, etc.-- to be equipped with metal detectors, fencing and other forms of security, in order to protect patrons from the fear of widespread and unchecked concealed firearms.

The Sheriff's Department's purpose in requiring proof of "need" for a CCW license is no less compelling as that which has been held constitutional throughout our nation's history – protecting *the public* from "the evil practice of carrying weapons secretly" and "preventing harm to person other than the offender." *Reid*, 1 Ala. at 616; *Hale*, 43 Cal. App. 3d at 356. Moreover, the Sheriff's practices in limiting CCW licenses to those with specific and documented needs is consistent with the compelling

1    and significant legislative goals underlying sections 12025 and 12031, i.e. the protection of the general

2    public from widespread and unchecked public carry of concealed and loaded firearms.  Thus, "the

3    legislature has a compelling interest in preventing the possession of guns in public under any such

4    circumstances." *Marin*, 795 N.E.2d at 958–59.

5              **2.      Necessarily Related**.

6              California law has consistently found concealed weapons restrictions to be necessarily related to

7    this compelling government interest of advancing public safety.  In *Hodges*, the Court stated that "[a]

8    person who carries a concealed firearm on his person . . . 'which permits him immediate access to the

9    firearm but impedes others from detecting its presence, poses an 'imminent threat to public safety . . . .'"

10   *Hodges*, 70 Cal. App. 4th at 1357.  California courts have found that "the habit of carrying concealed

11   weapons was one of the most fruitful sources of crime" *Ex part Luening*, 3 Cal. App. 76 (1906).  Thus,

12   limiting CCW licenses to only those with verifiable good reason reduces "one of the most fruitful

13   sources of crime" in society.

14             Handguns are common concealed weapons for similar reasons the Court explains in Heller for

15   self-defense in the home – they are small and easy to hide under clothing, easy to use, cannot easily be

16   wrestled away in self-defense, and pose a significant threat.  *Heller*, 128 S. Ct. at 2818.  They are used in

17   more than 75% of all killings and in even larger portions of robberies.  (Zimring Decl. ¶ 3.)  A concealed

18   handgun is the dominant weapon of choice for gun criminals and a special danger to government efforts

19   to keep public spaces safe and secure.  (Zimring Decl. ¶¶ 6-7.)   By requiring evidence, the government

20   is able to limit the amount of concealed weapons in public to only actual anticipated needs.  It also acts

21   as a backup to those who seek a CCW license for criminal purposes but do not yet have a criminal

22   record.  As the Court stated in *Miller*, "[s]uch legislation cannot be narrowly tailored to reach only the

23   bad people who kill with their innocent guns. . .To expect such legislation to reflect a tight fit between

24   ends and means is unrealistic." *Miller*, 604 F.Supp.2d at 1172 n.13 (quotation marks and citations

25   omitted); *See generally* Zimring Declaration.

26             In addition, requiring applicants to prove his or her need for self-protection prevents the carrying

27   of "arms for any sort of confrontation." *Heller*, 128 S. Ct. at 2799 ("the Court does not read the Second

28   Amendment to protect the right of citizens to carry arms for any sort of confrontation.").  In *Heller*, the

1    Court noted that "from Blackstone through the 19th-century cases, commentators and courts routinely

2    explained that the right was not a right to keep and carry any weapon whatsoever in any manner

3    whatsoever and for whatever purpose." *Id.* at 2816.  In order to protect its citizens, the Sheriff's

4    Department must ensure that weapons are not used for whatever purpose.  As supported by *Heller*,

5    requiring evidence of a specific threat, the Sheriff's Department meets the scope of the Second

6    Amendment without infringing upon the "core" of this right.

7           Therefore, requiring applicants to prove their need for a CCW license limits the number of

8    concealed guns on the street for "whatever purpose."  By reducing the number of concealed firearms in

9    public, the government is able to advance its compelling interest of protecting the lives of its citizens

10   and, in doing so, the government is meeting its interest using narrowly tailored means.

11                        **3.      Narrowly Tailored**.

12          "There is no constitutional right to bear concealed weapons."  *Klein v. Leis*, 99 Ohio St. 3d 537

13   (2003).  Many courts have allowed complete bans on concealed weapons, inasmuch as it did not deprive

14   a citizen of the natural right of self-defense, i.e. additional gun laws enacted.  *Nunn*, 1 Ga. 243; *Andrews*,

15   50 Tenn. 165; *Reid*, 1 Ala. 612.  As a result, Plaintiffs argument that requiring evidence to show good

16   cause is a violation of equal protection must be read in unison with all of California's gun regulation

17   laws as a concealed, loaded weapon is not the only means to which someone can defend him or herself.

18   In *Flores*, the Court held that Cal. Pen Code "section 12031 *is narrowly tailored* to reduce the incidence

19   of unlawful public shootings, while at the same time respecting the need for persons to have access to

20   firearms for lawful purposes, including self-defense.  *Flores*, 169 Cal. App. 4th at 576-577 (italics

21   added).

22          Moreover, Plaintiffs' claim that "limiting the amount of CCWs issued in an attempt to affect

23   public safety would be to engage in the type of interest-balancing test *Heller* expressly rejected."  Pl.

24   MSJ at 19.  However, requiring evidence to strategically limit the amount of concealed weapons in

25   public does just the opposite.  If the Sheriff's Department allowed anyone to claim self-defense as his or

26   her good reason, the Sheriff would be left to interest-balancing with little to guide his decision.  Now, if

27   one cannot prove their need for self-protection, there is no interest balanced – the application is denied

28   ///

1   for lack of good cause.  If one does provide evidence, it is not interests that are balanced but rather facts

2   as to the truth of the matter asserted by the applicant.

3       Furthermore, the Sheriff's Department requests nothing more than is required by the judicial

4   system for other avenues of protection, i.e. restraining orders.  In protecting the lives of its citizens and

5   law enforcement officers, this is a small burden to place upon applicants.

6       Accordingly, requiring evidence of "good cause" to carry a concealed weapon in public under

7   the Second Amendment does not infringe on the Second Amendment "core right" that has been held to

8   be fundamental by the Supreme Court.

9       In conclusion, Plaintiffs fail to assert an Equal Protection violation.  Plaintiff Peruta's application

10  was denied for good cause and, therefore, was not treated differently based upon his residency.

11  Plaintiffs fail to establish a proper control group as well as a causal connection between "politically-

12  connected, wealthy, contributors of the Sheriff's campaign" or HDSA members and the issuance of

13  CCW licenses and their claims fail factually.  Plaintiffs allegations of discrimination based upon the

14  ability to prove "good cause" also fail to show that they are similarly situated and treated differently or

15  that their core right under the Second Amendment is denied because of this standard.

16                                              **VII**

17                          **THE RIGHT TO TRAVEL AND**
                          **PRIVILEGES AND IMMUNITIES CLAIMS**

18

19      Plaintiffs allege that the residency policy of the Defendant violates the constitutional "right to

20  travel" and the Privileges and Immunities Clause.  These claims are identical.  Plaintiffs generally, and

21  Peruta specifically, allege that they are being penalized because the Sheriff requires more than part-time

22  residency in order to obtain a permit.  Plaintiffs' allegations are not true.  Part-time residency is

23  sufficient to obtain a permit under the Sheriff's policy and practice.  (Pelowitz Decl, ¶ 8.)  Peruta was

24  not denied a permit because of his part-time residency status; it was solely because he failed to

25  document good cause.  (Pelowitz Decl, ¶ 17; Plaintiffs' Exhibit G.)  There is no other allegation relating

26  to this claim; therefore it fails factually at the outset.

27      In any event, the residency requirement of Penal Code section 12050 would be constitutional

28  even if it was interpreted more strictly than the approach adopted by Defendant.  A state law implicates

///

1    the right to travel in three situations—when it actually deters travel, when impeding travel is its primary

2    objective, or when it uses a classification that penalizes the exercise of the right. *Attorney General of*

3    *N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986).  California's restrictions on carrying concealed weapons

4    do none of those.  "[S]omething more than a negligible or minimal impact on the right to travel is

5    required . . . ." *Kansas v. United States*, 16 F.3d 436, 442 (D.C Cir. 1994).

6         The right to travel is usually considered to be one of the rights guaranteed by the Privileges and

7    Immunities Clause of Article IV and the Privileges and Immunities Clause of the Fourteenth

8    Amendment.  *See*, *Soto-Lopez*, 476 U.S. at 902 (citations omitted).  But only those activities

9    "sufficiently basic to the livelihood of the Nation" are encompassed in the right.  *Supreme Court of*

10   *Virginia v. Friedman*, 487 U.S. 59, 64 (1988) (quoting *Baldwin v. Montana Fish & Game Comm'n*, 436

11   U.S. 371, 388 (1978)).  *Cf. Memorial Hosp. v. Maricopa County*, 415 U.S. 250, 221 (1974) (right to

12   travel "must be seen as insuring new residents the same right to vital government benefits and privileges

13   in the States to which they migrate as are enjoyed by other residents.").

14        A law will survive a "right to travel" challenge if it has a "substantial" interest that is "closely"

15   related to the means employed to differentiate between residents and non-residents.  *Bach v. Pataki*, 408

16   F.3d 75, 88 n.27 (2nd Cir. 2005).  But non-residents are not guaranteed all the rights enjoyed by *bona*

17   *fide* residents.  *Toomer v. Witsell*, 334 U.S. 385, 396 (1948).  "A bona fide residence requirement,

18   appropriately defined and uniformly applied, furthers the substantial state interest in assuring that

19   services provided for its residents are enjoyed only by residents.  Such a requirement . . . [generally]

20   does not burden or penalize the constitutional right of interstate travel, for any person is free to move to

21   a State and to establish residence there." *Id.* quoting *Martinez v. Bynum*, 461 U.S. 321, 328–29 (1983).

22   Here, the State's requirement that only residents are permitted to obtain concealed weapons permits

23   easily fits this test as a *bona fide* residence requirement.

24        In *Bach*, a resident of Virginia who possessed a concealed-weapon permit from that state alleged

25   that New York's refusal to recognize such permits violated his right to travel.  *Bach v. Pataki*, 289

26   F.Supp.2d 217, 222 (N.D.N.Y. 2003), *affirmed*, 408 F.3d 75 (2nd Cir. 2005), *cert. denied*, 546 U.S.

27   1174 (2006).  The trial court rejected that claim, finding that "New York's permit scheme bears a close

28   relationship to substantial and valid reasons for the disparate treatment of nonresident travelers, beyond

the mere fact that they are citizens of other states. . . . Thus, the proper processing of permit applications is 'vitally essential to public order and safety.'" *Bach*, 289 F.Supp.2d at 227 (quoting *Federation of N.Y. State Rifle & Pistol Clubs, Inc. v. McGuire*, 420 N.Y.S.2d 602, 603 (1979) (additional citations omitted)).  New York's permit statute mirrors California's in significant regards.

The court in *Bach* agreed with the defendants that

> [t]he practical implications of requiring New York to accept applications from all nonresidents are apparent.  First, the strain on investigatory resources would be significantly increased.  More importantly, however, the ability to obtain, and verify, information would be negatively impacted were New York officials required to make inquiries in other states.
>
> [T]he administrative problems in investigating, monitoring, enforcing and revoking permits where the applicant does not have residency, employment or business ties with New York and the resultant likelihood of errors, would be inimical to New York's scheme of licensing firearms as a means of controlling their possession for the public good.  Accordingly, as the state defendants contend, New York acted reasonably in denying the privilege to those with relatively remote contacts to New York.  Likewise, allowing nonresidents with licenses from other states to carry weapons in New York without complying with New York requirements has the potential to present administrative problems and interfere with the achievement of New York's licensing goals.

*Bach*, 289 F.Supp. 2d at 227–28.

The Second Circuit affirmed, holding that "New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest . . . ." *Bach*, 408 F.3d at 87.

> The State can only monitor those activities that actually take place in New York.  Thus, New York can best monitor the behavior of those licensees who spend significant amounts of time in the State. By limiting applications to residents and in-state workers, New York captures this pool of persons. It would be much more difficult for New York to monitor the behavior of mere visitors like Bach, whose lives are spent elsewhere.

*Id.* at 92.16

Here, California's interests are the same. The state's interest in monitoring gun licensees has a substantial public-safety justification amply supporting the differential treatment of nonresidents. Consequently, each Plaintiff's right to travel is not infringed.  *See also Torraco v. Port Authority of N.Y. & N.J.*, 539 F.Supp.2d 632, 652 (E.D.N.Y. 2008) (refusal to allow the transport of a firearm is not sufficiently material to infringe upon the right to travel.  It does not rise to the level of receiving medical

care, or subsistence benefits, or earning a living.); *Pencak v. Concealed Weapon Licensing Bd. of County of St. Clair*, 872 F.Supp. 410, 414 (E.D. Mich. 1994) ("Plaintiff has cited no authority for the proposition that denial of a concealed weapon permit deters migration, penalizes the right to travel, or that a concealed weapons permit is a 'vital government benefit and privilege.'").

Notwithstanding this conclusion, federal law provides protections for individuals who wish to transport their lawful firearms. Congress enacted the Firearms Owners' Protection Act, Pub. L. 99-360, § 1(a), 100 Stat. 766 (July 8, 1986), *codified* at 18 U.S.C. § 926A ("FOPA"), to allow what the plaintiffs here assert, at least implicitly, the right to do, i.e., to transport their weapons from place to place without restriction by intervening jurisdictions.

Other gun owners have tried, unsuccessfully, to invoke FOPA in claiming that a jurisdiction's gun restrictions violate their "right to travel." *See, e.g., Torraco*, 539 F.Supp.2d at 652; *In re Two Seized Firearms*, 602 A.2d 728, 731 (N.J. 1992) ("Although enacted to assure to gun owners freedom to travel from state to state with weapons legally possessed in the state of residence, the statute qualifies that freedom with the sensible accommodation of each state's right to ensure the safety, health, and welfare of its own citizens."). Compliance with FOPA gives plaintiffs all the protections they are entitled to in travels to and through California and the County of San Diego.

## VIII

## DUE PROCESS

### A.      There is No Liberty or Property Interest.

Plaintiffs allege a violation of procedural due process under the Fourteenth Amendment in their Seventh Claim for Relief. The threshold requirement for a due process claim is the existence of a liberty or property interest. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972). In the absence of any enforceable contractual right, there is no recognizable property right under the due process clause. "He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577. The concealed weapons permit statute does not create a contract, nor can Plaintiffs claim an entitlement to a permit. "Section 12050 explicitly grants discretion to the issuing officer to issue or not issue a license to applicants meeting the minimum statutory requirements. Where state law gives the issuing authority broad discretion to grant or deny license applications in a closely

1    regulated field, initial applicants do not have a property right in such licenses protected by the

2    Fourteenth Amendment." *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir. 1982); *See also*, *Guillory v.*

3    *Orange County*, 731 F.2d 1379, 1382-1383 (9th Cir. 1984).

4         Plaintiffs allege in general terms that they "have a right to access and review Defendants' CCW

5    polices, to obtain applications to apply for a CCW, to submit applications, and to have those applications

6    reviewed in a fair, impartial, and constitutional manner and obtain a CCW when they meet the

7    constitutional and legal prerequisites or standards."  (FAC ¶ 140.)  By those very allegations, Plaintiffs

8    admit that no individual can claim an entitlement to a permit – certain statutory prerequisites must be

9    met.  There is no legally enforceable expectation in a concealed weapons permit and there is no

10   entitlement created by Penal Code section 12050.  Nor does one have a liberty interest in obtaining a

11   concealed weapons license.  *Erdelyi v. O'Brien*, 680 F.2d at 63-64; *Nichols v. County of Santa Clara*,

12   223 Cal. App. 3d 1236 (1990).

13        **B.     The Sheriff's Permit Procedure Complies with Due Process**.

14        Even if Plaintiffs could somehow show a legitimate claim of entitlement to a concealed weapons

15   permit, procedural due process is satisfied by the permit procedure.  Applications are available on-line

16   and at the Sheriff's Department; the Licensing Division offers an initial information interview to assist

17   applicants in the process; once an application is filed and documentation is received, an investigation is

18   conducted to verify that the statutory requirements have been met; the applicant is notified in writing of

19   the decision on the application; the decision is appealable to the Assistant Sheriff who conducts a

20   hearing.   (Pelowitz Decl, ¶ 11-14; Plaintiffs' Exhibits H, I and J.)  The Assistant Sheriff's decision is

21   the final administrative decision which is reviewable in Superior Court by writ of mandamus.  *See*, *e.g.*,

22   *Gifford v. City of Los Angeles*, 88 Cal. App. 4th 801 (2001); *Erdelyi v. O'Brien*, 680 F.2d 61, 64 fn. 2.

23        Due process is the opportunity to be heard at a meaningful time and in a meaningful manner.

24   *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Unlike some legal rules, due process is not a technical

25   conception with a fixed content unrelated to time, place and circumstance.  Rather, it "'is flexible and

26   calls for such procedural protections as the particular situation demands.'"  *Id.* at 334 (internal citation

27   omitted).  "Determining whether a particular administrative procedure is constitutionally sufficient

28   requires analysis of the governmental and private interests involved: (1) the private interest that will be

1   affected by the official action; (2) the risk of an erroneous deprivation of such interest through the

2   procedures used and any probable value of additional or substitute procedural safeguards; and (3) the

3   government's interest, including the function involved and the fiscal and administrative burdens that the

4   additional or substitute procedural requirement would entail." *Id.* at 335.

5        Further, the court observed that "[t]he judicial model of an evidentiary hearing is neither a

6   required, nor even the most effective, method of decisionmaking in all circumstances." *Mathews v.*

7   *Eldridge*, 424 U.S. at 348.  All that is necessary to comport with due process "is that the procedures be

8   tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be

9   heard,' . . . to insure that they are given a meaningful opportunity to present their case." *Id.* at 349.

10       Here, the Sheriff's procedures offer applicants the opportunity to present information regarding

11  their need for a concealed weapons permit, which is subject to investigation and verification,

12  supplemented by an appeal process and superior court writ review.  Due process is satisfied by this

13  procedure.

14                                  **IX**

15                         **QUALIFIED IMMUNITY**

16       Until January 21, 2009, the Supreme Court mandated a two-part analysis to determine whether

17  qualified immunity protects individual law enforcement officers from liability.  *Saucier v. Katz*, 533

18  U.S. 194 (2001).  The first part of the test was to determine whether the alleged facts showed that the

19  officer's conduct violated a constitutional right.  *Id.* at 201.  Second, if a colorable claim for a

20  constitutional violation appeared from the alleged facts, the court determined whether the constitutional

21  right was clearly established in the particular context of the case.  *Id.* at 201-202.  ["The relevant,

22  dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a

23  reasonable officer that his conduct was unlawful in the situation he confronted"].  When an officer is

24  alleged to have acted unconstitutionally, it is next determined "whether it would be clear to a reasonable

25  officer that his conduct was unlawful in the specific situation he confronted."  *Saucier*, 533 U.S. at 202.

26  Summary judgment must be entered "if, under the governing law, there can be but one reasonable

27  conclusion as to the verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 250-51 (1986).  The

28  ///

1   Supreme Court then  ruled that the first Saucier step may be omitted, focusing only on the second part of

2   the analysis.  *Pearson v. Callahan*, 555 U.S. __, 129 S.Ct. 808 (2009).

3          "'Clearly established' for purposes of qualified immunity means that 'the contours of the right

4   must be sufficiently clear that a reasonable official would understand that what he is doing violates that

5   right.'"  *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (quoting *Anderson v. Creighton*, 483 U.S. 635,

6   640 (1987)).  "This is not to say that an official action is protected by qualified immunity unless the very

7   action in question has previously been held unlawful, but it is to say that in the light of pre-existing law

8   the unlawfulness must be apparent."  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483

9   U.S. at 640) (internal quotation marks and citations omitted).  The "salient question" is whether the state

10  of the law gave the deputies fair warning that their actions were unconstitutional.  *See*, *Hope*, 536 U.S. at

11  741; *see also Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (*en banc*) ("What is required is

12  that government officials have 'fair and clear warning' that their conduct is unlawful") (Emphasis

13  added; citation omitted).

14         Given the Supreme Court precedent prior to Heller that there was no individual right to bear

15  arms under the Second Amendment, and given that courts nationwide and in this Circuit are in the midst

16  of identifying the scope of the right to bear arms after Heller, and since this case is the first of its kind on

17  the issue of concealed carry permits, Defendant Gore is entitled to immunity from suit.  It cannot be said

18  that the state of Second Amendment law on concealed weapons permits or the law on residency

19  standards for issuing such permits gave the Sheriff fair warning that his actions were unconstitutional.

20                                        CONCLUSION

21         Based on the foregoing, Defendant's motion for summary judgment should be granted and

22  Plaintiffs' motion denied.

23  DATED:  October 4, 2010                    JOHN J. SANSONE, County Counsel

24                                             By: s/ *James M. Chapin*
                                                    JAMES M. CHAPIN, Senior Deputy
25                                             Attorneys for Defendant William D. Gore

26

27

28