1  JOHN C. EASTMAN, Cal. Bar No. 193726
   Center for Constitutional Jurisprudence
2  c/o Chapman University School of Law
   One University Drive
3  Orange, California 92866
   Telephone:  (714) 628-2500
4  Facsimile:  (714) 844-4817

5  DAVID B. KOPEL
   Adjunct Professor of Advanced Constitutional Law,
6  Denver University, Sturm College of Law
   13952 Denver West Parkway, Suite 400
7  Golden, Colorado 80401
   Telephone: (303) 279-6536
8  Facsimile: (303) 279-4176

9  ATTORNEYS FOR AMICI CURIAE
   INDEPENDENCE INSTITUTE,
10 CENTER FOR CONSTITUTIONAL JURISPRUDENCE,
   DOCTORS FOR RESPONSIBLE GUN OWNERSHIP,
11 AND LAW ENFORCEMENT ALLIANCE OF AMERICA

12                IN THE UNITED STATES DISTRICT COURT

13                  SOUTHERN DISTRICT OF CALIFORNIA

14

15 EDWARD PERUTA, MICHELLE LAXSON,   )  CASE NO: 09-CV-2371 IEG (BGS)
   JAMES DODD, DR. LESLIE BUNCHER,   )
16 MARK CLEARY, and CALIFORNIA RIFLE )  **AMICUS BRIEF IN SUPPORT OF**
17 AND PISTOL ASSOCIATION            )  **PLAINTIFFS' MOTION FOR**
   FOUNDATION                        )  **SUMMARY JUDGMENT**
                                     )  **[PROPOSED]**
18 Plaintiffs,                       )
                                     )  Date:              November 15, 2010
19 v.                                )  Time:              10:30 a.m.
                                     )  Location:          Courtroom 1
20 COUNTY OF SAN DIEGO, WILLIAM D.   )  Judge:             Hon. Irma E. Gonzalez
21 GORE, INDIVIDUALLY AND IN HIS     )  Date Action Filed: October 23, 2009
   CAPACITY AS SHERIFF,              )
22                                   )
   Defendants                        )
23 _____  )

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3   TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

4   TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

5   CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

6   INTERESTS OF AMICUS CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7   Independence Institute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

8   Center for Constitutional Jurisprudence, and Doctors for Responsible Gun Ownership . . . . . . . 1

9   Law Enforcement Alliance of America . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

11  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

12  I.     The case can be decided without a standard of review, because near-total
13         prohibition of a constitutional right is never constitutional. . . . . . . . . . . . . . . . . . . . 2

       II.    A "reasonable" regulation is one that does not eliminate the exercise of a right,
14            but instead is narrowly tailored, is based on a significant government interest,
15            and leaves ample alternatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       III.   The state court cases approvingly cited in *Heller* expressly affirm the right to carry . . . . 7
16
       IV.    Twentieth century state courts decisions affirm the general right to carry for lawful
17            self-defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18  V.     McDonald specifically addresses and prohibits mass deprivation of the right
           to bear arms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| 1 | **TABLE OF AUTHORITIES** |

**U.S Supreme Court Cases**

*Aptheker v. Secretary of State*, 378 U.S. 500 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*McDonald v. Chicago*, 130 S.Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*NAACP v. Alabama*, 377 U.S. 288 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Other Authorities**

Brief of Law Professors Erwin Chemerinsky and Adam Winkler, as Amici Curiae in
Support of Petitioner, District of Columbia v. Heller, 2008 WL 157186 . . . . . . . . . . . . . . . . . . 6

CONG. GLOBE, 39th Cong., 1st Sess., 3210 (June 17, 1866) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Other Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Arnold v. City of Cleveland*, 616 N.E.2d 163 (Ohio 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Aymette v. State*, 21 Tenn. 154 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bleiler v. Chief, Dover Police Dep't.*,
    155 N.H. 693, 699, 927 A.2d 1216, 1222 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744 (1972) . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d 737 (Ct. App. 1971) . . . . . . . . . . . . . . . 10

*Harrold v. Collier*, 107 Ohio St.3d 44, 836 N.E.2d 1165 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kalodimos v. Vill. of Morton Grove*, 470 N.E.2d 266 (Ill. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 5

*Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Nunn v. State*, 1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Rabbitt v. Leonard*, 36 Conn. Supp. 108, 413 A.2d 489 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Robertson v. City & County of Denver*, 874 P.2d 325, 328 (Colo. 1994) . . . . . . . . . . . . . . . . . . 9

*State ex rel. City of Princeton v. Buckner*,
    80 W.Va. 457, 377 S.E.2d 139 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Chandler*, 5 La. Ann. 489 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921) . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Reid*, 1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Watson v. Stone*, 148 Fla. 516, 4 So.2d 700 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Scholarly Journals**

Kopel, David B. & Clayton Cramer, *State Court Standards of Review for the*

    *Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1113 (2010) . . . . . . . . . . . 6

Kopel, David B., Pretend *"Gun-Free" School Zones*,

    42 CONN. L. REV. 515 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Winkler, Adam, Scrutinizing the Second Amendment,

    105 MICH. L. REV. 683 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

**Books**

DOCUMENTARY HISTORY OF RECONSTRUCTION (W. Fleming ed.1950) . . . . . . . . . . 11

HALBROOK, STEPHEN, FREEDMEN, THE FOURTEENTH AMENDMENT,

    AND THE RIGHT TO BEAR ARMS, 1866-1876, at 9 (1998) . . . . . . . . . . . . . . . . . 11

JOHNSON, NICHOLAS J., DAVID B. KOPEL, MICHAEL P. O'SHEA,

    AND GEORGE MOSCARY, FIREARMS REGULATION, RIGHTS, AND

    RESPONSIBILITIES (Aspen Publications, 2011, forthcoming) . . . . . . . . . . . . . . . . 1

MCCLURG, ANDREW, DAVID B. KOPEL & BRANNON P. DENNING,

    GUN CONTROL AND GUN RIGHTS (NYU Press, 2002) . . . . . . . . . . . . . . . . . . . . . . 1

## CORPORATE DISCLOSURE STATEMENT

Law Enforcement Alliance of America (Virginia) and Independence Institute (Colorado) each state that they are non-profit corporations, incorporated in the states listed after their respective names. The Center for Constitutional Jurisprudence is the public interest legal arm, and Doctors for Responsible Gun Ownership is a research arm, of The Claremont Institute, a California non-profit corporation.

The aforesaid amici have no parent corporations, nor is there any publicly held corporation that owns more than 10% of the stock of any of them.

Respectfully submitted,


_____/s/ John C. Eastman_____
John C. Eastman
Center for Constl. Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, California 92866
Telephone:  (714) 628-2500

David B. Kopel
13952 Denver West Parkway, Suite 400
Golden, Colo. 80401
(303) 279-6536

Counsel of Amici Curiae

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTERESTS OF AMICUS CURIAE**

**Independence Institute**

Founded in 1985, the Independence Institute is a nonpartisan, nonprofit public policy research organization dedicated to the principles of the Declaration of Independence. Its interest in the case is protection of the human rights with which we are endowed by our Creator.

Independence Institute staff have written or co-authored scores of law review and other scholarly articles on the gun issue, and several books, including the only university textbook on the subject: ANDREW MCCLURG, DAVID B. KOPEL & BRANNON P. DENNING, GUN CONTROL AND GUN RIGHTS (NYU Press, 2002). Currently in preparation is the first law school textbook on the Second Amendment. NICHOLAS J. JOHNSON, DAVID B. KOPEL, MICHAEL P. O'SHEA, AND GEORGE MOSCARY, FIREARMS REGULATION, RIGHTS, AND RESPONSIBILITIES (Aspen Publishers, 2011). The Institute's amicus brief in *McDonald* was cited by Justice Alito's majority opinion and by Justice Stevens' dissent. The Institute's amicus brief in *Heller* was cited by Justice Breyer's dissent.

**Center for Constitutional Jurisprudence, and**

**Doctors for Responsible Gun Ownership**

The Center for Constitutional Jurisprudence was founded in 1999 as the public interest legal arm of The Claremont Institute, a public policy think tank devoted to restoring the principles of the American founding to their rightful and preeminent authority in our national life.  The Center advances this mission by representing clients or appearing as *amicus curiae* in cases of constitutional significance, including *McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010). Doctors for Responsible Gun Ownership ("DRGO") is also a project of The Claremont Institute, launched in 1994.  Headed by Dr. Timothy Wheeler, a southern California surgeon, DRGO is now a nationwide network of physicians, allied health professionals, and others who support the safe and lawful use of firearms.

**Law Enforcement Alliance of America**

Founded in 1991, the Law Enforcement Alliance of America's 75,000 members and supporters are comprised of law enforcements officers, crime victims, and concerned citizens.

1  LEAA's interest in the case is the advancement of public safety, based on the experience of

2  the large majority of states, where law-abiding, trained adults are allowed to carry firearms for

3  lawful protection.

**SUMMARY OF ARGUMENT**

5  No standard of review analysis is needed. A government action which forbids almost the

6  entire population from exercising a constitutional right is *per se* unconstitutional. Banning almost

7  everyone from exercising the right to bear arms is as facially unconstitutional as forbidding almost

8  everyone from speaking out loud in public places. As *Heller* and *McDonald* make clear,

9  self-defense is by definition a "good cause" for exercising the right to keep and bear arms; indeed

10  it is the best possible cause, the core of the right.

11  While defendants and their amicus argue at length for "reasonableness," that standard

12  forbids obliteration of a right, such as by forbidding almost everyone to bear arms.

13  Further, in the context of a fundamental right, precedent teaches that reasonable laws must

14  be narrowly tailored, serve a significant government interest, and leave ample alternatives.

15  Defendants' ban fails all three tests.

16  The state court decisions which *Heller* quoted and cited as authoritative and accurate

17  descriptions of the right to keep and bear arms directly show that public bearing of arms may not

18  be effectively banned. *Heller* expressly rejects defendants' theory that the Second Amendment

19  applies only to the home.

20  The comprehensive ban which defendants have created by misuse of the "good cause"

21  statute is precisely the kind of ban which the Fourteenth Amendment was designed to prevent, and

22  which *McDonald* specifically denounced.

**ARGUMENT**

24  I.    **The case can be decided without a standard of review, because near-total prohibition**
       **of a constitutional right is never constitutional.**

25

26  This is an easy case. There is no need for a standard of review. It is certainly true that a

27  legislature may, subject to strict scrutiny in many cases, or intermediate scrutiny in some others,

28  impose limited restrictions on the exercise of a constitutional right. For example, a legislature may

1   impose reasonable time, place, and manner controls speech in public places. Some narrow

2   categories of speech, such as revealing the movement of troops during wartime, may be

3   prohibited. However, a legislature cannot prohibit almost all persons from speaking out loud in

4   public.

5       Similarly, a legislature could, if meeting the appropriate standards of scrutiny, impose

6   some regulations on exercise of the right of assembly. But no legislature could forbid almost all

7   persons from assembling in public.

8       The same is true for the Second Amendment. *Heller* declares the obvious: The right to

9   "keep and bear arms" is "the individual right to possess and carry weapons in case of

10  confrontation." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2797 (2008).

11      Further, *Heller* states that the right to bear arms does not bar "laws forbidding the carrying

12  of firearms in sensitive places such as schools and government buildings." *Id.* at 2817. The

13  obvious and inescapable implication is that there is a right to carry firearms in places which are

14  not "sensitive."

15      Defendants assert that they have the power to prohibit entirely the defensive carrying of

16  arms by almost the entire public-that is, everyone who cannot point to an imminent and

17  identifiable particular threat.

18      Under *Heller*, this is plainly wrong. Nothing in the *Heller* decision asserted that Richard

19  *Heller* would have Second Amendment rights only if he could point out a specific threat. Nothing

20  in *Heller* asserted that the right to "bear" arms by carrying them for purposes of confrontation, in

21  places which are not "sensitive," was contingent on a specific threat.

22      As defendants admit, their licensing policy prohibits nearly all people from carrying

23  firearms in public places for lawful self-defense. The comprehensive prohibition of a

24  constitutional right is necessarily unconstitutional.

25      Standard of review analysis *would* be appropriate for various aspects of California's

26  licensing system, such as the training requirement, the application fee, and so on. However, none

27  of these controls are being challenged, only defendants' prohibition.

28      Further, California could prohibit concealed carry entirely (or impose the near-prohibitive

1  licensing system as currently administered by defendants) if California had open carry laws which

2  allowed (perhaps under a fair licensing system), law-abiding California adults to carry firearms

3  openly for protection. However, because defensive open carry is generally forbidden in California,

4  then the only way for California's overall system for carry controls to be constitutional is for

5  concealed carry to be available to the law-abiding adult population.

6      The California statute authorizes issuance of concealed carry permits to qualified persons

7  who have "good cause." According to *Heller*, lawful self-defense is by definition "good cause" for

8  exercising the right to keep and bear arms. Indeed, it is the very best cause, being "the core lawful

9  purpose of self-defense." *Id.* at 2818.

10  **II.   A "reasonable" regulation is one that does not eliminate the exercise of a right, but
        instead is narrowly tailored, is based on a significant government interest, and leaves**

11  **ample alternatives.**

12      As with the right to keep and bear arms, the right to freedom of speech has sometimes

13  been analyzed in terms of "reasonable" regulation. For example, many public events for exercise

14  of First Amendment rights may be subject to "reasonable" time, place, and manner regulations. So

15  the "government may impose reasonable restrictions," which means that the restrictions must be

16  "narrowly tailored to serve a significant governmental interest, and that they leave open ample

17  alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491

18  U.S. 781, 791 (1989).[1]

19      In the instant case, defendants' whim to deny permits to almost everyone is a broad

20  prohibition, the opposite of narrow tailoring. Nor does the prohibition leave any practical

21  "alternative." Almost everyone is forbidden from possessing or carrying defensive firearms almost

22  everywhere outside the home.

23      For these reasons alone, defendants' actions fail a reasonableness standard. They also fail

24  because they do not advance a significant government interest. Mere fretting about the dangers of

25  carrying guns in general does not address the reasonableness of carrying by adults who have

26  passed a rigorous background check, and taken safety classes, and whose carrying has been

27  _____

28  [1] Narrow tailoring is also an element of strict scrutiny. Strict scrutiny, however, requires a "compelling state interest," whereas "reasonableness" merely asks for "a significant government interest."

1    determined to be for the constitutionally supreme good cause of lawful self-defense.

2        Indeed, years of statewide data gathered from Minnesota, Michigan, Ohio, Louisiana,

3    Texas, and Florida-all of which treat self-defense to be a good cause for concealed carry

4    permits-shows that people with such permits are *much more law-abiding* than the general

5    population. David B. Kopel, Pretend *"Gun-Free" School Zones*, 42 CONN. L. REV. 515, 564-69

6    (2009).

7        Defendants and their amicus point to "studies" purporting to list crimes committed by

8    carry licensees. On closer examination, these studies, which amount to write-ups of Google

9    searches, omit crucial details-such as the fact that the licensee was determined to have acted in

10   lawful self-defense, or (in the rare case of licensee misconduct) the misconduct had nothing to do

11   with the carry permit, but took place in the home. *Id.* at 569-72; John Pierce, *Brady Center Joins*

12   *VPC in Deception*, THE EXAMINER (Minneapolis), July 23, 2009,

13   http://www.examiner.com/gun-rights-

14   in-minneapolis/brady- campaign-joins-the-vpc-deception (Violence Policy Center and the Brady

15   Center asserted that "court records" showed that a murderer had a carry permit, although the court

16   records specifically stated that he had no carry permit).

17       Rather than following the U.S. Supreme Court's standard of "reasonableness" in the

18   context of a fundamental right, defendants and their amicus proffer a crabbed and unreasonable

19   characterization. Their briefs amounts to a condensed version of Adam Winkler's article

20   *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683 (2007). The article was written

21   before *Heller* and *McDonald*, and under those cases, Winkler's thesis is simply invalid. As an

22   example of what Winkler considered to be in accordance with his version of a "reasonable" gun

23   control law, Winkler pointed to an Illinois case which upheld a suburb's handgun ban despite the

24   state constitution's right to keep and bear arms. Winkler at 718-79, discussing *Kalodimos v. Vill.*

25   *of Morton Grove*, 470 N.E.2d 266 (Ill. 1984).

26       Winkler's feeble version of "reasonableness" is not applicable to the Second Amendment,

27   because nearly identical handgun bans by two cities in the Morton Grove area were found

28   unconstitutional under *McDonald v. Chicago*, 130 S.Ct. 3020 (2010).

1    Further, it is worth noting that Winkler co-authored an amicus brief in *Heller*, in which he

2    argued that the Court should adopt his version of "reasonableness" and uphold the District of

3    Columbia handgun ban. Brief of Law Professors Erwin Chemerinsky and Adam Winkler, as

4    Amici Curiae in Support of Petitioner, *District of Columbia v. Heller*, 2008 WL 157186.

5    Obviously the Court did just the opposite.

6    We agree with Winkler, defendants, and their amicus that the word "reasonable" has often

7    appeared in state court decisions on state right to arms protections. We simply disagree that

8    Winkler's extremely weak formulation of what is "reasonable" can possibly be the proper standard

9    of review for the Second Amendment. *Heller* and *McDonald* are directly to the contrary.

10    Nor is the weak Winkler theory really a fair description of how modern courts have

11    applied reasonableness. *See* David B. Kopel & Clayton Cramer, *State Court Standards of Review*

12    *for the Right to Keep and Bear Arms*, 50 SANTA CLARA L. REV. 1113 (2010). The use of the

13    term "reasonable" by some courts is a far cry from defendants' concept that it is "reasonable" to

14    ban a constitutional right altogether. For example, *Bleiler v. Chief, Dover Police Dep't.*, 155 N.H.

15    693, 699, 927 A.2d 1216, 1222 (2007), upheld the requirement of a license to carry a concealed

16    weapon as "reasonable" because it "does not prohibit carrying weapons; it merely regulates the

17    manner of carrying them. . . . Even without a license, individuals retain the ability…to carry

18    weapons in plain view." The same could not be said here.

19    Similarly, *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004), used "reasonableness " to

20    examine the licensing systems for carrying handguns in public, and ruled: "Because the Firearms

21    Act provides for both discretionary and mandatory licensing to qualified applicants, the

22    constitutional guarantee to keep and bear arms is fulfilled." *Id.* at 1047 (also noting that the

23    plaintiff "was entitled to a carrying permit from the licensing authority"). By contrast, the policy

24    here generally prohibits the carrying of arms.

25    Even Winkler agrees that a government may not "effectively eliminate the core right to

26    bear arms." Winkler at 725.  In the instant case, defendants' microscopically tiny standard of

27    "good cause" effectively eliminates the right to bear arms.

28    It is no use for defendants to point out that while destroying the right to bear arms, they

1  have not destroyed the right to keep arms. A government could not justify destruction of the

2  freedom of the press (e.g., preventing most people from reading newspapers) by pointing out that

3  the government had not destroyed the freedom of speech (since people could still speak out loud

4  as much as they wanted).

5      Destruction of a constitutional right is never reasonable. *Heller*'s rule about carrying guns

6  in "sensitive places" is an example of a reasonable regulation. Defendant's preventing the

7  defensive carrying of guns anywhere in public is not reasonable.

8  **III.   The state court cases approvingly cited in *Heller* expressly affirm the right to carry**

9      Directly on point is *State v. Reid*, 1 Ala. 612, 616-17 (1840), which upheld a ban on

10  carrying a weapon concealed, but added: "A statute which, under the pretence of regulating,

11  amounts to a destruction of the right, or which requires arms to be so borne as to render them

12  wholly useless for the purpose of defence, would be clearly unconstitutional." This sentence is

13  quoted in *Heller* as an accurate expression of the right to bear arms. *Heller*, 128 S. Ct. at 2818.

14      Likewise cited by the Supreme Court as an accurate reading of the Second Amendment

15  was *Nunn v. State*, 1 Ga. 243 (1846). That case, relying on the Second Amendment struck down a

16  general ban on carrying handguns for protection. *Nunn* upheld a ban on concealed carry, because

17  open carry was allowed. *Nunn* too is approvingly cited in *Heller* for having "perfectly captured" a

18  correct understanding of the Second Amendment.  *Heller*, 128 S. Ct. at 2809.

19      *Heller* also relies on *State v. Chandler*, 5 La. Ann. 489 (1850) for correctly expressing that

20  the Second Amendment guarantees a right to carry, but the legislature may determine whether the

21  carry is to be open or concealed. *Heller*, at 2809.

22      To the exact same effect is *Andrews v. State*, 50 Tenn. 165 (1871), where the Tennessee

23  Supreme Court equated the state constitutional provision to the Second Amendment, and struck

24  down a law against carrying handguns "publicly or privately, without regard to time or place, or

25  circumstances." Again, the legislature had the power to determine the mode of carry, but no

26  legislature (let alone a sheriff misapplying a statute) could ban public carry. *Andrews* too is cited

27  as authoritative by *Heller*. *Heller*, 128 S. Ct. at 2806, 2809.

28      *Heller* also discussed one case which adopted the Second Amendment reading that

1    defendants and their amicus prefer: that everyone has a Second Amendment right to "keep" arms

2    in the home, but there is no general right to "bear" arms in public. *Aymette v. State*, 21 Tenn. 154

3    (1840). *Heller* described this theory as an "odd reading of the right" and "not the one we adopt."

4    *Heller*, 128 S. Ct. at 2809.

5       *Reid*, *Nunn*, *Chandler*, and *Andrews*, all cited as correct Second Amendment precedents by

6    *Heller*, provide the controlling guidance in the instant case. They trump any contrary conclusion

7    from cases which are not cited approvingly by the Supreme Court, but instead are merely cited

8    approvingly by defendants and their amicus. Even more helpfully, for the instant case, the

9    Supreme Court has already announced that defendants' home-only version of the Second

10    Amendment is not the law of the land.

11       Just as a lower court does not need to worry about the standard of review when a

12    government official effectively prohibits the exercise of a textual right, a lower court does not

13    need to delve into the standard of review when the controlling Supreme Court precedent, issued

14    two years earlier, directly shows a defendant's smothering of a right to be unconstitutional. This is

15    a very easy case.

16   **IV.**    **Twentieth century state courts decisions affirm the general right to carry for lawful**
17         **self-defense**

18       Invalidating an ordinance which prohibited firearms from being transported or possessed

19    in a vehicle or place of business for self defense, *City of Lakewood v. Pillow*, 180 Colo. 20, 501

20    P.2d 744 (1972), reasoned:

21       A governmental purpose to control or prevent certain activities, which may be
         constitutionally subject to state or municipal regulation under the police power,
22       may not be achieved by means which sweep unnecessarily broadly and thereby
         invade the area of protected freedoms. . . . Even though the governmental purpose
23       may be legitimate and substantial, that purpose cannot be pursued by means that
         broadly stifle fundamental personal liberties when the end can be more narrowly
24       achieved.

25    *Id.* at Colo. 23, citing and quoting from *Aptheker v. Secretary of State*, 378 U.S. 500 (1963) (First
   and Fifth Amendments, and right to travel); *NAACP v. Alabama*, 377 U.S. 288 (1958) (First
26    Amendment rights of assembly and association).

27       Defendants and their amicus prefer a different case from the Colorado Supreme Court,

28    which upheld a ban on some firearms, affirmed its adherence to *Lakewood v. Pillow*, but said that

1    "this case does not require us to determine whether that right is fundamental." *Robertson v. City &*

2    *County of Denver*, 874 P.2d 325, 328 (Colo. 1994). Such deliberate ignorance is precluded here by

3    *McDonald*'s holding that the right is fundamental.[2] *Robertson* upheld the gun law simply because

4    it was based on the police power. The *Robertson* approach is plainly invalid for the Second

5    Amendment, because the D.C. handgun ban was also based on the police power, but was ruled

6    unconstitutional in *Heller*.

7        *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 462, 377 S.E.2d 139 (1988),

8    invalidated a statute which prohibited carrying a handgun without a license, in that it "operates to

9    impermissibly infringe upon this constitutionally protected right to bear arms for defensive

10   purposes." Following and citing *Pillow*, the court explained that "the legitimate governmental

11   purpose in regulating the right to bear arms cannot be pursued by means that broadly stifle the

12   exercise of this right where the governmental purpose can be more narrowly achieved." *Id.* at 464.

13   Carrying concealed weapons may be regulated, but not "by means which sweep unnecessarily

14   broadly . . . ." *Id.* at 467. The West Virginia legislature remedied the constitutional problem by

15   enacting a statute for the issuance of concealed carry permits to law-abiding qualified citizens,

16   thereby eliminating the risks of wholesale denial, such as those manifest in the instant case. Kopel

17   & Cramer, 50 SANTA CLARA L. REV. at 1207-08.

18       *Rabbitt v. Leonard*, 36 Conn. Supp. 108, 112, 413 A.2d 489 (1979), held in a case

19   involving a license to carry a handgun: "It appears that a Connecticut citizen, under the language

20   of the Connecticut constitution, has a fundamental right to bear arms in self-defense, a liberty

21   interest which must be protected by procedural due process."[3]

22       *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921), invalidated a requirement of a

23

24      [2] Similarly, *Arnold v. City of Cleveland*, 616 N.E.2d 163 (Ohio 1993), invented a
     "reasonableness test" for the admittedly "fundamental right" to have arms, but that Court applies
25   strict scrutiny for other fundamental rights. *E.g., Harrold v. Collier*, 107 Ohio St.3d 44, 836
     N.E.2d 1165 (2005). *McDonald* rejects this "second-class right" approach. 130 S.Ct. at 3044.
26

27      [3] The existence of a later decision which ignored that principle does not help defendants.
     *Benjamin v. Bailey*, 662 A.2d 1226, 1232 (Conn. 1995), adopted the very reasoning *Heller*
28   rejected: if "some types of weapons" are available, "other weapons" may be banned. More
     importantly, the effect of defendants' policy here is not to narrow the types of firearms which may
     be carried for lawful self-defense; it is to prohibit defensive carry by almost everyone.

1  license to carry a handgun, because "the right to bear such arms unconcealed cannot be infringed."

2  The court held: "As a regulation, even, this is void because an unreasonable regulation, and,

3  besides, it would be void because for all practical purposes it is a prohibition of the constitutional

4  right to bear arms. There would be no time or opportunity to get such permit . . . on an

5  emergency." *Id.* at 225.

6  Again, the constitutional problem of a permit system can be remedied with a

7  fairly-administered permit system that respects the good cause of self-defense. As for situations of

8  emergency, plaintiffs in the instant case have not raised the issue, such as by requesting expedited

9  licensing, or permission to carry during an emergency while an application is pending.

10  Also on point for the instant case are *City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d

11  737 (Ct. App. 1971) ("an ordinance may not deny the people the constitutionally guaranteed right

12  to bear arms" by generally banning the carrying of arms); and *State v. Rosenthal*, 75 Vt. 295, 55 A.

13  610, 611 (1903) (invalidating prohibition on carrying weapon without written permission of

14  mayor or chief of police).

15  This court does not have to go as far as the North Carolina and Vermont Supreme Courts

16  did in interpreting their state constitutions. This court must go as far as the U.S. Supreme Court

17  has mandated for the United States Constitution: protecting the right to bear arms (while allowing

18  legislative choice about open or concealed), and enforcing the requirements that restrictions on the

19  right to carry be narrowly tailored.

20  **V.   *McDonald*  specifically addresses and prohibits mass deprivation of the right to bear**

21          **arms.**

22  Right at the beginning of the discussion of the constitutional violations that the Fourteenth

23  Amendment was designed to remedy, *McDonald* points to a firearm carry license law with

24  excessive discretion. The Fourteenth Amendment, according to *McDonald*, was aimed at laws

25  such as the Mississippi statute providing that "no freedman, free negro or mulatto, not in the

26  military service of the United States government, and not licensed so to do by the board of police

27  of his or her county, shall keep or carry fire-arms of any kind . . . ." *McDonald*, 130 S.Ct. at 3038.

28

1    *McDonald* then stated, "see also Regulations for Freedmen in Louisiana, in id.,[4] at 279-280,"

2    which included the following: "No negro who is not in the military service shall be allowed to

3    carry firearms, or any kind of weapons, within the parish, without the written special permission

4    of his employers, approved and indorsed by the nearest and most convenient chief of patrol."

5        *McDonald* described a convention of black citizens in South Carolina who petitioned

6    Congress, stating their petition that the Constitution "explicitly declares that the right to keep and

7    bear arms shall not be infringed" and urging that "the late efforts of the Legislature of this State to

8    pass an act to deprive us [of] arms be forbidden, as a plain violation of the Constitution." 130

9    S.Ct. at 3038 n.18, quoting STEPHEN HALBROOK, FREEDMEN, THE FOURTEENTH

10   AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, at 9 (1998). Rep. George W.

11   Julian described that law and another in urging adoption of the Fourteenth Amendment:

12       Although the civil rights bill is now the law, . . . [it] is pronounced void by the
    jurists and courts of the South. Florida makes it a misdemeanor for colored men to

13       carry weapons without a license to do so from a probate judge, and the punishment
    of the offense is whipping and the pillory. South Carolina has the same enactments;

14       and a black man convicted of an offense who fails immediately to pay his fine is
    whipped. . . . Cunning legislative devices are being invented in most of the States

15       to restore slavery in fact.

16   CONG. GLOBE, 39th Cong., 1st Sess., 3210 (June 17, 1866).

17       "The most explicit evidence of Congress' aim" regarding the Fourteenth Amendment,

18   *McDonald* continued, appeared in the recognition in the Freedmen's Bureau Act of 1866 of "the

19   right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty,

20   personal security, and the acquisition, enjoyment, and disposition of estate, real and personal,

21   *including the constitutional right to bear arms* . . . ." 130 S.Ct. at 3040 (emphasis added by Justice

22   Thomas).

23       *McDonald* rejected the argument that the above Act and the Fourteenth Amendment

24   sought only to provide a non-discrimination rule. The Act referred to the "full and equal benefit,"

25   not just "equal benefit." The equality-only theory would imply that "the First Amendment, as

26   applied to the States, would not prohibit nondiscriminatory abridgments of the rights to freedom

27   of speech or freedom of religion . . . ." *Id.* at 3043.

28   _____

    [4] 1 DOCUMENTARY HISTORY OF RECONSTRUCTION 289 (W. Fleming ed.1950).

1    Justice Thomas's concurrence referred to states that "enacted legislation prohibiting blacks

2   from carrying firearms without a license," *Id.* at 3082, and quoted Frederick Douglass as stating

3   that "the black man has never had the right either to keep or bear arms," a problem which would

4   be remedied by adoption of the Fourteenth Amendment. *Id.* at 3083.

5    Selectively allowing only privileged persons to exercise the right to bear arms  persisted

6   well after adoption of the Fourteenth Amendment. See *Watson v. Stone*, 148 Fla. 516, 524, 4

7   So.2d 700 (1941) (Buford, J., concurring) ("the Act [requiring a carry license] was passed for the

8   purpose of disarming the negro laborers . . . . The statute was never intended to be applied to the

9   white population . . . .").

10    Selective favoritism for the right to bear arms persists today in San Diego County. But

11   *McDonald*,  affirms that "the Second Amendment right protects the rights of minorities and other

12   residents of high-crime areas whose needs are not being met by elected public officials." 130 S.Ct.

13   at 3049.

14    The effect of defendants' misuse of the "good cause" standard is to place almost all the

15   law-abiding citizens of San Diego County in the same position as southern blacks under the heel

16   of the Black Codes and Jim Crow: forbidden to exercise their Second Amendment right to bear

17   firearms for lawful self-defense.

18    Accordingly, this court should grant summary judgment for plaintiffs, and require

19   defendants to issue carry permits to all qualified applicants who wish to bear arms for the

20   eminently good cause of lawful self-defense.

21   Respectfully submitted,

22   _____/s/ John C. Eastman_____
John C. Eastman
23   Center for Constl. Jurisprudence
c/o Chapman University School of Law
24   One University Drive
Orange, California 92866
25   Telephone:  (714) 628-2500

26   David B. Kopel
13952 Denver West Parkway, Suite 400
27   Golden, Colo. 80401
(303) 279-6536
28
Counsel of Amici Curiae

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

EDWARD PERUTA, MICHELLE LAXSON,   )   CASE NO: 09-CV-2371 IEG (BGS)
JAMES DODD, DR. LESLIE BUNCHER,   )
MARK CLEARY, and CALIFORNIA RIFLE )   **CERTIFICATE OF SERVICE**
AND PISTOL ASSOCIATION            )
FOUNDATION                        )
                                  )
Plaintiffs,                       )
v.                                )
                                  )
COUNTY OF SAN DIEGO, WILLIAM D.   )
GORE, INDIVIDUALLY AND IN HIS     )
CAPACITY AS SHERIFF,              )
                                  )
Defendants.                       )
————————————————————             )

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is One University Drive, Orange, California, 92866.

     I am not a party to the above-entitled action. I have caused service of:

### AMICUS BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

### SEE SERVICE LIST ATTACHED

     I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 18, 2010.

                        _____/s/ John C. Eastman_____
                        John C. Eastman, Declarant

SERVICE LIST

James M. Chapin
County of San Diego
Office of County Counsel
1600 Pacific Highway, Room 355
San Diego, CA 92101-2469
(619) 531-5244
Fax: (619-531-6005)
james.chapin@sdcounty.ca.gov

Paul Neuharth, Jr. (State Bar #147073)
PAUL NEUHARTH, JR., APC
1140 Union Street, Suite 102
San Diego, CA 92101
Telephone:      (619) 231-0401
Facsimile:      (619) 231-8759
pneuharth@sbcglobal.net

C. D. Michel
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
Fax: (562) 216-4445
cmichel@michellawyers.com