1    C. D. Michel – SBN 144258
     Clint B. Monfort - SBN 255609
2    Sean A. Brady - SBN 262007
     cmichel@michellawyers.com
3    MICHEL & ASSOCIATES, P.C.
     180 E. Ocean Blvd., Suite 200
4    Long Beach, CA 90802
     Telephone: (562) 216-4444
5    Facsimile:    (562) 216-4445
     www.michellawyers.com
6    Attorneys for Plaintiffs / Petitioners

7    Paul Neuharth, Jr. (State Bar #147073)
     pneuharth@sbcglobal.net
8    PAUL NEUHARTH, JR., APC
     1440 Union Street, Suite 102
9    San Diego, CA 92101
     Telephone: (619) 231-0401
10   Facsimile:    (619) 231-8759
     Attorney for Plaintiffs / Petitioners

11

12             **IN THE UNITED STATES DISTRICT COURT**

13                **SOUTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,<br><br>Defendants. | **CASE NO: 09-CV-2371 IEG (BGS)**<br><br>**CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND;**<br><br>**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:          November 15, 2010<br>Time:       10:30 a.m.<br>Location:      Courtroom 1<br>Judge:        Hon. Irma E. Gonzalez<br>Date Action Filed: October 23, 2009 |

1

**TABLE OF CONTENTS**

2

**Page(s)**

3 ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4 I.   PLAINTIFFS' SEEK TO HAVE THIS COURT CONSTRUE PENAL
     CODE § 12050 IN A CONSTITUTIONAL MANNER, *NOT* TO HAVE IT OVERTURNED . 1
5
6 II.  THE RIGHT TO BEAR ARMS DOES NOT END AT ONE'S
     THRESHOLD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

7       A.   "Bear Arms" Means Carry, Including in Public . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8       B.   The County Confuses Cases That Ban *All* Carry with Cases That Ban *Some* Form of
            Carry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
9
   III. STRICT SCRUTINY IS THE APPROPRIATE STANDARD OF JUDICIAL REVIEW . . . . . 7
10
        A.   The "Presumptively Lawful" Language in *Heller* Does Not Preclude
11           Strict Scrutiny Judicial Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

12       B.   Intermediate Scrutiny Is Inappropriate, Especially after *Mcdonald* . . . . . . . . . . . . . . . . 8

13       C.   Undue Burden / Reasonable Regulation Review is Also Inappropriate . . . . . . . . . . . . . 9

14       D.   The Trend After *McDonald* Is Toward Adopting Strict Scrutiny Judicial Review . . . . 11

15 IV.  THE COUNTY CANNOT MEET ITS BURDEN TO SHOW AN INTEREST IT IS
     ACTUALLY FURTHERING THAT JUSTIFIES ITS SPECIAL NEEDS "GOOD CAUSE"
16   POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

17       A.   The County Has Provided No Credible Evidence Establishing That Issuing CCWs to
            Law Abiding Citizens Will Increase Violent Crimes or Otherwise *Adversely* Affect
18          Public Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19       B.   The Cases Relied on by the County Are Unpersuasive . . . . . . . . . . . . . . . . . . . . . . . . . 14

20 V.   PLAINTIFFS HAVE ESTABLISHED THEIR EQUAL PROTECTION CLAIMS . . . . . . . . . 15

21       A.   The County's Special Needs Policy Creates a Class of People Ineligible to Obtain a
            CCW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
22
        B.   There Are No Material Factual Disputes Regarding HDSA Member's Unequal
23           Treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

24 VI.  DISPUTES OF MATERIAL FACT EXIST ON THE COUNTY'S OTHER CLAIMS, WHICH
     SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
25
        A.   The Facts Suggest Plaintiff Peruta Was Denied a CCW for Lack of Residency . . . . . . 18
26
        B.   Peruta's Right to Travel Was Violated When Denied a CCW Based on His Part-time
27           Residency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28

1

**TABLE OF CONTENTS,** *Cont.*

2

**Page(s)**

3      C.      The Facts Support Plaintiffs' Due Process Claims ........................... 19

4   VII.   FACIAL CHALLENGE AND QUALIFIED IMMUNITY ISSUES ................... 20

5   VIII.   CONCLUSION ............................................................. 20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1 **TABLE OF AUTHORITIES**

2 **Page(s)**

**SUPREME COURT CASES**

3

4 *Attorney Gen. of N.Y. v. Soto-Lopez*,
476 U.S. 898 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5 *Burdick v. Takushi*,
504 U.S. 428 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

6

7 *City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432, 440 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**

8 *City of L.A. v. Alameda Books, Inc.*,
535 U.S. 425, 438 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

9

10 *DeShaney v. Winnebago County Dept. of Soc. Servs.*,
489 U.S. 189 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

11 *District of Columbia v. Heller*,
128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

12

13 *Gonzalez v. Carhart*,
550 U.S. 124, 146 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

14 *Harman v. Forssenius*,
380 U.S. 528, 540 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15

16 *Harper v. Va. State Bd. of Elections*,
383 U.S. 663, 670 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

17 *Harlow v. Fitzgerald*,
457 U.S. 800, 806 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18

19 *Johnson v. California*,
543 U.S. 499, 515 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

20 *Kramer v. Union Free Sch. Dist.*,
395 U.S. 621, 626-28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21

22 *McDonald v. Chicago*,
561 U.S. __ 130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

23 *Muscarello v. United States*,
524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24

25 *R.A.V. v. City of St. Paul*,
505 U.S. 377, 390 n.6 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

26 *Robertson v. Baldwin*,
165 U.S. 275, 281-282 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

27

28 *Santa Fe Indep. Sch. Dist. v Doe*,
530 U.S. 290 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1

**TABLE OF AUTHORITIES,** *Cont.*

2

**Page(s)**

3

*United States ex rel. Attorney Gen. v. Del. & Hudson Co.,*
213 U.S. 366 (1909) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

4

5

*U.S. v. Hall,*
No. 2:08-00006, 2008 U.S. Dist. LEXIS 59641
(S.D.W. Va., Aug. 4, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

6

7

*Village of Willowbrook v. Olech,*
528 U.S. 562 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

8

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

9

10

*Zablocki v. Redhail,*
434 U.S. 374 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

11

**FEDERAL CASES**

12

13

*Bowers v. DeVito,*
686 F.2d 616, 618 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

14

*Erdelyi* v. *O'Brien,*
680 F.2d 61 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

15

16

*Freeman v. City of Santa Ana,*
68 F.3d 1180 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

17

*Heller v. District of Columbia* (*Heller II*),
698 F. Supp.2d 179 (D.D.C. 2010)

18

19

*Joyce v. Mavromatis,*
783 F.2d 56, 57 (6th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

20

*Kachalsky v. Cacace,*
No. 10-05143 (S.D.N.Y. filed July 15, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21

22

*Kellogg* v. *City of Gary,*
562 N.E.2d 685 (Ind. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

23

*March v. Rupf,*
No. 00-3360, 2001 U.S. Dist. LEXIS 14708 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 17

24

25

*Miller v. Reed,*
176 F.3d 1202, 1205-1206 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

26

*Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.,*
466 F.2d 552, 554 (9th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

27

28

*Nordyke v. King,*
563 F.3d 439, 460 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1

**TABLE OF AUTHORITIES,** *Cont.*

**Page(s)**

*Parker v. District of Columbia*,
478 F.3d 370, 399 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Order Denying Defendant's Motion to Dismiss,
*Peruta v. County of San Diego*,
678 F. Supp. 2d 1046, 1055 (S.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 6, 11, 19

*Presbyterian Church (U.S.A.) v. U.S.*,
870 F.2d 518, 527 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Thornton v. City of St. Helens*,
425 F.3d 1158 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Engstrum*,
609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Aguilar*,
883 F.2d 662, 706 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE CASES**

*Andrews v. State*,
50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Aymette v. State*,
21 Tenn. (2 Hum.)154 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bliss v. Commonwealth*,
12 Ky. (2 Litt.) 90 (1822) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*City of Lakewood v. Pillow*,
501 P.2d 744 (Colo. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dano v. Collins*,
166 Ariz. 322 (Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fife v. State*,
31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Glasscock v. City of Chattanooga*,
157 Tenn. 518 (1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Nunn v. State*,
1 Ga. 243, 251 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

*People v. Dykes*,
46 Cal. 4th 731 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*People v. Flores*,
169 Cal. App. 4th 568 (Ct. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**TABLE OF AUTHORITIES,** *Cont.*

2

**Page(s)**

3   *People v. Hale*,

4         43 Cal. App. 3d 353, 356 (Ct. App. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14

5   *People v. Hodges*,
          70 Cal. App. 4th 1348, 1357 (Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6   *People v. Marin*,
          795 N.E.2d 953 (Ill. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
7

8   *People v. Yarbrough*,
          169 Cal. App. 4th 303 (Ct. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

9   *Junction City v. Mevis*,
          601 P.2d 1145 (Kan. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
10

11   *Riddick v. United States*,
          995 A.2d 212 (D.C. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12   *Schubert v. DeBard*,
          398 N.E.2d 1339 (Ind. Ct. App.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
13

14   *Sims v. United States*,
          963 A.2d 147, 148 (D.C. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15   *State ex rel. City of Princeton v. Buckner*,
          377 S.E.2d 139 (W. Va.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
16

17   *State of Wisconsin v. Schultz*,
          No. 10-CM-138, slip op. (Wis. Cir. Oct. 12, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

18   *State v. Buzzard*,
          4 Ark. 18 (1842) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
19

20   *State v. Chandler*,
          5 La. Ann. 489 (1850) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

21   *State v. Jumel*,
          13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
22

23   *State v. Kerner*,
          107 S.E. 222 (N.C. 1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

24   *State v. Reid*,
          1 Ala. 619 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
25

26   *State v. Rosenthal*,
          55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

27   *State v. Smith*,
          571 A.2d 279 (N.H. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
28

1

**TABLE OF AUTHORITIES, *Cont.***

2

**Page(s)**

*State v. Workman,*
3      5 W. Va. 367 (1891) .......................................................... 6

4   *Wilson v. State,*
5      33 Ark. 557 (1878) ........................................................... 6

6 **STATUTES & RULES**

7  Cal. Pen. Code § 12025(a) ..................................................... 1, 2, 3

8  Cal. Pen. Code § 12031 ............................................................ 1, 3

9  Cal. Pen. Code § 12031(a) ...................................................... 1, 2, 3

10  Cal. Pen. Code § 12050 ................................................... 1, 2, 3, 18, 20

11  Cal. Pen. Code § 12054 ............................................................. 19

12  42 U.S.C. § 1983 ................................................................. 19

13

14 **OTHER AUTHORITY**

15  *See About the Violence Policy Center,*
    http://www.vpc.org/aboutvpc.htm (last visited Oct. 13, 2010) ............................... 12

16  Ninth Cir. Adv. Comm. Notes to Circuit Rules 35-3. (Rev. 1/1/00) ............................ 5

17  David Kopel, *State Court Standards of Review for the Right to Keep and Bear Arms,* 50 Santa Clara L.
18  Rev. 1113, 1215-1218 ............................................................. 10

19  Enrique Rangel, *Majority of Gun Licensees White Males, Law* Abiding, Lubbock Avalanche J., Aug.
    16, 2009, http://lubbockonline.com/stories/081609/loc_482262241/shtml ............... 12

20  Terry Flynn, *Gun-Toting Kentuckians Hold Their Fire,* Cincinatti Enquirer, June 16, 1997,
21  http://www.enquirer.com/editions/1997/06/16/loc_kccarry.html ............................. 12

22  *Scrutinizing the Second Amendment,*
    105 Mich. L. Rev. 683, 686, 716-17 (2007) ........................................ 10

23  Thom Goolsby, *Concealed Weapons Advocates Were Right: Crime Didn't Go Up,*
24  Chapel Hill Herald, May 6, 1997, at 4 ............................................. 13

25  Tad Dickens & Ray Reed, *Pistol-Packing and Proud of It,*
    Roanoke Times, May 19, 2002, A1 .................................................. 13

26  Eugene Volokh, *The Second Amendment and the Right to Keep and Bear Arms
    After D.C. v. Heller: Implementing the Right to Keep and Bear Arms for Self-Defense:*
27  *An Analytical Framework and a Research Agenda,* 56 UCLA L. Rev. 1443 (2009) ....... 13

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ARGUMENT

### I.   PLAINTIFFS SEEK TO HAVE THIS COURT CONSTRUE PENAL CODE § 12050 IN A CONSTITUTIONAL MANNER, *NOT* TO HAVE IT OVERTURNED

Defendants William Gore and County of San Diego (collectively "the County") misstate

Plaintiffs' claim as a request "to strike the 'good cause' language" from California Penal Code § 12050

and to advocate "the theory that *Heller* provides that everyone has a constitutional right to carry a

concealed weapon in public." (Defs.' Mem. Opp. to Mot. Partial Summ. J.  8:24-26). The County builds

its case on this flawed foundation, suggesting Plaintiffs should challenge Cal. Pen. Code §§ 12025(a)

and 12031(a) instead of, or concurrently with, challenging the County's policy of requiring proof of a

special need for issuance of a license issued pursuant to Cal. Pen. Code §§ 12050 *et seq*. (a "CCW").

But Plaintiffs are only challenging the *County's policy* in implementing section 12050's "good

cause" requirement.  This approach is consistent with the doctrine of constitutional avoidance,[1] under

which the Court should *uphold* section 12050's licensing scheme, as well as sections 12025 and 12031

(to the extent these need to be considered at all), by construing the existing state statutes in a

constitutional manner.  This means holding section 12050's "good cause" criterion to be satisfied where

CCW applicants of good moral character assert "self-defense as their basis."

This is the approach taken in *Schubert v. DeBard*, 398 N.E.2d 1339, 1341 (Ind. Ct. App.1980),

which construed the "proper reason" requirement (virtually identical to "good cause") in Indiana's

provision for licensing concealed handguns consistent with the right to bear arms as follows:

> [T]he superintendent decided the application on the basis that the statutory reference to "a proper reason" vested in him the power and duty to subjectively evaluate an assignment of "self-defense" as a reason for desiring a license and the ability to grant or deny the license upon the basis of whether the applicant "needed" to defend himself.
>
> Such an approach contravenes the essential nature of the constitutional guarantee.  It would supplant a right with a mere administrative privilege which might be withheld simply on the basis that such matters as the use of firearms are better left to the organized military and police forces even where defense of the individual citizen is involved.

---

[1]  The canon of constitutional avoidance provides "when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is [the court's] plain duty to adopt that construction which will save the statute from constitutional infirmity." *United States ex rel. Attorney Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 407 (1909);

1  Further, Plaintiffs have never claimed that *District of Columbia v. Heller*, 128 S. Ct. 2783

2  (2008), "provides that everyone has a constitutional right to carry a *concealed* weapon in public." (8:25-

3  26) (emphasis added).) Nor do Plaintiffs assert that there is necessarily a right to carry a firearm *in any*

4  *manner*. (Opp. 9:11-12.) Rather, Plaintiffs assert that the Second Amendment protects a fundamental

5  right to carry a firearm ready to use for self-defense *in some manner*. To a degree, the legislature can

6  constitutionally dictate that manner. In California, the legislative preference is for licensed, discrete

7  concealed carry instead of open carry. (Pls.' Mem. Supp. Mot. Partial Summ. J. 23:6-8). Licenses can

8  constitutionally be required, but a license or permit cannot be denied to individuals of "good moral

9  character" (as required by section 12050) who seek a CCW permit for self-defense but cannot prove a

10  special need beyond self-defense.[2]

11  In light of the Second Amendment's protections, Penal Code § 12050 cannot grant local Sheriffs

12  unbridled discretion to decide, as a matter of policy, that the fundamental right to self-defense does not

13  constitute "good cause," nor to impose a heightened "special needs" test for CCW issuance. But that is

14  what the County's policy does. The question in this case is under what circumstances *must* a CCW

15  permit be issued under California's existing statutory scheme, *not* whether the state can choose to

16  structure a regulatory scheme that prohibits people from bearing an arm without one.

17  When considered in that proper context, the County's arguments are misdirected. The County's

18  efforts to establish that because sections 12025(a) and 12031(a) are constitutional there thus is no right

19  to carry arms, are irrelevant because Plaintiffs do not question their constitutionality. The two

20  California Court of Appeal cases the County cites for this proposition, *People v. Yarbrough*, 169 Cal.

21  App. 4th 303 (Ct. App. 2008), and *People v. Flores*, 169 Cal. App. 4th 568 (Ct. App. 2008), do not

22  address the issue presented here: whether the Second Amendment protects a fundamental right to carry

23  a firearm ready to use for self-defense *in some manner*.

24  Plaintiffs' challenge is not inconsistent with *Yarbrough*'s holding. *Heller* approves of bans on

25

26  [2] An illustrative analogy is the state's scheme for issuing driver's licenses. Requiring a license to operate a vehicle is not an unconstitutional infringement on the right to travel. *See Miller v. Reed*, 176

27  F.3d 1202, 1205-1206 (9th Cir. 1999) (quoting *Monarch Travel Servs., Inc. v. Associated Cultural

28  Clubs, Inc.*, 466 F.2d 552, 554 (9th Cir. 1972) ("We have previously held that burdens on a single mode of transportation do not implicate the right to interstate travel. Whereas requiring people to prove they have a *need* to drive somewhere, which *need* separates them from the general public, likely would be unconstitutional and certainly would be if the "right to drive cars" was enshrined in the Bill of Rights.

1  carrying *concealed* firearms *when the law allows for an alternative method of carrying.*  And carrying a

2  firearm pursuant to a valid CCW is *not* a violation of either section 12025(a) or section 12031(a).  *See*

3  Cal. Penal Code § 12050.[3]

4  The same goes for *Flores*, in which, as the County acknowledges (Opp. 7:18-20), the court

5  explains that the "wealth of exceptions" provided in California Penal Code § 12031 – one of which is

6  carrying pursuant to a valid CCW – distinguishes it from the holding in *Heller*.[4]  *Flores*, 169 Cal. App.

7  4th at 576. This hardly articulates the proposition that there is no right to carry a firearm at all.  There is

8  no legal authority nor logical nexus for making that argumentative leap.

9  **II.     THE RIGHT TO BEAR ARMS DOES NOT END AT ONE'S THRESHOLD**

10  *McDonald* held that the Second Amendment right to keep and to bear arms is fundamental, not

11  merely that some subset of that right is fundamental.  *McDonald v. Chicago*, 130 S. Ct. 3020, 3049-50

12  (2010).  There is no basis to subdivide the right to keep arms from the right to bear arms, nor to

13  designate bearing arms as a "non-core" part of the Second Amendment right having second-class status.

14  *McDonald* expressly and emphatically rejected the notion that the Second Amendment right, or any part

15  of it, is somehow second-class.  *Id.* at 3044.  There is no support for the proposition that bearing arms

16  outside the home is any less fundamental than keeping arms in the home.

17  **A.     "Bear Arms" Means Carry, Including in Public**

18  The County ignores the inevitable ramifications of *Heller*'s definition of "bear" as adopted from

19  *Muscarello v. United States*, 524 U.S. 125 (1998), which, as already recognized by this Court, is

20  controlling, and *not* mere dicta.[5]  *See* Order Denying Defendant's Motion to Dismiss, *Peruta v. County*

21  *of San Diego*, 678 F. Supp. 2d 1046, 1055 (S.D. Cal. 2010) (No. 09-2371) (citing *Heller*, 128 S. Ct. at

22  2793).  Nor does the County distinguish *Heller*'s repeated references to the right to "carry" firearms.

23

24  [3] Two other cases cited by the County, *People v. Hale*, 43 Cal. App. 3d 353, 356 (Ct. App. 1974), and
*People v. Hodges*, 70 Cal. App. 4th 1348, 1357 (Ct. App. 1999), are irrelevant for the same reasons, and

25  additionally because they pre-date both the *Heller* and *McDonald* decisions.

26  [4] The *Flores* court even states "section 12031 is narrowly tailored to reduce the incidence of unlawful
public shootings, while at the same time respecting  the need for persons to have access to firearms for

27  lawful purposes, *including self-defense* . . . .(emphasis added)." *Flores*, 169 Cal. App. 4th at 576

28  [5] In deciding *Heller*, the Supreme Court had to decide whether, as the government argued, "bear
arms" meant militia-use.  In doing so, the Court had to define "bear," which it did.  Thus, that definition
is not dicta, but was *required* to support the Court's decision to reject the government's argument.

*See Heller*, 128 S. Ct. at 2793 ("At the time of the founding, as now, to 'bear' meant to 'carry' "); 128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms . . ."); 128 S. Ct. at 2817 ("the right to keep *and carry* arms") (emphasis added); and 128 S. Ct. at 2796 ("bear arms means . . . simply the carrying of arms . . . .").

This very Court has already explained "*Heller* does not preclude Second Amendment challenges to laws regulating firearm possession outside of home." Order Denying Defendant's Motion to Dismiss, *Peruta*, 678 F. Supp. 2d at 1051 (No. 09-2371). Nonetheless, both the County and Amicus desperately attempt to support their position by pointing to the Supreme Court's holding that "the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense." (Opp. 9:1-6; Brady Center Amicus Br. 5:19-6:5 (citing *Heller*, 128 S. Ct. at 2821-22 (emphasis added).) Amicus insists that "Plaintiffs cannot explain why Justice Scalia would be so explicit about the fact that the Second Amendment was 'not unlimited' and that a (non-exhaustive) host of gun laws remained 'presumptively lawful,' yet leave this supposed ruling that the Second Amendment protected a right to carry guns in public hidden, implicit, leaving courts to expand on its 'confrontation' reference, if they wished."[6] (Brady Center Amicus Br. 6:7- 11). But Justice Scalia and the majority did not hide anything. *Heller* (and *McDonald)* focused on the scope of the right to keep arms in the home because the ordinances at issue and the specific question that the Supreme Court was answering concerned restrictions on firearms *in the home*. The opinion simply did not address every aspect of the Second Amendment's protections outside the home because it was not called for given that limited context.[7]

Neither the County nor Amicus can explain *Heller's* repeated references to the right to Arms *outside* the home. *See Heller*, 128 S. Ct. at 2801 ("Americans valued the ancient right [to keep and bear

---

[6] This argument cuts both ways. Knowing the very foreseeable question of public carry would arise, the Court could have cleared up any confusion by *expressly* declaring that a right to carry does *not* exist. Neither *Heller* nor *McDonald* did so. This is the same reason Amicus's reliance on *People v. Dawson*, 223 Ill. 2d 645 (2007) (Opp. 7:5-16), is inappropriate.

[7] Further, this Court has already rejected the County's argument that banning the public carry of firearms is sanctioned by *Heller's* "presumptively valid" language. Order Denying Defendant's Motion to Dismiss, *Peruta*, 678 F. Supp. 2d at 1052, 1054 (No. 09-2371).

arms] . . . for self-defense *and hunting*." (emphasis added)); 128 S. Ct. at 2812 (" 'No doubt, a citizen who keeps a gun or pistol under judicious precautions, *practices in safe places the use of it*, and in due time teaches his sons to do the same, *exercises his individual right.*' " (citation omitted) (emphasis added). Hunting and practicing firearm use are hardly indoor activities. Even *Heller*'s dissenters acknowledge the decision protected the *public* carrying of arms:

> Given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home, I fear that the District's policy choice may well be just the first of an unknown number of dominoes to be knocked off the table.

*Id.* at 2846 (Stevens, J., dissenting).

*Heller* describes the right to arms as "most acute" when defending hearth and home. *Id.* at 2817. *McDonald* holds that the Second Amendment applies "*most notably* for self-defense within the home." *McDonald*, 130 S. Ct. at 3044 (plurality op.) (emphasis added). The Supreme Court's word choice shows that the Second Amendment applies to places outside one's home (albeit perhaps less *"notably"* or less "*acutely*"). Construing the language in *Heller* otherwise is simply wishful thinking.

**B.   The County Confuses Cases That Ban *All* Forms of Carry with Cases That Ban *Some* Form of Carry**

Rather than cite cases upholding bans on *both* open *and* concealed carry,[8] the County cites unhelpful, pre-*Heller* cases that uphold limited restrictions on some manner of *concealed* carry. *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), is both unhelpful and unciteable.[9]  And in any event, the ordinance at issue in *Nordyke* exempts from its ban (of firearms on county-controlled property) carrying concealed pursuant to a valid CCW. (*See* Ex. "A.")  *Nordyke* does not address whether a government can outright ban bearing arms by withholding the permits required to do so absent proof of some special need.

---

[8]  This is why the County's and Amicus's reliance on *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) ("the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of *concealed* weapons (emphasis added)"), *U.S. v. Hall*, No. 2:08-00006, 2008 U.S. Dist. LEXIS 59641 (S.D.W. Va., Aug. 4, 2008) (Prohibitions "on the carrying of a concealed weapon *without a permit*, continues to be a lawful exercise by the state of its regulatory authority notwithstanding the Second Amendment"), and *People v. Dykes*, 46 Cal. 4th 731 (2009), is *not* instructive. The relief Plaintiffs seek is *not inconsistent* with any of those cases.

[9]  The panel opinion was vacated. *"The three-judge panel opinion shall not be cited as precedent by or to this court or any district court of the Ninth Circuit, except to the extent adopted by the en banc court."* Ninth Cir. Adv. Comm. Notes to Circuit Rules 35-3. (Rev. 1/1/00)

1    Almost all the cases Amicus cites as upholding bans on carrying firearms (*see* Brady Center

2  Amicus Br. 7:5-9:11) are equally irrelevant.  The cases either expressly leave open some form of carry[10]

3  and/or involve a criminal defendant challenging a conviction for *unlicensed* carry.[11]  *One* post-*Heller*,

4  but pre-*McDonald* decision from a state trial court in New York, *In re Bastiani*, 881 N.Y.S.2d 591

5  (N.Y. Supp. 2008), upheld New York's "special need" requirement for firearm carry permits.  *Id.* at

6  593.  But *Bastiani* did not discuss the authorities cited in *Heller,*[12] was decided before *McDonald*

7  confirmed the right to keep and bear arms is itself a fundamental individual right, and failed to grasp the

8  distinction between banning concealed *or* open carry, and banning concealed *and* open carry.  This

9  Court, unlike the Court in *Bastiani*, has already recognized *Heller*'s distinction between presumptively

10  lawful restrictions, like *concealed* carry bans when alternative methods of carry are allowed, and

11  unconstitutional *total bans* on carrying firearms outside the home for self-defense.  Order Denying

12  Defendant's Motion to Dismiss, *Peruta*, 678 F. Supp. 2d at 1053-54 (No. 09-2371).[13]  The County and

13  Amicus simply ignore this distinction.  The County also ignores the multitude of state constitutional

14  right to arms provisions that have likewise been interpreted as securing the right to carry firearms for

15  defense in public.[14]

16

17  [10] *See, e.g., State v. Buzzard*, 4 Ark. 18 (1842) (wherein concealed carry of pistols was restricted, but the open carry of rifles, muskets, etc. was left as an option); *State v. Jumel*, 13 La. Ann. 399 (1858)

18  (same); *Aymette v. State*, 21 Tenn. (2 Hum.)154 (1840) (same); *State v. Workman*, 35 W. Va. 367 (1891) (same).  These cases were overruled by *Heller*.  *See, e.g., Fife v. State*, 31 Ark. 455 (1876)

19  (where the court found the Second Amendment was a restraint on federal *not state* legislation).

20  [11] *See, e.g., Riddick v. United States*, 995 A.2d 212 (D.C. App. 2010); *see also Sims v. United States*,

21  963 A.2d 147, 148 (D.C. App. 2008).

22  [12] *State v. Chandler*, 5 La. Ann. 489, 489-90 (1850); *Nunn v. State*, 1 Ga. 243, 251 (1846); James Kent, Commentaries on American Law 340 n. 2 (Oliver Wendell Holmes ed., 1873);William

23  Blackstone, The American Students' Blackstone: Commentaries on the Laws of England, in Four Books

24  84 n. 11 (George Chase ed., 1884).

25  [13] Unlike this Court, the court in *Bastiani* performed no analysis of *State v. Chandler*, 5 La. Ann. at 489-90 (1850), *Nunn v. State*, 1 Ga. at 251 (1846), Kent, *supra* n. 11, 340 n. 2, or Blackstone, *supra* n.

26  11, 84 n. 11.  *Bastiani*'s lack of precedential value is underscored by the fact a Second Amendment challenge

27  to that *same statute* is currently being litigated in New York in *Kachalsky v. Cacace*, No. 10-05143 (S.D.N.Y. filed July 15, 2010).

28  [14] *See, e.g., Wilson v. State*, 33 Ark. 557 (1878) (struck down pistol carrying statute as too restrictive); *City of Lakewood v. Pillow*, 501 P.2d 744 (Colo. 1972) (struck down law on sale, possession, and carrying of guns as too broad); *Junction City v. Mevis*, 601 P.2d 1145 (Kan. 1979) (struck down gun

1    To be sure, there may be cases where a law burdens the keeping and bearing of arms only
2  tangentially, or where the restriction targets conduct that has never been thought protected by the
3  Second Amendment. In those cases, courts may have to grapple with questions about the exact
4  contours of the Second Amendment right. But this is not one of those cases. This case is about a
5  blanket ban on the majority of law-abiding adults from carrying firearms outside the home by denying
6  them a CCW absent a demonstration of a special need.

7  **III.    STRICT SCRUTINY IS THE APPROPRIATE STANDARD OF JUDICIAL REVIEW**

8    Because self-defense is the "central component" of the Second Amendment right, *McDonald*,
9  130 S. Ct. at 3036 (quoting *Heller*, 128 S. Ct. at 2783), the County's policy of denying permits to
10  Plaintiffs and others seeking to exercise the right to bear arms for that very purpose must be reviewed
11  under a strict scrutiny standard. As Plaintiffs' motion explains, *Heller* and *McDonald* together make
12  clear that strict scrutiny judicial review applies. (Pls.' Mem. Supp. Mot. Partial Summ. J. 8:23-14:23.)
13  *McDonald* also emphatically rejected the argument that Second Amendment rights are somehow less
14  fundamental than other enumerated individual rights and can be given second-class treatment. *See* 130
15  S. Ct. at 3042. There is no legitimate basis to depart from the rule that restrictions on fundamental
16  rights require strict scrutiny.

17  **A.    The "Presumptively Lawful" Language in *Heller* Does Not Preclude
         Strict Scrutiny Judicial Review**

18

19    While ignoring the points raised in Plaintiffs' Motion, the County argues that *Heller's*

20  categorical approach of listing "presumptively lawful" regulatory measures' is inconsistent with strict

21  scrutiny review. (Opp. 13:8-9.) But the Supreme Court's "presumptively lawful" language suggested

    only that some fact patterns were likely to survive strict scrutiny.
22

23    The "presumptively lawful" phrase seems best read as a predictive judgment about which

    regulations are subject to but likely to survive strict scrutiny. In its recent Second Amendment cases,
24

25  carrying ordinance as too broad); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) (struck down
26  concealed carrying statute as infringement on right to arms; the constitution was later amended to allow
    regulation of concealed carrying of arms); *State v. Kerner*, 107 S.E. 222 (N.C. 1921)(struck down pistol
27  carrying license and bond requirement law as too restrictive); *Glasscock v. City of Chattanooga*, 157
    Tenn. 518 (1928) (struck down gun carrying ordinance as too restrictive); *Kellogg* v. *City of Gary*, 562
28  N.E.2d 685 (Ind. 1990); *State v. Rosenthal*, 55 A. 610 (Vt. 1903) (struck down pistol carrying ordinance
    as too restrictive); *State ex rel. City of Princeton v. Buckner*, 377 S.E.2d 139 (W. Va.1988) (struck
    down gun carrying law as too restrictive).

the Supreme Court has frequently cited the First Amendment as a helpful analog, and the First Amendment has categorical exclusions. *See Heller*, 128 S. Ct. at 2821; *see also McDonald*, 130 S. Ct. at 3040, 3050. For example, the freedom of speech protected by the First Amendment has never been understood to include things like obscenity. The Supreme Court may eventually interpret the Second Amendment in that fashion as well. If that is the case, though, then it is even more important to insist on narrowly tailored, thoroughly justified, carefully drawn distinctions to limit prohibitions on carrying firearms. A State likely has a compelling interest in prohibiting firearm possession by violent felons and the insane, as it may in keeping private firearms out of certain *truly* "sensitive" places. Thus, it is of no great significance that the *Heller* Court suggested that in future cases the government might easily prove that laws prohibiting firearm possession by convicted felons, or possession in sensitive places like courthouses or prisons, satisfy strict scrutiny. Because "[t]he fact that strict scrutiny applies 'says nothing about the ultimate validity of any particular law,'" predicting that such restrictions will be upheld is in no way inconsistent with requiring strict scrutiny. *Johnson v. California*, 543 U.S. 499, 515 (2005) (citation omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6 (1992) (stating in First Amendment context that "presumptive invalidity does not mean invariable invalidity"). This Court need not read more into the "presumptively lawful" dictum than that.

**B.     Intermediate Scrutiny Is Inappropriate, Especially after *McDonald***

Amicus rely on a ruling in a new case brought by Mr. Heller, *Heller v. District of Columbia* (*Heller II*), 698 F. Supp.2d 179 (D.D.C. 2010), to advocate for no more than intermediate scrutiny review. (Brady Center Amicus Br. 15:22-16:6, 15 n. 5.) In adopting that standard, the *Heller II* court assumed that the right to keep and bear arms was *not* fundamental "[i]f the Supreme Court had wanted to declare the Second Amendment right a fundamental right, it would have done so explicitly." *Id.* at 187. Since then, *McDonald has* done so explicitly, putting that issue to rest.[15]

Some other courts, like *Heller II*, also adopted intermediate scrutiny before *McDonald* was decided. They did so based on the misunderstanding that, although self-defense is a fundamental right under *Heller*, Second Amendment rights themselves were not fundamental, or at least are not as fundamental as other enumerated rights. (Pls.' Mem. Supp. Mot. Partial Summ. J. 11:17-27.) But

---

[15] Even *Heller II* rejected a "reasonableness" test, as it "subjects firearms laws to only a *marginally* more heightened form of review than rational-basis review." *Id.* at 186 (emphasis added).

1  *McDonald* clarifies that the right to keep and bear arms is itself fundamental, and no less so than other
2  rights like the freedom of speech. And it is black-letter law that infringements upon core conduct of
3  fundamental rights receive strict scrutiny.

4      Even before *McDonald*, *Heller* itself effectively rejected an intermediate scrutiny standard.
5  Justice Breyer's dissenting "interest-balancing inquiry," *Heller*, 128 S. Ct. at 2852 (Breyer, J.,
6  dissenting), is effectively intermediate scrutiny by another name, and the Court rejected it, *Id.* at 2821.
7  Justice Breyer based his proposed standard extensively on intermediate scrutiny cases, even invoking
8  *Burdick v. Takushi*, 504 U.S. 428 (1976), the case the United States principally relied on in advocating
9  intermediate scrutiny. *Id.* at 2852 (Breyer, J., dissenting). Since *Heller* rejected Justice Breyer's test
10  —and *McDonald* reaffirmed the rejection— intermediate scrutiny cannot be the appropriate standard.

11      **C.     Undue Burden / Reasonable Regulation Review is Also Inappropriate**

12      The County claims that since its policy does not affect firearms in the home (Opp. 14:15-16), it
13  survives the "undue burden" test[16] usually associated with restrictions on abortions. But the Supreme
14  Court, and this Court, have already rejected lesser standards of review such as the County's and
15  Amicus' proposed "reasonable regulation" or "undue burden" tests.

16      Adopting a reasonable regulation or undue burden standard is simply not a course that is open to
17  this Court after *Heller* and *McDonald*. *Heller* rejected both rational basis and Justice Breyer's "interest-
18  balancing" approach. *Heller*, 128 S. Ct. at 2821. It is not clear that a "reasonableness" test is any
19  different from rational basis,[17] but it is, if anything, a less rigorous standard than the "interest-balancing"
20  approach advocated by Justice Breyer. The Court in *Heller* could not have been clearer that they were
21  rejecting that proposed approach. Reasonableness review is also foreclosed by *McDonald*.

22      The argument for "reasonableness" review stems from the assertion that the right is not
23  fundamental, an assertion put to rest by *McDonald*. The County nonetheless here adopts the same
24  arguments made by Chicago and Amicus in *McDonald*, even relying on the same law review article.

25
26  _____

27  [16] A regulation constitutes an "undue burden" where it has the "purpose or effect [of] plac[ing] a
    substantial obstacle in the path" of the individual seeking to engage in constitutionally protected
28  conduct. *Gonzalez v. Carhart*, 550 U.S. 124, 146 (2007).

    [17] The term "reasonable" is a synonym of "rational." *Webster's New World Dictionary* 1118 (3rd
    College Ed. 1991).

1  *See* Brief for Respondents City of Chicago, et al. at 8, *McDonald v. Chicago*, 130 S. Ct. 3020 (2010)

2  (No. 08-1521) (right to arms not among "fundamental rights included in the Bill of Rights that are

3  'implicit in the concept of ordered liberty'"); Brief for Respondents City of Chicago, et al., *supra*, at 24

4  (arguing for a "reasonable regulation" standard and citing Adam Winkler, *Scrutinizing the Second*

5  *Amendment*, 105 Mich. L. Rev. 683, 686, 716-17 (2007), and the Amicus Brief of the Brady Center).

6  *See also* Brief for Petitioners D.C., et al. at 48, *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)

7  (No. 07-290) ("The District's Gun Regulations Satisfy the Reasonableness Standard").

8          The County and Amicus cite various cases that either adjudged whether state firearm statutes

9  were "reasonable" regulations, or which made use of the term "reasonable" in their analysis. (Opp.

10  13:6-15:10; Brady Center Amicus Br.14:6-15:11.)  Plaintiffs note, as an initial matter, the mere use of

11  the word "reasonable" by many of these courts did not constitute an adoption of the broad

12  "reasonableness" standard of review.[18]  Regardless, reliance on these cases is unpersuasive.  *Every* case

13  the County and Amicus cite involving a "reasonableness" approach for determining infringements of

14  states' right to arms guarantees was decided *prior* to *McDonald*'s express statement that the Second

15  Amendment guarantees a *fundamental* right.  Moreover, "reasonableness" approaches applied by state

16  courts pre-*Heller* varied widely among jurisdictions.  *See* David Kopel, *State Court Standards of*

17  *Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev. 1113, 1215-1218.  The only cases

18  cited to by the County and Amicus in the wake of *Heller* and *McDonald* are cases that apply either

19  intermediate or strict scrutiny. (Opp.13:6-15:10; Brady Center Amicus Br. 14:6-15:11.)

20          Moreover, adoption of a "reasonable regulation" standard would mean First Amendment and

21  other fundamental rights qualify for strict scrutiny while the right to keep and bear arms receives lesser

22  protection.  *McDonald* specifically rejected allowing "state and local governments to enact any gun

23  control law that they deem to be reasonable . . . "  130 S.Ct. at 3046.  The County's and Amicus's

24  argument is really "that the Second Amendment should be singled out for special - and specially

25  unfavorable - treatment."  *Id.* at 3043.  But the Supreme Court already rejected that idea.  *Id.* at 3044.

26

27  _____

    [18]  *See, e.g.,Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), which *Heller*

28  affirmed, that stated:  "The protections of the Second Amendment are subject to the same sort of
    reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Id.*
    (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  The court went on to elaborate that
    restrictions must not "impair the core conduct upon which the right was premised." *Id.*

| | |
|---|---|
| 1 | **D.     The Trend After *McDonald* Is Toward Adopting Strict Scrutiny Judicial Review** |
| 2 | Since *McDonald*, the District Court for the District of Utah in *United States v. Engstrum*, 609 F. |
| 3 | Supp. 2d 1227, 1231-32 (D. Utah 2009), adopted strict scrutiny.  And on October 12, 2010, a Wisconsin |
| 4 | court applied strict scrutiny in striking down a ban on the concealed carry of knives as violative of the |
| 5 | Second Amendment. *State of Wisconsin v. Schultz*, No. 10-CM-138, slip op. (Wis. Cir. Oct. 12, 2010). |
| 6 | But *McDonald* came down only recently.  Most courts have not yet had a chance to evaluate the |
| 7 | appropriate level of scrutiny in light of that ruling.  *McDonald*'s clear recognition of the right to keep |
| 8 | and bear arms as a *fundamental* right is dispositive.  Fundamental rights deserve strict scrutiny review. |

**IV.     THE COUNTY CANNOT MEET ITS BURDEN TO SHOW AN INTEREST IT IS
ACTUALLY FURTHERING THAT JUSTIFIES ITS SPECIAL NEEDS "GOOD
CAUSE" POLICY[19]**

This Court previously held that the County had failed (at that time) to identify a government interest "or demonstrate the required 'fit' between the law and the interest served."   Order Denying Defendant's Motion to Dismiss, *Peruta*, 678 F. Supp. 2d at 1055 (No. 09-2371).  The County now raises "public safety" and "preventing crime" as the general interests it seeks to further with its special needs "good cause" policy. (Opp. 26:1-4.)  The County admits the "central reason" for requiring evidence of a specific threat to establish "good cause" is to reduce the number of individuals with CCWs, allegedly to further these interests. (Opp. 26:17-23.)

The County does not, nor can it, demonstrate that keeping CCWs from people of good moral character is either necessarily related or narrowly tailored to achieve those particular interests.  It must be both to pass constitutional muster.

**A.     The County Provides No Credible Evidence Establishing That Issuing CCWs to
Law Abiding Citizens Will Increase Violent Crimes or Otherwise *Adversely* Affect
Public Safety**

The County offers no data or evidence establishing its policy of limiting CCW issuance reduces or is likely to reduce crime.[20]  The County cannot connect increased public danger or crime to increased

---

[19]  Because the County asserts the same interests in defending its "good cause" policy from both Plaintiffs' Second Amendment and Equal Protection (classification of people who are unable to obtain a CCW for lack of documented "need") claims, this Section applies to arguments for both claims.

[20]  Amicus provides *one* study claiming that between May 2007 and April 2009 CCW holders "killed 7 law enforcement officers and 42 private citizens." (Brady Center Amicus Br. 11:3-5.)  There are various apparent flaws with the study, mostly the credibility of its creator, the Violence Policy Center,

1   numbers of people who carry guns (whether discretely concealed or not) *pursuant to valid licenses.*

2   Instead of offering evidence making that connection, the County offers a conjectural connection

3   between its policy and public safety, claiming that public safety is advanced because reducing the

4   number of CCWs reduces the number of "unknown persons carrying concealed, loaded firearms" (Opp.

5   11:25-28), and "widespread and unchecked public carry of concealed and loaded firearms" (Opp.19:4-

6   7). But, this is not the case here. Rather, based on empirical data, the more likely result will be a small

7   percentage of individuals will choose, or at least to have the ability, to carry, firearms.[21] And those

8   individuals will have had been checked and trained by, and will be known to County officials.

9       In fact, the Declaration of Professor Carlisle Moody filed in support of Plaintiffs' Opposition-

10  Reply, establishes that more liberal CCW issuance reduces violent crime. (*See generally* Moody Decl.)

11  And Professor Moody is corroborated by several other professors experienced in the field. *See*

12  Declaration of Professor Patrick and Declaration of Professor Mauser. Actual evidence from states

13  where CCW permits are commonly issued suggests this as well.[22] In describing the proliferation of

14  liberal carry laws in other states, at least one court explained, "there have been no shootouts in town

15  squares, no mass vigilante shootings or other violent outbreaks attributable to allowed concealed carry."

16  *State of Wisconsin v. Schultz*, No. 10-CM-138, slip op. at 5 (Wis. Cir. Oct. 12, 2010).[23]

17      In the absence of empirical evidence tying the County's special need requirement to advancing a

18  _____

19  which describes itself as "the most aggressive group in the gun control movement." *See About the*
    *Violence Policy Center*, http://www.vpc.org/aboutvpc.htm (last visited Oct. 13, 2010). *See also* Ex. "P"
20  for a thorough refutation of the substance of that study by Bob Owens.

21  [21] *See* Thom Goolsby, *Concealed Weapons Advocates Were Right: Crime Didn't Go Up*, Chapel Hill
    Herald, May 6, 1997, at 4 (attached hereto as Ex. "B"); *see also* Tad Dickens & Ray Reed, *Pistol-*
22  *Packing and Proud of It*, Roanoke Times, May 19, 2002, A1 (attached hereto as Ex. "C"). These news
23  articles explain that most people with CCWs are law-abiding citizens.

24  [22] *See* Enrique Rangel, *Majority of Gun Licensees White Males, Law* Abiding, Lubbock Avalanche
    J., Aug. 16, 2009, http://lubbockonline.com/stories/081609/loc_482262241/shtml (attached hereto as
25  Ex. "D"); *see also* Terry Flynn, *Gun-Toting Kentuckians Hold Their Fire*, Cincinatti Enquirer, June 16,
26  1997, http://www.enquirer.com/editions/1997/06/16/loc_kccarry.html (attached hereto as Ex. "E").
    These news articles explain that CCW holders are less likely than the average person to commit a crime.
27

28  [23] *But see* Eugene Volokh, *The Second Amendment and the Right to Keep and Bear Arms After D.C.*
    *v. Heller: Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework*
    *and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) (explaining that there is no evidence CCW
    issuance is linked to increases or decreases in crime).

-12-                                                    09-CV-2371 IEG (BGS)

1   valid interest, the County and Amicus resort to baseless, and in some cases ridiculous hypothetical
2   constructs.  The County's suggestion that issuing CCWs only to persons with "actual anticipated needs"
3   is a legitimate means to further public safety (Opp. 27:19-20) is counterintuitive, since criminals
4   typically do not notify their victims in advance.  And its claim that requiring evidence of special "need"
5   from CCW applicants "acts as a backup to those who seek a CCW license for criminal purposes but do
6   not yet have a criminal record" (Opp. 27:19-22) is over the top.  Is the County actually claiming that the
7   majority of law-abiding people should be denied the exercise of a fundamental right based on the
8   premise that people planning to commit crimes with guns will forego doing so for lack of a CCW?
9   Does the County actually assert that would-be criminals are so concerned about being charged with a
10  *misdemeanor* and fined for carrying a firearm without a CCW that they would agree to have their good
11  character investigated and pay the $200 or so in fees to get a CCW before committing armed robbery?
12  It takes no special expertise to realize that felons do not forego committing crimes with a gun for lack of
13  a CCW, any more than they would forego driving to a bank to rob it for lack of a driver's license.[24]

14  As pointed out in Plaintiffs' Motion, even under the relatively relaxed scrutiny that applies to
15  indirect impositions on *less protected* speech, the Supreme Court has emphasized that a municipality
16  cannot "get away with shoddy data or reasoning."  *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425,
17  438 (2002).  "[A] municipality's evidence must fairly support the municipality's rationale for its
18  ordinance."  *Id.*  (*See also* Pls.' Mem. Supp. Mot. Partial Summ. J. 16:6-14).  Here, there is no such
19  evidentiary support.

20  Certainly, public safety *can* be a compelling state interest, but where constitutional rights are
21  concerned, the government must identify a *specific* interest related to public safety.  The interest has to
22  be targeted so as to allow a tailored response.  What the government may not do is simply rely on a
23  generic public safety rationale to support the regulation of firearms.  That approach would simply
24  resurrect Justice Breyer's rejected interest-balancing test, in which some public safety interest would
25  *always* be important or compelling.  That firearms are sometimes misused by criminals does not support

26

27  [24] Amicus also mentions the state's "duty" to protect its populace. (Brady Center Amicus Br. 17:2).
    There is a practical reason for the right to keep and bear arms: state and law enforcement owe *no* such
28  duty.  *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189 (1989). One federal court
    even boldly proclaimed "there is no constitutional right to be protected by the state against being
    murdered by criminals or madmen." *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

1  a *de facto* ban (by withholding licenses) on the lawful carrying of firearms for citizens of good moral

2  character, particularly when there is *no* connection between more CCW holders and increased crime.

3  The County's rationalizations are precisely the type of shoddy reasoning that the Supreme Court in

4  *Alameda Books* warned Courts not to fall for.

5  **B.  The Cases Relied on by the County Are Unpersuasive**

6  As support for the validity of its purported compelling interest – to protect the public from the

7  "evil" of *secretly* carried weapons by vetted licensees (Opp. 26:5-11, 24-27) – the County cites to

8  several cases,[25] *all* of which are either irrelevant, or actually support *Plaintiffs'* claim. *Hale, Marin*, and

9  *Smith* all involve criminal convictions for violations of *concealed* carry statues, which Plaintiffs, for

10  purposes of this lawsuit concede are constitutional. As for *Andrews, Dano, Nunn*, and *Reid*, the County

11  omits the crucial details of those cases. For example, as pointed out by Plaintiffs in its Motion (Pls.'

12  Mem. Supp. Mot. Partial Summ. J. 7:14-22), *Heller* said the following about *Andrews* and *Reid*:

13  > In *Andrews* v. *State*, the Tennessee Supreme Court likewise held that a statute that
   forbade openly carrying a pistol "publicly or privately, without regard to time or place, or
14  circumstances," violated the state constitutional provision (which the court equated with
   the *Second Amendment*). That was so even though the statute did not restrict the
15  carrying of long guns. *See also State v. Reid,* ("A statute which, under the pretence of
   regulating, amounts to a destruction of the right, or which requires arms to be so borne as
16  to render them wholly useless for the purpose of defence, would be clearly
   unconstitutional").

17  (*Heller*, 128 S. Ct. at 2818 (internal citations omitted).

18  *Dano* stands for a similar proposition as *Andrews* and *Reid*; specifically: "The right to bear arms

19  in self-defense is not impaired by requiring individuals to carry weapons openly." *Dano*, 802 P.2d 1021,

20  1022 (Ariz. 1990).[26] Finally, *Nunn* involved prohibitions where the right to arms was still available by

21  way of "open carry." *See Nunn*, 1 Ga. at 251 ("so far as the act . . . seeks to suppress the practice of

22  carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his

23  *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it,

24

25

26  [25]  *Dano v. Collins*, 166 Ariz. 322 (Ariz. Ct. App. 1990); *State v. Reid*, 1 Ala. 619 (1840); *Nunn v.*
   *State*, 1 Ga. 243 (1846); *Andrews v. State*, 50 Tenn. 165 (1871); *State v. Smith*, 571 A.2d 279 (N.H.
27  1990); *People v. Hale*, 43 Cal. App. 3d 353 (1974); and *People v. Marin*, 795 N.E.2d 953 (Ill. App.
28  2003).

[26]  The County, with no sense of irony, cites an Arizona case, where *unlicensed* open carry was lawful
at the time of *Dano*, and is the latest state to adopt *unlicensed concealed* carry.

-14-                                              09-CV-2371 IEG (BGS)

1    as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void . .*")

2    **V.    PLAINTIFFS HAVE ESTABLISHED THEIR EQUAL PROTECTION CLAIMS**

3         **A.    County's Special Need Policy Creates a Class of People Ineligible to Obtain a CCW**

4         The County's "good cause" policy, as the County admits (*see* Defs.' Statement of Undisputed

5    Facts 5), creates a class of people, i.e., those in the "mainstream having no "documentation of a specific

6    threat," which includes Plaintiffs, who are unable to lawfully carry firearms for self-defense.[27]  The

7    question is whether the classification "impinge[s] on personal rights protected by the Constitution."

8    *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (laws creating such classifications

9    violate equal protection and are subject to strict scrutiny);[28] *see also, e.g., Kramer v. Union Free Sch.*

10   *Dist.*, 395 U.S. 621, 626-28 (1969).  The answer is "yes," because the Constitution protects a right to

11   carry firearms for self-defense.  The County cannot justify its classification under strict scrutiny review.

12        **B.    There Are No Material Factual Disputes Regarding HDSA Member's Unequal
             Treatment**

13        The County's response to Plaintiffs' allegations of favoritism in issuing CCWs is convoluted.  It

14   claims the documentation it requires for *renewal* applications "is not held to the same scrutiny" as that

15   for *initial* applications. (Opp. 23:5-12.)  It then argues that the Plaintiffs whose *initial* applications were

16   denied are not similarly situated to HDSA members whose *renewal* application files lack supporting

17   documentation, and it is thus not a fair comparison by Plaintiffs. (Opp. 23:12-19.)  However, while the

18   County *may* subject the *evidentiary support* for a renewal to lesser scrutiny – and even that may be

19   improper – it definitely *cannot* subject the *underlying "good cause"* to less scrutiny.  Yet, that is what it

20   does.  For example, one HDSA member provided as his "good cause" that he drives in desolate areas

21   with his wife and wants "self-defense against anyone that might come" upon them. (*See* Ex. "N".)  This

22

23   [27]  The County's reliance on *United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989), and
24   *Freeman v. City of Santa Ana*, 68 F.3d 1180 (9th Cir. 1995), is misplaced as these cases deal with
     selective prosecution and enforcement of *valid* laws; Plaintiffs claim the County's CCW policy is itself
25   invalid.

26   [28]  The County's reliance on *Thornton v. City of St. Helens*, 425 F.3d 1158, and *Joyce v. Mavromatis*,
     783 F.2d 56, 57 (6th Cir. 1986), is also misplaced.  Those cases concerned Equal Protection challenges
27   based on discrimination against a *protected class*, whereas Plaintiffs here claim the County puts them in
     a class of people deprived of a fundamental right (i.e., the right to bear arms).  These are two distinct
28   concepts under Equal Protection jurisprudence.

1    is *almost identical* to Plaintiff Peruta's reason. Another example [29] is a letter addressed to Sheriff Gore

2    from an HDSA member who had been denied a renewal CCW. The letter was dated October 13, 2009.

3    After the author mentions his 19 year HDSA membership, he states: "I ask you [Sheriff Gore] intercede

4    in the process and direct the Licensing division to reissue my CCW." On October 22, 2009, that HDSA

5    member reapplied asserting "self-protection, a desire to be able to protect myself and my family from

6    criminal activity, in case response to request to law enforcement is delayed" as his "good cause." He

7    provided *no documentation* of a specific threat, but was issued a CCW nonetheless. (*See* Ex. "L".)[30]

8        To counter Plaintiffs' evidence of disparate treatment, the County calls it "misleading" and

9    provides various exhibits purporting to show supporting documentation was provided for the HDSA

10   applications Plaintiffs claim did not have any. (Opp. 22:18-21.) Yet, *entirely* missing from the County's

11   new exhibits is supporting documentation for any of the individuals Plaintiffs indicated as asserting

12   merely "personal protection" or "protection" as their "good cause statements."[31] (*See* Pls.' Exs. Supp.

13   Mot. Partial Summ. J. "U" at 2; "V" at 2; "W" at 5; and "X" at 2.) Once again, this shows some renewal

14   CCWs were subjected to a lesser "good cause" requirement, not just a lesser documentation standard.

15       The County provides a declaration from Ms. Blanca Pelowitz, Manager of the License Division,

16   stating that HDSA members are not favored in any way by the County in receiving CCWs. (Pelowitz

17   Decl. 7:8-9.) But, the credibility of Ms. Pelowitz is dubious when notes with her initials are found in

18   CCW files stating: "Comma[nder] for HDSA (SDSO) considered VIP @ sheriff level – okay to renew

19   standard personal protection." (*See* Ex. "M".) This note shows Ms. Pelowtiz was being instructed to

20   give preferential treatment to at least some HDSA members.[32]

21

22   [29] Since Plaintiffs' Motion was filed, the County disclosed more and less redacted documents
     including these examples that Plaintiffs deemed relevant without the previous redactions.
23

24   [30] Also, both these HDSA member's CCW state "retired," but Dr. Buncher was denied, as the County
     admits, because he was retired. (Opp. 6:22-23); *see also* Pls.' Exs. Supp. Mot. Partial Summ. J. "W" at
25   3 and "MM" at 4.

26   [31] Further, the County's Exhibits purport to show supporting documentation for the "good cause"
     statements provided, yet it is not clear how the documents provided do so.
27

28   [32] Note that right after proclaiming Sheriff Gore does not favor anyone in issuing CCWs, the County,
     without any sense of irony, admits it issued Peter Q. Davis a CCW and that Mr. Davis "did not need to

1    The County also argues that because Mr. Cleary's CCW was renewed after he appealed his

2    denial he cannot prove he was treated differently than HDSA members. (Opp. p. 6:20-21, 22:17-28,

3    23:1-3.) But the County fails to explain why Mr. Cleary was required to produce documentation

4    confirming his continued employment in the psych ward – his refusal to do so being the basis of his

5    denial – for his *renewal* CCW application, while the County granted several renewal applications for

6    members of the HDSA CCWs without requiring *any* supporting documentation. Also, the County fails

7    to mention that Mr. Cleary's successful appeal of his denial occurred *after* he became a plaintiff in this

8    lawsuit. Plaintiffs are skeptical that this had no bearing on the County overturning his denial.[33]

9    The County further provides no refutation to Mr. Cleary's declaration regarding his own account

10   of being preferentially treated by the County while a member of HDSA, but instead corroborates his

11   story by saying "During his initial application, Cleary was awarded his license after an appeal *with then*

12   *Undersheriff Gore*" (Opp. 23:23-24), exactly as Mr. Cleary describes. (Declaration of Mark Cleary 4-5.)

13   In sum, the evidence taken as a whole, including that provided in Plaintiffs' original Motion,

14   could easily allow a jury to conclude Plaintiffs were similarly situated to HDSA members but treated

15   differently, which is the standard set forth by the County from *March v. Rupf*, No. 00-03360, 2001 U.S.

16   Dist. LEXIS 14708 (N.D. Cal. 2001).[34] Plaintiffs here, unlike those in *March*, provide direct references

17   to HDSA, such as interviewers' notes, not mere tangential facts from which inferences could be drawn.

18   But, as stated in Plaintiffs' Motion, regardless of whether membership in the HDSA is the basis

19   for the disparate treatment, that the County treats one person differently in issuing CCWs from others is

20   a violation of equal protection. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

21

22   document [his] status" because he is "a prominent San Diegan who recently ran for mayor." (Opp.
     22:21-23.)

23

24   [33] Despite its claim that "the hearing officer was able to verify his employment" (Defs.' Opp. 6:20-
     21), Mr. Cleary provided *no further documentation* at his appeal hearing (*See* Cleary Decl. Supp. Pls.'

25   Mot. Partial Summ. J. (hereafter "Cleary Decl.").

26   [34] The second part of the test outlined in *March* – that the denials of CCWs be based on
     impermissible grounds – is met when denied applicants, as is the case here, demonstrate "good moral

27   character" and proficiency with a firearm, and assert self-defense as their "good cause." In fact, the
     value the *March* decision is dubious post-*McDonald*, since Sheriffs no longer have such wide discretion

28   to determine "good cause."

## VI.   TRIABLE ISSUES OF MATERIAL FACT EXIST ON THE COUNTY'S OTHER CLAIMS, WHICH SHOULD BE DENIED[35]

### A.   The Facts Suggest Plaintiff Peruta Was Denied a CCW for Lack of Residency

In its Motion, the County's position is Plaintiff Peruta was not denied a CCW for lack of residency. (Opp. 6:9-10, 22:1-2, 29:9-10, 29:20-25). It also describes its stated policy for determining residency. (Opp. 20:21-22:1-4). Both appear to be recently adopted positions by the County. First, despite his repeated requests, the County never provided Mr. Peruta its stated policy for determining residency. (*See* Exs. "A" through "J" - Correspondence between Peruta and SDSO regarding its residency requirement). Second, in trying to dismiss Plaintiff Peruta's original complaint, the County argued: "*Most significantly*, since the statute requires Plaintiff to meet all *three* requirements of [California Penal Code §] 12050 to be eligible for a permit, *the failure to meet the residency provision alone ends his constitutional claim*." (Def.'s Reply 3:19-21) (emphasis added).  In short, there is ample evidence the County denied Mr. Peruta a CCW for lack of residency.  Because a factual dispute exists, Defendants' motion must fail.[36]  Each of these documents provide a triable issue of fact as to whether Mr. Peruta was denied a CCW for lack of residency. (*See generally* Declaration of Edward Peruta)

All the authority the County cites concerns the legality of denying CCWs to *nonresidents*. (Opp. 30:6-32:1-16). Plaintiff Peruta contends he *is a resident,* and thus is treated differently than similarly situated persons (i.e., other residents) by being denied a CCW based on his "part-time" residency.

### B.   Facts Support Peruta's Right to Travel Was Violated

This Court has already made clear "'that a State may not impose a penalty upon those who

---

[35]   Please note the County brings this motion as to Plaintiffs' claims concerning the County's residency policy and due process violations, despite Plaintiffs voluntarily foregoing discovery on those issues, as a professional courtesy, so as to allow the County to focus on the Second Amendment and other Equal Protection claims. Plaintiffs' reason for doing so was in response to the County claiming it considered Plaintiff Peruta a resident, and discussions about avoiding litigation on this issue, as well as the issue of due process violations, by agreeing on mutually agreeable policies the County could adopt.

[36]   *See* Ltr. from Blanca Pelowitz, Manager of License Div., San Diego Sheriff's Dept., (March 17, 2009) ( "[T]he result of the investigation reflects doubt and uncertainty as to his 'permanent residency' in San Diego County") (attached hereto as Ex. "K"); *see also* correspondence from Millie Faiai: "it appears Peruta's primary residence and business is in Rock Hill, Connecticut." And Mr. Peruta was repeatedly told in his initial interview he is not a resident of San Diego County. *See also* Ex. "O" an Interview Questionnaire indicating that Plaintiff Peruta was a resident of Los Angeles.

1   exercise a right guaranteed by the Constitution,' " and that denying *part-time* residents a CCW for lack

2   of residency deters people "from exercising their right to travel in that they are being 'penalized' for

3   traveling and spending time outside of San Diego." Order Denying Defendant's Motion to Dismiss,

4   *Peruta*, 678 F. Supp. 2d at 1060 (No. 09-2371) (citing *Harman v. Forssenius*, 380 U.S. 528, 540

5   (1965)). Plaintiff Peruta provides a litany of facts showing he was denied a CCW by the County

6   because he is only a part-time resident of San Diego. (*See* Peruta Decl.)[37] Thus, County's request for

7   summary judgment on this claim should be denied.[38]

8            **C.    The Facts Support Plaintiffs' Due Process Claims**

9            A violation of Due Process exists where there is a direct and substantial interference with a

10  fundamental right. *See Zablocki v. Redhail*, 434 U.S. 374, 387 n.12 (1978). Plaintiffs allege the County

11  informs people seeking a CCW for self-defense who do not have a special "need" that they will be

12  denied if they submit a formal application (*see* Laxson Decl. Supp. Pls.' Mot. Partial Summ. J.), and, in

13  violation of California Penal Code § 12054, that application fees will be collected beforehand and are

14  not refundable. (*See* Ex. "K" ("Despite the fact that PERUTA was told he did not meet the criteria for a

15  CCW license PERUTA insisted this office accept his application. PERUTA was advised that no monies

16  would be refunded once his application was accepted."). By dissuading applicants who are *entitled* to

17  carry firearms under the Second Amendment, the County substantially interferes with their, and

18  Plaintiffs', access to the fundamental right of self-defense.

19           The County further burdens the fundamental right to self-defense by denying applicants,

20  including Plaintiffs, a CCW for lack of "good cause" under the County's policy, because such right is

21  both a property and liberty interest for purposes of 42 U.S.C. § 1983. *See Kellogg v. Gary*, 562 N.E.2d

22  685, 696 (Ind. 1990).[39]   When state action burdens a fundamental right, it is subject to strict scrutiny.

23

24     [37]   Plaintiffs note that since the County considers Mr. Peruta a resident, he likely has no standing to
25  bring a Privileges & Immunities claim, and he does not oppose that portion of the County's Motion.

26     [38]   Whenever a state law burdens the right to travel, the court must apply strict scrutiny. *Attorney*
27  *Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 904-05 & n.4 (1986) (plurality).

28     [39]   The case the County cites to support its position that there is no liberty interest in a CCW, *Erdelyi*
v. *O'Brien*, 680 F.2d 61 (9th Cir. 1982), did not consider the Second Amendment, and it was decided
long before *McDonald* clarified that the Second Amendment protects a fundamental, individual right to
keep and bear arms.

1 | *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).  Since the County cannot provide a

2 | "compelling interest," for dissuading applicants, it violated Plaintiffs' Due Process rights.

3 | **VII.    FACIAL CHALLENGE AND QUALIFIED IMMUNITY ISSUES**

4 |         The County argues Plaintiffs' facial challenge must fail because their statement that the County

5 | *may* exercise its discretion under § 12050 in a constitutional manner precludes Plaintiffs from

6 | establishing there are " 'no set of circumstances . . . under which' Penal Code § 12050 would be

7 | constitutionally valid." (Opp. 19:12-16).  Once again, the County fundamentally misunderstands

8 | Plaintiffs' claim.  Plaintiffs do *not* make a facial challenge *to § 12050*, rather, they challenge *the*

9 | *County's stated "good cause" policy both facially and as applied*. Government policies are subject to

10 | facial challenges.  *See Santa Fe Indep. Sch. Dist. v Doe*, 530 U.S. 290 (2000).

11 |         Finally, County's qualified immunity argument in unpersuasive.  This is an action for

12 | declaratory relief only. Qualified immunity "is an affirmative defense to *damage liability*; it does *not*

13 | bar actions for *declaratory* or *injunctive* relief." *Presbyterian Church (U.S.A.) v. U.S.*, 870 F.2d 518,

14 | 527 (9th Cir. 1989) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982) (emphasis added).

15 | **VIII.   CONCLUSION**

16 |         *Heller* and *McDonald* left questions unanswered, but provide sufficient guidance for *this* Court

17 | to hold the right to Arms includes a right to carry a firearm in public for self-defense, and that such right

18 | may be subjected to a licensing requirement such as Cal. Pen. Code § 12050, but not a "good cause"

19 | requirement that allows a local Sheriff the discretion to decide who can and who cannot exercise the

20 | right to bear Arms.  Accordingly, the Court should grant Plaintiffs' Motion for Partial Summary

21 | Judgment and deny Defendants' Cross Motion for Summary Judgment.

22 | **Date:** October 18, 2010

23 | **MICHEL & ASSOCIATES, P.C.**          **PAUL NEUHARTH, JR., A.P.C.**

24 |

25 | / s /C. D. Michel                              / s /Paul Neuharth, Jr.*as authorized on 10/18/10*

26 | C. D. Michel                                   Paul Neuharth, Jr. A.P.C.
27 | E-mail:cmichel@michellawyers.com               E-mail: pneuharth@sbcglobal.net
   | Attorneys for Plaintiffs                       Attorneys for Plaintiffs

28 |

1

2

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8

9

10

11

EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION

      Plaintiffs,

      v.

COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,

      Defendants.

)   **CASE NO. 09-CV-2371 IEG (BGS**)
)
)   **CERTIFICATE OF SERVICE**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

12

IT IS HEREBY CERTIFIED THAT:

13

      I, the undersigned, am a citizen of the United States and am at least eighteen years of age.  My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

14

      I am not a party to the above-entitled action. I have caused service of:

15

16

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

17

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

18

19

20

21

22

James M. Chapin
County of San Diego
Office of County Counsel
1600 Pacific Highway
Room 355
San Diego, CA 92101-2469
(619) 531-5244
Fax: (619-531-6005
james.chapin@sdcounty.ca.gov

Paul Neuharth, Jr. (State Bar #147073)
PAUL NEUHARTH, JR., APC
1140 Union Street, Suite 102
San Diego, CA 92101
Telephone:   (619) 231-0401
Facsimile:    (619) 231-8759
pneuharth@sbcglobal.net

23

24

      I declare under penalty of perjury that the foregoing is true and correct. Executed on October 18, 2010.

25

26

                   /s/  C.D. Michel
                   C. D. Michel
                   Attorney for Plaintiffs

27

28