1  | C. D. Michel – SBN 144257
   | Clint B. Monfort – SBN 255609
2  | Sean A. Brady – SBN 262007
   | cmichel@michellawyers.com
3  | MICHEL & ASSOCIATES, P.C.
   | 180 E. Ocean Blvd., Suite 200
4  | Long Beach, CA 90802
   | Telephone: (562) 216-4444
5  | Facsimile:   (562) 216-4445
   | Attorneys for Plaintiffs / Petitioners
6  |
   | Paul Neuharth, Jr. – SBN 147073
7  | pneuharth@sbcglobal.net
   | PAUL NEUHARTH, JR., APC
8  | 1140 Union Street, Suite 102
   | San Diego, CA 92101
9  | Telephone:  (619) 231-0401
   | Facsimile:   (619) 231-8759
10 | Attorney for Plaintiffs / Petitioners

11

# UNITED STATES DISTRICT COURT

12

## SOUTHERN  DISTRICT OF CALIFORNIA

| | |
|---|---|
| 13  EDWARD PERUTA, MICHELLE | **CASE NO: 09-CV-2371 IEG (BGS)** |
| 14  LAXSON, JAMES DODD, DR.<br>LESLIE BUNCHER, MARK | **EXHIBITS "A" THROUGH "P" IN** |
| 15  CLEARY, and CALIFORNIA RIFLE<br>AND PISTOL ASSOCIATION | **SUPPORT OF PLAINTIFFS'<br>CONSOLIDATED OPPOSITION TO** |
| 16  FOUNDATION | **DEFENDANT'S MOTION FOR<br>SUMMARY JUDGMENT AND;** |
| 17      Plaintiffs, | **REPLY TO DEFENDANT'S<br>OPPOSITION TO PLAINTIFFS'** |
| 18      v. | **MOTION FOR PARTIAL SUMMARY<br>JUDGMENT** |
| 19  COUNTY OF SAN DIEGO,<br>WILLIAM D. GORE, | Date:           November 15 2010 |
| 20  INDIVIDUALLY AND IN HIS<br>CAPACITY AS SHERIFF, | Time:           10:30 a.m.<br>Location:      Courtroom 1 |
| 21      Defendants. | Judge:         Hon. Irma E. Gonzalez<br>Date Action Filed: October 23, 2009 |

22

23

24

25

26

27

28

1

## TABLE OF EXHIBITS

2

3   Alameda County Code of Ordinances *9.12.120* .................... Exhibit "A"

4   "Concealed Weapons Advocates Were Right: Crime Didn't
      Go Up" *Chapel Hill Herald*, May 6, 1997 .................. Exhibit "B"
5
    "Pistol Packing and Proud of It" *The Roanoke Times*,
6      May 19, 2002 ........................................ Exhibit "C"

7   "Majority of Gun Licensees White Males, Law Abiding"
      *Lubbock Avalanche Journal*, August 16, 2009 .............. Exhibit "D"
8
    "Gun-Toting Kentuckians Hold Their Fire"
9      Enquirer Local News Converage, June 16, 1997 ............. Exhibit "E"

10  Formal Inquiry and Request for Clarification,
      December 5, 2008 ..................................... Exhibit "F"
11
    Letter from Sheriff Kolender,
12     December 9, 2008 ..................................... Exhibit "G"

13  Second Formal Inquiry and Request for Clarification,
      February 2, 2009 ..................................... Exhibit "H"
14
    Letter from Sheriff Kolender,
15     February 3, 2009 ..................................... Exhibit "I"

16  Response and Clarification of letter dated
      February 3, 2009 ..................................... Exhibit "J"
17
    Inter-departmental Correspondence Re: CCW Application
18     March 7, 2009 ....................................... Exhibit "K"

19  Exhibit Filed Under Seal .................................. Exhibit "L"

20  Exhibit Filed Under Seal .................................. Exhibit "M"

21  Exhibit Filed Under Seal .................................. Exhibit "N"

22  Exhibit Filed Under Seal .................................. Exhibit "O"

23  "More Bunk On Concealed Carry From the Violence
      Policy Center" *Pajamas Media*, August 19, 2009 ........... Exhibit "P"
24
25

26

27

28

1

**IN THE UNITED STATES DISTRICT COURT**

2

**SOUTHERN DISTRICT OF CALIFORNIA**

3

4

5

6

7

8

9

10

11

12

EDWARD PERUTA,
MICHELLE LAXSON, JAMES
DODD, DR. LESLIE
BUNCHER, MARK CLEARY,
and CALIFORNIA RIFLE
AND PISTOL ASSOCIATION
FOUNDATION

           Plaintiffs,

      v.

COUNTY OF SAN DIEGO,
WILLIAM D. GORE,
INDIVIDUALLY AND IN HIS
CAPACITY AS SHERIFF,

          Defendants.

) **CASE NO. 09-CV-2371 IEG (BGS)**
)
) **CERTIFICATE OF SERVICE**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

13

IT IS HEREBY CERTIFIED THAT:

14

15

    I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.

16

    I am not a party to the above-entitled action. I have caused service of:

17

18

**EXHIBITS "A" THROUGH "P" IN SUPPORT OF PLAINTIFFS'
CONSOLIDATED OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND; REPLY TO DEFENDANT'S OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

19

20

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

21

22

23

24

25

James M. Chapin
County of San Diego
Office of County Counsel
1600 Pacific Highway
Room 355
San Diego, CA 92101-2469
(619) 531-5244
Fax: (619) 531-6005
james.chapin@sdcounty.ca.gov

Paul Neuharth, Jr. (State Bar #147073)
PAUL NEUHARTH, JR., APC
1140 Union Street, Suite 102
San Diego, CA 92101
Telephone: (619) 231-0401
Facsimile: (619) 231-8759
pneuharth@sbcglobal.net

26

    I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 18, 2010.

27

28

                /s/ C.D. Michel
                C. D. Michel
                Attorney for Plaintiffs

# EXHIBIT "A"

**MUNICIPAL CODE County of ALAMEDA COUNTY, CALIFORNIA Codified through Ordinance No. 2009-56. enacted November 10, 2009. (Supplement No. 54)**

*Alameda County Code of Ordinances 9.12.120*

California

Alameda County Code of Ordinances

Title 9 - PUBLIC PEACE, MORALS AND WELFARE

Chapter 9.12 - FIREARMS AND DANGEROUS WEAPONS

§ 9.12.120 Possession of firearms on county property prohibited.

- A.   Findings. The board of supervisors finds that gunshot fatalities and injuries are of epidemic proportions in Alameda County. During the first five years of the 1990's, eight hundred seventy-nine (879) homicides were committed using firearms, and an additional one thousand six hundred forty-seven (1,647) victims were hospitalized with gunshot injuries. Firearms are the leading cause of death among young people between the ages of fifteen (15) and twenty-four (24) in Alameda County. Between July 1, 1996 and June 30, 1997, one hundred thirty-six (136) juveniles were arrested in Oakland for gun-related offenses. On July 4, 1998 a shooting incident on the Alameda County Fairgrounds resulted in several gunshot wounds, other injuries and panic among fair goers. Prohibiting the possession of firearms on county property will promote the public health and safety by contributing to the reduction of gunshot fatalities and injuries in the county.

- B.   Misdemeanor. Every person who brings onto or possesses on county property a firearm, loaded or unloaded, or ammunition for a firearm is guilty of a misdemeanor.

- C.   County Property. As used in this section, the term county property means real property, including any buildings thereon, owned or leased by the county of Alameda (hereinafter "county"), and in the county's possession, or in the possession of a public or private entity under contract with the county to perform a public purpose, including but not limited to real property owned or leased by the county in the unincorporated and incorporated portions of the county, such as the county park in Sunol and the Alameda County Fairgrounds in the city of Pleasanton, but does not include any "local public building" as defined in Penal Code Section 171b(c), where the state regulates possession of firearms pursuant to Penal Code Section 171b.

- D.   Firearm. "Firearm" is any gun, pistol, revolver, rifle or any device, designed or modified to be used as a weapon, from which is expelled through a barrel a projectile by the force of an explosion or other form of combustion. "Firearm" does not include imitation firearms or BB guns and air rifles as defined in Government Code Section 53071.5.

- E.   Ammunition. "Ammunition" is any ammunition as defined in Penal Code Section 12316(b)(2).

- F.   Exceptions. Subsection 9.12.120B does not apply to the following:
    1.   A peace officer as defined in Title 3, Part 2, Chapter 4.5 of the California Penal Code (Sections 830 et seq.);

2.    A guard or messenger of a financial institution, a guard of a contract carrier operating an armored vehicle, a licensed private investigator, patrol operator, or alarm company operator, or uniformed security guard as these occupations are defined in Penal Code Section 12031(d) and who holds a valid certificate issued by the Department of Consumer Affairs under Penal Code Section 12033, while actually employed and engaged in protecting and preserving property or life within the scope of his or her employment;

3.    A person holding a valid license to carry a firearm issued pursuant to Penal Code Section 12050;

4.    The possession of a firearm by an authorized participant in a motion picture, television, video, dance or theatrical production or event, when the participant lawfully uses the firearm as part of that production or event, provided that when such firearm is not in the actual possession of the authorized participant, it is secured to prevent unauthorized use.

5.    A person lawfully transporting firearms or ammunition in a motor vehicle on county roads;

6.    A person lawfully using the target range operated by the Alameda County sheriff;

7.    A federal criminal investigator or law enforcement officer; or

8.    A member of the military forces of the state of California or of the United States while engaged in the performance of his or her duty.

G.    Severability. If any provision of this section or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect any other provision or application of this section which can be given effect without the invalid provision or application, and to this end the provisions of this section

# EXHIBIT "B"

# The Durham Herald-Sun's News Archive

Click here to go back to search results.

Click here for a printer friendly version of this article.

## Chapel Hill Herald (NC){PUBLICATION2}

May 6, 1997
**Section:** Editorial
**Edition:** Final
**Page:** 4

### Concealed weapons advocates were right: Crime didn't go up

*THOM GOOLSBY Guest Columnist*

The supporters of North Carolina's **concealed weapon** carry law are saying, ``We told you so!'' after the State Bureau of Investigation (SBI) came out with its recent statistics on handgun violence. According to the SBI, citizens **licensed** to carry **concealed weapons** are not committing crimes. Of the 20,082 permits issued since the new law took effect in December 1995, no permitee has been charged with committing a crime with a gun. Additionally, police have only revoked less than one-half of 1 percent of the permits.

As the century-old ban against handguns was being repealed in the General Assembly, anti-gunners from across the state came to Raleigh wailing hysterically about the violence that would surely come to pass if legislators allowed law-abiding citizens to carry **concealed weapons**.

Gerald Galloway, then president of the state's Association of Police Chiefs, was a vocal opponent of the new law. He told a state Senate committee, ``We believe to be secretly armed is bad public policy.'' Even with the latest round of statistics, Galloway is unrepentant in his opposition to a citizen's right to carry a **concealed weapon** for self-protection.

In a recent interview with reporters, Galloway stated, ``**Concealed weapons** should not be the answer to making people safe on the street.'' He added, ``We need to deal with it from the side of catching criminals and convicting them, so citizens don't have to feel unsafe.''

Galloway's views, however, are unrealistic. No matter how much he might wish crime away, there is no way in a free society that we can ever hire enough police officers in order to do away with crime.

Lisa Price, wife of Congressman David Price and executive director of North Carolinians Against Gun Violence, is as equally unrepentant as Galloway. Although she admits to having been wrong in her assessment of the **concealed weapon** law, she continues to ask, ``Our basic question then and now remains, 'What good is it for North Carolina lawmakers to allow citizens to carry **concealed weapons**?' ''

Price's question is best answered by Fayetteville Police Chief Ron Hansen who originally opposed the **concealed weapon** law. He too was wrong when he warned in 1995 that the law would create a dangerous climate. However, to the chief's credit, he is willing to look at the facts and change his opinion.

In an interview with the Fayetteville Observer-Times, Hansen said, ``I am glad that I was wrong. I haven't had a single report of a **licensed concealed weapon** being used to commit a crime.'' Hansen now believes that allowing people to carry **concealed weapons** is a contributing factor in reducing a number of crimes. He added, ``I think that a criminal thinking about committing one of those border-line crimes actually may back off when he realizes that his victim may be armed.''

One extremely important fact that the anti-gun crowd refuses to admit is that the individuals obtaining **concealed weapon** permits pose no threat to society. Unlike criminals who will carry guns no matter what any law says, individuals seeking **concealed weapon** permits must undergo fingerprinting, background checks and handgun safety training.

In their zeal to treat any handgun -- whether wielded by a criminal or a law-abiding citizen -- as an instrument of the devil, anti-gunners refuse to even recognize the benefits that the new law has provided in public safety and reduction in the fear of crime. The basic question that Price and the anti-gun crowd should be facing is, ``When are they going to face reality and recognize that guns can play a very vital role in protecting lives and property when they are wielded by trained, responsible and law-abiding citizens?''

Thom Goolsby is managing partner and a trial attorney with the Currin Law Firm of Raleigh and Wilmington and a professor at Campbell Law School.
Photo: GOOLSBY

Copyright, 1997, The Durham Herald Company

# EXHIBIT "C"

# THE ROANOKE TIMES
### roanoke.com

This article is © 2002- the Times-World Corp.
- Click here to conduct another search
- Help with searching

# PISTOL-PACKING AND PROUD OF IT

**Date:** May 19, 2002 **Section:** VIRGINIA **Page:** A1

*By   TAD DICKENS THE ROANOKE TIMES<COMPUTER-ASSISTED REPORTING COORDINATOR
RAY REED CONTRIBUTED TO THIS REPORT*

On a near-perfect spring day, Brenda Coulter walks along a gravel road near a country church in rural Craig County.

You would think that no one was around for miles. There certainly are no cars moving nearby. The noise out here comes mostly in the form of chirps and tweets from birds and bugs. And Coulter feels quite safe. Not simply because of the relative peace around her, but because of the piece she has hidden away in her fanny pack. It's a loaded .32-caliber Smith & Wesson revolver, light and deadly.

"I've got my guardian angel with me," said Coulter, 41.

And she, like at least 460 other Craig County residents 21 and older, has a permit for it. That may not sound like a lot, but combine it with the state's second-smallest population, and you have a county with the highest rate of concealed gun permit holders in the state, according to state police and census figures.

In Virginia, 3.3 percent of more than 5 million people at least 21 years old have received the permits to carry hidden guns anywhere in the state since lawmakers loosened restrictions on the permits in 1995. In Craig County, more than 12 percent of the adult residents of the relatively crime-free locality have the licenses.

By contrast, in much larger, felony-troubled Richmond, 1.8 percent of people 21 and older may stow a gun out of sight. In Roanoke, 1.3 percent of adults who are at least 21 have permits.

Only Amelia and Surry counties to the east, also rural and lightly populated, come close to Craig, according to the police

and census numbers.

Craig County Commonwealth's Attorney Thad Cox said he
worried that after the law changed, he would have to prosecute a
rash of shootings. He was wrong, though, and pleasantly
surprised about it, he said.

"That says a lot about the character of people who live here,"
said Cox, who as a prosecutor has had his permit for about 20
years. "Good quality citizens are getting them. They're not
getting in trouble."

Recent Craig County transplants, such as Coulter, and longtime
residents may share permits in common, but many in Craig say
that even with the permits, they don't make a habit of carrying
around hidden weapons. It's just that in a culture centered on
hunting and guns, getting a concealed carry permit is just
something you do, many say.

"I guess because it's rural - good hunting territory over here, and
good hunters - it's something you grow up with, I guess," said
G.D. Fuller as he sat with friends drinking coffee and Cokes and
chewing plug tobacco around the stove at the Hunter's Den, a
gun and supply shop just outside New Castle.

But it's not all about hometown tradition. Some say they were
influenced to seek the permits after watching a National Rifle
Association program detailing what it said were attempts by
governments to take citizens' guns.

"Why not get one now, before I'm unable to get one?" said
Penny Stebar, 34.

Even that response is tempered with a claim to the local hunting
culture. Stebar said that her father, grandfather and husband
hunt. She used to, but gave it up to raise her children, one of
whom has already begun hunting. Her second is getting old
enough to start and is excited about the prospect.

"Not that we're obsessed with guns," Stebar said. "We just grew
up around them."

Statewide, rural counties dominate the list of permit holders.
Only one county of more than 20,000 residents - Henry County,
with some 57,000 - is among the top 10. Martinsville, which is
surrounded by Henry County, is the only city among the top 25.
Portsmouth is the only other city in the top 50.

Suburban Fairfax County, the state's largest, is near the bottom
with 1.6 percent. Nor do other Washington suburban counties

have large concentrations of permit holders.

Kristi Hoffman, an assistant professor of sociology at Roanoke College, said studies show that rural Southern localities, particularly ones with mostly white populations, are more likely to have guns, and residents are more likely to be concealed gun permit holders. The fact that so many permit holders live in areas with low crime rates makes little difference in the equation.

"They certainly haven't had a crime wave in Craig County," Hoffman said.

Inner cities, despite often staggering crime rates, have the lowest rates of concealed carry permits, she said.

Concealed gun proponents argue that hidden guns will deter crime. But Hoffman said poverty rates, employment levels and other social factors are more important.

"Part of the argument is deterrence," she said. "I think those claims are somewhat exaggerated."

Pocket protector

Stebar, whose family is full of hunters, doesn't own a pistol. She said she used to carry a 9 mm pistol her husband owned, but he sold it. When she needs one, she just borrows it - like the time she went Christmas shopping with her mother at Valley View Mall in Roanoke.

The mall has a no-weapons policy that was recently the center of debate after a gun-rights group filled mall management's e-mail in boxes with protests about the years-old ban. But Stebar had no idea about any of that, nor did she see the obscure notice about the rule, near the bottom of an entrance sign, on the day she walked in, she said.

She carried a borrowed snub-nose .38-caliber pistol in her pocket that day. She didn't need to use it, but just having it made her feel more confident, she said.

"You just never know, especially with two women out," Stebar said. "People are just too crazy. Over here, it's just so laid-back."

Coulter, married with two stepchildren, is not so sure about that. The daughter of a Northern Virginia gun dealer, she said she learned early not to trust too much, whether in bucolic Craig County or bustling Washington.

"Even living out here, you're not safe anywhere," she said. "I've heard stories. I read."

Even so, that fanny pack seems a little slow to open. Coulter said she realizes she might not be the quickest on the draw.

"Wait a minute," she said, joking as she slowly unzipped the pack. "I promise I'm going to shoot you."

Lots of Craig residents say they need to pocket a pistol on their properties for the snakes, coyotes and other varmints they might run into. Helms Hardware & Auto Parts owner Curtis Helms anticipates something else he might have to shoot.

Twenty-five years ago, burglars hit Helms' store twice in three months, costing him about 40 televisions, several appliances, $2,000 from his safe and dozens of guns. After that, he got a burglar alarm, and he started keeping a gun with him. A few years back, after the General Assembly made it easier for people to get concealed gun permits, he got one.

"The main reason I got a permit is I wanted to be legal, being in business and all, if I ever had a reason," Helms said.

He hasn't. Helms doesn't even carry his gun around in the store. But on trips out of town, he always makes sure he leaves heavy.

"I've tried to stay away from trouble, but if it came up, I think I could do it," he said. "You know what I mean?"

Matter of principle

The NRA video, featuring stories about people and communities that the organization said lost their gun ownership rights, got a lot of people stirred up, said Stebar, as well as others who declined to comment on the record.

"That's all you heard people talking about for a long time," she said.

Still, she and the others said they realize that there is no significant movement in gun-friendly Virginia to take away the state's loosened concealed carry laws. No one should even try, she said.

"The people here would not give up their guns," she said.

Such fears have been exaggerated, said Hoffman, the Roanoke College sociologist. Recently, the Bush administration informed the Supreme Court that it believes the U.S. Constitution gives

individuals the right to possess guns - an interpretation that
reverses four decades of government policy.

But NRA membership is high in rural counties such as Craig,
and residents there are more exposed to that organization's push
to protect what they say are their rights to carry a weapon, she
said.

"I don't think that people need to fear their guns are going to be
taken away," Hoffman said. "Both locally and at the national
level, gun control is essentially on hold."

Just for fun

The Hunter's Den is the social center for Craig County people
who love firearms and chasing after wild deer and turkey. No
one there is shy about discussing guns, concealed or not. Fuller,
75, who was squirrel hunting at 10, said he never has a gun
hidden on his person. But he said he always carries a couple of
pistols in his pickup truck, in the box they were shipped in. He
uses them for target practice.

"I'll shoot a pop bottle or paper or whatever," he said. With the
concealed carry permit, he doesn't have to worry about the fact
that they're usually hidden.

Any conversation about concealed guns in Craig usually winds
around to the bigger subjects - culture and education - which
residents say dwarf the concealed carry issue.

Craig County sheriff's Deputy Ike Craft is a longtime hunter,
though he's better known for his archery expertise. Craft said he
remembers that his school bus driver back in the 1960s had a
single-barrel Winchester propped up by the bus door during deer
season. Once the kids were off the bus, the driver was off to
hunt until class let out, he said.

"The kids never thought nothing about it," Craft said. Many
spent their free time hunting, too.

He and his peers learned respect for guns and knew better than
to take chances with something so dangerous, he said.

Craig County's concealed carry permit holders express
confidence in their knowledge of and ability to handle firearms,
and say they're passing those values down to their children.
Stebar and Coulter, both mothers of two, said their children
have an abiding respect for guns.

"They realize it's not a toy," Stebar said. "It kills."

Tad Dickens can be reached

at 981-3236 or tadd@roanoke.com.

**Caption:** Photo - 1 PHOTOS BY STEPHANIE KLEIN-DAVIS
THE ROANOKE
TIMES "My guardian angel" is how Brenda Coulter refers to the
.32-caliber Smith & Wesson that she carries. Coulter, a recent
transplant to Craig County and the daughter of a Northern
Virginia
gun dealer, is just one of many Craig County residents who has
a
permit to carry a concealed weapon. COLOR 2. Brenda Coulter
says
she always feels safe when she takes her walks along roads in
Craig
County. Her peace of mind comes in the form of a loaded .32-
caliber
Smith & Wesson revolver. COLOR 3. Bernard Vernon, 69, of
New
Castle has a concealed weapon's permit and carries a North
American
Arms, f+y . f-y 22-caliber magnum in a leather knife case on his
belt. The retired pipe fitter for the railroad said he mostly uses
his gun to kill snakes. COLOR 4. Ellen Horne owns the Hunter's
Den
in New Castle. The Den is a gun shop where locals hang out to
swap
stories and sip coffee. COLOR 5. chart - Permit holders
COLOR THE
ROANOKE TIMES 6. chart - Permit Requirements COLOR
THE ROANOKE
TIMES

All content herein is © 1997 Times-World Corp. and may not be republished
without permission.

**The Roanoke Times Online** is a service of The Roanoke Times.

*The Roanoke Times archives are stored on a SAVE (tm) newspaper library system from NewsBank Media Services.*

# EXHIBIT "D"



LUBBOCK AVALANCHE-JOURNAL

Site ⊙ Web ○          **Web Search powered by YAHOO! SE**

Home   News   Sports   Money   Life   Opinion   A-J Pedia   Obituaries   Autos   Homes   Jobs   Cla

# Majority of gun licensees white males, law abiding

**Published:** Sunday, August 16, 2009

ENRIQUE RANGEL

AUSTIN - Steve Farley is among the 1,511 certified instructors in Texas who teach concealed-handgun license applicants not only how to handle firearms but the rights and responsibilities that come with a permit.

And there is something else about the 45-year-old Lubbock police detective. He is also the typical concealed-handgun license holder in the state.

In Texas, the average person with a concealed-carry license is a white male between 45 and 60 years of age, according to Department of Public Safety data. Out of the 327,560 license holders as of mid-March, 70 percent were white males, but Farley's age group was by far the largest.

Farley, who served in the U.S. Marine Corps for 10 and a half years before joining the Lubbock Police Department 15 years ago, said he is not surprised by those numbers.

"I have a pretty good number of females, but yes, the majority of them are white males my age," he said.

The vast majority of license holders are law-abiding citizens, too, said state Reps. David Swinford, R-Dumas, and Joe Heflin, D-Crosbyton, who also have concealed-weapon permits.

"When you apply for a license you have to take a 10-hour course on how to handle your gun and what you can and cannot do with it," said Swinford, who was among the first to get a license in 1997 after the Legislature passed - and then-Gov. George W. Bush signed into law - a concealed-carry bill.

"You also have a background check," Swinford explained. "If you are some kind of nut who has been in trouble with the law you ain't going to get a license."

The rate of denials, revocation or suspension of a license is relatively low, according to DPS figures.

Swinford recalled an interview with a TV reporter in which she asked him why she had

never seen his gun. The lawmaker said he replied that the law is quite explicit that license holders should not let anyone see it because they would be breaking the law.

"The process you have to go through helps the DPS weed out the bad applicants," said Heflin, who got his license when he was county judge in rural Crosby County because he often traveled at night for meetings.

"Of course there's always a nut or two who gets a license, but for the most part, I'd say that those who carry a concealed gun got their license for legitimate reasons," Heflin added. "They want to protect themselves and their families ... not to settle an argument or a score."

Compared to the standard law breaker, the conviction rate for concealed-handgun license holders is quite low, according to DPS figures. In robberies, for example, the most violent crime in Texas, of the 1,791 people convicted in 2007, the most recent year for which such statistics are available, none were concealed-handgun license holders. And out of 1,432 deadly conduct convictions, only 15, or 1 percent, were license holders.

DPS Director Steven McCraw, who started his law enforcement career in the Panhandle, said he is not surprised by the low conviction rate of concealed-handgun license holders.

"We can't childproof this process, we need to be clear about in terms of judgment or what's inside someone's heart or mind and their level of character is very difficult to do through a background check," McCraw said.

But the required training is also of great help in determining whether the applicant is indeed fit for a concealed-carry license, McCraw said.

Farley said he rarely sees someone who, in his opinion, is unfit to get a license.

"I realize that if people have problems they will do their best not to show them, but after 10 hours you can tell if someone shouldn't get a license," Farley said. "It is something they say or something they do that tells you 'this guy is a knucklehead ... he shouldn't be allowed to carry a gun.' "

And like Swinford, Heflin and others, Farley said he has noticed the demand for his services has increased drastically since the gun sales boom started right after President Barack Obama was elected in November.

"I don't want to get into politics, but for the first two months after the election I could have spent all my time doing this, and that would not have been enough," Farley said.

Most of the people he trains want a concealed-carry license because they want to protect themselves and their families, he said.

"One of the most common comments that I hear is that it doesn't do much good when the police arrive because by that time someone is already hurt," Farley said. "They want to be able to protect themselves and their families before they are attacked."

To comment on this story:

enrique.rangel@morris.com I 512-673-7553

shelly.gonzales@lubbockonline.com I 766-8747

# EXHIBIT "E"



**# NEWS**

Front Page
Local
Sports
▸ Bengals
▸ Reds
▸ Bearcats
▸ Xavier
Business
Health
Technology
Weather
Traffic
Back Issues
Photographs
AP Wire
▸ World
▸ Nation
▸ Sports
▸ Business
▸ Arts
▸ Health

**# CLASSIFIEDS**

Jobs
Autos
General
Obits
Homes

**# FREETIME!**

Movies
Dining
Calendars
Weekend

**# OPINION**

Columns
Borgman

**# HELPDESK**

HelpDesk
Feedback
Circulation
Subscribe
Phone #'s
Search

ENQUIRER LOCAL NEWS COVERAGE
Monday, June 16, 1997

# Gun-toting Kentuckians hold their fire

## Permit law uneventful

**BY TERRY FLYNN**
The Cincinnati Enquirer

Fears by Northern Kentucky law enforcement officials that the state's concealed carry permit law would result in a "Dodge City" mentality appear unfounded thus far.

In the nine months since permits first were issued, authorities in Boone, Campbell and Kenton counties say they have yet to record an incident in which a permit holder shot someone.

"I have changed my opinion of this (program)," Campbell County Sheriff John Dunn said. "Frankly, I anticipated a certain type of people applying to carry firearms, people I would be uncomfortable with being able to carry a concealed weapon.

"That has not been the case. These are all just everyday citizens who feel they need some protection."

Since the concealed carry law enacted last year by the Kentucky General Assembly took effect in October 1996, about 24,500 permits have been issued. Kentucky's population is about 3.7 million, which means one of about every 150 people in the state now has the legal right to carry a concealed deadly weapon.

About 1,800 permits have been issued in Boone, Campbell and Kenton counties.

The concealed carry law allows people over 21 who complete an instruction course and clear a background check to carry a concealed deadly weapon. The permit costs $60 and is good for three years.

A concern of Ohio law enforcement officials when the Kentucky law was enacted was an influx of gun-toting visitors crossing the river. That however, is dealt with specifically in the concealed carry instruction course, where applicants are warned that their permit is not valid in any other state without reciprocal permit law.

Sheriff Dunn personally handles virtually all the concealed carry applications in Campbell County, so he sees the people who are seeking the permits.

"Interestingly, the average age is about 50," he said. "Most people say they don't necessarily want to carry a gun all the time, but they want the permit if there is a time when they would want to be able to carry (a concealed firearm) for protection."

Lt. Col. Bill Dorsey, Covington assistant police chief, was another doubter of the law who has changed his mind. He was opposed to the bill, as was the Kentucky Chiefs of Police Association, while the state FOP endorsed it.

"We haven't seen any cases where a (concealed carry) permit holder has committed an offense with a firearm," he said. "Licensing is not the problem relating to firearms."

Similarly, Kentucky State Police Trooper Jan Wuchner of Post 6 in Dry Ridge said he has "heard nothing around the state related to crimes with a gun committed by permit holders. There has been nothing like that that I've been informed of."

Sheriff Dunn schedules permit applicants on Tuesdays only, while the sheriff's departments in Kenton, Boone and Pendleton counties handle them as people show up.

"We've had no problems with it," said Kenton County Chief Deputy Chuck Fieger. "We have four people who handle permit applications, and we schedule them any time."

Deputy Fieger also noted that at least half of the people applying for permits were in their 50s to 70s.

"Many of them say they are worried about being attacked going to the store and things like that," he said. "I worry a little bit that some day some kid will do something that is interpreted as an attack and get shot for no reason."

Tony DiMuzio, owner of Tony's Gun Shop on U.S. 27 in Alexandria, said he has seen a definite increase in the number of people buying handguns and seeking training for concealed carry permits.

"I'm selling more small, concealable handguns than before the laws was passed," he said. "My handgun sales are probably up 20 percent from this time last year."

Mr. DiMuzio said when a customer comes in to buy a handgun and asks about where to take the concealed carry permit class, he refers them to one of several certified instructors listed by the sheriff's department.

The names and numbers of all certified instructors are on file with the sheriff's departments in the counties where they live. When applications are completed by the sheriffs, they are sent to the state police in Frankfort for a background check. The permit carries the holder's photo.

Mr. DiMuzio has also seen a lot of seniors seeking permits.

"My brother-in-law, Tony Feldman, is 81, and he's taking the test for a concealed carry permit. He just feels if it's available he should have it in case he feels the need to carry a gun."

Search | Questions/help | News tips | Letters to the editors
Web advertising | Place a classified | Subscribe | Circulation

Copyright 1995-2000. The Cincinnati Enquirer, a Gannett Co. Inc. newspaper.
Use of this site signifies agreement to terms of service updated 4/5/2000.

# EXHIBIT "F"

## FORMAL INQUIRY AND REQUEST FOR CARIFICATION

### Friday, December 05, 2008

San Diego County Sheriff's Department
9621 Ridgehaven Court
San Diego, CA 92123

**Attention:** Sheriff William Kolender, William Gore, Al Guerin Robert Ahern, James Cooke, Kim Quaco, John Gains, Jan Caldwell, Andy Chmielinski, Lori Bird, John Ingrassia, Michael McNally, Rich Miller, Anthony Nares, Ed Prendergast, Glenn Revell, Alan Skoglund, Agoston Haraszthy, Robert Faigin, John Madigan, Sanford Toyen, Maria Marshall, Brian Sampson, Mary Walsh, Weapons Unit Commander, License and Permits Unit.

### To Whom It May Concern:

The undersigned Edward A. Peruta is in need of a clarification on the current policies and practices of the San Diego County Sheriff's Department which mandate questionable requirements regarding the required "RESIDENCE" of applicants for CCW permits in San Diego County.

### THE ISSUE

California Penal Code Sections 12050 thru 12054 require CCW applicants to be a "RESIDENT" of the city or county in which application is made.

In order to properly understand the law and instruct individuals in the mandated requirements to obtain a CCW permit in California, I have conducted an extensive review of the California Penal Code regarding firearms and CCW permits

This document is prepared and submitted in an attempt to seek a clarification and understanding of the legislative intent and requirements imposed upon the San Diego Sheriff's Department by the California Legislature through their use of the term "RESIDENT" as it appears in the California penal code.

Recent events lead me to believe that the San Diego Sheriff's Department is currently requiring CCW applicants to establish and maintain what amounts to a "DOMICILE" in San Diego County in order to make application for a California CCW permit.

A serious issue may currently exist where members of the California law enforcement community, by their written and verbal directives, policies, procedures and practices have exceeded the mandates of the California Penal Code by expanding the definition of "RESIDENT" in a manner that compels applicants to establish or maintain a "DOMICILE" in the geographical area where the application is submitted.

If, any incorrect application of the penal code through the restrictive nature of requiring applicants to establish and/or maintain a "DOMICILE" rather than a simple "RESIDENCE" it is incumbent upon law enforcement to immediately correct the situation.

If after any review, it is found that a more restrictive definition of the term "RESIDENT" is currently being incorrectly applied to deny current and future applicants their rights under current California law, it may in fact evidence a clear and unmistakable abuse of power by those who implement the policies and practices of the Department.

The following four questions are posed regarding this issue:

Is there a clear and defined difference between a person who maintains a residence and person who maintains a domicile?

Can an individual in San Diego County maintain a residence in the county without establishing a domicile?

For purposes of applying for a CCW permit in San Diego County, may applicants have more than one residence?

What are the minimum legal time and fact requirements to establish or maintain a RESIDENCE in applying for a CCW permit in the State of California?

Respectfully Requested,

*Edward A. Peruta*

**Edward A. Peruta**
**American News and Information Services Inc.**
**3151 Driscoll Drive**
**San Diego, CA**

edperuta@amcable.tv

**860-978-5455**
**860-563-NEWS (6397)**
**858-206-5124**

**Information on which this document is based.**

# CALIFORNIA PENAL CODE SECTION 12050.

(a)(1)(A) The sheriff of a county, upon proof that the person applying is of **good moral character**, that **good cause exists** for the issuance, and that the person applying satisfies any one of the conditions specified in **subparagraph (D)** and has **completed a course of training** as described in **subparagraph (E)**, may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats: (i) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. (ii) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in that county a pistol, revolver, or other firearm capable of being concealed upon the person. (B) The chief or other head of a municipal police department of any city or city and county, **upon proof** that the person applying is **of good moral character**, that **good cause** exists for the issuance, and that the person applying is a **resident** of that city, and has completed **a course of training**

## PROVISIONS OF **CALIFORNIA PENAL CODE SECTIONS 349, 2027 & 2032**, DEFINING AND EXPLAINING "**RESIDENCE**", "**DOMICILE**" AND "**RESIDENCE IN A TRAILER OR VEHICLE**"

# CALIFORNIA PENAL CODE SECTION 349.

(a) "Residence" for voting purposes means a person's domicile.

(b) The DOMICILE of a person is that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. At a given time, a person may have only one domicile.

(c) The RESIDENCE of a person is that place in which the person's habitation is fixed for some period of time, but wherein he or she does not have the intention of remaining. At a given time, a person may have more than one residence.

# CALIFORNIA PENAL CODE SECTION 2027.

The place where a person's family is domiciled is his or her domicile unless it is a place for temporary establishment for his or her family or for transient objects. **Residence in a trailer or vehicle** or at any public camp or camping ground may constitute a domicile for voting purposes if the registrant complies with the other requirements of this article.

# CALIFORNIA PENAL CODE SECTION 2032.

Except as provided in this article, if a person has MORE THAN ONE RESIDENCE and that person has not **physically resided at any one of the residences within the immediate preceding year**, **there shall be a rebuttable presumption that those residences in which he or she has not so resided within the immediate preceding year are** MERELY RESIDENCES as defined in subdivision (c) of Section 349 and NOT HIS OR HER DOMICILE.

CODE OF CIVIL PROCEDURE SECTION 1060-1062.5

1060.  **Any person interested** under a written instrument, excluding a
will or a trust, or under a contract, or **who desires a declaration
of his or her rights or duties with respect to another**, or in respect
to, in, over or upon property, or with respect to the location of
the natural channel of a watercourse, may, in cases of actual
controversy relating to the legal rights and duties of the respective
parties, bring an original action or cross-complaint in the superior
court for a declaration of his or her rights and duties in the
premises, including a determination of any question of construction
or validity arising under the instrument or contract. He or she may
ask for a declaration of rights or duties, either alone or with other
relief; and the court may make a binding declaration of these rights
or duties, whether or not further relief is or could be claimed at
the time.  The declaration may be either affirmative or negative in
form and effect, and the declaration shall have the force of a final
judgment.  The declaration may be had before there has been any
breach of the obligation in respect to which said declaration is
sought.


1060.5.  Any individual claiming to be a nonresident of the State of
California for the purposes of the Personal Income Tax Law may
commence an action in the Superior Court in the County of Sacramento,
or in the County of Los Angeles, or in the City and County of San
Francisco, against the Franchise Tax Board **to determine the fact of
his or her residence in this state** under the conditions and
circumstances set forth in Section 19381 of the Revenue and Taxation
Code.


1061.  The court may refuse to exercise the power granted by this
chapter in any case where its declaration or determination is not
necessary or proper at the time under all the circumstances.


1062.  The remedies provided by this chapter are cumulative, and
shall not be construed as restricting any remedy, provisional or
otherwise, provided by law for the benefit of any party to such
action, and no judgment under this chapter shall preclude any party
from obtaining additional relief based upon the same facts.


1062.3.  (a) Except as provided in subdivision (b), **actions brought
under the provisions of this chapter shall be set for trial at the
earliest possible date  and shall take precedence over all other
cases, except older matters of the same character and matters to
which special precedence may be given by law.**
     (b) Any action brought under the provisions of this chapter in
which the plaintiff seeks any relief, in addition to a declaration of
rights and duties, shall take such precedence only upon noticed
motion and a showing that the action requires a speedy trial.


1062.5.  Any insurer who issues policies of professional liability

insurance to health care providers for professional negligence, as defined in Chapter 1 as amended by Chapter 2, Statutes of 1975, Second Extraordinary Session, any health care provider covered by such a policy, or any potentially aggrieved person, may bring an action in the superior court for a declaration of its, his, or her rights, duties, and obligations under Chapter 1 as amended by Chapter 2, Statutes of 1975, Second Extraordinary Session.

**The court shall permit any of the following persons to intervene in the action:**

(1) The Attorney General.

(2) Any other person whose appearance is determined by the court to be essential to a complete determination or settlement of any issues in the action.

**The action shall be commenced in the superior court in the county in which the Attorney General is required to reside** and keep his office pursuant to Section 1060 of the Government Code.

**The action shall be set for trial at the earliest possible date and shall take precedence over all cases other than those in which the state is a party.**

The court may make a binding declaration of the rights, duties, and obligations of the insurer, whether or not further relief is or could be claimed at the time.  The declaration may be affirmative or negative in form and effect and shall have the force and effect of a final judgment.

**If the declaration is appealed, the appeal shall be given precedence in the court of appeal and Supreme Court and placed on the calendar in the order of its date of issue immediately following cases in which the state is a party.**

The remedy established by this section is cumulative, and shall not be construed as restricting any remedy established for the benefit of any party to the action by any other provision of law.  **No declaration under this section shall preclude any party from obtaining additional relief based upon the same facts.**

# EXHIBIT "G"

 San Diego County Sheriff's Department 

Post Office Box 939062 • San Diego, California 92193-9062

William B. Kolender, Sheriff                                                                                   William D. Gore, Undersheriff

December 9, 2008

Edward A. Peruta
American News and Information Services, Inc.
3151 Driscoll Dr.
San Diego, CA 92117-4419

Dear Mr. Peruta:

The Sheriff's Department is in receipt of your letter dated December 5, 2008, inquiring
about requirements for CCW permits.

I have referred your inquiry to the Sheriff's Licensing Division. You may expect a
response within 2 weeks.

Sincerely,

WILLIAM B. KOLENDER, Sheriff

Sanford A. Toyen, Legal Advisor
Office of the Sheriff – Legal Affairs Unit

SAT:acb

' Keeping the Peace Since 1850 '

# EXHIBIT "H"

William B. Kolender, Sheriff
San Diego Sheriff's Department
P.O. Box 939062
San Diego, California 92193-9062

## Attention:

Office of the Sheriff – Legal Affairs Unit
Attention: **Sanford A. Toyen**, Legal Advisor

Office of the Sheriff – Licensing Division
Attention: **Bianca Pelowitz**, Manager

**William Gore, Al Guerin Robert Ahern, James Cooke, Kim Quaco, John Gains, Jan Caldwell, Andy Chmielinski, Lori Bird, John Ingrassia, Michael McNally, Rich Miller, Anthony Nares, Ed Prendergast, Glenn Revell, Alan Skoglund, Agoston Haraszthy, Robert Faigin, John Madigan, Sanford Toyen, Maria Marshall, Brian Sampson, Mary Walsh, Weapons Unit Commander**

## Re: **Second FORMAL INQUIRY AND REQUEST FOR CARIFICATION**

As you know, I submitted a written inquiry/request, (included in this letter) to your department on December 5, 2008.

At the time of my request, I also made your department aware of the fact that I had sent a copy of my correspondence to the County Law Enforcement Review Board together with a request to address them at their December 9th 2008 meeting.

At the meeting of the County Law Enforcement Review Board I stated my belief that the San Diego County Sheriff's Department is improperly applying the definition of domicile to the Penal Code requirement of residency for CCW permits.

In the response by Attorney Sanford A. Toyen dated December 9, 2008, I was assured that a response would be made in two weeks.

On December 31, 2008 at approximately 10:15am, I presented myself to your department and met with Bianca Pelowitz, manager of your Licensing Unit, who informed me that my presentation to her of the December letter was the first she had heard of my request.

At the meeting with Ms. Pelowitz, I made her aware of my belief that my request was being ignored.

Ms. Pelowitz in our meeting on 12/31/08, assured me that she would look into the situation and get back to me.

On or about January 26, 2009, I again presented myself to the Permit and Licensing Unit and spoke with an employee named Donna who informed me that Ms. Pelowitz was not available at the time.

I believe that I have been very reasonable in waiting for the response that was promised, and now find myself looking to other more formal ways to resolve the issue of residency as addressed in my letter of December 5, 2008.

With this letter, I formally request a timely resolution to this issue.

Respectfully,

Edward A. Peruta
American News and Information Services Inc.
860-978-5455

## FORMAL INQUIRY AND REQUEST FOR CARIFICATION

**Friday, December 05, 2008**

**San Diego County Sheriff's Department**
**9621 Ridgehaven Court**
**San Diego, CA 92123**

**Attention: <u>Sheriff William Kolender</u>, William Gore, Al Guerin Robert Ahern, James Cooke, Kim Quaco, John Gains, Jan Caldwell, Andy Chmielinski, Lori Bird, John Ingrassia, Michael McNally, Rich Miller, Anthony Nares, Ed Prendergast, Glenn Revell, Alan Skoglund, Agoston Haraszthy, Robert Faigin, John Madigan, Sanford Toyen, Maria Marshall, Brian Sampson, Mary Walsh, Weapons Unit Commander, License and Permits Unit.**

**<u>To Whom It May Concern</u>:**

**The undersigned Edward A. Peruta is in need of a clarification on the current policies and practices of the San Diego County Sheriff's Department which mandate questionable requirements regarding the required "<u>RESIDENCE</u>" of applicants for CCW permits in San Diego County.**

### THE ISSUE

California Penal Code Sections 12050 thru 12054 require CCW applicants to be a "<u>RESIDENT</u>" of the city or county in which application is made.

In order to properly understand the law and instruct individuals in the mandated requirements to obtain a CCW permit in California, I have conducted an extensive review of the California Penal Code regarding firearms and CCW permits

This document is prepared and submitted in an attempt to seek a clarification and understanding of the legislative intent and requirements imposed upon the San Diego Sheriff's Department by the California Legislature through their use of the term "<u>RESIDENT</u>" as it appears in the California penal code.

Recent events lead me to believe that the San Diego Sheriff's Department is currently requiring CCW applicants to establish and maintain what amounts to a "<u>DOMICILE</u>" in San Diego County in order to make application for a California CCW permit.

A serious issue may currently exist where members of the California law enforcement community, by their written and verbal directives, policies, procedures and practices have exceeded the mandates of the California Penal Code by expanding the definition of "<u>RESIDENT</u>" in a manner that compels applicants to establish or maintain a "<u>DOMICILE</u>" in the geographical area where the application is submitted.

If, any incorrect application of the penal code through the restrictive nature of requiring applicants to establish and/or maintain a "<u>DOMICILE</u>" rather than a simple "<u>RESIDENCE</u>" it is incumbent upon law enforcement to immediately correct the situation.

If after any review, it is found that a more restrictive definition of the term "RESIDENT" is currently being incorrectly applied to deny current and future applicants their rights under current California law, it may in fact evidence a clear and unmistakable abuse of power by those who implement the policies and practices of the Department.

**The following four questions are posed regarding this issue:**

Is there a clear and defined difference between a person who maintains a residence and person who maintains a domicile?

Can an individual in San Diego County maintain a residence in the county without establishing a domicile?

For purposes of applying for a CCW permit in San Diego County, may applicants have more than one residence?

What are the minimum legal time and fact requirements to establish or maintain a RESIDENCE in applying for a CCW permit in the State of California?

Respectfully Requested,

*Edward A. Peruta*

Edward A. Peruta
American News and Information Services Inc.
3151 Driscoll Drive
San Diego, CA

edperuta@amcable.tv

860-978-5455
860-563-NEWS (6397)
858-206-5124

# EXHIBIT "I"



## San Diego County Sheriff's Department



Post Office Box 939062 • San Diego, California 92193-9062

*William B. Kolender, Sheriff*                                                    *William D. Gore, Undersheriff*

February 3, 2009


Edward A. Peruta
3151 Driscoll Dr.
San Diego, CA 92117-4419


Dear Mr. Peruta:

I am in receipt of a letter entitled "Second FORMAL INQUIRY AND REQUEST FOR CARIFICATION (sic)".

Your recitation of events in this letter neglects the fact that on 12-31-08, Ms. Blanca Pelowitz met with you in her office, listened to your concerns, and explained that the Sheriff's Department uses the term "residency" as listed in Penal Code § 12050 when reviewing CCW applications. Ms. Pelowitz also met with you again on 2-2-09 and reiterated this to you. Additionally, Donna Burns met with you on 1-26-09 and explained this to you. The implication of your letter is that the Sheriff's Department has ignored you. In reality, the Sheriff's Department has been extremely accommodating to you. Sheriff's Licensing Supervisors have, on at least three occasions, taken time away from conducting the public's business to meet with you personally, without appointment, to explain our practice to you.

Nevertheless, you claim to be waiting for a "response" from the Sheriff's Department. According to Ms. Pelowitz and other Licensing & ID Division employees who have spoken to you, you appear to be seeking assurances that your Concealed Weapon Permit application, which you have not submitted yet, will be granted. You are seeking to have the Sheriff's Department assure you that the Sheriff's Department will consider you to be a "resident" of San Diego County.

The Sheriff's Department cannot and will not prejudge your application for a permit. We will consider your permit application once it is submitted. The Sheriff's Department declines to answer your hypothetical questions dealing with an applicant's residency. We will review your application, once it is submitted, and make a decision. If your application is denied, and you believe the Sheriff's Department applied an erroneous

*"Keeping the Peace Since 1850"*

Mr. Edward Peruta                              -2-                    February 3, 2009

definition of "residency", you may avail yourself of whatever legal remedies are available to you at that time. But until such time that the Sheriff's Department receives an application from you, we will not attempt to prejudge the merits of any particular hypothetical situation.

Sincerely,

WILLIAM B. KOLENDER, Sheriff

Sanford A. Toyen, Legal Advisor
Office of the Sheriff – Legal Affairs Unit

SAT:aeb

# EXHIBIT "J"

Friday, February 06, 2009

William B. Kolender, Sheriff
San Diego Sheriff's Department
P.O. Box 939062
San Diego, California 92193-9062

Attention:

Office of the Sheriff - Legal Affairs Unit
Attention: Sanford A. Toyen, Legal Advisor

Office of the Sheriff - Licensing Division
Attention:  Bianca Pelowitz, Manager

William Gore, Al Guerin Robert Ahern, James Cooke, Kim Quaco, John Gains, Jan Caldwell,
Andy Chmielinski, Lori Bird, John Ingrassia, Michael McNally, Rich Miller, Anthony Nares,
Ed Prendergast, Glenn Revell, Alan Skoglund, Agoston Haraszthy, Robert Faigin, John
Madigan, Sanford Toyen, Maria Marshall, Brian Sampson, Mary Walsh, Weapons Unit Commander

Re:  Response and clarification of letter dated February 3, 2009

Dear Mr. Toyen,

I am in receipt of, and would like to thank you for, your prompt reply letter dated
February 3, 2009.

After reading same, I find it necessary to correct and clarify information contained in
same.

Contrary to your written statement which states the following:

"you appear to be seeking assurances that your Concealed Weapon Permit application, which
you have not submitted yet, will be granted."

At no time was I seeking assurances that my Concealed Weapon Permit application would be
approved when submitted.

**What I was seeking was a written clarification following the verbal and written decision
on November 17, 2008, that I was a Resident of LA and NOT considered a resident of San
Diego**, which may be found in the written notes created and supplied to me during the
first scheduled meeting with a member of the Sheriff's License Division.

To the contrary, **I have reason to believe that regardless of my background or reasons,
the San Diego Sheriff's Department will offer some type of reason to justify the denial
of the application which was submitted on February 3, 2009.**

As you know, approximately $150.00 is required to make application for a Concealed Carry
Permit in San Diego, and it appears that the first of two interviews is to evaluate a
potential applicant and offer an opinion as to whether or not the application will meet
the local requirements to be accepted and/or approved.

During my initial interview, two distinct observations were made by the employees who
conducted the initial interviews, the first being that **I was not a resident of San Diego**
and needed to make my application in Los Angeles, and the second being that **my reason for
making an application was "very vague no documents".**

As a former member of law enforcement, member of the News Media and current part time
legal investigator, I have often found and currently find it necessary to read and
understand State and Federal law, together with various court cases on particular topics.

I have at no time intended to interfere with your department's operations, but have during the course of my life **found it necessary to memorialize the facts in written or recorded form so that they do not change**.

As an individual who prides himself in knowing and following the law, I can't help but expect others to do likewise.

I have other questions regarding the process of applying for a Concealed Carry Permit in San Diego, and will be happy to provide you or any member of your department with my concerns.

The first is the requirement to supply 3 written character reference letters originating in San Diego, and the second is the requirement to take a written test and demonstrate a particular level of proficiency with a firearm at the cost of the applicant.

As part of my current application to become an approved CCW instructor in San Diego, I found it necessary to read and fully understand the California Penal Code. In reviewing the San Diego Sheriff's Departments requirements on these two topics, I am under the impression that any additional forms, requirements or costs beyond the "Standard Application" may be in violation of the law.

As part of my current application, I have made it a point to supply ALL of the information requested regardless of whether or not I agree with having to supply same.

I have also provided your department with the names of individuals who, without question, are beyond reproach and who will offer and attest to my character and integrity for possessing a permit to carry a firearm.

Should you or your department have any questions regarding my application or my concerns about the application process, please feel free to contact me at your earliest opportunity.

Respectfully,

Edward A. Peruta
3151 Driscoll Drive
San Diego, CA 92117

860-978-5455

# EXHIBIT "K"



# COUNTY OF SAN DIEGO

### INTER-DEPARTMENTAL CORRESPONDENCE

March 7, 2009

| | |
|---|---|
| TO | Blanca Pelowitz, Manager (0·41)<br>Sheriffs License Division |
| FROM· | Millie Faiai, Sheriffs Licensing Specialist (O-41)<br>Sheriffs License Division |
| VIA: | Chain of Command |

RE: CCW APPLICATION GP25466 – PERUTA, EDWARD ALLAN

      On February 10, 2009, I received the file on Edward Allan **PERUTA** who submitted an application for a CCW license on February 3, 2009. **PERUTA** is retired and travels throughout the country in his RV.

**PERUTA** lists numerous reasons on his CCW application for desiring a CCW license. He listed the following:

    He and his wife like other individuals who maintain a mobile home/residence often carry large sums of cash, valuables and equipment in the motor home.

    He and his wife while traveling in their mobile residence, often find it necessary to stop and spend evenings in extremely remote rural areas of the United States and the State of California where there is no means to contact or summons assistance in the event of a public safety emergency.

    He and his wife are fearful of the possibility that they and. their mobile residence may become the target of criminal acts and violent crime(s) while spending nights in remote areas where in many situations, there are no means to summon public safety personnel.

    He is also the founder and sole stockholder of American News and Information Services Inc. and often gathers and disseminates breaking news video and still photographs together with timely information as an active member of the news media and legal investigator. As a full time member of the media and part time legal investigator, who specializes in breaking news and information he travels throughout the United States and California for business and pleasure. He often finds it necessary to enter high crime areas

Blanca Pelowitz, Manager
Page 2
March 7, 2009

    and location where there is no opportunity or means to summon assistance while
    performing his assignments.

When I received **PERUTA'S** application, it shows he was interviewed by Donna
BURNS (License Supervisor) on November 17 2008, for the initial phase of the
CCW application process. He was advised by BURNS he did not meet the criteria
for a CCW license. PERUTA not satisfied with this returned in December 2008 and
again in January 2009 to speak with Blanca PELOWITZ (Manager.) who also concurred with
the information given to him by her staff

Despite the fact that **PERUTA** was told he did not meet the criteria for a CCW
license **PERUTA** insisted this office accept his application. **PERUTA** was advised
that **no monies would be refunded** once his application was accepted.

While reviewing **PERUTA'S** application he did not provide any current documents
(i.e. police reports, TRO, etc) to substantiate or support his need for a CCW license
based on the reasons he listed. The residence address PERUTA listed on his
application, 3151 Driscoll Drive, San Diego CA 92117, is owned by his wife's sister
and brother-ill-law (Gloria and George Henderson) who **also** reside there. I
conducted a search of the County of San Diego's Assessor's database as well as the
Registrar of Voters system to determine whether **PERUTA** owns property(s) or is
registered to vote in San Diego County. The searches produced "no record" results. I
also conducted an ARJIS search to determine if there were any reports of threats or
violence against PERUTA and his family also with no results.

**PERUTA** lists his business as American News and Info Services located at, 38
Parish Road in Rocky Hill, Connecticut 06067. I conducted search of that business
and address and it revealed the property is a single family residence owned by
**PERUTA** (Hartford County Assessor #14-01-004.39). Also, listed on his application
was a mailing address in Pensacola, Florida. The background investigation revealed.
**PERUTA** has a single family residence located at, 2036 20th Avenue SW in Vero
Beach. Florida 32962 (Indian River County Assessor #33393500002146000007,0)
and another one at 8120 Holy Cross Place in Los Angeles (LA County Assessor
#4113-006-005).

On 03/4/09, I called the Finance Department (860·258-2720) in Rocky Hill, CT to
verify whether **PERUTA'S** business was still active. I spoke with **Kathy** who
referred me to the Town Clerk's office. **Kathy** asked me the name of the business
and. told me she wasn't familiar with it. I called the Town Clerk's office (860) 258-2705 and
spoke with **Linda** who said a business has to file a trade name with that office and
then pay taxes to the Assessor's Dept. in order to conduct business. American News
and Information Services, Inc. filed a trade name in 1997 by

Blanca Pelowitz, Manager
Page 3
March 7, 2009

Edward **PERUTA**. **Linda** said a person can file a trade name but it does not necessarily mean they are in business, I asked Linda if this filing was something like a Fictitious Business Name statement and she said "yes" .The only way to verify whether they are in business is to check with the Assessor's office and she transferred me. I spoke with **Cassandra** (Assessor's Dept.) who checked the business name, address and owner information and could not find anything in their system. **Cassandra** said if the business was paying taxable personal property for the business it would have shown on their database. **Based on our conversation PERUTA does not have a valid business license in Rocky Hill, CT at this time**. However the business is filed as an active corporation in the State of Connecticut and not California.

On 03/04l09, I called Jocelyn **PEREZ** (Los Angeles's Sheriffs Dept.) who processes COW licensee in Los Angeles County. Since **PERUTA** has a residence in Los Angeles I wanted to find out whether he had applied to their department as well. **PEREZ** left me a message stating' she checked their files and have no record of **PERUTA** applying with them.

On 03/04/09 I called Campland on the Bay because **PERUTA** stated, on the initial application he submitted, he resides full time at this facility, I spoke with **Kim** (Reservations Office) who said they offer long term stays which is 30 days or more up to a maximum of 270 days in a calendar year. Because they are a transient park, they have the campers vacate every 90 days for at least 24 hours then they can return. I asked whether **PERUTA** was a camper at their park and she stated he reserved the spot on November 15, 2008 until April 15, 2009. **Kim**, checked her records and stated he was also at the campgrounds in February 2007 to April 2007 but showed nothing for 2006.

On 03/04/09, I received information regarding a telephone call received from SDPD Officer **LIMON** regarding an incident at their front counter involving **PERUTA**. I called the phone number provided (619-531·2231) and spoke with Officer **HARVEY.** **HARVEY** stated his partner Officer **LIMON** was the one who had dealt with **PERUTA** but was out due to a family emergency. **HARVEY** stated he would be speaking to **LIMON** later in the afternoon and would have him send me a narrative of the incident via Interoffice (see **statement by LIMON**). It should also be noted that **PERUTA** attended the Citizens' Law Enforcement Review Board (**CLERB**) meeting on December 9, 2008, and addressed the Board requesting clarification on the California Penal Code sections 12050 through 12054 pertaining to the Sheriffs Department's denial of his application for a. concealed weapon permit (see attached minutes)

Although **PERUTA** travels extensively throughout the United States and has property in Florida and Los Angeles) California, based on the information revealed

Blanca Pelowitz, Manager
Page 4
March 7, 2009

during the background investigation it appears **PERUTA'S** primary residence and business is in Rocky Hill, Connecticut. **PERUTA** is also registered as a voter there.

In reviewing **PERUTA'S** reasons for the CCW license it appears his main reason in applying for a CCW is to have it when he's traveling throughout the country in his

On 03/09/09, PERUTA showed, up at the license counter to submit his 8 hour basic safety course. He also provided a photo of a Theft Warning notice that he wanted to submit as proof of his need for a COW license. Since the notice is posted for the Rincon Beach Campers in Ventura County (not San Diego County) this document is not sufficient proof.

One of the requirements an applicant must meet when applying for a COW license is to show "good cause." **PERUTA** listed numerous reasons for a CCW license, but did not provide any sufficient document(s) that would support his need. Although he was advised by licensing staff he did not meet the criteria for a ccw license, he insisted on submitting his CCW application for processing.

The *"burden of proof"* lies solely on the applicant to provide the necessary documents to substantiate his reason(s) for a CCW license. It is his responsibility to make sure these documents are submitted to show "***good cause***" and the **"need"** for a CCW license. **PERUTA** failed to provide any of these upon submission of his application. I could not locate any report(s) of past/current threats against **PERUTA** or his family.

Therefore, based on the information revealed during the background investigation and the fact that PERUTA has failed to provide the necessary documents to substantiate and/or support his need for a CCW license, this office recommends denial of his CCW application for "good cause".

Submitted By,


Millie Faiai, Sheriffs Licensing Specialist
Sheriffs License Division

Attachments

# EXHIBIT "L"

# EXHIBIT "L"
# FILED UNDER SEAL
# CASE NO.: 09-CV-2371

# EXHIBIT "M"

.

# EXHIBIT "M"
# FILED UNDER SEAL
# CASE NO.: 09-CV-2371

# EXHIBIT "N"

# EXHIBIT "N"
# FILED UNDER SEAL
# CASE NO.: 09-CV-2371

# EXHIBIT "O"

# EXHIBIT "O"
# FILED UNDER SEAL
# CASE NO.: 09-CV-2371

# EXHIBIT "P"

Click here to print.

## More Bunk On Concealed Carry From the Violence Policy Center

Posted By Bob Owens On August 19, 2009 @ 12:04 am In Crime, Gun Control, Health, Legal, Politics, Science & Technology, US News | 62 Comments

Before he was president — even before he was a senator — Barack Obama was active on the board of directors for several organizations. Most people know of the time Obama spent with domestic terrorist Bill Ayers on the board of the Chicago Annenberg Challenge, but fewer people seem to know that Obama was also a director of the left-wing Joyce Foundation [1].

The Joyce Foundation has always directed considerable monies towards funding gun control groups under the guise of scholarly research and anti-violence efforts. Thanks to the efforts of David T. Hardy, we know that Obama was part of a significant Joyce Foundation effort to subvert Second Amendment scholarship [2]. Though Joyce's efforts failed to sway the Supreme Court significantly, as evidenced by the *Heller* decision, Joyce has not given up on efforts to undermine Second Amendment rights and funds several anti-gun organizations.

Among these is the so-called Violence Policy Center [3] (VPC).

The VPC long ago established a reputation for playing fast and loose with the facts and has often been guilty of making accusations that are scurrilous or unsupportable. It has claimed that there are "virtually no differences [4]" between semi-automatic civilian rifles such as AR-15s and fully automatic military machine guns such as the M-16, even though the ability of a military weapon to fire automatically is a very significant difference, both as a practical and legal matter. The organization has also made repeated [5] accusations that .50-caliber rifles are a preferred terrorist and criminal tool, even though the claims have not held up.

Now, the Violence Policy Center has issued a new report, "Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders [6]," that will cement the organization's reputation for shoddy research and intentionally deceptive reporting.

The report claims to have collected data over a 23-month period (May 2007 to April 2009) that shows concealed handgun permit holders have killed seven law enforcement officers and 44 civilians in 31 incidents. The VPC hopes the media and other gun control organizations will scan the document's summary and report that concealed weapons permit holders are a danger to society.

The truth, of course, is an entirely different matter, starting with how the VPC conducted its research. The organization did not rely upon hard data, but instead compiled its report by searching media accounts, which are notoriously inaccurate. To compound their poor choice of source material, the organization decided to include concealed carry permit holders even when concealed weapons played no part in the alleged crime. To further cloud the issue, the VPC included carry permit holders that erroneously had permits and who should not have had permits if authorities had not made mistakes.

Here is just a sampling of the problems in the report:

– One of the men cited in the report, Jason Kenneth Hamilton, should not have had a carry permit because of a prior domestic violence conviction. Further, he did not even use a concealed handgun in the commission of his crimes. He instead used two rifles [7], rendering his inclusion in this list highly questionable.

– Richard Poplawski is the white supremacist who gunned down three police officers in Pittsburgh in April of this year. Like Hamilton, he should not have had a carry permit due to a previous domestic violence incident. Also like Hamilton, Poplawski was armed with two rifles [8] as his primary and secondary weapons.

- Michael McLendon, a spree killer [9] who killed four members of his family and five others with a rifle before committing suicide, made it into the VPC report even though he, like Hamilton and Poplawski, did not use a handgun, concealed or otherwise, during the commission of his crimes.

- Tony Villegas wasn't accused of using any weapon at all — he was accused of strangling his wife's friend.

- Andrew Sherman Conley was showing his girlfriend a handgun — again, not concealed — when it discharged, killing her. He had a negligent discharge and is charged with manslaughter. This cannot be characterized as a crime caused because someone had a concealed carry permit.

- William Garrido pled no contest in 1997 to charges of aggravated assault with a weapon. He, also, should not have had a carry permit.

Of the 31 incidents cited by the Violence Policy Center in its report, eight did not involved the use of concealed weapons. One used no weapon at all, four used rifles, one was a negligent discharge, and three were incidents of domestic violence where non-concealed handguns were used.

In seven of the 31 incidents — accounting for 13 deaths — law enforcement failed, providing permits to those who legally should not have had permits due to either previous violent crimes, domestic crimes, or mental health reasons.

All told, 30 of the 57 people that the Violence Policy Center suggested were killed as a result of concealed carry should not have been included in any study citing concealed carry of handguns as a significant contributing factor. The report — which would never survive first contact with any sort of academic peer review — amounts to nearly worthless propaganda. In that regard, it is consistent with the reputation that the VPC has established for shoddy methodology and agenda-driven conclusions.

There are estimated to be more than three million [10] concealed carry permit holders in the United States, and concealed carry permit holders are far less [11] likely [12] to commit any crime than the general population.

This truth doesn't keep the VPC from misstating the facts about concealed carry.

It could be fairly argued that this long-running willingness to promote anti-gun propaganda over facts was the reason that Barack Obama and the other directors of the Joyce Foundation funded the VPC during his tenure on the board, and why Joyce continues to fund Violence Policy Center reports (including this one) even today.

It isn't about being being accurate or truthful. Like its most famous backer, the VPC is willing to say or do nearly anything to trumpet its predetermined result.

---

Article printed from Pajamas Media: **http://pajamasmedia.com**

URL to article: **http://pajamasmedia.com/blog/more-bunk-on-concealed-carry-from-the-violence-policy-center/**

URLs in this post:

[1] Joyce Foundation: **http://www.joycefdn.org/**
[2] subvert Second Amendment scholarship: **http://pajamasmedia.com../../../../../blog/obama-and-the-attempt-to-destroy-the-second-amendment/**
[3] Violence Policy Center: **http://www.vpc.org/**
[4] virtually no differences: **http://www.vpc.org/studies/hoseone.htm**
[5] repeated: **http://www.vpc.org/snipercrime.htm**
[6] Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders: **http://www.vpc.org/studies/ccw2009.pdf**
[7] two rifles: **http://www.newwest.net/index.php/city/article**

**/first_jason_hamilton_killed_his_wife_crystal_then_he_turned_his_guns_on_the /C108/L108/**

[8] two rifles: **http://www.nytimes.com/2009/04/05/us/05pittsburgh.html**
[9] spree killer: **http://www.nydailynews.com/news/us_world/2009/03 /10/2009-03-10_alabama_shooting_spree_suspect_michael_m.html**
[10] three million: **http://blogostuff.blogspot.com/2004/12/percentage-of-adults-with-carry.html**
[11] less: **http://www.hoover.org/publications/policyreview/3574822.html**
[12] likely: **http://www.arkansascca.org/blog/index.php?content=detail&id=5**

Copyright © 2010 Pajamas Media. All rights reserved.