1 JOHN J. SANSONE, County Counsel
County of San Diego
2 By JAMES M. CHAPIN, Senior Deputy (SBN 118530)
1600 Pacific Highway, Room 355
3 San Diego, California 92101
Telephone:  (619) 531-5649
4 Facsimile:  (619) 531-6005
E-mail: james.chapin@sdcounty.ca.gov

6 Attorneys for Defendant William D. Gore

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,,<br><br>Defendants. | No. 09-CV-2371 IEG (BLM)<br><br>Date:   November 15, 2010<br>Time:   10:30 a.m.<br>Dept: 1 – Courtroom of the<br>          Hon. Irma E. Gonzalez |

**DEFENDANT WILLIAM D. GORE'S REPLY POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

09-CV-2371 IEG (BLM)

# I

# THE SECOND AMENDMENT

### A. What Plaintiffs Are Seeking.

Plaintiffs begin their opposition with a confusing argument about the remedy that they seek. The argument is an effort to distance themselves from the obvious – that they are asking the court to mandate that the State of California become a "shall issue" state by forbidding Sheriffs from requiring a showing of "good cause" for concealed carry licensure. Their underlying premise is that the "right to bear arms for self-defense" entitles them to bypass the statutory "good cause" requirement.

Plaintiffs admit that "*Heller* approves bans on carrying concealed firearms when the law allows for an alternative method of carrying." (Opposition, pp. 2-3.) Plaintiffs now assert that the Second Amendment protects a fundamental right to carry a loaded firearm "in some manner" for self defense in public places, and that the *only* means of exercising that right in San Diego County is by concealed carry. There is no evidentiary support for such a claim in this proceeding nor is there any support for this notion legally or factually. The concealed carry licensing statute is a corollary to the relevant Penal Code sections that govern firearm carry. Sections 12025 and 12031 prohibit only the concealed carry of loaded firearms; they do not eliminate the carry of firearms. This case is not about a "blanket ban" on carrying firearms outside the home as Plaintiffs declare. (Pl. Opp. p. 7.)

Open carry of unloaded firearms is permitted and the ammunition may be carried in a clip ready for instant loading. (*See* § 12031(g).) This allows for the "bearing" of arms for self-defense and offers an adequate "alternative method of carrying." But section 12031 goes even further than that and offers a host of exceptions that allow for carrying a loaded firearm: at one's place of business (subdivision h), while hunting (subdivision i), at any temporary residence or campsite (subdivision l), and, significantly, "by a person who reasonably believes that the person or property of himself or herself or

///

of another is in immediate, grave danger and that the carrying of the weapon is necessary for the preservation of that person or property." (Subdivision j.)

In the end, describing California's statutory scheme as a "blanket ban" on carrying firearms is melodramatic and dishonest. Plaintiffs offer no explanation as to why open carry with readily available ammunition, combined with the exceptions in 12031, is inadequate for self–defense. Nor do they offer any legal support whatsoever in the aftermath of *Heller* for the claim that the Second Amendment protects a fundamental right to carry a loaded firearm in public or that an "alternative method of carrying" means that the carry of a loaded firearm is a constitutional requirement in "may issue" concealed carry states.

**B.     Plaintiffs' Conception of *Heller* Has Yet to Survive Judicial Review**.

Plaintiffs do not effectively address the recent California decisions post-*Heller*: *People v. Flores*, 169 Cal. App. 4th 568 (2008) and *People v. Yarbrough*, 169 Cal. App. 4th 303 (2008). They are both decisions which have evaluated the scope of the Second Amendment as defined by *Heller* and have rendered opinions that counter Plaintiffs' arguments. *Yarbrough* notes that *Heller* had "specifically expressed constitutional approval of the accepted statutory proscriptions against carrying concealed weapons," and that carrying a concealed firearm "is not in the nature of a common use of a gun for lawful purposes which the court declared to be protected by the Second Amendment in *Heller*," that unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized "threat to public order," and poses an "imminent threat to public safety." *People v. Yarbrough*, 169 Cal. App. 4th at 314.

*Flores* concludes that with the wealth of exceptions in section 12031, in particular the exceptions for self-defense, there can be no claim that section 12031 in any way burdens the core Second Amendment right announced in *Heller* to any significant degree. "Instead, section 12031 is narrowly tailored to reduce the incidence of unlawful *public*

///

///

shootings, while at the same time respecting the need for persons to have access to firearms for lawful purposes, including self-defense." *People v. Flores*, 169 Cal .App. 4th at pp. 576-577.

Contrary to Plaintiffs' argument, the Court in *Heller* did not define the right to "bear" as anything more than the right to defend "hearth and home." The Second Amendment does not say the right is "to bear a concealed firearm in public places." *Yarbrough* and *Flores* reflect the prevailing judicial interpretation of the scope of the Second Amendment after *Heller*. The Seventh Circuit comments that the language of *Heller* "warns readers not to treat *Heller* as containing broader holdings than the Court set out to establish . . . . The opinion is not a comprehensive code; it is just an explanation of the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration." *United States v. Skoien*, 614 F.2d 638, 640 (7th Cir. 2010). The Court in *Heller* did not go beyond the limited facts of the case for a very good reason – *there were not five votes to do anything else*. Plaintiffs' efforts to construe anything more from *Heller* is purely wishful thinking.

There has been no case nationwide which has struck down a concealed weapons regulation since *Heller*. Two recent California federal cases have decided the issue at the trial level – both rejecting the challenge: *David K. Mehl et al. v. Lou Blanas et al.*, 2008 U.S. Dist. LEXIS 8349 (E.D. Cal. 2008); *James Rothery, et al. v. Lou Blanas, et al.*, U.S. District Court for the Eastern District of California, No. CIV. S 08-02064. The Court in *Rothery* concluded that the Second Amendment as interpreted by the United States Supreme Court and the Ninth Circuit does not provide a right to carry loaded concealed weapons outside the home and does not affect the operation of CCW statutes. Both cases are currently before the Ninth Circuit (*Mehl* #08-15773; *Rothery* #09-16852).

///
///
///

# II

# STANDARDS OF JUDICIAL REVIEW

### A.     There is no Strict Scrutiny Trend.

Plaintiffs state that the trend after *McDonald v. City of Chicago*, ___ U.S. ___, 130 S.Ct. 3020 (2010) is toward adopting strict scrutiny review.  Yet they cite only two trial court cases in support of that assertion.  One case was decided before *McDonald* – where the Defendant was in possession of a firearm in his own home -- but it still upheld the challenged regulation.  *United States v. Engstrum*, 609 F.Supp.2d 1227 (D.Utah 2009).  The other, *State of Wisconsin v. Schultz*, is a Wisconsin Circuit Court case that is not published anywhere nor is even citable under Wisconsin rules as either precedent or persuasive authority.  Wis. Stat. (Rule) § 809.23(3).  It is noteworthy that the opinion comes from rural Clark County, with a County seat populated by 2700.  What makes Plaintiffs' bold "trend" claim more disingenuous is their failure to even mention *United States v. Skoien*, 614 F.2d 638, a Wisconsin case decided after *McDonald*, which employs intermediate scrutiny to a statute affecting the possession of firearms in the home.  Nor do Plaintiffs mention any of the cases which have employed intermediate scrutiny -- most of which had assumed the right to be fundamental before *McDonald* was decided.  (See Defendant's Motion, Argument IV C.)

### B.     The Actual Trend.

In fact, no district or appellate court case that actually cites to *McDonald* uses strict scrutiny.  Every case uses either the "presumptively lawful" categorical approach from *Heller* or intermediate scrutiny.  *United States v. Hart*, 2010 U.S. Dist. LEXIS 77160 (D. Mass. July 30, 2010) puts concealed weapons restrictions into the *Heller* "presumptively lawful" category.  Other cases using the categorical approach are either felon or mental illness cases.  *Yohe v. Marshall*, 2010 U.S. Dist. LEXIS 109415 (D. Mass. Oct. 14, 2010); *United States v. Roy*, 2010 U.S. Dist. LEXIS 107620 (D. Me. Oct. 6, 2010); *Dority v. Roy*, 2010 U.S. Dist. LEXIS 84403 (E.D. Tex. Aug. 17, 2010); *United States v. Seay*, 2010 U.S. App. LEXIS 18738 (8th Cir. S.D. Sept. 8, 2010).

A majority of the intermediate scrutiny cases are within the Seventh Circuit following *Skoien*. The case of *Ezell v. City of Chicago*, 2010 U.S. Dist. LEXIS 108341, 17-18 (N.D. Ill. Oct. 12, 2010) tells the real story:

> The Seventh Circuit has applied intermediate scrutiny to laws categorically prohibiting possession of a firearm by different classes of individuals. *See Skoien*, 614 F.3d 638, (*Constitution permits Congress to bar those convicted of domestic violence crimes from possessing firearms*); Yancey, 2010 U.S. App. LEXIS 18442, 2010 WL 3447736, (*barring unlawful users of or addicts to any controlled substance from firearm possession is constitutional*); U.S. v. Williams, 616 F.3d 685, 2010 U.S. App. LEXIS 16194, 2010 WL 3035483 (7th Cir. 2010) (*barring felons from firearm possession is constitutional*). However, the Court "reserved the question of whether a different kind of firearm regulation might require a different approach." *Yancey*, 2010 U.S. App. LEXIS 18442, 2010 WL 3447736 at *2. Although Plaintiffs urge this Court to apply either strict scrutiny or intermediate scrutiny to the requirement that residents obtain firing range training outside of the City in order to obtain their CFPs, this Court notes that the Seventh Circuit has only applied intermediate scrutiny to laws that absolutely prohibit possession of a firearm by an individual."

The only identifiable trend is toward the use of a categorical approach based on the factors set out in *Heller*, or intermediate scrutiny in those cases involving regulations that in some way affect the possession of firearms in the home. Where regulations do not affect the possession of firearms in the home, such as the subject licensing procedures, there is no trend toward any heightened level of scrutiny.

### III

### EVIDENCE OF GOVERNMENTAL INTEREST

Plaintiffs attack Professor Zimring's declaration in numerous ways that are false and misleading. A careful review of the declarations submitted by Plaintiffs shows that there remains a substantial unresolved conflict about facts not yet in evidence in this litigation and that the declarations do nothing to undermine any of the governmental interests detailed in the Zimring declaration.

Patrick does not indicate his field of expertise and makes sweeping assertions -- "Licensure processes of the various states have been shown to effectively filter out the violent and the impulsive" -- with no reference to any supportive research data. Patrick ///

grossly overstates the efficiency of permissive licensing screening and never supports his passionate views with any data citations.

Mauser says that "Professor Zimring's assertions are generally correct, but omit a critical fact: serious criminal violence with firearms is almost exclusively committed by people (criminals) with histories of previous crime, or, occasionally by people who are seriously mentally disturbed." Mauser then asserts that "this omission is critical because it makes Professor Zimring's views irrelevant in a case like the present. I am informed that neither juveniles nor people with crime records or mental deviancy records are eligible for concealed weapons licenses - - - they are ineligible for such licenses in any event." (Mauser, p. 2.) Mauser presents no authority for the proposition that permissible licensing laws exclude all persons at risk of committing firearms robberies and assaults. He states that he is "informed" but provides no reference to the source of that information. This assertion is repeated by Dr. Moody: "these provisions are important because they exclude virtually all people who are likely to commit gun crimes from receiving carrying permits." (Moody, p. 6.) Moody also provides no reference for this statement.

The empirical and legal data on this question do not support the theory that state laws exclude "virtually all people" who are potential gun criminals. The data on high concentration of violence among persons with criminal records usually uses juvenile and adult arrest records. (*See* Wolfgang Marvin, Robert Figlio and Thorsten Sellin, *Delinquency in a Birth Cohort* (1972) University of Chicago Press Chicago.)[1] Many people involved in crime have some record of juvenile or criminal arrest. But state permissive licensing provisions only bar persons with felony convictions or sometimes convictions for very specific high violence misdemeanors such as domestic violence. Excluding non-conviction arrests, juvenile records and reductions by plea bargaining to non-covered misdemeanors creates huge gaps between disqualified and at-risk

---

[1] This is the most frequently cited of a whole series of such studies that use police contacts as the measure of criminality.

1   populations for gun crime.  The mental health criteria used by most permissive statutes
2   also are restricted to persons with previous histories of adjudication, probably a tiny
3   minority of the seriously disturbed at any given time.  With loopholes that large, the
4   average California citizen could quite rationally prefer to walk streets where very few of
5   the people on the street carry hidden weapons than to trust systems which allow the vast
6   majority of adults to carry hidden and loaded weapons until felony conviction or
7   adjudication for insanity has happened.  It is simply not true that California effectively
8   screens the mentally ill from possession of firearms.  The screening is limited to patients
9   *admitted* to a treatment facility, and to other very specific circumstances.  Welfare and
10  Institutions Code section 8100.

11       Among the many factual mistakes in the Moody declaration, Moody states that
12  Zimring "is not a criminologist."  In fact, Zimring was elected a life fellow of the
13  American Society of Criminology in 1992 and received that organization's two most
14  important research awards in 2006 and 2007.  (Zimring Declaration, CV attached, p. 1.)
15  This is why he is especially qualified to render opinions in this area.  Moody then
16  mentions "two University of Chicago criminologists, John Lott and David Mustard."
17  Neither Lott nor Mustard is a criminologist or ever was on the University of Chicago
18  faculty.  There is also an assertion that Zimring "incessantly predicted ---[increasing]
19  murder rates" (Moody par. 7) which is both undocumented and untrue.

20       But by far, the most problematic assertion by Moody is headlined "*No Controversy*
21  *As To CCW Issuance*."  Moody alleges that the crime decline in the United States since
22  1990 is evidence that handgun possession and CCW levels are not related to violence.  In
23  fact, there has not been a steady crime decline between 1991 and 2010 (there was no such
24  pattern between 2000 and 2007, see Zimring *The Great American Crime Decline* 2007),
25  and alleges with no support that handgun ownership rates increased in the late 1990's and
26  since 2000.  Published research using data *from* Professor Moody shows the opposite of
27  ///
28  ///

what Moody's declaration insinuates about the import of "shall issue" laws.[2]  Of course, Professor Moody doesn't refer to this work in his declaration.  Ayers and Donahue shred every claim by Moody in a thorough analysis of his work.

There is a very active controversy about the impact of CCW laws on crime and violence as Moody well knows.  (See also, Donahue and Ayres, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 Stan. L. Rev. 1193 (2003); Duggar, *More Guns, More Crime*, 109 Journal of Political Economy 1086-1114 (2001)).  States and cities with restrictive gun policies did especially well in crime declines in the 1990's and have done so since (see Zimring , 2007 at Ch. 6), but major urban centers with concentrations of crime and violence were under-represented in the right-to-carry states.

The theories that animate San Diego's restriction of hidden guns in public places are the special lethality of concealed handguns in assault and robbery and the contagious nature of concealed weapons in shared public space.  Plaintiffs' only response to this is the unsupported allegation that permissive screening criteria – usually only felony criminal convictions or recorded and court certified histories of insanity -- would remove all persons at risk of crime and violence from eligibility for carry permits.   There is no empirical evidence of this anywhere in this litigation, and the actual impact of permissive carry legislation is a hotly contested factual question.  The Plaintiffs in this case present two wildly different versions of state gun law effectiveness.  They allege that efforts to disqualify tiny categories of certified risks work miraculously well, but that any more selective criteria for limiting hidden handguns cannot promote public safety.

## IV

### THERE IS NO CONSTITUTIONALLY PROTECTED INTEREST IN A CONCEALED WEAPONS PERMIT

Plaintiffs cannot state a constitutional claim because they have no protected property interest which triggers 42 U.S.C. section 1983.  *Erdelyi v. O'Brien*, 680 F.2d 61

---

[2] Ian Ayres and John Donahue, "*Yet Another Refutation of the More Guns Less Crime Hypothesis* – with some help from Moody and Marvel," 6 Econ Journal Watch 35 (2009).

(9th Cir. 1982).  Plaintiffs completely dismiss *Erdelyi* because it was decided before *Heller* and *McDonald*.  However, *Erdelyi* remains binding Ninth Circuit precedent.  Hypocritically, Plaintiffs insist that they are not challenging the constitutionality of Penal Code section 12050 – that "the Court should uphold section 12050's licensing scheme." (Pl. Opp. at p. 1.)  At the same time, the relief they are demanding is that the Court take away the Sheriff's issuing discretion which is specifically authorized by statute and confirmed by case law.  If the Court is to uphold the licensing scheme, then *Erdelyi* applies.  And since the licensing scheme does not affect in any way the right to possession of firearms in the home, there is no basis for the overruling of *Erdelyi*.  No matter how the Sheriff exercises his statutorily authorized discretion, it will have no impact on the exercise of Second Amendment rights as set forth in *Heller*.  The statute leaves the issuance of CCW licenses to the unfettered discretion of the sheriff, in the interest of controlling dangerous weapons.  *CBS, Inc. v. Block*, 42 Cal.3d 646, 655 (1986).  And the Sheriff, who is a locally elected public official, is accountable to the local electorate and will act based on local concerns.  San Diego's concerns regarding the carrying of concealed weapons, in a large metropolitan area close to the border, are dramatically different from those of most other cities and states.

V

**EQUAL PROTECTION**

**A.     Requiring Evidence of "Good Cause" Does Not Violate Equal Protection.**

Plaintiffs erroneously imply that the County's requirement of proving "good cause" violates the equal protection clause simply because "the Constitution protects a right to carry firearms for self-defense." (Pl. Opp. 15:6-11).  If this were true, the government would never be able to regulate fundamental rights.

> The crux of the constitutional promise of equal protection is that persons similarly situated shall be treated equally by the laws. However, neither clause prohibits legislative bodies from making classifications; they simply require that laws or other governmental regulations be justified by sufficient reasons. The necessary quantum of such reasons varies, depending on the nature of the classification.

*In re Evans*, 49 Cal. App. 4th 1263, 1270 (Cal. App. 4th Dist. 1996) *citing*, *In re Eric J.*, 25 Cal.3d 522, 530 (1979). ).

      Plaintiffs never present evidence that shows they are similarly situated or treated differently.  Plaintiffs attempt to identify the class by implying that all who submitted evidence were in a preferred class from Plaintiffs, and then claim that they were all approved.  Plaintiffs, therefore, are not similarly situated.  Plaintiffs also do not offer any evidence that they were treated any differently than those who submitted evidence, as self-defense-based applications may be denied for lack of "good cause" even with documentation.  The standard used is that applicants must establish "good cause."  Documentation is not necessarily even required.  Documentation is simply the most common and convenient means of meeting that burden.

      Moreover, Plaintiffs claim that the County cannot justify its classification under strict scrutiny review.  Strict scrutiny is not the standard, and, in any event, the County has met this burden. (*See generally* Def. MSJ Sect. VI(C).)  The governmental interest – advancing safety and the lives of its citizens as well as the government's general interest in preventing crime – is furthered by the Sheriff's policy with regard to the "good cause" requirement and has consistently been deemed "compelling."  *Heller*, 128 S. Ct. at 2851 (Bryer, J., dissenting); *See also United States v. Salerno*, 481 U.S. 739 at 750 (1987); *Dano v. Collins*, 166 Ariz. 322 (Ct. App. Div. 1 1990); *See State v. Reid*, 1 Ala. 612, 616 (1840) ["the question recurs, does the act, 'to suppress the evil practice of carrying weapons secretly,' trench upon the constitutional rights of the citizen?  We think not."]; *Nunn v. State*, 1 Ga. 243 (1846); *Andrews v. State*, 50 Tenn. 165 (1871); *State v. Smith*, 11 La. Ann 633 (1856); Winkle*r*, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 727 (2007).  Federal and California law also recognize restrictions on concealed weapons to be necessarily related to this compelling interest of public safety.[3]  Lastly, the

---

[3] *See generally* Zimring, Francis E., *The Great American Crime Decline* 2007. New York: Oxford Univ Press (2007).; Ian Ayres and John J. Donohue III, *Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell*, 6 Econ Journal Watch 1, 35-59 (Jan. 2009): Donohue, *The Final Bullet In The*

1  Sheriff's policy is narrowly tailored to promote public safety while at the same time
2  respecting the need for persons to have access to firearms for lawful purposes, including
3  self-defense.  *Flores*, 169 Cal. App. 4th at 576-577.

4        Therefore, Plaintiffs allegations of discrimination based upon the ability to prove
5  "good cause" fail to show that they are similarly situated, treated differently or that their
6  core right under the Second Amendment is denied.

7        **B.**    **Plaintiffs Cannot Prove Preferential Treatment to HDSA Members**.
8        Plaintiffs continue to allege preferential treatment to HDSA members by
9  misleading this court with speculative "evidence" and misinterpretations of the Sheriff's
10 policies.  To sustain their burden at summary judgment, plaintiffs must show *actual*
11 *evidence* that would allow a reasonable jury to conclude first, that others similarly
12 situated generally have not been treated in a like manner; and second, that the denials of
13 concealed weapons licenses to them *were based on impermissible grounds*.  *See Kuzinich*
14 *v. County of Santa Clara*, 689 F.2d 1345, 1349 (9th Cir. 1983)(emphasis added).
15 Furthermore, "although an inference can serve as substantial evidence for a finding, the
16 inference must be a reasonable conclusion from the evidence and cannot be based upon
17 suspicion, imagination, speculation, surmise, conjecture or guesswork."  *Shandralina G.*
18 *v. Homonchuk*, 147 Cal. App. 4th 395, 411 (2007).  Here, Plaintiffs offer mere
19 speculation and cannot prove that they are similarly situated or treated differently.

20       First, Plaintiffs still fail to show that they are similarly situated.  Plaintiffs' only
21 evidence of HDSA members allegedly being given preferential treatment are renewal
22 applications.[4]  Plaintiffs Peruta, Buncher, Dodd, and Laxson are claiming disparate

23

---

24 *Body Of The More Guns, Less Crime Hypothesis*, 2 Stan. L. Rev. 3, 397-410 (2003); Ayres and Donohue, *The Latest Misfires in Support of the 'More Guns, Less Crime'*
25 *Hypothesis*. 55 Stan. L. Rev. 1371 (2003); Ayres and Donohue, *Shooting Down the "More Guns, Less Crime" Hypothesis*. 55 Stan. L. Rev. 1193 (2003); Ayres and
26 Donohue, *More Guns, Less Crime Fails Again: The Latest Evidence from 1977-2006.* 6 Econ Journal Watch 2, 218-238 (May 2009); Mark Duggan, *More Guns, More Crime*,
27 109 Journal of Political Economy 1086-1114 (Oct. 5, 2001).

28     [4] Plaintiffs presented two new application to prove preferential treatment to HDSA members.  Pl. Opp. Ex "N" and "L."  Both are renewal applications.

- 11 --                        09-CV-2371 IEG (BLM)

1  treatment based upon their initial interview or initial application, and therefore are not
2  similarly situated as those applying for renewals.  As previously explained, it is not that
3  renewal applicants are given "less scrutiny," in the terms Plaintiffs imply, it is that
4  renewal applicants have already completed a process not yet fulfilled by initial
5  applicants.  Renewal applicants have already met the same burden initial applicants must
6  prove.  Generally, the standard for a renewal application is that nothing has changed – no
7  law enforcement contacts, crime cases, arrests, changes in employment, mental health,
8  etc.  Because so much of the evidence for moral character, good cause and residency has
9  already been proven, review by a supervisor or manger is not needed for the renewal
10 process unless there has been a change.  As a result, renewal applications can be issued
11 on the spot with the affirmation that there have been no changes.  Plaintiffs again have
12 failed to produce any evidence of similarly situated initial applicants receiving preferred
13 treatment due to their HDSA membership.  Therefore, these four Plaintiffs are not
14 similarly situated.
15        Plaintiffs state that they are "skeptical" regarding Cleary's approval because it
16 occurred after he became a plaintiff in this lawsuit.  Yet, Cleary pursued an appeal and
17 his story is quite compelling.  There is no evidence whatsoever that the hearing officer
18 knew that Cleary was a plaintiff.  In any event, "skepticism" and "suspicion" do not rise
19 to the dignity of an inference.  *See e.g., Juchert v. California Water Service Co.*, 16
20 Cal.2d 500, 506 (Cal. 1940).
21        Even if Plaintiffs are similarly situated, they cannot prove that they were treated
22 differently than HDSA members.  To prove this allegation, Plaintiffs still try to argue that
23 the application of Peter Q. Davis, former San Diego City mayoral candidate, is evidence
24 of preferential treatment. (Pl. Opp 16, n. 32.)  Peter Q. Davis is a politician and public
25 figure whose identity and need for self-protection needs no documentation.  The fact that
26 he is a well-known public figure is proof of "good cause" for self-protection, not
27 favoritism.
28 ///

Additionally, Plaintiffs allude to preferential treatment by providing pieces of information and then asking the court to speculate as to its final product. Plaintiffs point to a notation made by Blanca Pelowitz stating: "Comma[nder] for HDSA (SDSO) considered VIP @ sheriff level – okay to renew standard personal protection." (Pl. Opp. 16:18-20.) However, Plaintiffs leave out the full notation which also says "Mr. Davis is a public figure – former CEO for Bank of Commerce . . . no restrictions as long as no negative contacts." (Pl. Opp. Ex. "M") When read in full, Pelowitz's notations are just that; several notations about the application. Moreover, when read in unison, one can only infer that Mr. Davis was granted a CCW permit for self-protection because he is a public figure. Whether or not Davis was a member of HDSA had no bearing on the decision.

Again, Plaintiffs present the application and appeal letter of Thomas Baglio, DDS, and point only to his statement of being an HDSA member, leaving out key other information. (Pl. Opp. 16:1-7.) In his letter, Mr. Baglio states that the reason he was told his application would not be renewed was because he sold his business. (Pl. Opp. Ex. "L") Mr. Baglio explains that he still carries large sums of money and that he still has his dental license. (*Id.*) As with Cleary, Mr. Baglio took advantage of the appeal process, presented his case and met his burden of proof. Here, Plaintiffs are asking the court to guess and speculate that Mr. Baglio was granted his renewal permit because of being a member of the HDSA, foregoing all other evidence. If anything Mr. Baglio's situation proves that the Sheriffs do not use favoritism. If preferential treatment was given based upon the fact that Mr. Baglio was an HDSA member, he would not have been denied the renewal permit in the first place.

In sum, Plaintiffs fail to prove with actual evidence that they are similarly situated and any difference in treatment between non-HDSA members and HDSA members was based upon impermissible grounds. And since Plaintiffs do not present any evidence of preferential treatment towards "politically-connected, wealthy, contributors of the Sheriff's campaign," this claim fails.

**C.     No Factual Dispute Exists as to Peruta's Denial**.

Plaintiff Peruta claims that a factual dispute exists as to whether Peruta was denied a CCW for lack of residency. However, all the evidence presented by Plaintiff concludes that Peruta's application was denied for lack of "good cause." (Pl. Opp. 18:3-18.) First, Peruta merely speculates that because the Sheriff did not respond in writing to his requests for its policy in determining residency that his application must have been denied for this reason. (*Id.* at 18:5-9.) Peruta falsely states that the County never provided him with its policy for determining residency. (*Id.*) In fact, the documentation Peruta presents shows that the staff met personally with Mr. Peruta on December 31, 2008, January 26, 2009 and again on February 2, 2009, where both Blanca Pelowitz and Donna Burns explained the County's residency policy, pursuant to California Penal Code section 12050, to him. (Pl. Opp. Ex. "K.") Moreover, it was not practical for the Sheriff Department to respond to Peruta's specific request. As Sheriff Legal Advisor Sanford A. Toyen stated, Peruta was merely seeking assurance that he would meet the residency requirement and the Sheriff was in no position to prejudge the merits of any particular hypothetical situation. (Pl. Opp. Ex. "I".) Furthermore, Plaintiff fails to provide any link between failing to respond to his letter and Peruta being denied a CCW permit.

Second, Plaintiffs point to Defendant's Reply for the purpose of the motion to dismiss the original complaint. (Pl. Opp. 18:9-12.) Defendant was seeking dismissal on the pleadings. The facts were not presented to the Court.

Plaintiffs' final "evidence" is referenced in a footnote (Pl. Opp. 18, n. 36), but those are matters relating to the investigation of Mr. Peruta's various residency claims. At his first interview, he told staff he was a resident of Los Angeles. Investigation showed that he was at least a resident of Connecticut. (Pl. Opp. Ex. "K".) But dual residency is acceptable and the denial ultimately was not based on residency status. (See Pl. Opp. Exs. "I" and "K".) As the investigation report into Peruta's application and letter of denial conclude, Peruta was denied a CCW permit solely on the basis of failing to prove "good cause." (Pl. MSJ Ex. "G;" Pl. Opp. Ex "K")

## CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment should be granted.

DATED: November 1, 2010        JOHN J. SANSONE, County Counsel

By: s/ *James M. Chapin*
JAMES M. CHAPIN, Senior Deputy
Attorneys for Defendant William D. Gore