C. D. Michel – SBN 144258
Clint B. Monfort - SBN 255609
Sean A. Brady - SBN 262007
cmichel@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:    (562) 216-4445
www.michellawyers.com
Attorneys for Plaintiffs / Petitioners

Paul Neuharth, Jr. (State Bar #147073)
pneuharth@sbcglobal.net
PAUL NEUHARTH, JR., APC
1440 Union Street, Suite 102
San Diego, CA 92101
Telephone: (619) 231-0401
Facsimile:    (619) 231-8759
Attorney for Plaintiff / Petitioner EDWARD PERUTA

**IN THE UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,<br><br>Defendants. | **PLAINTIFFS' CONSOLIDATED SEPARATE STATEMENT OF UNDISPUTED AND DISPUTED FACTS**<br><br>Date:  November 15, 2010<br>Time:  10:30 a.m.<br>Location:  Courtroom 1<br>Judge:  Hon. Irma E. Gonzalez<br>Date Action Filed:  October 23, 2009 |

## INTRODUCTION

Though a separate statement of facts at issue is not required in the Southern District for a motion for summary judgment or an opposition thereto, Plaintiffs submit this consolidated separate statement of facts as a courtesy to this Court, in recognition of the intricacy of some of the factual disputes between the parties.  This statement combines the previous separate

statements and oppositions, isolates facts from Plaintiffs' Opposition/Reply and Defendants' Opposition, clarifies which facts neither party disputes, and, for the facts that are in dispute, it lays out Defendants' position in one column with their proffered evidence, alongside Plaintiffs' position on the same fact with their proffered evidence.

This submission is intended soley as a reference for this Court. Plaintiffs sought the input of Defendants in preparing this statement of facts, but Defendants declined to participate and do not consent to this filing. Thus, while Plaintiffs have added clarifying material in their column of facts and evidence, the Defendants' column is merely a verbatim recitation of what appeared in their previous Separate Statement of Facts and Opposition to Plaintiffs' Separate Statement of Facts.  The only exception is the section relating to the experts' positions, where Plaintiffs quoted verbatim statements from Defendants' Motion/ Opposition that sum up its position alongside Plaintiffs' position.

| **UNDISPUTED FACTS** |
|---|
| 1.  Sheriff William Gore is responsible for administering the program for the licensing of persons to carry concealed weapons in San Diego County. ("CCW license") |
| 2.  State law sets forth the general criteria that applicants for concealed weapon licenses must meet. This requires that applicants be of good moral character, a resident of the County they apply in, demonstrate good cause and take a firearms course. |
| 3.  The "good cause" requirement is defined by Defendant County to be a set of circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way. Simply fearing for one's personal safety alone without documentation of a specific threat is not considered good cause. |
| 4.  James Dodd has submitted an application [for a CCW], which is still pending at this time. |
| 5.  Leslie Buncher was a physician who held a valid CCW license during the period of 1971 to 2003. In 2008 Dr. Buncher reapplied for a license. It was denied because he was no longer a practicing physician and the reasons he listed related to his former medical practice. Dr. Buncher declined to go through the reconsideration appeal process. |

| **DISPUTED FACTS** ||
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| <b>HONORARY DEPUTY SHERIFF'S ASSOCIATION</b> ||
| 1. There is no special treatment for members of the Honorary Deputy Sheriffs Association ("HDSA") or for Sheriff's campaign donors<br><br>Declaration of Blanca Pelowitz, ("Pelowitz Decl.") ¶ 22; see also Defendant's exhibits 2-18.<br><br>These are renewal applications for which supporting documentation was provided. Pelowitz Decl. ¶ 22; Defendant's Exhibits 2-11. | There is evidence that Ms. Pelowitz was being instructed to give preferential treatment to at least some HDSA members because notes with her initials were found in CCW files stating: "Comma[nder] for HDSA (SDSO) considered VIP @ sheriff level – okay to renew standard personal protection." (Ex. "M" Supp. Pls.' Consolidated Opp./Reply)<br><br>HDSA members were issued renewal CCWs for self-defense without providing documentation that the threat still existed. *See* Pls.' Exs. Supp. Mot. Partial Summ. J. "U" at 2; "V" at 2; "W" at 5; and "X" at 2. Plaintiffs assert this shows some renewal CCWs were subjected to a lesser "good cause" requirement, not just a lesser documentation standard.<br><br>One HDSA member provided as his "good cause" that he drives in desolate areas with his wife and wants "self-defense against anyone that might come" upon them. (*See* Ex. "N" Supp. Pls.' Consolidated Opp./Reply.) This is *almost identical* to Plaintiff Peruta's reason.<br><br>In a letter addressed to Sheriff Gore from an HDSA member who had been denied a renewal CCW, dated October 13, 2009, the author mentions his 19 year HDSA membership, and states: "I ask you [Sheriff Gore] intercede in the process and direct the Licensing division to reissue my CCW." On October 22, 2009, that HDSA member reapplied asserting "self-protection, a desire to be able to protect myself and my family from criminal activity, in case response to request to law enforcement is delayed" as his "good cause." He provided *no documentation* of a specific threat, but was issued a CCW nonetheless. (*See* Ex. "L" Supp. Pls.' Consolidated Opp./Reply.) |

| | **DISPUTED FACTS** |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| | Some HDSA members CCW state "retired," but Dr. Buncher was denied, as the County admits, because he was retired. (Opp. 6:22-23); *see also* Pls.' Exs. Supp. Mot. Partial Summ. J. "W" at 3 and "MM" at 4. |
| 2. The applications are renewal applications for which supporting documentation was provided with the initial application See Pelowitz Decl. ¶¶ 11, 22; | Certain HDSA members were granted CCWs by the County despite failing to provide supporting documentation. For example, in the "good cause" section of their applications, some HDSA members merely stated "personal protection" or "protection" without further explanation or supporting documentation. Exhibits "U" at 2; "V" at 2; "W" at 5; and "X" at 2 Supp. Pls. Mot. Partial Summ. J.<br><br>Plaintiffs lack knowledge as to whether supporting documentation was provided in the initial applications for those HDSA members because Defendants never supplied any, despite such documentation being responsive to Plaintiffs' discovery requests. |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 3.  Disputed. Pelowitz Decl. ¶¶ 11, 22; Defendant's Exhibits 2-15.<br><br>These are renewal applications for which supporting documentation was provided. Pelowitz Decl. ¶ 22; Defendant's Exhibits 2-11. | Plaintiffs assert that notes made by employees of the County who processed applications for certain HDSA members support Plaintiffs' contention that HDSA members are favored by the County in receiving CCWs. Exs. "W" at 2,6; "NN" at 1-2; "OO" at 1-2; and "PP" at 1 Supp. Pls.'s Mot. Partial Summ. J.<br><br>Exs. "L" through "O" Supp. Pls.' Consolidated Opp./Reply.<br><br>Multiple HDSA members were issued a CCW by the County for "business reasons" who failed to provide any supporting documentation. Exs. "AA", "BB", "CC", "DD", "EE". "FF", "GG". "HH", "II", "JJ", & "KK" Supp. Pls.' Mot. Partial Summ. J.<br><br>Plaintiffs lack knowledge as to whether supporting documentation was provided in the initial applications for those HDSA members because though Defendants provided Exhibits 2-11, Plaintiffs are unclear how those documents support those applicants' claims of "good cause." |
| 4.  The applications are renewal applications for which supporting documentation was provided with the initial application See Pelowitz Decl. ¶¶ 11, 22; And new documentation was provided with "LL." Defendant's Exhibit 12. | One renewal application simply stated "personal safety, carry large sums of money," and another said he is retired but he needs to accompany his employees to the bank; again, neither providing any supportive documentation. Exhibits "LL" and "MM" Supp. Pls.' Mot. Partial Summ. J.<br><br>Plaintiffs lack knowledge as to whether supporting documentation was provided in the initial applications for those HDSA members because though Defendants provided Exhibits 2-11, Plaintiffs are unclear how those documents support those applicants' claims of "good cause." |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 5. The referenced exhibits do not support the facts stated. The applications in "U" – "PP" are renewal applications for which supporting documentation was provided with the initial application See, Pelowitz Decl. ¶¶ 4, 7, 11, 16, 22; In any event, most renewal applicants did provide documentation. Defendant's Exhibits 2-15. | Despite the County's strict CCW issuance policy, it does not apply it evenly to all applicants, demanding less of some. Exhibits "F" and "PP". <br><br> Exs. "L" through "O" Supp. Pls.' Consolidated Opp./Reply. |
| 6. Exhibit WW does not support the factual statement made. See also, Pelowitz Decl. ¶¶ 11, 22; Defendant's Exhibits 2-15. | Not one single HDSA member who, while in good standing, has sought a CCW from the County from 2006 to the present has been denied, while 18 non-members have been denied and an unknown number of others decided not to formally apply based on their initial interview or failure to satisfy the County's strict "good cause" requirement applicable to the general public. Exhibit "WW" Supp. Pls.' Mot. Partial Summ. J. |
| 7. The application is a renewal application for which supporting documentation was provided with the initial application. Peter Q. Davis is a well-known public figure in San Diego who ran for mayor. See Pelowitz Decl. ¶¶ 11, 22; | One HDSA member simply stated "personal protection – public figure," without providing any supportive documentation. Exhibit "Y" at 2. <br><br> Plaintiffs lack knowledge as to whether supporting documentation was provided in the initial application for Mr. Davis because Defendants never disclosed it to Plaintiffs, despite it being responsive to Plaintiffs' |

| **DISPUTED FACTS** ||
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| | discovery requests. |
| 8. Plaintiffs have agreed to withdraw this allegation. | And, in perhaps the most egregious case, one member did not even provide a statement of "good cause" in his application. Exhibit "Z" at 2.<br><br>Defendants provided the "good cause" statement. Plaintiffs thus withdraw this allegation. |
| **POLICY** ||
| 9. In 2006, as a courtesy for applicants, the Department initiated an interview process to assist both applicants and line staff in determining pre-eligibility.<br><br>During this phase applicants will discuss reasons and situations with line staff and staff is trained to make notes of all comments made by the applicant during the interview. Staff assists in determining what documentation may be required of the applicant. If the clerk is able to determine that good cause is questionable, clerks are able to give an educated guess based on the scenarios described by applicants. The next phase involves applicants gathering their documentation, attending the 8-hour firearms course and returning to submit the written application, fees, and documentation.<br><br>During this process applicants will be fingerprinted, photographed, signatures will be obtained and applicants are instructed to go to Sheriff's Range for a weapons safety checked and to complete a final qualify-shoot. Once this phase is complete, the file and all documents are forwarded to the Background Unit for the comprehensive background and verification process. The investigator will provide a recommendation and forward to the Manager who will make the decision to issue or deny and will include any reasonable restrictions and/or instructions to staff. | Plaintiffs contend that Defendants' description of the initial interview process as a "courtesy for applicants" is misleading because Defendants sometimes discourage applicants from formally applying for a CCW by telling them they have no chance of obtaining one and will be wasting their time and money if they try.<br><br>Plaintiffs contend this serves Defendants' purpose of minimizing the number of applicants, and the documentation of denials.<br><br>Declaration of Michelle Laxson Supp. Pls.' Mot. Partial Summ. J. ¶¶ 6-7 (hereafter "Laxson Decl.").<br><br>Ex. "K" Supp. Pls.' Consolidated Opp./Reply.<br><br>Beyond that, Plaintiffs lack knowledge. |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 10. CCW license holders can renew licenses up to 30 days prior to the expiration date. All renewals must complete a firearms course, a qualify-shoot and firearm safety inspection. Renewals are issued on the spot if absent any negative law enforcement contacts, crime cases, arrests and there no changes from the initial application as to the reasons. No review by supervisor or managers is needed for the renewal process unless there have been changes to the reason. Applicants still need to provide some form of documentation to support his or her continued need but not to the extent of the initial application. Applicants sign under penalty of perjury that all prior conditions exist.<br><br>Pelowitz Decl. ¶ 12. | Though Plaintiffs lack knowledge regarding the first two sentences, as to the remaining claims, Plaintiffs assert Plaintiff Cleary was required to produce documentation confirming his continued employment in the psych ward for his renewal CCW application, that his refusal to do so was the basis of his denial, and that the County granted several renewal applications for members of the HDSA CCWs without requiring any supporting documentation.<br><br>Exhibit "M" Supp. Pls.' Mot. Partial Summ. J.<br><br>Declaration of Mark Cleary Supp. Pls.' Mot. Partial. Summ. J. (hereafter "Cleary Decl.") 4:9-20.<br><br>Exs. "U" through "MM" Supp. Pls.' Mot. Partial. Summ. J. |
| 11. There is an administrative reconsideration process for CCW applicants. When taking administrative action to deny, suspend or revoke a CCW license, an upper command concurrence through the Law Enforcement Service Bureau is required before taking action. All actions require the Manager to prepare a brief synopsis of the proposed action and recommendation. Command will either concur or request additional information. If concurrence is provided, the denial, suspension or revocation letter is mailed out. The individual is given the opportunity to request an appeal of the decision by writing to the Assistant Sheriff of the Law Enforcement Service Bureau. The appeal is heard by the Assistant Sheriff of the Bureau who will make the determination to overturn or uphold decision.<br><br>Pelowitz Decl. ¶ 14. | Though Plaintiffs do not dispute there is such an appeals process available, Plaintiffs allege that in some cases, the Manager has not prepared a brief synopsis of the proposed action and recommendation, but rather Defendant Sheriff Gore himself made the decision to overturn an applicant's denial based on personal appeals directed to him.<br><br>*See generally* Cleary Decl.<br><br>Opp. 23:23-24 "("During his initial application, Cleary was awarded his license after an appeal *with then Undersheriff Gore.*") (emphasis added)<br><br>Plaintiff Cleary provided no further documentation at his appeal hearing (*See* Cleary Decl.)<br><br>In a letter addressed to Sheriff Gore from an HDSA member who had been denied a |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| | renewal CCW, dated October 13, 2009, the author mentions his 19 year HDSA membership, and states: "I ask you [Sheriff Gore] intercede in the process and direct the Licensing division to reissue my CCW." On October 22, 2009, that HDSA member reapplied asserting "self-protection, a desire to be able to protect myself and my family from criminal activity, in case response to request to law enforcement is delayed" as his "good cause." He provided *no documentation* of a specific threat, but was issued a CCW nonetheless. (*See* Ex. "L" Supp. Pls.' Consolidated Opp./Reply.) |
| 12. The standard is the same. The nature of the documentation is typically different. Pelowitz Decl. ¶ 7. | The County has a separate standard for those seeking a CCW for business purposes (*i.e.,* to protect themselves during business activity). Exs. "A" and "C" Supp. Pls.' Mot. Partial Summ. J.<br><br>Plaintiffs assert business applicants need not show a specific threat as self-defense applicants must. |
| 13. Blanca Pelowitz has been the licensing manager since 2002, has been delegated the responsibility for CCW licensing by the Sheriff and makes all determinations on initial applications for CCW licenses<br><br>Pelowitz Decl. ¶¶ 1, 2, 4, 11. | Plaintiffs lack knowledge. Discovery is ongoing. |
| 14. Michelle Laxson did not apply for a CCW license. She was interviewed by staff but declined to complete and application and did not return.<br><br>Pelowitz Decl. ¶ 18. | Though Plaintiffs do not dispute that Plaintiff Laxson did not apply for a CCW, Plaintiff Laxson claims she was dissuaded from completing and filing a formal CCW application, and never "declined" to do so.<br><br>Laxson Decl. ¶¶ 4-7. |
| **RESIDENCY** | |
| 15. Edward Peruta was denied a license to carry a concealed weapon because he failed to | Plaintiff Peruta asserts there are facts that support he was denied a CCW by Defendants |

| **DISPUTED FACTS** | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| provide any documentation establishing good cause. Residency was not a factor in his denial which was based solely on the lack of good cause.<br><br>Pelowitz Decl. ¶ 17. | for lack of residency.<br><br>In trying to dismiss Plaintiff Peruta's original complaint, the County argued: "*Most significantly*, since the statute requires Plaintiff to meet all *three* requirements of [California Penal Code §] 12050 to be eligible for a permit, *the failure to meet the residency provision alone ends his constitutional claim*." (Def.'s Reply 3:19-21) (emphasis added)<br><br>See also Exs. "K" and "O" Supp. Pls.' Consolidated Opp./Reply.<br><br>As to Mr. Peruta being denied for lack of "good cause," undisputed. |
| 16. The "residency" requirement is generally defined by this County to be any person who maintains a permanent residence or spends more than six months of the taxable year within the County if the applicant claims dual residency. San Diego County uses the term "resident" as outlined in Penal Code section 12050(D), and not "domicile." Part-time residents who spend less than six months in the County are considered on a case-by-case basis, and CCW licenses have been issued in such circumstances.<br><br>Pelowitz Decl. ¶ 8. | Despite repeated requests, Defendants never provided Plaintiff Peruta its stated policy for determining residency, nor when it was promulgated.(*See* Exs. "A" through "J" Supp. Pls.' Consolidated Opp./Reply).<br><br>And, Plaintiff Peruta was expressly informed that his temporary residency was a basis for his denial of a CCW. *See generally* Declaration of Edward Peruta Supp. Pls.' Consolidated Opp./Reply. Plaintiffs contend this policy appears to be a post hoc creation prompted by this lawsuit.<br><br>Exs. "A" through "J" Supp. Pls.' Consolidated Opp./Reply. |
| **PLAINTIFF CLEARY** | |

| DISPUTED FACTS ||
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 17. Mark Cleary's renewal application was denied based on lack of supporting documentation relating to his employment in March of 2010. Cleary requested a reconsideration appeal and the decision to deny the license was overturned by Command after information about his employment was confirmed. He was issued a CCW license for a new term in June of 2010.<br><br>Pelowitz Decl. ¶ 20; Plaintiffs' Exhibit "F." | Though Plaintiffs do not dispute that Plaintiff Cleary's most recent renewal application was denied for lack of supporting documentation, Plaintiff Cleary never provided any additional "information about his employment" to Defendants for Defendants to "confirm" his appeal.<br><br>Cleary Decl. at 3-4. |
| 18. Cleary was not an HDSA member when he successfully obtained a renewal of his license. Declaration of Cleary; Pelowitz Decl. ¶¶ 11, 20, 22; Defendant's Exhibits 2-15. | Plaintiffs assert the account of events related by Plaintiff Cleary as to his process of obtaining a CCW leaves no doubt that the County treats HDSA members differently than the members of the general public.<br><br>Plaintiff Cleary received two renewal licenses from Defendants while a member of HDSA, and obtained a third one while not a member, but only after being denied, appealing, and becoming a plaintiff in this lawsuit.<br><br>*See generally* Cleary Decl. |
| 19. Laxson did not apply. Dodd did apply. Undisputed that Peruta did not provide supporting documentation.<br>Pelowitz Decl. ¶¶ 17, 18, 19. | All Plaintiffs sought a CCW from the County for self-defense purposes, but were denied or, in the cases of Plaintiffs Laxson and Dodd decided not to apply, because they were dissuaded at their initial interview and/or could not satisfy the requirements of County's unlawful policy. Peruta Decl., ¶¶ 8-13; Declaration of Plaintiff Michelle Laxson, ¶¶ 4-8; Exhibits "F", "G" and "T" Supp. Pls. Mot. Partial Summ. J.<br><br>Plaintiff Laxson asserts she was dissuaded from applying for a CCW.<br><br>Laxson Decl. ¶¶ 6-7. |
| **EXPERTS' POSITIONS** ||

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 20.  12050 as administered by Defendant -- the safety of the public from unknown persons carrying concealed, loaded firearms -- is both important and compelling. (Zimring Declaration.)<br><br>The Sheriff's Department's central reason to require a good reason for needing a gun is to reduce the number of secretly armed citizens on the streets and sidewalks of one of the biggest urban areas in the United States. Id. | The County does not, nor can it, demonstrate how keeping CCWs from people of good moral character is either necessarily related or narrowly tailored to achieve those particular interests.  It must be both to pass constitutional muster.<br><br>The County offers no data or evidence establishing its policy of limiting CCW issuance reduces or is likely to reduce crime.<br><br>See generally Moody Decl.; Declaration of Brian Patrick (hereafter "Patrick Decl."); and Declaration of Gary Mauser (hereafter "Mauser Decl.")<br><br>Evidence from states where CCW permits are commonly issued suggests this as well. Exs. "D" and "E" Supp. Pls.' Consolidated Opp./Reply. |
| 21.  Use of concealed weapons in streets and public places pose a greater threat to public safety. (See generally Zimring Declaration.) (the problem of gun robbery in American cities is almost exclusively a problem of concealable handguns). | Shall-issue laws seem to deter violent crime. Areas with widespread gun ownership among law abiding, responsible people consistently had significantly lower rates of murder and other violent crime than areas which severely restricted gun ownership (or for other reasons had much less ownership); murder and other violent crimes declined in areas which adopted policies of widely licensing law abiding, responsible adults to carry handguns. Declaration of Carlisle Moody (hereafter "Moody Decl.") ¶ 5.<br><br>The minority of individuals who carry concealed weapons pursuant to a valid CCW license help protect the majority because criminals are unable to distinguished unarmed victims from those who are armed.<br><br>See Moody Decl. ¶¶ 4, 8, 14.<br><br>See generally Patrick Decl. |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| 22. Handguns are common concealed weapons for similar reasons the Court explains in *Heller* for self-defense in the home – they are small and easy to hide under clothing, easy to use, cannot easily be wrestled away in self-defense, and pose a significant threat. *Heller*, 128 S. Ct. at 2818. They are used in more than 75% of all killings and in even larger portions of robberies. (Zimring Decl. ¶ 3.)<br><br>A concealed handgun is the dominant weapon of choice for gun criminals and a special danger to government efforts to keep public spaces safe and secure. (Zimring Decl. ¶¶ 6-7.) | Plaintiffs assert the County cannot connect increased public danger or crime to increased numbers of people who carry guns (whether discretely concealed or not) *pursuant to valid licenses*. |
| 23. By requiring evidence, the government is able to limit the amount of concealed weapons in public to only actual anticipated needs. It also acts as a backup to those who seek a CCW license for criminal purposes but do not yet have a criminal record. As the Court stated in *Miller*, "[s]uch legislation cannot be narrowly tailored to reach only the bad people who kill with their innocent guns. . .To expect such legislation to reflect a tight fit between ends and means is unrealistic." Miller, 604 F.Supp.2d at 1172 n.13 (quotation marks and citations omitted); See generally Zimring Declaration. | Plaintiffs contend that Defendants proffer no evidence that people planning to commit crimes with guns will forego doing so for lack of a CCW.<br><br>*See* Pls.' Mem. Supp. Opp./Reply 13:2-13 |
| 24. There is a very active controversy about the impact of CCW laws on crime and violence as Moody well knows. (See also, Donahue and Ayres, *Shooting Down the More Guns, Less Crime Hypothesis*, 55 Stan. L. Rev. 1193 (2003); Duggar, *More Guns, More Crime*, 109 Journal of Political Economy 1086-1114 (2001)). States and cities with restrictive gun policies did especially well in crime declines in the 1990's and have done so since (see Zimring , 2007 at Ch. 6), but major urban centers with concentrations of crime and violence were under-represented in the | Shall-issue laws seem to deter violent crime. Areas with widespread gun ownership among law abiding, responsible people consistently had significantly lower rates of murder and other violent crime than areas which severely restricted gun ownership (or for other reasons had much less ownership); murder and other violent crimes declined in areas which adopted policies of widely licensing law abiding, responsible adults to carry handguns. Declaration of Carlisle Moody (hereafter "Moody Decl.") ¶ 5. |

| DISPUTED FACTS | |
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| right-to-carry states. | |
| 25. Patrick does not indicate his field of expertise and makes sweeping assertions -- "Licensure processes of the various states have been shown to effectively filter out the violent and the impulsive" -- with no reference to any supportive research data. Patrick grossly overstates the efficiency of permissive licensing screening and never supports his passionate views with any data citations. | Brian Patrick is a tenured associate professor at the University of Toledo and holds a PhD from University of Michigan. His focus for the past decade or so has been studies regarding the law giving law-abiding, responsible applicants a right to concealed carry licensure. Patrick also has relevant publications, the most recent of which is a book published by academic press Lexington Book, entitled *Rise of the Anti-Media, Informing America's Concealed Weapons Movement* (2009).<br><br>Patrick Decl. ¶ 1. |
| 26. Mauser says that "Professor Zimring's assertions are generally correct, but omit a critical fact: serious criminal violence with firearms is almost exclusively committed by people (criminals) with histories of previous crime, or, occasionally by people who are seriously mentally disturbed." Mauser then asserts that "this omission is critical because it makes Professor Zimring's views irrelevant in a case like the present. "I am informed that neither juveniles nor people with crime records or mental deviancy records are eligible for concealed weapons licenses - - - they are ineligible for such licenses in any event." (Mauser, p. 2.) Mauser presents no authority for the proposition that permissible licensing laws exclude all persons at risk of committing firearms robberies and assaults. He states that he is "informed" but provides no reference to the source of that information. This assertion is repeated by Dr. Moody: "these provisions are important because they exclude virtually all people who are likely to commit gun crimes from receiving carrying permits." (Moody, p. 6.) Moody also provides no reference for this statement. | Mauser cites to Delbert S. Elliot, "Life Threatening Violence is Primarily a Crime Problem: A Focus on Prevention," 69 COLO. L. REV. 1081, 1081-1098. Mauser Decl. ¶¶ 4-5.<br><br>Plaintiffs contend that the paragraph prior to the one that Defendants take issue with in Moody's declaration gives the basis for which Moody makes the statement: "Federal law bars firearms acquisition or possession by people convicted of any felony or certain misdemeanors. It is my understanding that so does California law, and that California requires criminal records be checked before permitting anyone to even buy a gun; and that such a record check is also required before a permit to carry a gun is issued." Moody Decl. ¶¶ 16-18.<br><br>See also Exs. "B" through "E" Supp. Pls.' Consolidated Opp./Reply. |
| 27. The empirical and legal data on this question do not support the theory that state | Law enforcement has access to information concerning an individual's conviction record |

| DISPUTED FACTS ||
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| laws exclude "virtually all people" who are potential gun criminals. The data on high concentration of violence among persons with criminal records usually uses juvenile and adult arrest records. (See Wolfgang Marvin, Robert Figlio and Thorsten Sellin, Delinquency in a Birth Cohort (1972) University of Chicago Press Chicago.)<br><br>Many people involved in crime have some record of juvenile or criminal arrest. But state permissive licensing provisions only bar persons with felony convictions or sometimes convictions for very specific high violence misdemeanors such as domestic violence. Excluding non-conviction arrests, juvenile records and reductions by plea bargaining to non-covered misdemeanors creates huge gaps between disqualified and at-risk populations for gun crime. The mental health criteria used by most permissive statutes also are restricted to persons with previous histories of adjudication, probably a tiny minority of the seriously disturbed at any given time. With loopholes that large, the average California citizen could quite rationally prefer to walk streets where very few of the people on the street carry hidden weapons than to trust systems which allow the vast majority of adults to carry hidden and loaded weapons until felony conviction or adjudication for insanity has happened. It is simply not true that California effectively screens the mentally ill from possession of firearms. The screening is limited to patients admitted to a treatment facility, and to other very specific circumstances. Welfare and Institutions Code section 8100. | and can access information concerning a person's arrests, charges, modification of charges, convictions, sentence terms (also probation and/or jail sentence), and post-conviction relief (reduction, expungement, certificate of rehabilitation and/or pardon). (*See Penal Code § 11105*). California laws that restrict firearm and ammunition ownership, Penal Code §§ 12021 and 12021.1, cover certain juvenile convictions, non-violent felony convictions, and 10 year restrictions for a myriad of misdemeanor offenses. A person is prohibited in California from possessing firearms as a result of firearm prohibiting probation terms, certain temporary and permanent restraining orders, and mental health restrictions. (*Cal Pen 12021*).<br><br>The firearm restrictions as a result of a mental illness pursuant to Welfare & Institutions Code §§ 8100 and 8103 prohibit a wide range of persons with mental and developmental disabilities, including when there is probable cause to believe a person is a danger to themselves or others or gravely disabled, that person may be taken into custody by law enforcement and placed under 72-hour evaluation. *W&I Code § 5150*. Once a person is taken in pursuant to W&I Code § 5150 that person is prohibited from owning and possessing firearms for five years. W&I 8103(f)(1). W&I Code § 8103 restricts those suffering from mental illness access to a firearm, including: those adjudicated to have a mental disorder, illness or mentally disordered sex offenders; those found not guilty by reason of insanity; individuals incompetent to stand trial; those placed under conservatorship; those taken into custody pursuant to W&I Code § 5150; and those certified for intensive treatment. *Cal W&I. 8103*. |
| 28. Among the many factual mistakes in the Moody declaration, Moody states that Zimring "is not a criminologist." In fact, Zimring was | Both Lott and Mustard were professors at University of Chicago. |

| | DISPUTED FACTS | |
|---|---|---|
| | **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| | elected a life fellow of the American Society of Criminology in 1992 and received that organization's two most important research awards in 2006 and 2007. (Zimring Declaration, CV attached, p. 1.) This is why he is especially qualified to render opinions in this area. Moody then mentions "two University of Chicago criminologists, John Lott and David Mustard." Neither Lott nor Mustard is a criminologist or ever was on the University of Chicago faculty. There is also an assertion that Zimring "incessantly predicted ---[increasing] murder rates" (Moody par. 7) which is both undocumented and untrue. | John Lott was a visiting professor and fellow at the University of Chicago.<br><br>See James L. Meriner, *The Shootout*, CHICAGO MAGAZINE, August 2006, available at ("That was John R. Lott, then a *visiting professor of economics at the University of Chicago*") (emphasis added) (article available at http://www.chicagomag.com/Chicago-Magazine/August-2006/The-Shootout/).<br><br>David Mustard was also an economics lecturer at the University of Chicago. See Terry College of Business: Profile for David Mustard, University of Georgia, http://www.terry.uga.edu/profiles/?person_id=466 (last visited November 5, 2010) (listing that Mustard was an economics lecturer at the University of Chicago from 1995 to 1997 under Mustard's prior professional positions). |
| | 29. But by far, the most problematic assertion by Moody is headlined "No Controversy As To CCW Issuance." Moody alleges that the crime decline in the United States since 1990 is evidence that handgun possession and CCW levels are not related to violence. In fact, there has not been a steady crime decline between 1991 and 2010 (there was no such pattern between 2000 and 2007, see Zimring The Great American Crime Decline 2007), and alleges with no support that handgun ownership rates increased in the late 1990's and since 2000. Published research using data from Professor Moody shows the opposite of what Moody's declaration insinuates about the import of "shall issue" laws.2<br>There is a very active controversy about the impact of CCW laws on crime and violence as Moody well knows. (See also, Donahue and Ayres, Shooting Down the More Guns, Less Crime Hypothesis, 55 Stan. L. Rev. 1193 (2003); Duggar, More Guns, More Crime, 109 Journal of Political Economy 1086-1114 | Areas with widespread gun ownership among law abiding, responsible people consistently had significantly lower rates of murder and other violent crime than areas which severely restricted gun ownership (or for other reasons had much less ownership); murder and other violent crimes declined in areas which adopted policies of widely licensing law abiding, responsible adults to carry handguns. Declaration of Carlisle Moody (hereafter "Moody Decl.") ¶ 5.<br><br>See Exs. "B" through "E" Supp. Pls.' Consolidated Opp./Reply.<br><br>See generally, Lott, MORE GUNS, LESS CRIME (U. of Chicago Press, 3d edition 2010). |

| DISPUTED FACTS ||
|---|---|
| **DEFENDANT'S POSITION** | **PLAINTIFFS' POSITION** |
| (2001)). States and cities with restrictive gun policies did especially well in crime declines in the 1990's and have done so since (see Zimring , 2007 at Ch. 6), but major urban centers with concentrations of crime and violence were under-represented in the right-to-carry states. Of course, Professor Moody doesn't refer to this work in his declaration. Ayers and Donahue shred every claim by Moody in a thorough analysis of his work. | |
| **MISC.** ||
| 30. Plaintiff Cleary obtained a permit, Declaration of Cleary, par 19; Plaintiff Laxson never applied so it is unknown whether she could qualify, Declaration of Laxson. Plaintiff's Ex. F; Pelowitz Decl. ¶¶ 18, 20. | Plaintiffs cannot obtain the permits that state law requires for concealed carry from the County, nor can they generally carry loaded handguns openly under state law.<br><br>Declaration of Plaintiff Edward Peruta (hereafter, "Peruta Decl."), ¶¶ 3, 7-8, 10, 13; Laxson Decl., ¶¶ 6-7; Exs. "F", "G", "J" & "T". Supp. Pls. Mot. Partial Summ. J. |
| 31. There is no competent evidentiary support for this. The subject declaration is based on hearsay and speculation. | Plaintiff California Rifle and Pistol Association Foundation ("CRPAF"), an organization dedicated to educating the public about firearms and protecting the rights thereto, its thousands of supporters and CRPA members in San Diego County are likewise injured by the County's issuance policy and practices for these same reasons.<br><br>*See generally* Declaration of Silvio Montanarella Supp. Pls.' Mot. Partial Summ. J. (hereafter "Montanarella Decl."). |

Dated: November 8, 2010                    **MICHEL & ASSOCIATES, PC**


   /s/   C.D. Michel
C.D. Michel
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD PERUTA, MICHELLE LAXSON, JAMES DODD, DR. LESLIE BUNCHER, MARK CLEARY, and CALIFORNIA RIFLE AND PISTOL ASSOCIATION FOUNDATION,<br><br>         Plaintiffs,<br><br>     v.<br><br>COUNTY OF SAN DIEGO, WILLIAM D. GORE, INDIVIDUALLY AND IN HIS CAPACITY AS SHERIFF,<br><br>         Defendants. | ) CASE NO. 09-CV-2371 IEG (BGS)<br>)<br>) **CERTIFICATE OF SERVICE**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

IT IS HEREBY CERTIFIED THAT:

   I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 E. Ocean Blvd., Suite 200, Long Beach, California, 90802.
   I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' CONSOLIDATED SEPARATE STATEMENT
OF UNDISPUTED AND DISPUTED FACTS**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| James M. Chapin<br>County of San Diego<br>Office of County Counsel<br>1600 Pacific Highway<br>Room 355<br>San Diego, CA 92101-2469<br>(619) 531-5244<br>Fax: (619-531-6005<br>james.chapin@sdcounty.ca.gov | Paul Neuharth, Jr. (State Bar #147073)<br>PAUL NEUHARTH, JR., APC<br>1140 Union Street, Suite 102<br>San Diego, CA 92101<br>Telephone:   (619) 231-0401<br>Facsimile:    (619) 231-8759<br>pneuharth@sbcglobal.net |

   I declare under penalty of perjury that the foregoing is true and correct. Executed on November 8, 2010.

                              /s/ C.D. Michel
                              C. D. Michel
                              Attorney for Plaintiffs