**EXHIBIT B**



1 of 1 DOCUMENT

UNITED STATES OF AMERICA, Plaintiff, v. MELISSA A. HUET, Defendant.

Criminal No. 08-0215

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2010 U.S. Dist. LEXIS 123597

November 22, 2010, Filed

**COUNSEL:** [*1] For MARVIN E. HALL, Defendant: Elisa A. Long, LEAD ATTORNEY, Federal Public Defender's Office, Pittsburgh, PA.

For MELISSA A. HUET, Defendant: Patrick M. Livingston, LEAD ATTORNEY, Pittsburgh, PA.

For USA, Plaintiff: Margaret E. Picking, LEAD ATTORNEY, United States Attorney's Office, Pittsburgh, PA.

**JUDGES:** ARTHUR J. SCHWAB, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ARTHUR J. SCHWAB

**OPINION**

<u>Memorandum Opinion</u>

**I. Introduction**

Pending before this Court are numerous pre-trial motions, including defendant Melissa A. Huet's (hereinafter "Huet" or "defendant Huet") Motion to Dismiss Count Three of a Three-Count Indictment charging her with aiding and abetting possession of a firearm by a convicted felon, from on or about August 10, 2007 to on or about January 11, 2008, in violation of Title *18, United States Code, Sections 922(g)(1)* and *2(a)*.

Huet's co-defendant and paramour, Marvin E. Hall (hereinafter "Hall" or "defendant Hall"), was charged at Count One of the Indictment, with possession of a firearm by a convicted felon on or about January 11, 2008, in violation of Title *18, United States Code, Section 922(g)(1)*. Count Two charged Hall with transfer of unregistered firearms, on or about January 11, 2009, in violation [*2] of Title *26, United States Code, Section 5861(e)*. On February 1, 2010, defendant Hall pled guilty to Count One of the Indictment, and on June 25, 2010, Hall was sentenced by this Court to time served. [1] Defendant Hall already had served twenty four (24) months imprisonment in pretrial detention, and actually served more time than was called for under the advisory sentencing guideline range of fifteen (15) to twenty-one (21) months imprisonment. See the *Vue* case, 09-cr-48, doc. no. 120.

   1   The government moved to dismiss Count Two, and the Court granted that motion. Doc. No. 133.

Defendant Huet moves to dismiss Count Three of the Indictment pursuant to *Fed.R.Crim.P. 12(b)(3)(B)* on the basis that: (1) it fails to state an offense under the aiding and abetting statute, *18 U.S.C. § 2*, and/or (2) if it does state an offense under *section 2*, on the grounds that said offense violates the *Second Amendment to the United States Constitution*, as it has been construed in *District of Columbia v. Heller, 554 U.S.    , 128 S.Ct. 2783 (2008)*.

**II. Legal Standard**

Case 3:09-cv-02371-IEG -BGS   Document 62-2   Filed 11/30/10   Page 3 of 11

Page 2
2010 U.S. Dist. LEXIS 123597, *2

*Rule 12(b)(3)(B)* permits a Court "at any time while the case is pending . . . [to] hear a claim that the indictment or information fails to . . [*3] . state an offense." When ruling on a motion to dismiss for failure to state an offense under *Fed.R.Crim.P. 12(b)(3)(B)*, the Court is generally limited to reviewing the face of the Indictment, and the allegations of the Indictment are to be accepted as true for purposes of the motion to dismiss. *United States v. Besmajian, 910 F.2d 1153, 1154 (3d Cir. 1990)*. A motion under *Fed.R.Crim.P. 12(b)(3)* is appropriate when it raises questions of law rather than fact. *See United States v. Levin, 973 F.2d 463, 469 (6th Cir. 1992)* (affirming the district court's dismissal of an Indictment when "undisputed extrinsic evidence" demonstrated that "the government was, as a matter of law, incapable of proving" an element of the offense). As the United States Court of Appeals for the Sixth Circuit explained in *United States v. Levin*:

> *Rule 12 of the Federal Rules of Criminal Procedure* and its component parts encourage district courts to entertain and dispose of pretrial criminal motions before trial if they are capable of determination without trial of the general issues. Moreover, district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions [*4] so long as the trial court's conclusions do not invade the province of the ultimate finder of fact.

*973 F.2d 463, 469*.

A pretrial motion raising factual issues may be ruled upon where there is no right to jury resolution of a factual dispute. *United States v. MacDougall, 790 F.2d 1135 (4th Cir. 1986)*. Where, as here, the factual information underpinning the indictment is not in dispute and the only question is a legal one, motions to dismiss an Indictment may be ruled upon as a matter of law. See *United States v. Ali, 557 F.3d 715, 719-29 (6th Cir. 2009)*(court may rule on a motion to dismiss where defendant's motion pleads that undisputed facts did not give rise to the offense charged in the Indictment, or whether the Indictment, based on such undisputed facts failed to state an offense). *United States v. Todd, 404 F.3d 1062, 1067 (10th Cir. 2006); United States v. Flores, 404 F.3d 320 (5th Cir. 2005)*.

The Indictment must include all of the elements of the crime alleged, *United States v. Spinner, 180 F.3d 514 (3d. Cir. 1999)*, as well as specific facts that satisfy all those elements; a recitation "in general terms the essential elements of the offense" is not sufficient. *United States v. Panarella, 277 F.3d 678, 684-85 (3d Cir. 2002)*. [*5] The dismissal of an Indictment is authorized only if its allegations are not sufficient to charge an offense, but such dismissals may not be based upon arguments related to the insufficiency of the evidence that will be offered to prove the charges in the Indictment. *United States v. DeLaurentis, 230 F.3d 659, 660-661 (3d Cir. 2000)*.

This pretrial motion to dismiss is properly addressed and resolved by this Court because defendant Huet's argument that the Indictment fails to state an offense is based upon facts which are, for purposes of this Motion, either undisputed or resolved in the government's favor, and involve a constitutional claim involving her *Second Amendment* right to keep and bear arms.

### III. Background Factual Information[2]

> 2 This Court, being mindful of, and adhering to the standard of review on a motion to dismiss the Indictment under *Fed. R. Crim. P. 12(b)(3)(B)*, provides the following factual information mostly as background, and the Court has not relied upon facts outside of the four corners of the Indictment as a basis to dismiss this Indictment. However, the facts as set forth in the underlying guilty plea and other proceedings of co-defendant Hall are a matter of public [*6] record and therefore have been relied upon by this Court in fashioning this decision.

#### A. Investigation of Defendant Huet

Defendant Huet is 35 years old, has never been convicted of any crime, and is not disabled or otherwise prohibited from possessing a firearm under *18 U.S.C. § 922(g)(1)*, or its Pennsylvania counterpart, *18 Pa.C.S.A. § 6105*.

Count Three (3) of the Indictment charges Huet with aiding and abetting the possession by her paramour, defendant Hall, of a firearm identified as an SKS rifle, [3] from August 10, 2007 to January 18, 2008. During discovery, materials provided to defendant pursuant to *Fed. R. Crim. P. 16* describe the rifle as an Interordnance M59/66 Rifle, Serial Number F151932 (hereinafter

Case 3:09-cv-02371-IEG -BGS   Document 62-2   Filed 11/30/10   Page 4 of 11

Page 3
2010 U.S. Dist. LEXIS 123597, *6

referred to as "the SKS rifle"), which as described more fully later in this Opinion is not an "assault" rifle (like an AK-47) but a "curio" or collectors' rifle. Defendant Hall's guilty plea and sentencing at Count One of the Indictment confirm that he had been convicted in March, 1999, of possessing an unregistered firearm in violation of Title 26, *United States Code, Section 5861(d)*.

> 3  The Indictment had originally referred to the SKS rifle as an "assault rifle," but in its "Omnibus [*7] Brief and Responses to Pre-Trial Motions of Defendant," the government stated that it has "no objection to referring to the rifle merely as an SKS rifle, as the 'assault' designation has no bearing whatsoever on either the elements of the offense or the penalties Ms. Huet faces upon conviction." Doc. No. 134, at 14.

The genesis of the investigation by federal agents claims that they worked undercover "to penetrate a cell of militia extremists," and during their investigation, they met defendants Hall and Huet, while the agents pretended to have an interest in the activities of Morgan Jones, of Lucinda, Clarion County, including Jones' collection of guns and his hosting of an annual "flame-throwing" party in 2005. [4] See *United States v. Hall*, Doc. No. 44, Detention Hearing Transcript, June 11, 2008, p. 13-14.

> 4  According to testimony at the detention hearing of Hall, FBI Special Agent Yocca testified that according to "some of the defendants in this case" (although Huet is not mentioned), a flame-throwing party is one that certain militia members, as well as neighbors and other Pennsylvania gun owners attend, and it is held at Jones' property. Doc. No. 44 at 25-26. The government has not [*8] alleged that Huet took part in any of these alleged activities.

Under authority of a search warrant, federal agents seized the SKS rifle from an upstairs bedroom at the Hall/Huet home at Lawsonham Road in Clarion County, during a raid conducted on June 6, 2008. The raid occurred approximately nine (9) months to a year after the agent first met the couple, and nearly five (5) months from the end date of defendant Huet's "aiding and abetting" possession by a convicted felon charge pleaded in the Indictment. Doc. No. 120-1.

According to the *Rule 16* discovery materials, at no time during the undercover investigation did agents observe either Huet or Hall actually handle the SKS rifle. They did not observe Huet handle or otherwise deliver the rifle to Hall or direct him to handle it. Importantly, at no time over the five (5) months period covered by the Indictment did agents observe Huet in the same room as the rifle. There is no allegation that it had been discharged, either legally or illegally, by either Hall or Huet, and in particular, there is no allegation that Huet directed Hall to discharge the rifle, or possess the rifle, nor that Huet was a "straw" [*9] purchaser of the rifle for Hall.

As set forth in the affidavit of probable cause, Huet indicated to one or more of the agents on August 10, 2007 the following:

> That she was angry that HALL had been showing off an SKS assault rifle. HUET said that if it happened again, she would take it back to MORGAN. HUET further elaborated that she was worried that if HALL 'gets in trouble with that, I get in trouble, too. Cause it's in my name and he's got it.' HALL invited [the undercover agent] into his residence, where the [undercover agent] observed an SKS rifle assault in HALL's computer room. Referring to the SKS rifle HALL said, 'That's her SKS rifle, I'm not allowed to have a gun.'

Doc. No. 120-1, ¶ 19.

According to the Agent's summary of Huet's June 8, 2009 (FBI Form 302) statement, government agents reported that after they told Huet that they raided her house, arrested Hall and had a warrant to search her truck, she told them that "the guns in her home belong to her and that it is not illegal for her to purchase weapons." Doc. No. 120-2.

While the affidavit is filled with labels of "assault" rifle and "militia" language, there are no allegations that SKS rifle is a "true" assault weapon (at [*10] least for the last 50 to 60 years), or that Huet was personally involved in any militia activities, legal or illegal. The attempt to "label" Huet should not deter a thorough analysis in this case - - is the government, through the framework of "aiding and abetting," attempting to convert a lawful rifle owner into a criminal?

Case 3:09-cv-02371-IEG -BGS   Document 62-2   Filed 11/30/10   Page 5 of 11

Page 4
2010 U.S. Dist. LEXIS 123597, *10

Importantly, absent from the Indictment are *any* facts supporting an inference that Huet did anything to aid and abet defendant Hall in "possessing" her firearm, the SKS rifle, or that Huet purchased or possessed the rifle as a means to assist Hall to avoid his restrictions. In other words, the government has set forth no facts addressing any specifics as to how defendant Huet aided and abetted Hall. The government simply charges *its conclusion* that Huet "knowingly and unlawfully aided and abetted the possession of a firearm, that is an SKS rifle assault rifle, in and affecting interstate commerce, by Marvin E. Hall." Doc. No. 1. The facts as gleaned from the underlying proceedings of defendant Hall, which are a matter of public record, also do not address how defendant Huet aided and abetted Hall.

## B. The Firearm - - Not An Automatic "Assault" Weapon

The following [*11] brief historical review will be of assistance:

The SKS (or M59/66 ) is a legal, common semi-automatic rifle that is used as a hunting rifle and, like many hunting rifles, does not accept a magazine and cannot hold more than ten (10) rounds. The Interordance M59/66 is a semiautomatic carbine manufactured in the former Yugoslavia based upon the Russian SKS (Samorzaryadnyi Karabin Simonova) design of the 1940s. It carries a 7.62 x 39 mm cartridge in a *fixed* magazine holding up to ten (10) cartridges, and it has a barrel length of approximately 21 inches. This is important because, unlike an AK-47 or M-16, the SKS rifle cannot accept magazines and has a limited ammunition capacity of ten (10) rounds.

"Carbine" is derived from the French "carabine," the type of soldier who originally carried them. The "carbine" was designed as early as the 17th or 18th century as a lighter, shorter shoulder weapon for French and English cavalrymen. See Russell, Carl P., *Guns on the Early Frontier*, University of California Press, 1957), pp. 167-175. The term also referred to the inside diameter of the barrel, which was narrower than that of a musket. See Neumann, George C, *The History of Weapons of the American* [*12] *Revolution*, (Crown Publishers, Inc. 1967), pp. 36-39, 114-122. American carbines were manufactured and used for military purposes from approximately 1833.

Carbines were used by unmounted officers and others who sought a lighter, more compact weapon, and later were used as a sporting arm for hunting in heavy brush. The Russian SKS rifle is an example of this historical trend. The Russian SKS rifle was first used in the 1940s as a military weapon and was displaced in the late 1940s by the more deadly AK-47. The Russians shared the design of the SKS rifle with its post-World War II allies, and retained it largely for military ceremonial use. At least in the 1950s the Russian SKS rifle became the "standard hunting rifle for the majority of Russian hunters" for antelope, moose, boar, and brown bear. Doc. No. 120-4, S.P. Fjestad, *Blue Book of Gun Values*, 30th ed. (Blue Book Publications, Inc., 2009), p. 1559-61.

Ultimately, large military surpluses of Russian SKS rifles or rifles built upon the SKS design became widely available, including the M59/66 (manufactured in the former Yugoslavia), and were *lawfully* imported into the United States as sporting rifles. According to the *Blue Book of* [*13] *Gun Values*, it rapidly became one of the favorites for American hunters and shooters, based upon its affordability and durability. *Id.* Nothing indicates that the SKS rifle is a "weapon of choice" among criminals or gangs - - only of hunters and collectors.

The parties do not dispute for purposes of this Motion that the Interordnance M59/66, while a carbine by design, meets the definitions of "semiautomatic rifle" in *18 U.S.C. §§ 921(a)(7), (28)*. It is a firearm which is "intended to be fired from the shoulder," "which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." *Id.* In contrast to semi-automatics, automatic weapons, also called machine guns, shoot multiple cartridges in response to a single trigger pull. *26 U.S.C. § 5845(b)*.

In 1994, Congress enacted a ten-year prospective ban on the manufacture, transfer or possession of a particular subset of semiautomatic rifles, which it characterized as "semiautomatic assault weapons." The ban *exempted* a large number of specifically-identified firearms, including any "semiautomatic rifles . . . that [*14] cannot accept a detachable magazine that holds more than 5 rounds of ammunition," and any semiautomatic shotgun "that cannot hold more than five rounds of ammunition in a fixed or detachable magazine." See former *18 U.S.C. § 922(v)(3)*. The M59/66 was *not* included in the ban. [5]

Case 3:09-cv-02371-IEG -BGS   Document 62-2    Filed 11/30/10   Page 6 of 11

Page 5
2010 U.S. Dist. LEXIS 123597, *14

Further, as early as 2001 (and certainly no later than 2005), the Yugoslavian M59/66 had been designated a "curio" by the Bureau of Alcohol, Tobacco and Firearms' under *27 CFR § 478.11*.

> 5   There is nothing in the record to indicate that the rifle at issue was modified to accept a removable high capacity magazine.

Although the semiautomatic assault weapons ban ended in 2004, Congress's determination of which weapons were, and which weapons were not, dangerous, bears upon the constitutional inquiry regarding whether defendant Huet's rifle was "dangerous" or "unusual," especially since the SKS rifle was *not* within the ban (see *District of Columbia v. Heller, infra*), coupled with its "curio" or collectors' status.

## IV. Analysis

### A. Aiding and Abetting

As stated above, notably absent from the Indictment in this case are any facts setting forth *how* defendant Huet aided and abetted defendant Hall in his unlawful possession of [*15] the SKS rifle. The government's theory, disclosed on the record as set forth in defendant Hall's proceedings, appears to be that defendant Huet passively aided and abetted Hall in his possession of the curio firearm which *she* owned and kept in their shared residence. Supported by the June 8, 2008 statement made by Huet claiming ownership of this collectors' rifle, the government's theory in support of the aiding and abetting charge is that Huet owned the firearm and kept it unsecured in the home. At defendant Hall's guilty plea hearing, which is a matter of public record, government counsel stated that:

> Mr. Hall lived with . . . Melissa Huet, (who) had no prior record of which we are aware, but . . . bought firearms in her name for (sic) Morgan Jones, who on the side sold firearms. . . Miss Huet would allow Mr. Hall to have access to those firearms. In essence, that's the very basis of the charge against Mr. Hall to which he is pleading guilty today.

See *United States v. Hall*, Cr. No. 08-215, Change of Plea Hearing, 1/29/2010, Doc. No. 113 at 18.

*Section 2 of Title 18 of the United States Code* states that anyone who "directly commits an act or aid, abets, counsels, commands, induces or [*16] procures its commission, is punishable as a principal." In 1951, the aiding and abetting statute was amended to include the language "punishable as" in order to "eliminate all doubt that in the case of offense whose prohibition is directed at members of specified class (e.g. federal employees) a person who is not himself a member of that class may nonetheless be punished as a principal if he induces a person in that class to violate the prohibition." See S.Rep. 1020, 82d. Cong. 1st Sess., 7-8 (1951); See also, *Standefer v. United States, 447 U.S. 10, 19, n. 11 (1980)*.

In *United States v. Nolan, 718 F.2d 589, 591 (3d Cir. 1983)*, quoting *Nye & Nissan v. United States, 336 U.S. 613 (1949)*(other citations omitted), the United States Court of Appeals for the Third Circuit held that in order to "aid and abet" another person to commit a crime it is required "that a defendant 'in some sort associate himself with the venture, that he participate in it as something that he wished to bring about, that he seek by his action to make it succeed."

In *United States v. Xavier*, the United States Court of Appeals for the Third Circuit held that one may be an aider and abetter to possession by a convicted [*17] felon charge under *18 U.S.C. §§ 2(a)*, and *922(g)*, upon proof that the aider and abetter knew or had cause to know of the possessor's status as a felon.

The United States Supreme Court's recent unanimous decision in *Abuelhawa v. United States, 566 U.S.    , 129 S.Ct. 2102 (2009)*, limits the government's practice of invoking accomplice liability. In that case, the Supreme Court rejected a loose construction of *21 U.S.C. § 843(b)*, which makes it a felony to use a telephone to facilitate a drug transaction, to punish the buyer of small drug quantities who merely arranges the purchases over the telephone. The Supreme Court likened the word "facilitate" in *section 843(b)* with "aid", "abet" and "assist" in other criminal statutes, and relied upon its decision in *Gebardi v. United States, 287 U.S. 112 (1932)*, which was a Mann Act decision which "refused to infer that the mere acquiescence of the woman transported [across state lines] was intended to be condemned by the general language punishing those who aid and assist the transporter, any more than it has inferred that the purchaser of liquor was to be regarded as an abettor of the illegal sale." *Id. at 2106*.

Case 3:09-cv-02371-IEG -BGS   Document 62-2   Filed 11/30/10   Page 7 of 11

Page 6
2010 U.S. Dist. LEXIS 123597, *17

Defendant argues, and this Court [*18] agrees, that based upon the government's undercover investigation, the government cannot successfully establish that Huet "participat[ed] in the venture as something that [she] wished to bring about," and application of the Supreme Court's unanimous decision in *Abuelhawa* changes the government's case from weak to legally deficient.

The facts in the Indictment fail to set forth *any* allegations to support the conclusion that defendant Huet aided and abetted defendant Hall in his unlawful possession of the SKS rifle. Here, as stated above, there are no allegations in the Indictment (nor any information at the proceedings produced in the proceeding of co-defendant Hall) that Huet was a straw purchaser of the SKS rifle, or that she ever witnessed defendant Hall handling or firing the weapon. The most the government proffers is that Huet stated that if defendant Hall got in trouble with the gun, she would get in trouble also because she was the owner of the rifle. This statement, which the Court accepts as undisputed, does nothing to advance the cause that defendant Huet knew, or had reason to know that defendant Hall was a felon in possession *and* that her owning a weapon somehow aided or [*19] abetted him in his unlawful possession of the SKS rifle. The Court therefore finds that Count Three (3) of the Indictment against defendant Huet must be dismissed for failure to state an offense under the aiding and abetting statute, *18 U.S.C. § 2*.

**B.** *Second Amendment*

**(1) The Nature of Defendant Huet's** *Second Amendment* **Challenge**

At the outset, the Court must first determine whether the defendant is launching her attack on the constitutionality of the statutes at issue on their face, or on an as-applied basis. While a facial attack tests a law's constitutionality based on its text alone and does not address the facts or circumstances of the particular case, an as-applied attack does not allege that a law is unconstitutional as written, but that the application of the law to a particular person under particular circumstances deprives that person of his or her constitutional rights. *United States v. Marcavage, 609 F.3d 264 (3d Cir. 2010)*.

Although defendant Huet does not specify whether the constitutional challenge is facial or as-applied, it appears to this Court that defendant attacks these statutes on an as-applied basis and under the facts of this case. Accordingly, the Court confines [*20] its analysis of the constitutionality of the laws as-applied to the factual scenario of this case. As previously noted, these facts have been gleaned primarily from the public judicial record of co-defendant Hall's proceedings.

**(2) Summary of Conclusion**

For the reasons set forth below, this Court finds that under the facts of this case, to punish Huet, who has not been convicted of a felony under *18 U.S.C. § 922(g)(1)*, as a principal, violates the core of the *Second Amendment* right to keep arms, at least, where, as here, the conduct said to have aided or abetted the substantive firearm possession is itself purely possessory.

**(3) History of** *Second Amendment* **as Construed Through Recent Case Precedent**

The language of the *Second Amendment* provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

**(a) District of Columbia v. Heller**

In the landmark case of *District of Columbia v. Heller, 554 U.S. , 128 S.Ct. 2783 (2008)*, the United States Supreme Court, for the first time, addressed the scope of the individual right to bear arms and interpreted the meaning of the *Second Amendment* within the [*21] context of deciding whether a District of Columbia prohibition on the possession of usable handguns in the home violates the *Second Amendment*. The Supreme Court in *Heller* set forth an exhaustive analysis on the meaning and purpose of the *Second Amendment*, which, like the *First* and *Fourth Amendments*, codified a *pre-existing* right, and examined the meaning of the operative clause, "right of the people" to "keep and bear Arms", and the prefatory clause, "A well regulated Militia, being necessary to the security of a free State . . . ". *Id. at 2789*. Further, the Court evaluated the relationship between the operative clause and the prefatory clause of the *Second Amendment*, as well as the post-ratification commentaries, pre-civil war case law, post-civil war legislation and commentaries, and ultimately struck down as unconstitutional two District of Columbia statutes which totally banned handgun possession in the home, and required all other firearms to be inoperable at all times.

Of note, the Court in *Heller* held that, "the *Second Amendment* extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of founding." *128 S.Ct. at 2791-92.* [*22] The Court characterized as "bordering on the frivolous" the argument that "only those arms in existence in the 18th Century are protected by the *Second Amendment*." *Id.* The Supreme Court wholesale rejected the argument based upon the language from *United States v. Miller, 307 U.S. 174 (1939)* that "only those weapons useful in warfare are protected." *Id. at 2815.* [6] The Court, however, noted that the right is not unlimited as the *Second Amendment* does not protect an individual's right to possess "dangerous and unusual weapons." *Id. at 2817* (citations omitted).

> 6   In *United States v. Miller, 307 U.S. 174 (1939)*, the United States Supreme Court upheld a section of the National Firearms Act making it unlawful to possess an unregistered sawed-off shotgun. The Court emphasized that "[i]n the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the *Second Amendment* guarantees the right to keep and bear such an instrument." *Id. at 178.* The Court further stated that "it is not within judicial notice that this weapon is any part [*23] of the ordinary military equipment or that its use could contribute to the common defense." *Id.*

While the majority in *Heller* held that the *Second Amendment* provides an individual the right to possess a firearm unconnected with service in a militia and to use that arm for traditionally lawful purposes, especially the right of self defense within the home, the dissent (and petitioners) believed that it protects only the right to possess and carry a firearm in connection with militia service. *Id. at 2789.*

Although *Heller* did not settle on a standard of scrutiny, it unmistakably ruled out the deferential rational basis test that was applied in *Miller*. The Court in discussing the standard of scrutiny applicable to the hand gun prohibition, stated:

> [T]he inherent right of self-defense has been central to the *Second Amendment* right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning [*24] from the home 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family' would fail constitutional muster.

*Id. at 2817-18. (Internal citations omitted).*

While not recognizing an unalienable right of every citizen to possess any type of firearm and to brandish it wherever they wish, the majority in *Heller* held that the *Second Amendment* established a core right that protects a citizen's ability to possess firearms used by militia members in his or her home for personal protection, provided that the possessor is not disqualified by virtue of being a felon or insane.

**(b) McDonald v. City of Chicago**[7]

> 7   This Court required additional briefing from the parties on the effect of the decisions in *United States v. Marzzarella* (3d Cir. July 29, 2010), *and McDonald v. City of Chicago, 130 S.Ct. 3040 (U.S. June 28, 2010).* See Text Orders of July 14, 2010 and August 12, 2010.

In the recent case *of McDonald v. City of Chicago, U.S.   , 130 S.Ct. 3020, 3047 (U.S. June 28, 2010)*, a four member plurality nearly identical to the majority in *Heller*, held that the *Fourteenth Amendment's Due Process Clause*, includes the right to bear arms as affirmed in *Heller*. Thus, [*25] the opinion at least arguably subjects numerous state and local firearms regulations to constitutional evaluation. The plurality in *McDonald* reasoned that the *Second Amendment's* right to bear arms, though only recently illuminated in *Heller*, is nonetheless both "deeply rooted in this Nation's history and tradition," and "fundamental to our scheme of ordered liberty and system of justice." *Id. at 3023. (Citations omitted).*

The five opinions in *McDonald* are splintered in

Case 3:09-cv-02371-IEG -BGS   Document 62-2    Filed 11/30/10   Page 9 of 11

Page 8
2010 U.S. Dist. LEXIS 123597, *25

different directions on core approaches to American constitutional analysis as well as the right to bear arms. Nonetheless, the Justices share common ground, expressed by Justice Stevens' dissent, which acknowledges that, "a rule limiting the federal constitutional right to keep and bear arms to the home would be less intrusive on state prerogatives and easier to administer." *Id. at 3105.*

### (c) United States v. Marzzarella

Most recently, in *United States v. Marzzarella, 614 F.3d 85 (3d Cir. July 29, 2010)*, the United States Court of Appeals for the Third Circuit took its first run at the precedent established by the Supreme Court in the *Heller* case. In *Marzzarella*, defendant argued that his conviction under *18 U.S.C. § 922(k)* [*26] for possession of a handgun with an obliterated serial number violated his *Second Amendment* right to keep and bear arms under the *Heller* decision.

The factual scenario and the offense charged are quite different and distinct from the facts in this case, and therefore, the holding of the Court of Appeals for the Third Circuit in *Marzzarella*, that the *Second Amendment* does not protect defendant's right to possess a handgun in his home with an obliterated serial number which places it in the category of "dangerous" or "unusual," is not directly applicable to this case.

However, the Court of Appeals interpreted the pronouncements of the Supreme Court to be garnered from *Heller*, and those pronouncements are most relevant to the instant case. According to the Court in *Marzzarella*, a central principle to be gleaned from *Heller* is that the *Second Amendment* "confer[s] an individual right to keep and bear arms . . . at least for the *core purpose* of allowing law-abiding citizens to use arms in defense of hearth and home." *Id. at 92* (emphasis added). The Court of Appeals, also citing the discussion in *Heller* of the importance of hunting to the pre-ratification of the right to bear arms, noted, that [*27] "to some degree, it must protect the right of law-abiding citizens to possess firearms for other yet-undefined lawful purposes." *Id.* The Court of Appeals reiterated the Supreme Court's holding that "[t]he right is not unlimited, however, as the *Second Amendment* affords no protection for the possession of dangerous and unusual weapons, possession by felons, and the mentally ill, and the carrying of weapons in certain sensitive places." *Id.*, citing *Heller, at 2816-17.*

The Court of Appeals in *Marzzarella* highlighted the two-pronged approach to *Second Amendment* challenges as set forth in *Heller*. The Court must first ask whether the challenged law imposes a burden on conduct falling within the scope of the *Second Amendment's* guarantee. If it does not, the Court's inquiry is complete. If it does, the Court must evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid. *Id. at 89.*

The Court, while ultimately adopting an intermediate, rather than strict level of scrutiny, seemed to acknowledge that the *Second Amendment* could impose more than one particular standard of scrutiny. Borrowing from the *First Amendment* [*28] speech context which employs the intermediate level of scrutiny, the Court stated that the asserted governmental end must be more than just legitimate, rather, it requires the end to be either "significant," "substantial," or "important." In other words, the fit between the challenged regulation and the asserted objective must be reasonable, not perfect. *Id. at 79.*

In *Marzzarella*, the Court found that the burden imposed by the statutory provision did not severely limit the possession of firearms, and the legislative intent behind the provision was not to limit the ability of persons to possess any class of firearms. The Court also contrasted the District of Columbia's handgun ban as an example of a law at the far end of the spectrum of infringement on *Second Amendment* rights. *Id. at 97.* ("It did not just regulate possession handguns; it prohibited it, even for the stated fundamental interest protect by the right -- the defense of hearth and home.")

### (d) Application of Case Precedent

Applying the guiding principles set forth in *Heller*, and the above standard elucidated by the panel in *Marzzarella*, and evaluating the facts in the light most favorable to the government, defendant Huet's possession [*29] of the gun - - which is the crux of the government's case against her - - at all times occurred within the home, where her right to possess is undoubtedly most sacrosanct. As Justice Stevens concluded in *McDonald*, "firearms kept inside the home generally pose a lesser threat to public welfare as compared to firearms taken outside . . . " *McDonald, 130 S.Ct. at 3105.*

At the time of the offense charged in this case,

Case 3:09-cv-02371-IEG -BGS   Document 62-2   Filed 11/30/10   Page 10 of 11

Page 9
2010 U.S. Dist. LEXIS 123597, *29

defendant Huet, who was charged with aiding and abetting, was neither a felon, nor insane. *Heller at 2816*; *McDonald at 3047* (plurality opinion of Alito, J.)("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill . . .'"). Rather, Huet allegedly aided and abetted another who was not permitted to lawfully possess a firearm, thus compounding an inchoate offense upon another inchoate offense.

The SKS rifle was owned by and kept in defendant Huet's home. Applying the aiding and abetting statute at *section 2*, together with the alleged violation of *section 922(g)(1)*, under the facts of this case, implicates the protections of the *Second Amendment*. Were this [*30] Court to permit this Indictment to go forward, the Court would be countenancing the total elimination of the right of a sane, non-felonious citizen to possess a firearm, in her home, simply because her paramour is a felon, and not because of some affirmative act taken by the citizen. Under any level of scrutiny, said Indictment as to Huet is a substantial, if not unfettered, infringement on her *Second Amendment* right to keep arms.

Further, the SKS rifle owned by defendant Huet is a type of firearm that was *not* banned by the 1994 assault weapons ban and thus was *not* a "dangerous" or "unusual" weapon, such as a firearm with an obliterated serial number in *Marzzarella*. Instead, the Court takes judicial notice that as early as 2001 (and certainly no later than 2005), the Yugoslavian M59/66 had been designated a "curio" by the Bureau of Alcohol, Tobacco and Firearms' under *27 CFR § 478.11*. The SKS rifle was commonly used as a sporting rifle, and was mass produced and is owned by American gun owners in the hundreds of thousands. Doc. Nos. 120-3, 120-5, 120-6.

Having determined that the prosecution of Huet, a non-felon, for possession of a firearm which she owns, in her own home, infringes [*31] on her "core" *Second Amendment* protections as set forth in *Heller*, the Court must next balance her rights against the government's interest.

As stated above, under *18 U.S.C. § 922(g)(1)*, certain classes of persons, most notably those convicted of felonies, are prohibited from possessing firearms. As *Marzzarella* and other cases have illuminated, by passing *section 922(g)(1)*, "Congress sought to rule broadly - - to keep guns out of the hand of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society," *614 F.3d at 93* (citations omitted); *United States v. Walls, 225 F.3d 858 (7th Cir. 2000)*("Congress enacted *section 922(g)(1)* 'in order to keep firearms out of hands of those persons whose prior conduct indicated a heightened proclivity for using firearms to threaten community peace and the continued operation of the Government of the United States.'")

Broadening the scope of *section 922(g)(1)*, by expanding the class to whom it applies to include non-felons, punishes a non-felon as a principal under a statute which, by its express terms, is applicable only to felons. Especially where, as here, the non-felon's allegedly culpable activity [*32] is inchoate - - in this case mere possessory - - the non-felon has not earned the title of "felon," and has done nothing to "demonstrate that [she] may not be trusted to possess a firearm without becoming a threat to society." *Id. at 93*.

Additionally, as defendant Huet highlights, and this Court agrees, persons convicted of felony antitrust violations are not included within the prohibition of *section 922(g)(1)*, which is to say that Congress is capable of, and has, exempted persons outside the class to whom a penal statute is directed from accomplice liability. *Abuelahawa, supra*; see also *United States v. Shear, 951 F.2d 488, 490-95 (5th Cir. 1992)*(employee not culpable for aiding and abetting an employer's criminal offense under Occupational Safety and Health Act). Therefore, to attempt to punish defendant Huet, who has a guiltless past (or at least one free from any felonies or misdemeanors), and has done nothing to establish that she may not be trusted with a firearm without becoming a threat to society, *Marzzarella, supra*, places her in a more perilous position than other felons who are certainly less guiltless.

## V. Conclusion

The Court finds that the Indictment fails to set forth [*33] an offense under *18 U.S.C. § 2*. Furthermore, under *Heller*, and its progeny, the *Second Amendment* protects defendant Huet's right to possess the firearm the government seeks to criminalize through the use of *sections 2* and *922(g)(1)*. To hold otherwise would be to ignore *Heller*: defendant Huet, not being a felon, insane, or otherwise disabled from possessing a gun, is entitled to possess a lawful firearm in her home, a place which is recognized as sacrosanct for purposes of *Second*

*Amendment* analysis.

In conclusion, this Court echoes the words of the United States Supreme Court *in Heller*, when it stated:

> The *First Amendment* contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The *Second Amendment* is no different. Like the First, it is the very *product* of an interest-balancing by the people. . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Heller, at 2821.*

Defendant Huet, is one such law [*34] abiding citizen, and she is entitled to at least keep arms (if not to bear arms) within the confines of her home. For these reasons, defendant's motion to dismiss (doc. no. 120) will be GRANTED, the other Pretrial Motions (doc. nos. 115, 116, 117, 118 and 119) will be DENIED AS MOOT, and the Indictment shall be DISMISSED. An appropriate Order follows.

/s/ Arthur Schwab

ARTHUR J. SCHWAB

UNITED STATES DISTRICT JUDGE